**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **RAI STRATEGIC HOLDINGS, INC.** and **R.J. REYNOLDS VAPOR COMPANY** | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:20-cv-257 |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| **ALTRIA CLIENT SERVICES LLC; PHILIP MORRIS USA, INC.;** and **PHILIP MORRIS PRODUCTS S.A**. | ) ) ) ) | |
| Defendants. | ) ) ) | |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

David M. Maiorana (VA Bar No. 42334)
Ryan B. McCrum
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com
Email: rbmccrum@jonesday.com

Anthony M. Insogna
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178
Email: aminsogna@jonesday.com

Stephanie E. Parker
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Email: separker@jonesday.com

John J. Normile
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: jjnormile@jonesday.com

*Counsel for Plaintiffs*
*RAI Strategic Holdings, Inc. and*
*R.J. Reynolds Vapor Company*

Plaintiffs, RAI Strategic Holdings, Inc. ("RAI") and R.J. Reynolds Vapor Company ("RJRV") (collectively, "Plaintiffs"), for their Amended Complaint against Altria Client Services LLC ("ACS"), Philip Morris USA, Inc. ("PM USA"), and Philip Morris Products S.A. ("PMP") (collectively, "Defendants") allege as follows:

## THE PARTIES

1.      RAI is a North Carolina corporation with its principal place of business located at 401 North Main Street, Winston-Salem, N.C.  RAI is the assignee and sole owner of U.S. Patent Nos. 9,814,268 (the "'268 patent") attached hereto as Exhibit A, 9,839,238 (the "'238 patent") attached hereto as Exhibit B, 9,901,123 (the "'123 patent") attached here to as Exhibit C, 9,930,915 (the "'915 patent") attached hereto as Exhibit D, and 10,492,542 (the "'542 patent") attached hereto as Exhibit E (collectively, the "Asserted Patents").

2.      RAI is the assignee of, and has the right to enforce (including for past infringement), each of the Asserted Patents.

3.      RJRV is a North Carolina corporation with its principal place of business located at 401 North Main Street, Winston-Salem, N.C.  RJRV is the exclusive licensee of the Asserted Patents.

4.      ACS is a Virginia corporation with offices at 6601 West Broad Street, Richmond, Virginia 23230.

5.      PM USA is a Virginia corporation with offices at 6601 West Broad Street, Richmond, Virginia 23230.

6.      PMP is a societe anonyme duly existing under the laws of Switzerland with a corporate address at Quai Jeanrenaud 3, 2000 Neuchâtel, Switzerland.

## JURISDICTION AND VENUE

7.      This action involves federal statutory questions and claims arising under the laws of the United States.  This Court has jurisdiction over the subject matter of this action, without regard to the amount in controversy, pursuant to 35 U.S.C. § 271, *et. seq.* and 28 U.S.C. §§ 1331 and 1338.

8.      Personal jurisdiction exists over the Defendants ACS and PM USA because they are Virginia corporations and ACS and PM USA have their principal places of business in this District.

9.      As a foreign corporation, personal jurisdiction exists over PMP at least by virtue of Federal Rule of Civil Procedure 4(k)(2).  In addition, personal jurisdiction exists over PMP based on the fact that, upon information and belief, it is responsible for causing the tort of patent infringement to occur in Virginia and this District.

10.      Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).  Defendants ACS and PM USA are Virginia corporations, and thus reside in the District.  In addition, a substantial part of the events or omissions giving rise to this claim occur in the District.  Finally, ACS and PM USA have regular and established places of business in the District and, upon information and belief, have committed, induced, or contributed to acts of infringement in this District.  One or more of the Defendants has been selling and continues to sell the infringing products in this District.

11.      Venue is proper as to PMP by virtue of 28 U.S.C. §§ 1391(c)(3) and 1400(b) because it is a foreign corporation.

## FACTUAL BACKGROUND

**THE ASSERTED PATENTS**

12.     The '268 patent is directed to a tobacco-containing smoking article.  The USPTO issued the '268 patent on November 4, 2017, with two independent claims, including Claim 16, which recites:

16. A tobacco-containing, electrically-powered smoking article comprising:

(a) a tubular outer housing having a mouth-end and an end distal to the mouth-end, the housing comprising an opening adapted for intake of air into the smoking article;

(b) an electrical power source within the outer housing;

(c) a controller adapted for regulating current flow through the heater;

(d) a rod-shaped carrier device removably engaged with the mouth-end of the outer housing and comprising a tubular mouth-end piece and a tubular cartridge with two open ends allowing air to flow therethrough, wherein the cartridge includes a tobacco material and an aerosol-generating material; and

(e) an electrical resistance heater in contact with the tobacco material and the aerosol-generating material and adapted for heating at least a portion of the tobacco material and the aerosol-generating material.

13.     The '238 patent is directed to a control body for an electronic smoking article. The USPTO issued the '238 patent on December 12, 2017, with two independent claims, including Claim 19, which recites:

19. A control body for an electronic smoking article, the control body comprising:

an elongated shell with an interior, a proximal end, and an opposing distal end;

a coupler formed of an elongated body having a first end that forms a wall and that engages the proximal end of the shell and a second end that comprises a cavity configured to releasably engage a cartridge, wherein the coupler includes a pressure channel extending between a first end that is in fluid communication with the cavity and a second end that opens through the wall at the first end of the coupler, wherein the coupler includes an air inlet channel in fluid communication with the cavity and an air inlet aperture in an exterior surface of the coupler, and wherein the coupler has a longitudinal axis extending from the

first end to the second end, and the first end of the pressure channel is spatially separated from the air inlet channel relative to the longitudinal axis of the coupler; and

a microprocessor.

14.     Plaintiffs have virtually marked and continue to virtually mark the '238 patent at www.vusevapor.com/patents, pursuant to 35 U.S.C. § 287(a).

15.     The '123 patent is directed to a smoking article that includes an electrical power source that powers a heater to heat aerosol-forming material in a disposable portion of the smoking article.  The USPTO issued the '123 patent on February 27, 2018, with three independent claims, including Claim 27, which recites:

> 27. An electrically-powered, aerosol-generating smoking article comprising:
>
> an electrical power source in the form of a battery within a tubular outer housing having a mouth-end and an end distal to the mouth-end;
>
> at least one electrical resistance heater powered by said electrical power source, wherein at least a portion of the resistance heating element is elongated and extending downstream toward the mouth-end of the outer housing, the elongated portion of the resistance heating element positioned proximal to the center of the outer housing;
>
> a controller within the tubular outer housing and adapted for regulating current flow through the electrical resistance heater; and
>
> a cigarette-type device removably engaged with the mouth-end of the tubular outer housing and comprising a tobacco segment circumscribed by a wrapping material and comprising a tobacco material and an aerosol-forming material, wherein the elongated portion of the resistance heating element extends into the tobacco segment when the cigarette-type device is engaged with the mouth-end of the outer housing, such that during draw, aerosol-forming material can be volatilized to produce a visible mainstream aerosol incorporating tobacco components or tobacco-derived components that can be drawn into the mouth of the user of the smoking article.

16.     Plaintiffs have virtually marked and continue to virtually mark the '123 patent at www.vusevapor.com/patents, pursuant to 35 U.S.C. § 287(a).

17.     The '915 patent is directed to smoking articles and use thereof for yielding inhalation materials.  The USPTO issued the '915 patent on April 3, 2018, with one independent claim, which recites:

> 1. A reusable control unit for use with a disposable smoking article, the reusable control unit comprising a control housing including:
>
> a receiving end for receiving an engaging end of the disposable smoking article and having an electrical energy source that includes a projection extending outwardly therefrom and that includes a component that forms an electrical connection with electrical contacts on a separate electrical heating member; and
>
> a control unit section that houses a power source, a switching component that actuates flow of electrical current from the electrical energy source to the electrical heating member, and a flow regulating component that regulates a previously initiated current flow from the electrical energy source to the electrical heating member, wherein the component that forms an electrical connection with the electrical contacts is located on the projection.

18.     Plaintiffs have virtually marked and continue to virtually mark the '915 patent at www.vusevapor.com/patents, pursuant to 35 U.S.C. § 287(a).

19.     The '542 patent is directed to smoking articles and use thereof for yielding inhalation materials.  The USPTO issued the '542 patent on December 3, 2019, with two independent claims, including claim 1, which recites:

> 1. A smoking article for receiving a disposable aerosol forming substance, the smoking article comprising:
>
> a housing having a proximal end for receiving the disposable aerosol forming substance and an opposite distal end;
>
> a power source arranged within the housing adjacent to the distal end;
>
> a receiving chamber formed at the proximal end of the housing and having an opening for receiving the disposable aerosol forming substance;
>
> a heating projection extending at least partially in the receiving chamber towards the proximal end of the housing and terminating at a free end which is configured to be inserted into the disposable aerosol forming substance for heating the disposable aerosol forming substance, the heating projection comprising:

6

a heating member comprising an electrically resistive metal which is configured to heat the disposable aerosol forming substance;

an electrical connector for providing a flow of electricity to the heating member for heating the heating member; and

a control circuit positioned within the housing between the power source and the heating projection and connecting the heating member of the heating projection to the power source.

**THE ACCUSED PRODUCTS**

20.     Defendants have developed a heat-not-burn tobacco system called IQOS®.  The IQOS® system includes an electrically powered smoking article that comprises an IQOS® holder, a disposable tobacco stick, and a charger.

21.     Defendants use, offer to sell, and sell the IQOS® system in United States, and import that system into the United States.  For example, Defendants use, offer to sell, and sell the IQOS® system from a store that they own and operate in Atlanta, Georgia, since at least October 2019, and from a store they own in this District (at 3402 W. Cary St. in the Carytown district of Richmond) since approximately November 2019.  In addition, Defendants have sold the infringing tobacco sticks to retailers in both Atlanta, Georgia and in this District, which retailers sell those products to consumers.  The packaging for the IQOS® device Defendants sell in the United States recites:  "Manufactured for Philip Morris USA, Richmond, VA.  Made in Malaysia."  The packaging for the disposable tobacco sticks states:  "Mfd. for Philip Morris USA, Richmond, VA.  Made in Italy."

22.     The IQOS® holder is a rechargeable and reusable power unit that includes a casing or housing, control electronics, a battery as its electrical source, and a heating blade that heats using a regulated current flow from the battery to produce heat through resistance.  The heater can be turned on using a pushbutton activated switch and turns off after a certain amount of time.  The IQOS® holder has an end for receiving the tobacco stick.  It is a tubular product,

and its dimensions approximate the dimensions of a smoking article. The IQOS® holder has a circuit board that includes a projection extending outwardly therefrom and that includes a component that forms an electrical connection with electrical contacts on a separate electrical heating member.

23.     The disposable tobacco stick is rod-shaped and is specially designed and intended for exclusive use with the IQOS® holder. The tobacco stick contains specially processed tobacco made from tobacco powder that has been reconstituted into sheets following the addition of water, glycerin, guar gum, and cellulose fibers. The IQOS® tobacco stick is sold in different flavors, including regular and menthol flavors (Smooth Menthol with 1.25 mg menthol per stick and Fresh Menthol with 2.5 mg menthol per stick) to satisfy different consumer preferences. The structure and operation across the variety of sticks is otherwise the same. The IQOS® tobacco stick is specifically designed to function with the IQOS® holder to produce an aerosol. Users inhale through the mouth-end of a filter on the IQOS® tobacco stick. The IQOS® tobacco stick is also marketed in conjunction with the Marlboro™ brand and is sometimes referred to as a HeatStick or Marlboro™ HeatStick.

24.     The IQOS® system also includes an IQOS® charger for charging and storing the IQOS® holder after each use and an AC power adaptor for recharging the charger. The charger contains its own battery that contacts the IQOS® holder for charging.

25.     Neither the IQOS® holder, nor the tobacco stick, nor the IQOS® charger is a staple article or commodity of commerce suitable for substantial non-infringing use. Instead, they are authorized by the United States Food and Drug Administration ("FDA") solely and exclusively for use as part of the IQOS® system and are marketed and sold by Defendants solely and exclusively for use as part of the IQOS® system.

26.     The IQOS® holder constitutes a material part of the invention claimed in all the Asserted Patents.  The tobacco stick constitutes a material part of the invention claimed in at least the '268 and '123 patents.

27.     Defendants sell the IQOS® charger, IQOS® holder, and tobacco stick in a kit that also contains a tool designed for cleaning the IQOS® holder.  The IQOS® tobacco sticks are also sold separately, in, for example, packs of 20 for exclusive use with the IQOS® system.

28.     Defendants are offering for sale and selling the IQOS® system with a User Guide and Quick Start Guide, both of which instruct end users to operate the IQOS® system in a way that infringes the Asserted Patents.

29.     Upon information and belief, Defendants' customers, distributors, or resellers, as well as end users of the IQOS® system demonstrate or operate the IQOS® system in the United States in accordance with the IQOS® User Guide and Quick Start Guide that are included with the IQOS® system.

30.     The IQOS® system works as follows:  The user inserts a tobacco stick into the holder and turns on the device by means of the pushbutton activated switch.  The switch signals to the control electronics, which cause the battery to produce and supply electrical current to the heating blade.  The blade heats the aerosol-forming materials in the tobacco stick, generating an inhalable nicotine-containing aerosol for the user.  The temperature of the heating blade is controlled so that its operating temperature does not exceed 350°C.  This allows for heating of the tobacco constituents below the level of combustion, while producing a visible aerosol containing water, glycerin, and nicotine.

31.     Upon information and belief, ACS is licensed to distribute, offer to sell, and sell the IQOS® system and the corresponding tobacco sticks in the U.S., and it started doing so at least as early as October 2019.

32.     Upon information and belief, PM USA is licensed to distribute, offer to sell, and sell the IQOS® system and the corresponding tobacco sticks in the U.S., and it started doing so at least as early as October 2019.  According to packaging materials submitted to the FDA and sold in the United States, the IQOS® system and components thereof are manufactured for PM USA.

33.     Upon information and belief, PMP is the applicant for the pre-market tobacco application ("PMTA") for the IQOS® system and is responsible for and controls the worldwide design, manufacturing and marketing of the IQOS® system, either directly or indirectly through its related entities, including manufacturing of the IQOS® system or components thereof in one or more of Switzerland, Italy, China, Malaysia, and/or Singapore for importation into the United States.

**THE IMPORTATION, SALE, OFFER FOR SALE, AND DISTRIBUTION OF IQOS® DEVICES**

34.     Upon information and belief, on or around May 24, 2017, PMP, in concert with the other Defendants, filed PMTAs with FDA seeking approval to offer for sale and sell the IQOS® system in the United States.

35.     On or around April 30, 2019, FDA announced that it had authorized the marketing and sale of the IQOS® system in the United States.

36.     ACS and PM USA started importing, selling, offering for sale, and distributing IQOS® products in the United States at least as early as October 2019.

37.     Upon information and belief, PMP manufactures portions or all of the IQOS®

system for ACS and PM USA, and the IQOS® system is imported into the United States for sale

and offer for sale after importation.

**DEFENDANTS KNOW OF THE ASSERTED PATENTS, KNOW AND SPECIFICALLY INTEND THAT THE IQOS® PRODUCTS INFRINGE THE ASSERTED PATENTS, AND KNOW THAT THE IQOS® PRODUCTS ARE ESPECIALLY MADE OR ESPECIALLY ADAPTED FOR USE IN INFRINGING THE ASSERTED PATENTS**

38.     Upon information and belief, Defendants know of the Asserted Patents.  *First*,

upon information and belief, Defendants regularly survey the patent literature—and especially

that of their competitors—for relevant patents and have encountered the Asserted Patents.

*Second*, this complaint informs Defendants about the Asserted Patents.  *Third*, some of the

Defendants have cited the Asserted Patents during prosecution of their own patents.  ACS cited

U.S. Patent No. 7,726,320 (the "'320 patent"), the ancestor of both the '268 and '123 patents,

during prosecution of its U.S. Patent No. D844,221 and its U.S. Patent No. 10,258,087 (the "'087

patent"); and it cited U.S. Patent No. 9,078,473 (the "'473 patent"), the parent of the '915 patent,

during prosecution of its U.S. Patent No. 10,278,424.  PMP cited both the '320 and '473 patents

during prosecution of its U.S. Patent No. 10,206,428; and it cited U.S. Patent publication No.

2017/0020200, which corresponds to the '123 patent, during prosecution of its U.S. Patent No.

9,986,767.  Defendant ACS cited the U.S. publication of the '238 patent (U.S. Patent Application

Publication No. 2015/0245658) during prosecution of its U.S. Patent Nos. D870,375 and

10,021,910.  Moreover, Plaintiffs have virtually marked and continue to virtually mark the '123,

'915, and '238 patents.

39.     Upon information and belief, Defendants know and specifically intend that their

actions—including providing the User Guide and Quick Start Guide with their products—induce

actual infringement of the Asserted Patents.  *First*, upon information and belief, Defendants

analyze whether they have freedom to operate and therefore have considered whether their actions induce others to infringe the Asserted Patents.  *Second*, this complaint informs Defendants that their actions induce infringement.

40.     Upon information and belief, Defendants know that each of the elements in the IQOS® system is especially made or especially adapted for use in an infringement of the Asserted Patents and is not a staple article or commodity of commerce suitable for substantial noninfringing use.  *First,* upon information and belief, Defendants analyze whether they have freedom to operate and therefore have considered whether their actions contribute to others infringing the Asserted Patents.  *Second,* this complaint informs Defendants of their infringement.

## COUNT ONE
## INFRINGEMENT OF U.S. PATENT NO. 9,814,268

41.     Plaintiffs reallege, adopt, and incorporate by reference the allegations included within paragraphs 1 through 40 as if fully set forth herein.

42.     The USPTO thoroughly examined the '268 patent.  It is currently in force and presumed valid.

43.     Defendants import, sell, offer for sale, and/or distribute the IQOS® system in the United States.

44.     Upon such importation, sale, offer for sale, and/or distribution in the United States, Defendants directly infringe, induce others to infringe, and contribute to the infringement by others of one or more claims of the '268 patent (including claim 16) under 35 U.S.C. § 271(a), (b), and (c) in this Judicial District and elsewhere.

45.     For example, claim 16 recites "A tobacco-containing, electrically-powered smoking article."

12

46.     As illustrated in the figure below, the IQOS® system is a tobacco-containing article – it includes a tobacco stick that is inserted into a holder:



47.     As illustrated in the figures below, the IQOS® system is electrically-powered – it includes a battery (shown on the right below) that provides electrical power to the device:



48.     The IQOS® system is a smoking article.  In Defendants' Modified Risk Tobacco Product Application ("MRTPA") submitted to FDA, Defendants characterized the IQOS® system as follows:  "In use, the Holder heats the tobacco plug of the Tobacco Stick and produces an aerosol that is inhaled by the user."

49.     Claim 16 further recites "a tubular outer housing having a mouth-end and an end distal to the mouth-end."

50.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS® system, the IQOS® system includes a tubular housing having two ends – a mouth end (the end in which the tobacco stick is inserted) and an opposite end distal to the mount end:



51.     Claim 16 further recites that the housing comprises "an opening adapted for intake of air into the smoking article."

52.     As illustrated in the figure below, the IQOS® system includes an opening at the mouth end adapted for intake of air into the smoking article (arrows show intake of air through the opening):



53.     Claim 16 further recites "an electrical power source within the outer housing."

54.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS® system, the IQOS® system includes an electrical power source (a battery) within the outer housing:



55.     Claim 16 further recites "a controller adapted for regulating current flow."

56.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS® system, the IQOS® system includes a controller (control electronics) adapted for regulating current flow through the heater:



57.   Defendants' MRTPA for the IQOS® system describes the IQOS® system as having a "microcontroller[]" that controls the "heating process."  That MRTPA further discloses that the microcontroller "will turn off the heating process in the event that overheating is detected by the thermal monitoring system."

58.   Claim 16 further recites "a rod-shaped carrier device removably engaged with the mouth-end of the outer housing."

59.   As illustrated in the figures below taken from Defendants' Quick Start Guide, the IQOS® system includes a rod-shaped carrier device (the tobacco stick) that is removably engaged with the mouth end of the outer housing."




60.   Claim 16 further recites that the rod-shaped carrier device comprises "a tubular mouth-end piece and a tubular cartridge with two open ends allowing air to flow therethrough, wherein the cartridge includes a tobacco material and an aerosol-generating material."

61.   As illustrated in the figures below, the rod-shaped carrier device in the IQOS® system (the tobacco stick) includes a tubular mouth end piece and a tubular cartridge with two open ends (at the top and bottom of the tobacco stick) allowing air to flow therethrough wherein the cartridge includes a tobacco material and an aerosol-generating material (in Defendants' MRTPA, the IQOS® system is described as having a tobacco plug, which, when heated, "produces an aerosol"; the tobacco plug includes "[g]lycerol" and "[p]ropylene glycol.")



62.   Claim 16 further recites "an electrical resistance heater in contact with the tobacco material and the aerosol-generating material and adapted for heating at least a portion of the tobacco material and the aerosol-generating material."

16

63.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS®
system, the IQOS® system includes an electrical resistance heater (heater element) that is in
contact with the tobacco material and the aerosol-generating material and adapted for heating at
least a portion of the tobacco material and the aerosol-generating material; the tobacco stick and
aerosol-generating material is heated via the heater element that is inserted into the tobacco.
Defendants' MRTPA for the IQOS® system further states that "[t]he Holder heats the tobacco
using a ceramic blade, which is pushed into the tobacco plug by the act of inserting the Tobacco
Stick into the Holder."



64.     Plaintiffs have been and continue to be damaged by Defendants' infringement of
the '268 patent.

65.     Plaintiffs have suffered and continue to suffer irreparable harm with no adequate
remedy at law unless this Court enjoins Defendants and their agents, servants, employees,
attorneys, representatives, and all others acting on their behalf from directly infringing, inducing
infringement, and/or contributing to infringement of the '268 patent.

66.     The balance of hardships favors an injunction, and such injunction would not
disserve the public interest.

67.     Defendants' infringement has been and continues to be deliberate, willful, and
unlicensed, permitting Plaintiffs to seek enhanced damages under 35 U.S.C. § 284.

68.     Defendants' infringement has been and continues to be deliberate, willful, and
unlicensed, permitting Plaintiffs to seek attorneys' fees and costs under 35 U.S.C. § 285.

69.     Therefore, Plaintiffs seek a judgment that Defendants directly infringe, induce infringement of, and contribute to infringement of one or more claims of the '268 patent by the importation, sale, offer for sale, and distribution in the United States of the IQOS® system.

**COUNT TWO**
**INFRINGEMENT OF U.S. PATENT NO. 9,839,238**

70.     Plaintiffs reallege, adopt, and incorporate by reference the allegations included within paragraphs 1 through 69 as if fully set forth herein.

71.     The USPTO thoroughly examined the '238 patent.  It is currently in force and presumed valid.

72.     Defendants import, sell, offer for sale, and/or distribute the IQOS® system in the United States.

73.     Upon such importation, sale, offer for sale, and/or distribution in the United States, Defendants directly infringe, induce others to infringe, and contribute to the infringement by others of one or more claims of the '238 patent (including claim 19) under 35 U.S.C. § 271(a), (b), and (c) in this Judicial District and elsewhere.

74.     For example, claim 19 recites a "control body for an electronic smoking article."

75.     As illustrated in the figures below, the IQOS® system contains a control body:



76.     Claim 19 further recites that the control body comprises "an elongated shell with an interior, a proximal end, and an opposing distal end."

77.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS® system, the IQOS® system includes a control body comprising an elongated shell with an interior, a proximal end, and an opposing distal end:



78.     Claim 19 further recites "a coupler formed of an elongated body having a first end that forms a wall and that engages the proximal end of the shell."

79.     As illustrated in the figures below, the IQOS® system's control body further comprises a coupler formed of an elongated body having a first end that forms a wall and that engages the proximal end of the shell:



80.     Claim 19 further recites "a second end that comprises a cavity configured to releasably engage a cartridge."

81.     As illustrated in the figures below, the IQOS® system's control body further comprises a cavity configured to releasably engage a cartridge (*i.e.*, the tobacco stick):



82.     Claim 19 further recites that "wherein the coupler includes a pressure channel extending between a first end that is in fluid communication with the cavity and a second end that opens through the wall at the first end of the coupler."

83.     As illustrated in the figure below, the IQOS® system's coupler includes a pressure channel extending between a first end that is in fluid communication with the cavity and a second end that opens through the wall at the first end of the coupler:



84.     Claim 19 further recites "wherein the coupler includes an air inlet channel in fluid communication with the cavity and an air inlet aperture in an exterior surface of the coupler."

85.     As illustrated in the figure below, the IQOS® system's coupler includes an air inlet channel in fluid communication with the cavity and an air inlet aperture in an exterior surface of the coupler:



86.     Claim 19 further recites "wherein the coupler has a longitudinal axis extending from the first end to the second end."

87.     As illustrated in the figure below, the IQOS® system's coupler has a longitudinal axis extending from the first end to the second end:



88.     Claim 19 further recites that "the first end of the pressure channel is spatially separated from the air inlet channel relative to the longitudinal axis of the coupler."

89.     As illustrated in the figure below, the first end of the pressure channel in the IQOS® system's coupler is spatially separated from the air inlet channel relative to the longitudinal axis of the coupler:



90.     Claim 19 further recites a "microprocessor."

91.     As illustrated in the figures below, the IQOS® system includes a microprocessor:



92.     Plaintiffs have been and continue to be damaged by Defendants' infringement of the '238 patent.

93.     Plaintiffs have suffered and continue to suffer irreparable harm with no adequate remedy at law unless this Court enjoins Defendants and their agents, servants, employees, attorneys, representatives, and all others acting on their behalf from directly infringing, inducing infringement, and/or contributing to infringement of the '238 patent.

94.     The balance of hardships favors an injunction, and such injunction would not disserve the public interest.

95.     Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek enhanced damages under 35 U.S.C. § 284.

96.     Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek attorneys' fees and costs under 35 U.S.C. § 285.

97.     Therefore, Plaintiffs seek a judgment that Defendants directly infringe, induce infringement of, and contribute to infringement of one or more claims of the '238 patent by the importation, sale, offer for sale, and distribution in the United States of the IQOS® system.

## COUNT THREE
## <u>INFRINGEMENT OF U.S. PATENT NO. 9,901,123</u>

98.   Plaintiffs reallege, adopt, and incorporate by reference the allegations included within paragraphs 1 through 98 as if fully set forth herein.

99.   The USPTO thoroughly examined the '123 patent.  It is currently in force and presumed valid.

100.   Defendants import, sell, offer for sale, and/or distribute the IQOS® system in the United States.

101.   Upon such importation, sale, offer for sale, and/or distribution in the United States, Defendants directly infringe, induce others to infringe, and contribute to the infringement by others of one or more claims of the '123 patent (including claim 27) under 35 U.S.C. § 271(a), (b), and (c) in this Judicial District and elsewhere.

102.   For example, claim 27 recites "an electrically-powered aerosol-generating smoking article."

103.   As illustrated in the figures below, the IQOS® system is electrically-powered – it includes a battery (shown on the right below) that provides electrical power to the device:



104.   The IQOS® system is an aerosol-generating smoking article.  In Defendants' MRTPA submitted to FDA for the IQOS® system, Defendants characterized the IQOS® system as follows:  "In use, the Holder heats the tobacco plug of the Tobacco Stick and produces an aerosol that is inhaled by the user."

105.   Claim 27 further recites "an electrical power source in the form of a battery within a tubular outer housing having a mouth-end and an end distal to the mouth-end."

106.    As shown in the figures below, the IQOS® system's power source is a battery (shown in the figure on the bottom right) within an outer housing; the housing is tubular and has two ends, a mouth end, and an opposite distal end:



107.    Claim 27 further recites "at least one electrical resistance heater powered by said electrical power source."

108.    As shown in the figure below, the heating in the IQOS® system's holder is done through an electrical resistance heater (heating blade), where the heat is produced by a conductive material laid on a ceramic support; the electrical resistance heater is formed of a heating element and a resistive track printed onto a ceramic blade:



109.    As set forth in Defendants' MRTPA for the IQOS® system, the heater in the IQOS® system comprises a "glass-coated metallic resistive element through which electricity is passed to create the heating," and the "battery powers [the] microprocessor and heating system."

110.    Claim 27 further recites that "wherein at least a portion of the resistance heating element is elongated and extending downstream toward the mouth-end of the outer housing, the elongated portion of the resistance heating element positioned proximal to the center of the outer housing."

111.     As shown in the figures below, at least a portion of the heating blade in the

IQOS® system is elongated and extending downstream toward the mouth end of the outer

housing, and the elongated portion is proximal to the center of the outer housing:



112.     Claim 27 further recites "a controller within the tubular outer housing and adapted

for regulating current flow through the electrical resistance heater."

113.     As illustrated in the figure below taken from Defendants' MRTPA for the IQOS®

system, the IQOS® system includes a controller (control electronics) within the tubular outer

housing adapted for regulating current flow through the electrical resistance heater:



114.     As set forth in Defendants' MRTPA for the IQOS® system, "In order to maintain

controlled processes, both the Holder and the Charger contain microcontrollers and firmware.

For the Holder, [the microcontrollers and firmware] control . . . The heating process (both during

the inhalation experience and blade cleaning process" and "[t]he power to the heating element is

controlled by an embedded electronic system, which ensures that the temperature follows a pre-defined heating profile for each puff."

115.    Claim 27 further recites "a cigarette-type device removably engaged with the mouth-end of the tubular outer housing."

116.    As shown in the image below, the tobacco stick in the IQOS® system is removably engaged with the mouth end of the tubular housing:



117.    Claim 27 further recites that the cigarette-type device comprises "a tobacco segment circumscribed by a wrapping material and comprising a tobacco material and an aerosol-forming material."

118.    Defendants' MRTPA for the IQOS® system states that the tobacco stick in the IQOS® system is within an "outer paper" and includes a tobacco plug which, when heated, "produces an aerosol."  That MRTPA further states that the tobacco plug includes "[g]lycerol" and "[p]ropylene glycol."  The MRTPA further states that "glycerin, which has been added to the tobacco as an aerosol former, aids the formation of the aerosol that is inhaled."  The '123 patent

describes these ingredients as aerosol-forming materials. *See, e.g.*, '123 patent col. 8 ll. 21–22 ("Exemplary aerosol-forming materials include glycerin, propylene glycol, and mixtures thereof.").

119.     As shown in the figure below from Defendants' MRTPA for the IQOS® system, the Heatstick in the IQOS® system has an outer paper and a tobacco plug:



Figure 2: Heatstick Components

120.     Claim 27 further recites that "the elongated portion of the resistance heating element extends into the tobacco segment when the cigarette-type device is engaged with the mouth-end of the outer housing."

121.     As shown in the figures below, when inserted into the IQOS® system's holder, the tobacco stick is pierced by the holder's heating blade; then, when electrical current flows through the conductive material in the heating blade, heat is dissipated and released into the surrounding tobacco.  Defendants' MRTPA for the IQOS® system further states that "[t]he Holder heats the tobacco using a ceramic blade, which is pushed into the tobacco plug by the act of inserting the Tobacco Stick into the Holder."





122.    Claim 27 further recites that "during draw, aerosol-forming material can be volatilized to produce a visible mainstream aerosol incorporating tobacco components or tobacco-derived components that can be drawn into the mouth of the user of the smoking article."

123.    Defendants' MRTPA discloses that when heated, the Tobacco Stick "produces an aerosol" of the tobacco products.  That MRTPA further discloses that "[w]hen heated, the glycerin [in the Tobacco Stick] evaporates and re-condenses into small droplets to generate a visible aerosol."

124.    Plaintiffs have been and continue to be damaged by Defendants' infringement of the '123 patent.

125.    Plaintiffs have suffered and continue to suffer irreparable harm with no adequate remedy at law unless this Court enjoins Defendants and their agents, servants, employees, attorneys, representatives, and all others acting on their behalf from directly infringing, inducing infringement, and/or contributing to infringement of the '123 patent.

126.    The balance of hardships favors an injunction, and such injunction would not disserve the public interest.

127.    Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek enhanced damages under 35 U.S.C. § 284.

128.    Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek attorneys' fees and costs under 35 U.S.C. § 285.

129.    Therefore, Plaintiffs seek a judgment that Defendants directly infringe, induce infringement of, and contribute to infringement of one or more claims of the '123 patent by the importation, sale, offer for sale, and distribution in the United States of the IQOS® system.

## COUNT FOUR
## INFRINGEMENT OF U.S. PATENT NO. 9,930,915

130.    Plaintiffs reallege, adopt, and incorporate by reference the allegations included within paragraphs 1 through 129 as if fully set forth herein.

131.    The USPTO thoroughly examined the '915 patent.  It is currently in force and presumed valid.

132.    Defendants import, sell, offer for sale, and/or distribute the IQOS® system in the United States.

133.    Upon such importation, sale, offer for sale, and/or distribution in the United States, Defendants directly infringe, induce others to infringe, and contribute to the infringement by others of one or more of the claims of the '915 patent (including claim 1) under 35 U.S.C. § 271(a), (b), and (c) in this Judicial District and elsewhere.

134.    For example, claim 1 recites "a reusable control unit for use with a disposable smoking article."

135.    The IQOS Holder is a reusable control unit for use with a disposable smoking article.  As shown below, the tobacco stick (HeatStick) is removed and "dispose[d]" after use, and the IQOS holder is reused, and recharged "after each use."




136.  Claim 1 further recites that "the reusable control unit compris[es] a control

housing."

137.  As shown in the figures below, the IQOS® system's reusable control unit includes

a control housing:



138.  Claim 1 further recites that the control housing includes "a receiving end for

receiving an engaging end of the disposable smoking article."

139.  As shown in the figures below, the IQOS® system's control housing includes a

receiving end of the IQOS® system's holder for receiving an engaging end of the disposable

tobacco stick:



140.    Claim 1 further recites that the control unit includes "an electrical energy source that includes a projection extending outwardly therefrom."

141.    As shown in the figures below and emphasized by the orange circles, the green circuit board in the IQOS® system is an electrical energy source and there are two projections that extend outwardly from the circuit board:




142. Claim 1 further recites that "a component that forms an electrical connection with electrical contacts on a separate electrical heating member."

143. As shown in the figures below, the IQOS® system includes components (*e.g.*, wires) that connect the circuit board and the heating blade, and the electrical heating member is separate from the electrical energy source.



144. Claim 1 further recites "a control unit section that houses a power source."

145.    As shown in the figures below, the IQOS® system's control unit section houses a battery (on the right in these figures), and the battery is a power source:



146.    Claim 1 further recites "a switching component that actuates flow of electrical current from the electrical energy source to the electrical heating member."

147.    As shown in the figure below, the heating in the IQOS® system is activated by pressing and holding the "power button," which actuates flow of electrical current from the energy source to the electrical heating member:



148.   Defendants' MRTPA discloses that "[t]he power to the heating element is controlled by an embedded electronic system. . . . The Holder is activated by simple button" and that "[t]he heating of the Tobacco Stick is initiated by pressing the button on the Holder where corresponding LED illuminates and indicates when the pre-heating process is completed."

149.   Claim 1 further recites "a flow regulating component that regulates a previously initiated current flow from the electrical energy source to the electrical heating member."

150.   The IQOS® system has a flow regulating component that regulates a previously initiated current flow from the electrical energy source to the electrical heating member. Defendants disclosed in their MRTPA for the IQOS® system that the product includes a controller that "will turn off the heating process in the event that overheating is detected by the thermal monitoring system."  That MRTPA further discloses that the "EHTP heating blade temperature is measured by the resistivity of the heating element, and is used to control the electric power supplied to the heating blade."

151.   Claim 1 further recites that "the component that forms an electrical connection with the electrical contacts is located on the projection."

152.   As shown in the figures below (and as emphasized by the orange circles), the IQOS® system's electrical connections (*e.g.*, wires) connect the circuit board and the heat blade, and those electrical connections are located on the projection.



153. Plaintiffs have been and continue to be damaged by Defendants' infringement of the '915 patent.

154. Plaintiffs have suffered and continue to suffer irreparable harm with no adequate remedy at law unless this Court enjoins Defendants and their agents, servants, employees, attorneys, representatives, and all others acting on their behalf from directly infringing, inducing infringement, and/or contributing to infringement of the '915 patent.

155. The balance of hardships favors an injunction, and such injunction would not disserve the public interest.

156. Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek enhanced damages under 35 U.S.C. § 284.

157. Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek attorneys' fees and costs under 35 U.S.C. § 285.

158.     Therefore, Plaintiffs seek a judgment that Defendants directly infringe, induce infringement of, and contribute to infringement of one or more claims of the '915 patent by the importation, sale, offer for sale, and distribution in the United States of the IQOS® system.

**COUNT FIVE**
**INFRINGEMENT OF U.S. PATENT NO. 10,432,542**

159.     Plaintiffs reallege, adopt, and incorporate by reference the allegations included within paragraphs 1 through 158 as if fully set forth herein.

160.     The USPTO thoroughly examined the '542 patent.  It is currently in force and presumed valid.

161.     Defendants import, sell, offer for sale, and/or distribute the IQOS® system in the United States.

162.     Upon such importation, sale, offer for sale, and/or distribution in the United States, Defendants directly infringe, induce others to infringe, and contribute to the infringement by others of one or more claims of the '542 patent (including claim 1) under 35 U.S.C. § 271(a), (b), and (c) in this Judicial District and elsewhere.

163.     Plaintiffs have been and continue to be damaged by Defendants' infringement of these claims.

164.     Plaintiffs have suffered and continue to suffer irreparable harm with no adequate remedy at law unless this Court enjoins Defendants and their agents, servants, employees, attorneys, representatives, and all others acting on their behalf from directly infringing, inducing infringement, and/or contributing to infringement of the '542 patent.

165.     The balance of hardships favors an injunction, and such injunction would not disserve the public interest.

166.     Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek enhanced damages under 35 U.S.C. § 284.

167.     Defendants' infringement has been and continues to be deliberate, willful, and unlicensed, permitting Plaintiffs to seek attorneys' fees and costs under 35 U.S.C. § 285.

168.     Defendants have admitted that they understand Plaintiffs' contentions as set forth in Count 5 herein.

169.     In view of the foregoing, Plaintiffs seek a judgment that Defendants directly infringe, induce infringement of, and contribute to infringement of one or more claims of the '542 patent by the importation, sale, offer for sale, and distribution in the United States of the IQOS® system.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for the following relief:

A.     That the Court adjudge and decree that Defendants have infringed and are infringing the Asserted Patents;

B.     That the Court adjudge and decree that Defendants have contributed to and induced infringement and are actively contributing to and inducing infringement of the Asserted Patents;

C.     That the Court enter preliminary and permanent injunctions enjoining Defendants, their officers, employees, agents, and all others acting in concert with them or participating with them from further acts that infringe the Asserted Patents;

D.     That the Court enter preliminary and permanent injunctions enjoining Defendants, their officers, employees, agents, and all others acting in concert with them or participating with them from actively contributing to or inducing others to infringe the Asserted Patents;

E.      That Defendants be ordered by this Court to account for and pay to Plaintiffs damages adequate to compensate Plaintiffs for Defendants' infringement, contribution to, and inducement of infringement of the Asserted Patents;

F.      That the Court treble the damages for Defendants' willful infringement of the Asserted Patents;

G.      That the Court award pre-judgment interest on the damages;

H.      That the Court declare this an exceptional case under 35 U.S.C. § 285;

I.      That the Court award Plaintiffs their costs and attorneys' fees incurred in this action; and

J.      That the Court award such other relief as it deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.

Dated: July 13, 2020

Respectfully submitted,

 _/s/ David M. Maiorana_

Stephanie E. Parker
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Email: separker@jonesday.com

David M. Maiorana (VA Bar No. 42334)
Ryan B. McCrum
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com
Email: rbmccrum@jonesday.com

Anthony M. Insogna
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178
Email: aminsogna@jonesday.com

John J. Normile
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: jjnormile@jonesday.com

*Counsel for Plaintiffs*
*RAI Strategic Holdings, Inc.*
*R.J. Reynolds Vapor Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of July, 2020, a true and correct copy of the foregoing was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record.

*/s/ David M. Maiorana*
David M. Maiorana (VA Bar No. 42334)
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com

*Counsel for Plaintiffs*
*RAI Strategic Holdings, Inc. and*
*R.J. Reynolds Vapor Company*