**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| RAI STRATEGIC HOLDINGS, INC. and R.J. REYNOLDS VAPOR COMPANY, | ) ) ) | Civil No. 1:20-cv-00393-LO-TCB |
| Plaintiffs and Counterclaim Defendants, | ) ) | |
| v. | ) ) | |
| ALTRIA CLIENT SERVICES LLC; PHILIP MORRIS USA, INC.; and PHILIP MORRIS PRODUCTS S.A., | ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) ) | |

**BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**
**BY PLAINTIFFS RAI STRATEGIC HOLDINGS, INC. AND**
**<u>R.J. REYNOLDS VAPOR COMPANY</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ............................................................ 1

    A.    The '374 Patent ................................................................................. 1

    B.    The '911 Patent ................................................................................. 4

    C.    Willful Infringement ...................................................................... 10

SUMMARY JUDGMENT STANDARD .............................................................. 12

ARGUMENT ........................................................................................................ 13

I.     THE '374 PATENT IS INVALID AS ANTICIPATED UNDER 35 U.S.C.
      § 102(a)(1) .................................................................................................. 13

II.    DEFENDANTS CANNOT SHOW THAT ANY OF THE VUSE ALTO, SOLO
      G1, VIBE, OR CIRO PRODUCTS INFRINGE THE '911 PATENT ........... 18

    A.    The Solo G1, Vibe, Ciro, And Alto Products Do Not Literally Infringe ............ 18

         1.    Defendants' expert does not—and cannot—offer any literal
             infringement opinion regarding the Solo G1, Vibe, and Ciro
             products ................................................................................... 19

         2.    The Alto product simply has no "cavity" that is a "blind hole," and
             even if it did, the "largest" cross-sectional dimension is far outside
             the claimed range ................................................................... 20

    B.    As A Matter Of Law, Defendants Are Barred From Relying On The
         Doctrine Of Equivalents To Prove Infringement ................................ 23

         1.    Prosecution history estoppel and claim vitiation bar Defendants
             from claiming infringement by Solo G1, Vibe, and Ciro under the
             doctrine of equivalents ........................................................... 23

         2.    Prosecution history estoppel bars Defendants from claiming
             infringement by Alto under the doctrine of equivalents, and
             Dr. Abraham's equivalence opinion creates no genuine issue of
             fact ......................................................................................... 25

III.   DEFENDANTS CANNOT SHOW WILLFUL INFRINGEMENT UNDER
      35 U.S.C. § 284 ....................................................................................... 26

CONCLUSION ..................................................................................................... 29

## TABLE OF AUTHORITIES

**Page**

CASES

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
　725 F.2d 1350 (Fed. Cir. 1984)..................................................................................13, 14

*Amgen Inc. v. Coherus Biosciences Inc.*,
　931 F.3d 1154 (Fed. Cir. 2019)..........................................................................................18

*Applied Material, Inc. v. Tokyo Seimitsu, Co.*,
　446 F. Supp. 2d 538 (E.D. Va. 2006) .................................................................................12

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
　598 F.3d 1336 (Fed. Cir. 2010) (en banc)...........................................................................14

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
　181 F.3d 1291 (Fed. Cir. 1999)..........................................................................................15

*Aylus Networks, Inc. v. Apple Inc.*,
　856 F.3d 1353 (Fed. Cir. 2017)..........................................................................................20

*Bayer Healthcare LLC v. Baxalta Inc.*,
　989 F.3d 964 (Fed. Cir. 2021)............................................................................................28

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*,
　No. 2:18-cv-585, 2021 WL 1143767 (E.D. Va. Mar. 25, 2021) (Davis, C.J.) .......................27

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
　No. 1:18-CV-760, 2019 WL 8107921 (E.D. Va. Feb. 26, 2019) ....................................28, 29

*Computer Docking Station Corp. v. Dell, Inc.*,
　519 F.3d 1366 (Fed. Cir. 2008)..........................................................................................22

*Ecolab, Inc. v. FMC Corp.*,
　569 F.3d 1335 (Fed. Cir. 2009)..........................................................................................20

*Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*,
　508 F.3d 1366 (Fed. Cir. 2007)..........................................................................................19

*Felix v. Am. Honda Motor Co.*,
　562 F.3d 1167 (Fed. Cir. 2009)..........................................................................................25

## TABLE OF AUTHORITIES
### (continued)

Page

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,*
535 U.S. 722 (2002)..................................................................................23, 24

*Finnigan Corp. v. U.S. Int'l Trade Comm'n,*
180 F.3d 1354 (Fed. Cir. 1999).................................................................18

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.,*
356 F.3d 1348 (Fed. Cir. 2004).................................................................18

*Graver Tank & Mfg. Co. v. Linde Air Products Co.,*
339 U.S. 605 (1950)....................................................................................26

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
136 S. Ct. 1923 (2016)..........................................................................26, 29

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,*
370 F.3d 1131 (Fed. Cir. 2004).................................................................24

*Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co.,*
285 F.3d 1046 (Fed. Cir. 2002).................................................................24

*K-2 Corp. v. Salomon S.A.,*
191 F.3d 1356 (Fed. Cir. 1999).................................................................18

*Key Mfg. Group, Inc. v. Microdot, Inc.,*
925 F.2d 1444 (Fed. Cir. 1991).................................................................18

*Lockwood v. Am. Airlines, Inc.,*
107 F.3d 1565 (Fed. Cir. 1997).................................................................14

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
851 F.3d 1275 (Fed. Cir. 2017).................................................................27

*Moore USA, Inc. v. Standard Register Co.,*
229 F.3d 1091 (Fed. Cir. 2000).................................................................24

*Omega Eng'g, Inc, v. Raytek Corp.,*
334 F.3d 1314 (Fed. Cir. 2003).................................................................20

*Phillips Petroleum Co. v. Huntsman Polymers Corp.,*
157 F.3d 866 (Fed. Cir. 1998)...................................................................26

**TABLE OF AUTHORITIES**
(continued)

Page

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)................................................................... passim

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006).........................................................................22

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005).........................................................................23

*Sanofi v. Watson Labs. Inc.*,
    875 F.3d 636 (Fed. Cir. 2017)...........................................................................20

*Searfoss v. Pioneer Consol Corp.*,
    374 F.3d 1142 (Fed. Cir. 2004).........................................................................24

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019).........................................................................27

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007).........................................................................26

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008).............................................................13, 14, 17

*TechSearch, L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002).........................................................................18

*TecSec, Inc. v. Adobe, Inc.*,
    No. 1:10-cv-115, 2019 WL 1233882 (E.D. Va. Mar. 14, 2019) (O'Grady, J.) ...........26, 27, 28

*TecSec, Inc. v. Adobe Sys. Inc.*,
    326 F. Supp. 3d 105 (E.D. Va. 2018) (O'Grady, J.) ...............................................12

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharms. LP*,
    661 F.3d 1378 (Fed. Cir. 2011).........................................................................13

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
    90 F.3d 1558 (Fed. Cir. 1996)...........................................................................26

*Tronzo v. Biomet, Inc.*,
    156 F.3d 1154 (Fed Cir. 1998)..........................................................................24

**TABLE OF AUTHORITIES**
(continued)

Page

*Upsher-Smith Labs., Inc. v. Pamlab, LLC,*
   412 F.3d 1319 (Fed. Cir. 2005)...........................................................13

*Vanmoor v. Wal-Mart Stores, Inc.,*
   201 F.3d 1363 (Fed. Cir. 2000)...........................................................13

*Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.,*
   520 U.S. 17 (1997)..............................................................................18

*WMS Gaming, Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1999)...........................................................18

## STATUTES

35 U.S.C. § 102................................................................................2, 13, 18

35 U.S.C. § 112.....................................................................................5, 14

35 U.S.C. § 284.............................................................................10, 11, 26

35 U.S.C. § 298.........................................................................................27

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ...............................................................................19

## INTRODUCTION

Plaintiffs RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company (collectively, Plaintiffs) brought this action against Altria Client Services LLC (Altria), Philip Morris USA, Inc. (PM USA), and Philip Morris Products S.A. (PMP) (collectively, Defendants) on April 9, 2020, alleging that Defendants' IQOS heat-not-burn tobacco system infringed six patents held by Plaintiffs. Defendants brought counterclaims alleging, among other things, that Plaintiffs' VUSE e-cigarette products infringed five patents held by Defendants and that the infringement was willful, such that Defendants are entitled to enhanced damages. As to two of those patents and the claim to enhanced damages, there is no genuine dispute of material fact and thus summary judgment should be granted on those counterclaims in favor of Plaintiffs.

## STATEMENT OF UNDISPUTED FACTS

### A.  THE '374 PATENT

1.      U.S. Patent No. 10,420,374 (the '374 Patent) is directed to an improved puff sensor assembly of an electronic vaping device. Ex. A ('374 Patent). It was filed on July 7, 2015, and issued on September 24, 2019. Ex. A cover page.

2.      RJRV markets and sells electronic nicotine delivery systems under the brand names VUSE Solo, VUSE Ciro, VUSE Vibe, and VUSE Alto. Doc. 276 (Pltfs.' Am. Answer to Countercl.) ¶ 3 (Oct. 30, 2020).

3.      Altria and PM USA allege that VUSE Solo, Ciro, Vibe, and Alto and the associated Flavor Packs infringe claims 1-10 and 16-25 (the asserted claims) of the '374 Patent. Doc. 193 (Defs.' Am. Partial Answer to the Am. Compl. & Am. Countercls.) ¶¶ 31-50; Ex. B. (McAlexander Second Supp. Opening Expert Rep.) ¶ 299.

4.      VUSE Solo was first sold by Reynolds in the United States in March 2013, more than one year before the filing of the '374 Patent. Doc. 655 (Joint Stipulation of Uncontroverted Facts) ¶ 10. Since it first went on the market to the present day, each VUSE Solo has contained ▮▮▮▮▮ puff sensors: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. B (McAlexander Second Supp. Opening Expert Rept.) ¶ 326; Ex. C (▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████ ).  Altria and PM USA allege that both puff sensors infringe the '374 Patent.  *See* Ex. B ¶¶ 327, 394.  Reynolds therefore contends that VUSE Solo renders the asserted claims invalid for anticipation under 35 U.S.C. § 102.

5.    As Altria and PM USA's expert acknowledges, the puff sensors in the other accused products "share a substantially identical structure and operate in materially the same way" as the puff sensors in the VUSE Solo.  Ex. B ¶ 120; *see also id.* ¶¶ 300-311.

6.    Altria and PM USA contend that the asserted claims of the '374 Patent are entitled to a priority date of June 29, 2010, which is the date that the '374 Patent's parent application, PCT/IB2010/052949 ("the '949 PCT Application") was filed.  Ex. D ('949 PCT Application); Ex. E (McAlexander Second Supp. Rebuttal Expert Rep.) ¶¶ 578-95.

7.    The '374 Patent is a continuation-in-part of the '949 PCT Application.  Ex. A, cover page.  The specification of the '374 Patent contains a substantial amount of new matter.  *Compare* Ex. A ('374 Patent) *with* Ex. D ('949 PCT Application).  In fact, there "is more new material in the specification of the '374 Patent than there is original material from the '949 PCT Application."  Ex. F (Blalock Opening Expert Rep.) ¶ 60.

8.    For example, the '374 Patent includes new text describing the conductive membrane of the puff sensor as "flexible and resilient."  Ex. A at 3:24, 3:26, 3:32, 3:34-36, 3:40, 5:25, 5:30, 5:35-36, 7:46.  The specification describes "a flexible and conductive membrane which is under lateral or radial tension and spans across a central aperture defined by the ring spacer 23 under radial tensions."  *Id.* at 3:23-26.  The '374 Patent consistently describes the conductive membrane as "flexible."  *Id.* at 3:24, 3:26, 3:32, 3:34-36, 3:40, 5:25, 5:30, 5:35-36, 7:46.

9.    The specification of the '374 Patent further states that, "[i]n some embodiments, the first conductive plate member 21 is a flexible and resilient conductive membrane made of metal, carbonised or metalized rubber, carbon or metal coated rubber, carbonised or metalized soft and resilient plastic materials such as a PPS (Polyphenylene Sulfide), or carbon or metal coated soft and resilient plastic materials."  *Id.* at 5:24-29.

10.    The '949 PCT Application never described the conductive membrane as "flexible."

*Compare* Ex. D ('949 PCT Application) *with* Ex. A ('374 Patent) at 3:24, 3:26, 3:32, 3:34-36, 3:40, 5:25, 5:30, 5:35-36, 7:46. Instead, the '949 PCT Application described the conductive membrane as being "*a rigid or semi-rigid* conductive membrane (121), such as a metallic sheet." Ex. D. at 6:18-19 (emphasis added). In subsequent passages, the '949 PCT Application referred to the membrane as a "resilient metallic membrane," "metallic membrane," or "resilient membrane," using those terms interchangeably. *See, e.g.*, Ex. D at 8:1, 8:2, 8:6, 8:7, 8:10, 8:12-13.

11.     The '949 PCT Application also did not describe the conductive membrane as being made from "carbonised or metalized rubber, carbon or metal coated rubber, carbonized or metal-ized soft and resilient plastic materials such as a PPS (Polyphenylene Sulfide), or carbon or metal coated soft and resilient plastic materials." *Compare* Ex. D ('949 PCT Application) *with* Ex. A ('374 Patent) at 5:24-29. The "only material disclosed for the conductive membrane in the '949 PCT Application is metal or 'a metallic sheet.'" Ex. F (Blalock Opening Expert Rep.) ¶ 292.

12.     In short, the specification of the '374 Patent changed the description of the membrane (1) from "rigid or semi-rigid" to "flexible" and (2) from made of a "metallic sheet" to made of "soft … plastic," such as a PPS. *Compare* Ex. D ('949 PCT Application) at 6:18-19 *with* Ex. A ('374 Patent) at 5:24-29.

13.     Dr. Travis Blalock, an electrical engineer and Associate Professor in the Depart-ment of Electrical and Computer Engineering at the University of Virginia, explained that a PPS membrane "can in no way be construed as rigid or semi-rigid." Ex. F (Blalock Opening Expert Rep.) ¶ 293. Rather, it "is extremely thin and flexible." *Id.* "It is soft, easily deformed, and flexes a great deal with very little pressure from a probe." *Id.*

14.     Each of the asserted claims recites, in relevant part, a "capacitor consisting essen-tially of *a flexible conductive membrane* and a rigid conductive plate spaced apart by an insulating ring spacer between the flexible conductive membrane and the rigid conductive plate, and an air dielectric between the flexible conductive membrane and the rigid conductive plate." Ex. A ('374 Patent) at 12:65-13:5, 14:1-7, 14:52-58 (emphasis added). The Court declined to issue any claim construction for this term. Doc. 360 (Claim Construction Order).

15.     Altria and PM USA rely on the new matter in the '374 Patent to accuse the VUSE products, ████████████████████ of infringing the asserted claims.  *See* Doc. 193 (Altria & PM USA's Am. Partial Answer to the Am. Compl. & Am. Countercls.) ¶¶ 31-50; Ex. B (McAlexander Second Supp. Opening Expert Rep.) ¶¶ 364-69.

16.     Based on review of the '374 Patent, Dr. Blalock concluded that the asserted claims of the '374 Patent are not entitled to the priority date of the '949 PCT Application because, among other things, "the amendments to the specification of the '374 Patent had the effect of broadening the scope of the asserted claims" beyond the invention disclosed in the '949 PCT Application. Ex. F (Blalock Opening Expert Rep.) ¶ 295.  Accordingly, Dr. Blalock concluded that the VUSE Solo anticipates the asserted claims of the '374 Patent unless it does not infringe them.  *Id.* ¶¶ 300-301.

## B.  THE '911 PATENT

17.     PMP alleges that the VUSE Ciro and Vibe products infringe claims 1, 9-11, and 13 of U.S. Patent No. 10,104,911 ("the '911 Patent"), that the VUSE Solo G1 and G2 products infringe claims 1, 10-11, and 13 of the '911 Patent, and that the VUSE Alto product infringes claims 1, 2, and 9-12 of the '911 Patent.  Ex. G (Abraham Second Am. & Supp. Opening Expert Rep.) ¶ 54; Ex. H (Abraham Am. & Supp. Expert Rep.) ¶¶ 4–70; Ex. I ('911 Patent).

18.     The '911 Patent includes only a single independent claim—claim 1.  *See* Ex. I at 18:22-30 (emphasis added).

19.     During the prosecution of the application that led to the issuance of the '911 Patent, the Examiner rejected the pending claims multiple times as unpatentable in view of prior art.  On multiple occasions, PMP amended the final "wherein" clause of pending independent claim 13, which eventually issued as independent claim 1.  Those amendments are collectively shown here:

**wherein** the **at least one** cavity **is a blind hole recessed in the wall of the aerosol-forming chamber and has an open end, a closed end, and a longitudinal direction extending between the open end and the closed end, and wherein the at least one cavity** has a **largest** cross-sectional dimension x **taken along a cross-section of the cavity in a direction perpendicular to the longitudinal direction of the cavity**, where x is ~~preferably~~ 0.5 mm**,** or 1 mm**,** or between 0.5 mm and 1 mm

*See generally* Ex. J (selected excerpts from '911 Patent file history) (emphases reflecting amendments from Jan. 6, 2016; July 29, 2016; Oct. 6, 2016; and May 10, 2018).

20.     The original claim recited that "the leakage prevention means comprises at least one cavity" that "has a cross-sectional dimension x, where x is ***preferably*** 0.5 mm or 1 mm or between 0.5 mm and 1 mm." Ex. J at DEF_PUB_EDVA000015581 (May 29, 2013 Preliminary Amendment at Claim 13) (emphasis added).

21.     On October 6, 2015, the Examiner rejected this claim under 35 U.S.C. § 112 as being indefinite for failing to particularly point out and distinctly claim the subject matter. The Examiner stated, "the phrase 'preferably' renders the claim indefinite because it is unclear whether the limitation(s) following the phrase are part of the claimed invention." Ex. J at DEF_PUB_EDVA000015837 (Oct. 6, 2015 Non-Final Rejection at 3).

22.     On January 6, 2016, PMP amended the claim, in relevant part, by deleting "preferably" and adding the requirement that the "dimension x" is "taken along a cross-section of the cavity." Ex. J at DEF_PUB_EDVA000015966 (Jan. 6, 2016 Amendment at 2).

23.     On May 6, 2016, the Examiner again rejected the pending independent claim (along with several dependent claims) as being unpatentable over Taieb (U.S. Publ'n No. 2010/0200008) in view of Rose *et al.* (U.S. Patent No. 5,935,975) ("Rose"), stating: "Applicant has not shown that a cavity having a cross-section measuring .5 mm, 1 mm, or between 0.5 mm and 1 mm is critical." Ex. J at DEF_PUB_EDVA000016066–69 (May 6, 2016 Final Rejection at 2-5).

24.     On July 29, 2016, PMP submitted an After Final Consideration Program Request, proposing to amend the pending independent claim to require that "***at least one*** cavity ***is a blind hole in the wall of the aerosol-forming chamber***," and also disagreeing with the Examiner's comments that "[a]pplicant has not shown that a cavity having a cross-section measuring .5 mm, 1 mm, or between 0.5 mm and 1 mm is critical." Ex. J at DEF_PUB_EDVA000016091, DEF_PUB_EDVA000016099 (July 29, 2016 Amendment at 2, 10).

25.     PMP also made the following arguments regarding the prior art Rose reference:

But Rose's fingers 62 are narrow protrusions that do *not* each extend around the inner surface of the tube 58. So, fingers 62 do *not* form a part of a wall of an aerosol-forming chamber, and spaces 64 behind fingers 62 do *not* form a cavity as claimed. However, even if the inner surface of tube 58 and fingers 62 could be considered a 'wall,' Rose still does not provide any teaching or suggestion of the claimed 'at least one cavity' being '*a blind hole in the wall of the aerosol-forming chamber*.' Rather, the spaces behind each finger 64 in Rose are open around the sides of each finger—meaning that such features are *non-blind*. This is the opposite of what is claimed.

*Id.* at DEF_PUB_EDVA000016098 (July 29, 2016 Amendment at 9) (emphases in original).

26.     On October 6, 2016, PMP amended the pending independent claim to require that "***at least one* cavity *is a blind hole recessed in the wall of the aerosol-forming chamber*.**"  Ex. J at DEF_PUB_EDVA000016118 (Oct. 6, 2016 Amendment at 2).

27.     PMP also repeated and made further arguments regarding the prior art Rose reference in the October 6, 2016 Amendment:

Applicant's representative explained that Rose's fingers 62, whether they are inwardly extending filaments (col. 13, l. 38), or slots, or bristles as if of an inverted pipe cleaner, would still remain "open" around their sides/ends and hence be *non-blind*.  Applicant's representative explained how this is the opposite of what is claimed.

*** 

But Rose's finge*rs* 62 (plural) are narrow protrusions that do *not* each extend around the inner surface of the tube 58. So, fingers 62 do *not* form a part of a wall of an aerosol-forming chamber, and spaces 64 behind fingers 62 do *not* form a cavity as claimed. Rose's finge*rs* (plural) are also *not* a recessed blind hole, as claimed.  That is, even if the inner surface of tube 58 and fingers 62 could be considered a 'wall,' Rose still does not provide any teaching or suggestion of the claimed 'at least one cavity' being '*a blind hole recessed in the wall of the aerosol-forming chamber*.' Rather, the spaces behind each finger 64 in Rose are open around the sides of each finger—meaning that such features are *non-blind*. And, as already noted above, such features are *not* recessed in the wall.  This is the opposite of what is claimed.

Ex. J at DEF_PUB_EDVA000016122, DEF_PUB_EDVA000016129 (Oct. 6, 2016 Amendment at 6, 13) (emphases in original).

28.     On May 19, 2017, the Examiner rejected the pending independent claim (along with several other dependent claims) as being unpatentable over Thorens *et al.* (U.S. Publ'n No. 2009/0272379) ("Thorens '379") in view of Miller (U.S. Patent No. 4,275,747).  Ex. J at DEF_PUB_EDVA000016143–45 (May 19, 2017 Non-Final Rejection at 4-6).

29.     On September 19, 2017, PMP filed a Request for Reconsideration, disagreeing with the Examiner and arguing that the dimensions of the cavity in the Miller prior art reference were "an order of magnitude greater than Applicant's claimed dimensions" of 0.5 mm to 1 mm:

> Applicant's disclosure explains exemplary advantages of the claimed "at least one cavity [being] a blind hole recessed in the wall of the aerosol forming chamber [having] a cross-sectional dimension x taken along a cross-section of the cavity, where x is 0.5 mm, or 1 mm, or between 0.5 mm and 1 mm," as recited in independent claim 13. By providing at least one cavity in the form of a blind hold recessed in the wall of the aerosol-forming chamber with the claimed dimensions for the cavity, aerosol condensate may be retained in the cavity by capillary action, even if the aerosol generating system is inverted, rotated, or vertically aligned. … In contrast, Miller does not provide any indication or suggestion of such dimensions … For example, as can be seen from Miller's drawings, the lower extension 22 is significantly wider and higher than the smoke conducting passage 18 from the bowl 12.  Miller describes the diameter of the smoke conducting passage 18 as "between 3 and 5 mm."  *See* Miller, col. 3, ll. 42-43.  Thus, Miller implicitly discloses that the lower extension 22 has a cross-sectional dimension of significantly more than "between 3 and 5 mm."  For example, in Miller's Fig. 1, lower extension 22 appears to have a height of approximately twice that of the passage 18.  This would be the height of lower extension 22 at around 6 mm to 10 mm.  This is an order of magnitude greater than Applicant's claimed dimensions.

Ex. J at DEF_PUB_EDVA000016171–73 (Sept. 19, 2017 Applicant Request for Reconsideration and Remarks at 7-9).

30.     On January 10, 2018, the Examiner issued an Office Action, once again rejecting the pending independent claim as unpatentable over Thorens '379 in view of Miller.  Ex. J at DEF_PUB_EDVA000016186–88 (Jan. 10, 2018 Final Rejection at 3-5).  The Examiner stated:

> [T]he modified device of Thorens [in view of Miller] does not explicitly disclose the cavity having a cross-sectional dimension x, where x is between 0.5 mm and 1 mm[,] [but] [a]t the time the invention was made, it would have been obvious to one of ordinary skill in the art to modify the cavity in the modified device of Thorens because Applicant has not disclosed that cavity provides an advantage, is used for a particular purpose, or solves a stated problem.

Ex. I at DEF_PUB_EDVA000016187 (Jan. 10, 2018 Final Rejection at 4).

31.     The Examiner summarized an April 12, 2018 Applicant interview concerning the patentability rejections based on Thorens '379 and Miller, stating: "Discussed adding 'largest' before cross-sectional dimension x that would better clarify the limitation 'dimension x.'"  Ex. J at DEF_PUB_EDVA000016296 (Apr. 19, 2018 Applicant Initiated Interview Summary).

32.     On May 10, 2018, PMP further amended the pending independent claim to require a "*largest* cross-sectional dimension x"; PMP amended the claim to require: "at least one cavity is a blind hole recessed in the wall of the aerosol-forming chamber and has an open end, a closed end, and a longitudinal direction extending between the open end and the closed end, and wherein the at least one cavity has a ***largest cross-sectional dimension x*** taken along a cross-section of the cavity in a direction perpendicular to the longitudinal direction of the cavity, ***where x is 0.5 mm, or 1 mm, or between 0.5 mm and 1 mm***." Ex. J at DEF_PUB_EDVA000016304 (May 10, 2018 Amendment at 2).

33.     In the May 10, 2018 Amendment, PMP also repeated and made further arguments regarding the dimensions of the prior art Miller cavity, again stressing that the size of Miller's cavity was "an order of magnitude greater" than the now-claimed "*largest* cross-sectional dimension" between 0.5 mm and 1 mm:

> [T]he recitation of the "*largest* cross-sectional dimension" strengthens the arguments of record regarding the notable difference in size of Miller's trap 22, as well as the arguments flowing therefrom regarding lack of motivation to combine, no reasonable expectation of success, and changing the principle of operation of the reference. … As can be seen from Miller's drawings, the lower extension 22 is significantly wider and higher than the smoke conducting passage 18 from the bowl 12. Miller describes the diameter of the smoke conducting passage 18 as "between 3 and 5 mm." See Miller, col. 3, ll. 42-43. Thus, Miller implicitly discloses that the lower extension 22 has a cross-sectional dimension of significantly more than "between 3 and 5 mm." For example, in Miller's Fig. 1, lower extension 22 appears to have a height of approximately twice that of the passage 18. This would be the height of lower extension 22 at around 6 mm to 10 mm. This is an order of magnitude greater than Applicant's claimed dimensions.

Ex. I at DEF_PUB_EDVA000016313–15 (May 10, 2018 Amendment at 11-13) (emphasis in original).

34.     PMP further argued in the May 10, 2018 Amendment that a person of ordinary skill in the art would not have modified Miller to have a "*largest* cross-sectional dimension of '0.5 mm, or 1 mm, or between 0.5 mm to 1 mm" because "such a small cavity" with the claimed numerical dimensions would "frustrate the entire purpose" of Miller:

> Even if the person of ordinary skill had considered reducing the dimensions of *Miller's* lower extension 22, such a person would not have looked to provide the lower extension

8

22 with a _largest_ cross-sectional dimension of "0.5 mm, or 1 mm, or between 0.5 mm and 1 mm," as claimed, since the high viscosity and surface tension of tar would prevent the tar from entering such a small cavity. Thus, Applicant's claimed _largest_ cross-sectional dimension would frustrate the entire purpose of Miller's lower extension 22, which is to trap tar condensate that has dripped from pin 24.

Ex. I at DEF_PUB_EDVA000016315 (May 10, 2018 Amendment at 13).

35. The '911 Patent states that a "cross-sectional dimension x" with a size of 0.5 mm or 1 mm or between 0.5 mm and 1 mm "has been found to be advantageous since it is large enough to collect a sufficient amount of liquid, but small enough to trap the liquid in the cavity by capillary action, even if the aerosol generating system is rotated or vertically aligned." Ex. I at 11:27-32.

36. PMP's technical expert, Dr. John Abraham, testified that "the size of the cavities matter" in the '911 Patent claims, that the patentee claimed cavity dimensions "between .5 and 1," that "the patentee has claimed those [dimensions] because they are advantageous," and that the '911 Patent does not describe any cavities outside the claimed range of 0.5 mm to 1 mm:

> So a person of ordinary skill would want to know, how do I make this thing? And what's great about this patent is it provides guidance. It says, look, if you want to make cavities that are going to work, use cavities that are between .5 and 1. And that's all that's claimed. I don't see anywhere in this patent a description of cavity sizes x or y that is outside the range. And a person of ordinary skill would understand that that is the range that's claimed.

Ex. K (Abraham Dep.) at 192:4-194:6.

37. The "largest cross sectional dimension x" of the alleged cavity or blind hole in the Solo G1, Ciro, and Vibe is not "0.5 mm, or 1 mm, or between 0.5 mm and 1 mm." Dr. Abraham opined that the largest cross-sectional dimension x of the alleged cavity or blind hole in the Solo G1, Ciro, and Vibe is ████████████████, respectively. _See_ Ex. G (Abraham Second Am. & Supp. Opening Expert Rep.) at ¶¶ 176, 201, 211.

38. As pictured below, the alleged cavities or blind holes in the VUSE Alto as identified by PMP's expert Dr. Abraham are formed by a raised lip or protrusion on one side and the wall of the cartomizer holder tap on the other side. Dr. Abraham identifies two protrusions on either side of the area around the opening in the VUSE Alto mouthpiece. _See, e.g._, Ex. H (Abraham Am. & Supp. Expert Rep.) ¶¶ 23, 38 (citing CAD file at RJREDVA_001642024). These protrusions do

not extend around the entire circumference of the opening for the VUSE Alto air outlet. Ex. L (RJR EDVA_001651203) (annotated).



39.     The ▮▮▮▮▮ measurement of the alleged VUSE Alto cavity pictured below is an accurate measurement of a cross-sectional dimension that is perpendicular to the longitudinal direction of the alleged cavity in the VUSE Alto:



Ex. M (Kodama Supp. & Am. Responsive Expert Rep.) at ¶ 88 (using CAD files for Alto, which include RJREDVA_001642024); Ex. N (RJREDVA_001651195).

**C. Willful Infringement**

40.     Defendants seek "[a]n award of treble damages for willful infringement pursuant to 35 U.S.C. § 284" for five patents: the '374, '911, '265, '545, and '556 Patents. Doc. 193 (Altria & PM USA's Am. Partial Answer to the Am. Compl. & Am. Countercls.) at 78; Doc. 473 (PMP's Am. Partial Answer to the Am. Compl. & Second Am. Countercls.) at 83.

41.     Defendants revealed the bases for their willful infringement claim during discovery. *See* Ex. O (Altria & PM USA's Am. Suppl. Objs. & Resps. to Pls.' Second Set of Interrogs. (No. 12) (April 21, 2021) ("Altria and PM USA Interrogs.")); Ex. P (PMP's Suppl. Objs. & Resps. to Pls.' Second Set of Interrogs. (No. 12) (April 12, 2021) ("PMP Interrogs.")).

42.    During discovery, Defendants stated that they allege willful infringement based on the following:

(a)    ███████████████████████████████████████████████

(b)    Reynolds has continued to produce and sell the accused products after the filing of Altria's infringement claims in this action.[2]

(c)    Some of the asserted patents (or their applications) came up during the patent-application process for Reynolds's allegedly infringing products.[3]

(d)    ███████████████████████████████████████████████[4]

Reynolds does not dispute those facts, but it does dispute that they satisfy Defendants' burden of proving willful infringement to obtain enhanced damages under 35 U.S.C. § 284.

43.    Defendants also cited, as a basis for their willful infringement claim, █████ and other Reynolds documents" supposedly showing that "Reynolds was aware that the Reynolds Accused Products infringe the asserted claims."[5] ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████[6] ███████████████

████████████████████████████████████████████

44.    The "other Reynolds documents" are Reynolds technical documents and reports

---

[1] Altria and PM USA Interrogs. at 7 (making this argument as to the '545 Patent); *id.* at 11 (same as to the '374 Patent); PMP Interrogs. at 7 (same as to the '911, '265, and '556 Patents).

[2] Altria and PM USA Interrogs. at 7 (making this argument as to the '545 Patent); *id.* 10-11(same as to '374 Patent); PMP Interrogs. at 9 (same as to the '911, '265, and '556 Patents).

[3] Altria and PM USA Interrogs. at 7 (making this argument as to the '545 Patent); PMP Interrogs. at 6-7 (same as to the '265 and '911 Patents).

[4] Altria and PM USA Interrogs. at 9 (making this argument as to the '545 Patent); *id.* at 11 (same as to the '374 Patent); PMP Interrogs. at 9 (same as to the '911,'265, and '556 Patents).

[5] Altria and PM USA Interrogs. at 8 (making this argument as to the '545 Patent); *id.* at 11 (same as to the '374 Patent); PMP Interrogs. at 7-9 (same as to the '265, '911, and '556 Patents).

[6] Plaintiffs have not filed ████████████████ as exhibits because they span more than two thousand pages.  But, if helpful to the Court, Plaintiffs will provide them.

from engineering firms  These reports simply explain how the products work;

45.     During this litigation, "PM USA drop[ped] its claim for pre-suit damages for in-fringement of the '545 Patent."  Doc. 549 (Joint Pre-Trial Stipulation).

## SUMMARY JUDGMENT STANDARD

"Summary judgment will be granted where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact." *TecSec, Inc. v. Adobe Sys. Inc.*, 326 F. Supp. 3d 105, 108 (E.D. Va. 2018) (O'Grady, J.).  "A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists and that summary judgment should not be granted in favor of the moving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, (1986)).  "Conclusory assertions of state of mind or motivation are insufficient." *Id.* (citation omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphases in original) (citations omitted).  In a patent case, the burden is on the patent owner to prove infringement by establishing that the accused product meets every limitation of an asserted claim.  *Applied Material, Inc. v. Tokyo Seimitsu, Co.*, 446 F. Supp. 2d 538, 543 (E.D. Va. 2006).

---

[7] Plaintiffs have not filed the ▆▆▆▆▆▆▆ and related documents as exhibits because they span nearly a thousand pages. But, if helpful to the Court, Plaintiffs will provide them.

## ARGUMENT

**I.     THE '374 PATENT IS INVALID AS ANTICIPATED UNDER 35 U.S.C. § 102(a)(1)**

A patent is not valid if the claimed invention was already "in public use, on sale, or other-wise available to the public before the effective filing date of the claimed invention."  35 U.S.C. § 102(a)(1).  And an invalid patent cannot be infringed.  *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1310–11 (Fed. Cir. 2008).

The '374 Patent was filed on July 7, 2015.  Statement of Undisputed Fact ("SUF") ¶ 1.  It is undisputed that VUSE Solo, which Defendants allege infringes the '374 Patent, was in public use and on sale for more than one year before that date and has not materially changed since then. SUF ¶ 4.  "A century-old axiom of patent law holds that a product which would literally infringe if later in time anticipates if earlier."  *Upsher-Smith Labs., Inc. v. Pamlab, LLC*, 412 F.3d 1319, 1322 (Fed. Cir. 2005) (internal quotation marks and citation omitted).  Thus, the accused VUSE Solo product must be assumed to anticipate the '374 Patent.  *See Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) (defendant's burden to prove anticipation by clear-and-convincing evidence is "satisfied by [an] allegation" of infringement); *accord Teva Pharm. Indus. Ltd. v. AstraZeneca Pharms. LP*, 661 F.3d 1378, 1382 (Fed. Cir. 2011).  Accordingly, the asserted claims of the '374 Patent are invalid as anticipated, pursuant to 35 U.S.C. § 102(a)(1).

Altria and PM USA try to escape this consequence by claiming an earlier priority date for the '374 Patent.  Specifically, they argue that their asserted claims should have the benefit of the '949 PCT Application's June 2010 priority date.  To support that argument, Altria and PM USA must come forward with evidence to prove entitlement to that earlier priority date.  *See PowerOa-sis*, 522 F.3d at 1303–06; *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327–28 (Fed. Cir. 2008).[8]  They cannot meet that burden because the '374 Patent's written description changed

---

[8] Although Plaintiffs prevail regardless, Plaintiffs should not bear the burden of persuasion on the question of entitlement to the June 2010 priority date—and certainly should not bear a clear and convincing evidence burden.  *See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed. Cir. 1984) ("When an attacker simply goes over the same ground travelled by the PTO,

in material ways.

Under well-established case law and the undisputed evidence, the '374 Patent is not entitled to an earlier priority date, and therefore VUSE Solo anticipates the asserted claims. "It is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application, as required by 35 U.S.C. § 112." *PowerOasis*, 522 F.3d at 1306 (citation omitted). "[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc) (citation omitted). "The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, a prior application itself must describe an invention … in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought." *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

When new matter is added in a continuation-in-part application, claims encompassing the new matter lose the priority date of the earlier application even if that application would support a narrower version of the claim. *PowerOasis*, 522 F.3d at 1311. In *PowerOasis*, the claimed invention was a vending machine that provided Wi-Fi service to a customer's laptop. *Id.* at 1301. The original application described a "user interface" as part of the vending machine, but the continuation-in-part application added language describing "a user interface located remotely from the vending machine, such as on a user's laptop." *Id.* at 1307. The patentee asserted that the claims covered both kinds of user interfaces. *Id.* The Federal Circuit agreed, but found that the claims

---

part of the *burden* is to show that the PTO was wrong in its decision to grant the patent. When new evidence touching validity of the patent not considered by the PTO is relied on, the tribunal considering it is not faced with having to *disagree* with the PTO or with *deferring* to its judgment or with taking its expertise into account."), *abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011). This argument is foreclosed by *Tech. Licensing*, 545 F.3d at 1327–28, but Reynolds preserves it for further review.

were not entitled to the priority date of the earlier application.  The court reasoned: "That the Original Application may support a narrower construction of 'customer interface' as a display on the vending machine does not mean that the Original Application supports broader construction of a 'customer interface' as an interface located on the customer's laptop (remote from the vending machine)."  *Id.* at 1311.  "Since the Original Application does not support a 'customer interface' on a customer laptop, the asserted claims are not entitled to the effective filing date of the Original Application."  *Id.*

Here, just as in *PowerOasis*, the continuation-in-part that led to the '374 Patent expanded and transformed what the '949 PCT Application disclosed.  The '374 Patent recast the claimed invention from the "rigid or semi-rigid" membrane made from "a metallic sheet" of the '949 PCT Application to a membrane that is "flexible" and made of "soft … plastic materials" such as PPS. This transformation from what the '949 PCT Application disclosed dooms any argument that the asserted claims of the '374 Patent should receive the June 2010 priority date of the '949 PCT Application.

The '949 PCT Application described a "rigid or semi-rigid" conductive membrane—but never a flexible one.  Ex. D ('949 PCT Application) at 6:18-19.  The '374 Patent, by contrast, excised that "rigid or semi-rigid" language and replaced it with "flexible."  Ex. A ('374 Patent) at 3:24, 3:26, 3:30-32, 3:34-36, 3:40, 5:25, 5:30, 5:35-36, 7:46.  As Dr. Blalock confirmed, "[t]he '374 Patent consistently describes the conductive membrane as 'flexible,'" and never describes the conductive membrane as "rigid or semi-rigid."  Ex. F ¶¶ 289, 292 (citing '374 Patent, 3:24, 3:26, 3:30-32, 3:34-36, 3:40, 5:25, 5:30, 5:35-36, 7:46).  So to support the claimed "flexible" conductive membrane of the '374 Patent, one must look to the new language first added in 2015—which defeats any claim to the earlier priority date. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302–03 (Fed. Cir. 1999) ("Subject matter that arises for the first time in [a] CIP application does not receive the benefit of the filing date of the parent application.").

Even if the '949 PCT Application could support a claim to a narrower interpretation of "flexible conductive membrane," it cannot support the "flexible conductive membrane" as claimed

in the '374 Patent because the scope of that term was broadened by the new matter added in the specification of the '374 Patent. *PowerOasis*, 522 F.3d at 1311. The '374 Patent describes a conductive membrane made of "soft … plastic materials such as a PPS (Polyphenylene Sulfide)"—

███████████████████████████████████████████████████████████████████████████

████ Ex. A at 5:24-29; SUF ¶ 4. The '949 PCT Application, by contrast, does not support a claim to a conductive membrane made of soft plastic like PPS—rather than metal. Indeed, the '949 PCT Application states that "a metallic sheet having a good axial resilience property is preferred to be used as the conductive membrane." Ex. D at 7:4-7. Dr. Blalock explained that a membrane made of PPS—the "soft … plastic" described for the first time in the '374 Patent—"can in no way be construed as rigid or semi-rigid"; instead, it "is extremely thin and flexible." Ex. F ¶ 293. So the '374 Patent in 2015 described for the first time—████████████████████████████████████

████████████████████████████—a conductive membrane made of a soft plastic like PPS.

Based on the marked differences between the written description in the '949 PCT Application and the '374 Patent, Dr. Blalock opined that those skilled in the art "reading the '949 PCT Application would not have understood the inventor to possess the full scope of the asserted claims of the '374 Patent at that time." *Id.* ¶ 44. "In particular, a [person of ordinary skill] reading the '949 PCT Application would not have understood the inventor to be in possession of puff sensor assemblies and puff sensors having a 'flexible conductive membrane' … as [that] term[] [is] used in the asserted claims of the '374 Patent." *Id.*

Altria and PM USA's expert, Dr. McAlexander, does not (and cannot) dispute that (1) the '949 PCT Application describes the membrane as "rigid or semi-rigid" and made of a "metallic sheet," and (2) the '949 PCT Application never describes the membrane as "flexible" or made of "soft … plastic" like PPS. Instead, Dr. McAlexander argues that the '949 PCT Application's description of the conductive membrane as "deformable" would have alerted those skilled in the art that the inventor of the '949 PCT Application had possession of an e-cigarette consisting of a *flexible* conductive membrane. Ex. E ¶ 581 (emphasis added). Even if the '949 PCT Application's

mention of a "deformable" membrane could, in context, suggest the possibility of a flexible membrane, it is undisputed that the Application, while expressly disclosing a rigid or semi-rigid conductive membrane *made of a metallic sheet*, does not disclose a flexible conductive membrane *made of soft plastic like PPS*, even implicitly.  Dr. McAlexander offers no such opinion.  That is dispositive because "[e]ntitlement to a filing date does not extend to subject matter which is not disclosed," even if it "would be obvious over what is expressly disclosed."  *PowerOasis*, 522 F.3d at 1306 (citation omitted).

Dr. McAlexander also claims that the disclosures of the '949 PCT Application regarding a "metallic sheet" or a "metallic membrane" are "merely non-limiting examples" and thus the Application should not be understood to describe a conductive membrane "exclusively as metal or a metallic sheet."  Ex. E ¶ 584.  Again, this assertion fails as a matter of law.  It is undisputed that the '949 PCT Application does not disclose membranes made of soft plastic, like PPS.  *See* Ex. D ('949 PCT Application) at 7:4-7.  That is dispositive under settled law.  It bears repeating: "Entitlement to a filing date does not extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed."  *PowerOasis*, 522 F.3d at 1306.  And, in any event, Dr. McAlexander does not explain how a specification stating that a "metallic membrane" is "preferred" could reasonably convey to those skilled in the art that the invention also includes membranes made of soft plastic, like PPS—a material nowhere listed in the '949 PCT Application.  *See id.* (citation omitted); *Tech. Licensing*, 545 F.3d at 1333-34 ("The issue is whether the person skilled in the art would understand from the earlier application alone … that the inventor had possession of the [claimed invention]" when the application was filed.).  Even if the '949 PCT Application's examples are "non-limiting," nothing in it would allow a person skilled in the art to jump from those "rigid or semi-rigid" and "metallic" examples to the conclusion that the '949 PCT Application also covered a flexible membrane made of soft plastic.

In sum, because the asserted claims cover a flexible conductive membrane made of soft plastic like PPS, they are invalid under the doctrine of anticipation:  The asserted claims of the '374 Patent are not entitled to the June 2010 priority date of the PCT Application because the

Application's written description does not support them, and therefore the VUSE Solo predates the asserted claims and thereby renders them invalid as anticipated.  *See* 35 U.S.C. § 102(a)(1).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ SUF ¶ 5.  Either way, the Court should grant summary judgment in Reynolds's favor on the '374 Patent.

## II.   DEFENDANTS CANNOT SHOW THAT ANY OF THE VUSE ALTO, SOLO G1, VIBE, OR CIRO PRODUCTS INFRINGE THE '911 PATENT

Defendants allege infringement of the '911 Patent both literally and under the doctrine of equivalents.  The patent owner bears the burden of proving infringement.  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). To literally infringe, an accused device must meet every limitation of a claim exactly. *Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1449 (Fed. Cir. 1991). To infringe under the doctrine of equivalents, the accused device must contain an equivalent to each claim limitation that is not literally present.  *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 29–30 (1997).  However, prosecution history estoppel prevents a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution—either by making a narrowing amendment or through argument to the examiner.  *See Amgen Inc. v. Coherus Biosciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019).  Application of prosecution history estoppel is a legal question that must be resolved exclusively by this Court.  *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1351 (Fed. Cir. 2004); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366–67 (Fed. Cir. 1999).

### A.  The Solo G1, Vibe, Ciro, And Alto Products Do Not Literally Infringe

Defendants have counterclaimed for infringement of claims 1, 2, and 9-13 of the '911 Patent.  Because dependent claims 2 and 9-13 depend from independent claim 1, all of Defendants' infringement claims fail as a matter of law if Defendants fail to show "that the accused device contains every limitation in" claim 1.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1350 (Fed. Cir. 1999); *see also, e.g.*, *Finnigan Corp. v. U.S. Int'l Trade Comm'n*, 180 F.3d 1354,

1364-65 & n.7 (Fed. Cir. 1999).  Summary judgment of non-infringement is appropriate where a feature required by just one limitation of a claim is absent from the accused products.  *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1374–75 (Fed. Cir. 2007).

### 1. Defendants' expert does not—and cannot—offer any literal infringement opinion regarding the Solo G1, Vibe, and Ciro products

Independent claim 1 of the '911 Patent requires, in part, "at least one cavity ha[ving] a ***largest*** cross-sectional dimension x taken along a cross-section of the cavity in a direction perpendicular to the longitudinal direction of the cavity, ***where x is 0.5 mm, or 1 mm, or between 0.5 mm and 1 mm***."  Ex. I ('911 patent) at 18:26-30 (emphasis added).  A product with a cavity larger than 1 mm therefore cannot literally infringe claim 1.  For his expert report, Dr. Abraham measured the alleged cavities of the Solo G1, Vibe, and Ciro products, concluding that they each measure, respectively, ▮▮▮▮▮▮▮▮▮▮▮.  SUF ¶ 37.  Even assuming that these alleged cavities constitute the "blind hole recessed in the wall of the aerosol-forming chamber" required by claim 1, and even assuming Dr. Abraham is correctly measuring the "largest cross-sectional dimension x," Dr. Abraham's measured dimensions plainly fall outside the claimed range of "0.5 mm, or 1 mm, or between 0.5 mm and 1 mm."

Indeed, Dr. Abraham testified that none of these three products (Solo G1, Vibe, Ciro) literally infringe the '911 Patent.  Ex. K, Dep. of Dr. John Abraham 99:25-100:6; 101:21-102:7; 105:3-12 (Solo G1): *id.* 107:18–109:4 (Vibe); *id.* 109:23–111:12 (Ciro).  Reynolds's technical expert, Kelly R. Kodama, has offered additional expert testimony negating literal infringement.  Ex. Q (Kodama Mar. 24 Responsive Expert Rep.) at ¶¶ 99-101 (Solo G1); *id.* ¶¶ 111-113 (Vibe); *id.* ¶¶ 118-120 (Ciro).  Accordingly, the evidence is undisputed and the technical experts agree that the Solo G1, Vibe, and Ciro products do not literally infringe claim 1 of the '911 Patent, and Reynolds is therefore entitled to summary judgment.  *See* Fed. R. Civ. P. 56(a) (authorizing motions for summary judgment on any "claim or defense" or any "part of each claim or defense").

**2.     The Alto product simply has no "cavity" that is a "blind hole," and even if it did, the "largest" cross-sectional dimension is far outside the claimed range**

Dr. Abraham's literal infringement opinion regarding the alleged cavity in the Alto product rests on two assertions.  First, he opines that "[t]he cavities in the Alto are formed by two raised lips on either side of the area around the opening in the Alto mouthpiece." Ex. H (Abraham Am. & Supp. Expert Rep.) ¶ 13.  Second, he opines that the "largest cross-sectional dimension x of the cavity is less than 1 mm." *Id.* ¶ 50.  But Dr. Abraham has neither identified a "cavity [that] is a blind hole," nor has he measured its "largest" cross-sectional dimension as the '911 Patent requires.

*First*, Dr. Abraham's identification of the "at least one cavity [that] is a blind hole" in the Alto is legally barred by the doctrine of prosecution disclaimer.  *See Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (prosecution disclaimer presents a question of law).  "The doctrine of prosecution disclaimer … preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  Prosecution disclaimer "occurs when a patentee, either through argument or amendment, surrenders claim scope during the course of prosecution," *Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 650 (Fed. Cir. 2017) (internal quotation marks and citation omitted), and it "ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers."  *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

Dr. Abraham opines that the Alto meets the "wherein the at least one cavity is a blind hole" claim limitation because the Alto contains two spaces "bounded by a raised lip on one side and the wall of the cartomizer holder tap on the other side," which he claims "is consistent with the plain and ordinary meaning of the term "cavity."  Ex. H (Abraham Am. & Supp. Expert Rep.) ¶ 33.[9]

---

[9] PMP first disclosed this new infringement theory based on the alleged "raised lips" or protrusions in the Alto product in Dr. Abraham's supplemental report on March 12, 2021, long after the parties had completed claim construction briefing in October and November 2020, and nearly four

These spaces are indisputably open on at least two sides, however, as Dr. Abraham admitted in his deposition.  *See* Ex. K (Abraham Dep.) at 137:2-7 ("Q.  The raised lips -- and you say there are two of them, right? A.  Correct. Q.  They do not extend all the way around the air outlet hole, do they? A.  They do not."); *id.* at 142:3-12 ("Q.  You will agree, won't you, that they are not enclosed around all the sides? A.  I would agree that these blind holes are not enclosed on every side. Q.  In each of the blind holes you identified there are two sides that are not enclosed? A.  I would agree. And a person of ordinary skill would still understand that these are the blind holes that are explained in the '911 patent.").

PMP's arguments to the Examiner during the prosecution of the '911 Patent clearly and unmistakably disclaimed structures forming spaces that are "open around their sides/ends" from meeting the "wherein the at least one cavity is a blind hole" claim limitation.  Ex. I ('911 patent). During prosecution, the Patent Office repeatedly rejected the pending claims based on the prior art Rose reference because Rose's protrusions or fingers 62 created spaces 64 that satisfied the "at least one cavity is a blind hole" claim limitation.



Ex. R (Rose) at Fig. 5.

In response, PMP consistently argued that Rose's protrusions "do *not* form a cavity as claimed" because "the spaces behind each finger 64 in Rose are open around the sides of each finger—meaning that such features are *non-blind*."  SUF ¶¶ 25, 27.  And at least three times, PMP argued to the Examiner that Rose's open-sided spaces are "the opposite of what is claimed" by the "wherein at least one cavity is a blind hole" claim limitation of the '911 patent.  SUF ¶¶ 25, 27. This is the sort of "clear and unmistakable" statement that leads to a surrender of claim scope.

_____

months after the Court's claim construction ruling (Dkt. 360, Nov. 24, 2020).  Consequently, PMP's prosecution disclaimer foreclosing this infringement theory was not before the Court at the time of the claim construction ruling.

*Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see also, e.g.*, *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008) (affirming summary judgment for non-infringement where "the sum of the patentees' statements during prosecution would lead a competitor to believe that the patentee had disavowed coverage"). Just like Rose's fingers 62, the "raised lips" or protrusions in the Alto identified by Dr. Abraham create spaces that are open around two sides of each raised lip or protrusion—and just like PMP represented to the Patent Office, the Alto structures are "*non-blind*" and are "*the opposite of what is claimed*," and therefore the Alto does not literally infringe '911 Patent claim 1.

*Second*, even if the protrusions or raised lips in the Alto could be viewed as forming some sort of cavity, summary judgment of no literal infringement is still required because Dr. Abraham has not measured the "*largest* cross-sectional dimension x of the cavity." The alleged "cavity" identified by Dr. Abraham has a generally rectangular shape that is larger in one direction than the other. In what direction does Dr. Abraham measure to purportedly determine the "*largest* cross-sectional dimension x of the cavity"? The *shorter* direction. *See* Ex. H (Abraham Am. & Supp. Expert Rep.) ¶¶ 50, 53-57.[10] Mr. Kodama, on the other hand, correctly measured the true "*largest* cross-sectional dimension*" of the alleged rectangular cavity along the larger direction, as depicted in the image accompanying Statement of Undisputed Fact 37, and arrived at a measurement of ███, almost ████████ than the "*largest* cross-sectional dimension" required by '911 Patent claim 1. *See* Ex. M (Kodama Supp. & Am. Responsive Expert Rep.) ¶ 88. Neither Dr. Abraham nor Defendants have disputed the accuracy of Mr. Kodama's measurement. On this record, no reasonable jury could find that the *largest* cross-sectional dimension is anything other than ███, and no reasonable jury could find that Alto literally infringes '911 Patent claim 1.

---

[10] Dr. Abraham's attempt to justify this method of measuring the cross-sectional dimension—*i.e.*, that capillary cavities are "measured from one wall to another" in the direction of "capillary action," Ex. K (Abraham Dep.) at 161:3-23—fails in light of his concession that "Claim 1 does not use the word 'capillary action,'" *id.* at 162:2-5, and his further "opinion that there is capillary action or capillary forces in all directions," *id.* at 164:18-20.

**B. As A Matter Of Law, Defendants Are Barred From Relying On The Doctrine Of Equivalents To Prove Infringement**

**1. Prosecution history estoppel and claim vitiation bar Defendants from claiming infringement by Solo G1, Vibe, and Ciro under the doctrine of equivalents**

As noted, Dr. Abraham relies exclusively on the doctrine of equivalents for his infringement opinion as to Solo G1, Vibe, and Ciro. The doctrine of equivalents cannot apply here—as a matter of law—for two independent reasons.

*First*, prosecution history estoppel bars Defendants from using the doctrine of equivalents to claim infringement for cavity cross-sectional dimensions that fall outside a range of 0.5 mm to 1 mm as required by all the '911 Patent claims. "The doctrine of prosecution history estoppel serves to limit the doctrine of equivalents when the applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to the examiner." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1344 (Fed. Cir. 2005). Once a patentee has made a narrowing amendment for a patentability reason, a rebuttable presumption arises that estoppel applies and equivalents between the original and amended claim limitations are surrendered. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 736-37 (2002).

Here, there is no dispute that PMP amended pending independent claim 13 (later issued as independent claim 1) to add additional limitations, thus expressly narrowing the scope of the original claim. *See* SUF ¶¶ 19, 22, 24-27, 29, 32; Ex. M (Kodama Supp. & Am. Responsive Expert Rep.) ¶¶ 47–56. Through the course of those amendments, the patentee (a) deleted the word "preferably" to overcome a rejection by the examiner that the word rendered the claim indefinite and unpatentable, thereby eliminating the possibility that the dimension x could fall outside the claimed range of 0.5 mm to 1 mm; (b) added the word "largest" to the claim language "*largest* cross-sectional dimension x … where x is 0.5 mm, or 1 mm, or between 0.5 mm and 1 mm" to distinguish prior art, including the Miller patent, that did not disclose "such a small cavity"; and (c) repeatedly stressed that these amendments were critical to patentability. There is no dispute that the patentee

23

made these narrowing amendments intentionally for the purpose of obtaining issuance of claim 1—*i.e.*, it "made [the amendments] for a reason related to patentability." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004).

Defendants have offered only conclusory responses to estoppel, parroting the language of *Festo* that estoppel does not arise here because the amendment eliminating "preferably" "was not a narrowing amendment," and that the amendment "bears no more than a tangential relation to the equivalent in question."  Ex. S (PMP's 6th Supp. Objs. & Resps. to Pls.' Second Set of Interrogs. (No. 8)) at 15; Ex. G (Abraham Second Am. & Supp. Opening Expert Rep.) ¶ 251.  The amendments *narrowed* the claim scope both by excluding cross-sectional dimensions outside the 0.5 mm to 1 mm range and by specifying that the cross-section must be measured along its "largest" dimension.  *See Honeywell*, 370 F.3d at 1141 ("[W]e hold that an amendment adding a new claim limitation constitutes a narrowing amendment that may give rise to an estoppel").

*Second*, permitting PMP to assert infringement based on allegedly equivalent dimensions outside the numerical range of 0.5 mm to 1 mm would entirely vitiate limitations required by claim 1.  *See Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed Cir. 1998) ("If a theory of equivalence would vitiate a claim limitation … then there can be no infringement under the doctrine of equivalents as a matter of law.").  "The doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" *Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (citation omitted).  A "partial or complete summary judgment should be rendered by the court" when a theory of equivalence vitiates a claim limitation.  *Searfoss v. Pioneer Consol Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) (citation omitted).  Permitting PMP's and Dr. Abraham's infringement theory based on cavity dimensions that indisputably ███ the specific numerical range recited in the claim would vitiate the numerical range limitation.  *See Moore USA, Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) (allowing "what is undisputedly a minority (i.e., 47.8%) to be equivalent to a majority would vitiate" the "majority" claim limitation).

2.      **Prosecution history estoppel bars Defendants from claiming infringe-
ment by Alto under the doctrine of equivalents, and Dr. Abraham's
equivalence opinion creates no genuine issue of fact**

The same prosecution history that bars PMP from asserting literal infringement of the '911

Patent likewise estops PMP from relying on Dr. Abraham's opinion that the open-sided spaces in

the Alto mouthpiece adjacent to the protrusions or raised lips are equivalent to the "at least one

cavity [that] is a blind hole" required by claim 1.  *See* Ex. H (Abraham Am. & Supp. Expert Rep.)

¶ 34.  As explained above, PMP repeatedly argued that independent claim 1 was limited to a cavity

that differed from the open-spaces formed by Rose's "narrow protrusions," which "do *not* form a

cavity as claimed."  On multiple occasions, PMP represented to the Examiner (and to the public)

that Rose's open-sided spaces are "non-blind" and "the opposite of what is claimed" in '911 Patent

claim 1.  PMP thereby surrendered any claim that protrusions or raised lips like those in the Alto

can be equivalent to the "at least one cavity is a blind hole" claim limitation.  "[A]n amendment

made to avoid prior art that contains the equivalent in question is not tangential; it is central to

allowance of the claim."  *Felix v. Am. Honda Motor Co.*, 562 F.3d 1167, 1184 (Fed. Cir. 2009)

(internal quotation marks and citation omitted).

Notably, Dr. Abraham does *not* offer an alternative equivalence opinion justifying his

measurement of the "*largest* cross-sectional dimension x" of the Alto.  *See* Ex. H (Abraham Am.

& Supp. Expert Rep.) ¶ 34.  So, even if the doctrine of equivalents could legally apply, there is no

evidence to support an infringement theory that a cross-sectional dimension of ███████ (Mr. Ko-

dama's measurement) is equivalent to the dimension falling within the range of "0.5 mm to 1 mm"

required by claim 1.  In any event, prosecution history estoppel would bar PMP from asserting

infringement under the doctrine of equivalents as to the cross-sectional dimension of the alleged

Alto "cavity" for the same reason that PMP is estopped from claiming that the Solo G1, Vibe, and

Ciro products infringe under the doctrine: PMP amended its claim to overcome the Examiner's

patentability objections by deleting the word "preferably" and adding the word "largest," explicitly

limiting the claimed "largest cross-sectional dimension x" to a precise range of 0.5 mm to 1 mm.

Finally, even assuming the doctrine of equivalents could apply, Dr. Abraham's opinion regarding the Alto "cavity" does not create an issue for the jury. A patentee must present "particularized evidence" that the alleged equivalent performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claim limitation. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950); *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1365 (Fed. Cir. 2007). Conclusory allegations of equivalence do not create a genuine issue of material fact. *See Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998) (affirming summary judgment of noninfringement where the "expert declarations are wholly conclusory, devoid of facts upon which the affiants' conclusions, as experts, were reached" (quotation and alteration omitted)). Here, Dr. Abraham opines that the "Alto cavities performs substantially the same function (e.g., collects/traps liquid condensate) in substantially the same way (e.g., by capillary action) to obtain the same result (e.g., leakage prevention or reduction) as the claimed cavity. Furthermore, I am unaware of any substantial difference between the Alto cavities and the claimed 'at least one cavity.'" Ex. H (Abraham Am. & Supp. Expert Rep.) ¶ 34. Dr. Abraham merely recites the standard and identifies the function-way-result. He provides no analysis of equivalence to support his conclusion, "merely generalized testimony as to overall similarity." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567–68 (Fed. Cir. 1996).

## III.   DEFENDANTS CANNOT SHOW WILLFUL INFRINGEMENT UNDER 35 U.S.C. § 284

"Courts have the discretion to award up to treble damages in patent cases if the plaintiff can prove willful infringement by a preponderance of the evidence." *TecSec, Inc. v. Adobe, Inc.*, No. 1:10-cv-115, 2019 WL 1233882, at *1 (E.D. Va. Mar. 14, 2019) (O'Grady, J.). "The sort of conduct warranting enhanced damages has been variously described in [Supreme Court] cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed— characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). As those statements of the standard make plain, "[e]nhanced damages 'are generally reserved for

egregious cases of culpable behavior.'"  *TecSec*, 2019 WL 1233882, at *2 (quoting *Halo*, 136 S. Ct. at 1932).  Based on the undisputed facts of this case, Defendants cannot reasonably be found to have carried their burden of satisfying that standard, and Reynolds therefore is entitled to summary judgment on Defendants' enhanced damages claim as to all patents-in-suit.  *See, e.g.*, *Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, No. 2:18-cv-585, 2021 WL 1143767, at *15 (E.D. Va. Mar. 25, 2021) (Davis, C.J.).

In arguing to the contrary, Defendants point to four different types of evidence—none of which can support a finding of willful infringement.  *First*, for each of the asserted patents, Defendants state that ███████████████████████████████████████████████████████ ████████████████████████████████████████████  SUF ¶ 42(a).  That consideration is statutorily barred.  "The failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent."  35 U.S.C. § 298; *accord SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019).

*Second*, for each of the asserted patents, Defendants point out that Reynolds has continued to produce and sell the accused products since this action was filed.  SUF ¶ 42(b).  Post-lawsuit conduct of that sort cannot support a claim for enhanced damages because analysis of willfulness turns on pre-lawsuit conduct.[11]  *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295 (Fed. Cir. 2017) ("[I]n ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct." (quotation marks and citation omitted)).  At minimum, and as this Court has already held, an alleged infringer's "continued sale of the infringing product without removing its

---

[11]  PM USA agreed to "drop[] its claim for pre-suit damages for infringement of the '545 Patent" and "not pursue any claim for damages arising from alleged acts of infringement of the '545 Patent occurring before June 29, 2020," the date that PM USA filed its complaint alleging infringement of the '545 Patent.  Doc. 549 (Joint Pre-Trial Stipulation) ¶ 4.  Because PM USA has dropped its claim for damages arising from pre-suit conduct as to the '545 Patent, PM USA has no basis for seeking enhanced damages as to the '545 Patent.

infringing capability is merely typical infringement behavior that is not a proper basis for enhanced damages." *TecSec*, 2019 WL 1233882, at *2.  Thus, the post-lawsuit conduct identified by Defendants is inadequate, as "'[n]o reasonable jury could find willful infringement based on' evidence that the defendant 'has continued to update, produce, and sell' the infringing product after the suit was filed." *Id.* (quoting *Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 612 (D. Del. 2017)).

*Third*, Defendants point to purported evidence of Reynolds's pre-suit awareness of the allegedly infringed patents:  (1) Some of the allegedly infringed patents (or their applications) came up during the patent-application process for Reynolds's allegedly infringing products, SUF ¶ 42(c); and (2) ██████████████████████████████████████ ███████████████████   SUF ¶ 42(d).  During discovery, Defendants emphasized that "Reynolds developed, launched and made available for sale in the United States the Reynolds Accused Products after it became aware of" certain patents. Ex. O (Altria and PM USA Interrogs.) at 10 (making this argument as to the '545 Patent); *accord* Ex. P (PMP Interrogs.) at 9 (same as to the '911, '265, and '556 Patents).  But "the mere knowledge of plaintiff's patents, without more, is insufficient to support plaintiff's claim that defendant willfully infringed."  *Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*, No. 1:18-CV-760, 2019 WL 8107921, at *2 (E.D. Va. Feb. 26, 2019); *see also Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021) ("Knowledge of the asserted patent and evidence of infringement is necessary, but not sufficient, for a finding of willfulness."). Speaking to a specific example of the general point, Judge Ellis in *Bushnell* dismissed a claim alleging willful infringement, holding that the "mere fact that the patent examiner cited [the allegedly infringed patent] in defendant's patent application in no way shows that defendant was put on notice that using its patent and the associated product in the marketplace would likely infringe plaintiff's patent or that defendant's conduct was otherwise egregious."  *Bushnell*, 2019 WL 8107921, at *2.  Likewise, the Federal Circuit has concluded that testimony "concerning [defendants'] awareness of the patent application that issued as the [allegedly infringed patent]" was inadequate to support to a finding of willfulness. *Bayer Healthcare*,  989 F.3d at 987.  Defendants'

evidence of purported pre-suit awareness of the asserted patents thus cannot support their claim for enhanced damages.

*Finally*, during discovery Defendants listed a litany of documents that do not mention a single patent, let alone any of the asserted patents—and therefore cannot possibly support a finding that Reynolds deliberately and intentionally infringed the asserted patents. *See Halo*, 136 S.Ct. at 1932. Among these are ███████████████████████████████████████████ ██████████████████████████████████████████████████████ SUF ¶ 43. Likewise, Defendants pointed to █████████████ and other reports that discuss how particular products work—none of which mention any patent. SUF ¶ 44. At most, some of the documents show that ██████████████████████████████████████████████████ ███████████████████████████; the documents "in no way show[] that [Reynolds] was put on notice that using its patent and the associated product in the marketplace would likely infringe plaintiff's patent or that [Reynolds's] conduct was otherwise egregious." *Bushnell*, 2019 WL 8107921, at *2. Moreover, many of these documents ████████████████ ██████████████████████████ and thus are irrelevant to the willful-infringement assessment for that additional reason.[12] *See supra* p. 28.

In sum, Defendants have not presented any evidence that would allow a reasonable finding that they have carried their burden to prove that Reynolds willfully infringed the asserted patents.

## CONCLUSION

Summary judgment should be entered in Reynolds's favor as to the infringement accusations for the '374 and '911 Patents, and the claim for enhanced damages as to all patents-in-suit.

---

[12] ████████████████████ ████████████████ ████████████████████ ████████████████████████████████████████████████████████████

Dated: June 2, 2021

Stephanie E. Parker
JONES DAY
1221 Peachtree Street, N.E.
Suite 400
Atlanta, GA 30309
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Email: separker@jonesday.com


Anthony M. Insogna
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178
Email: aminsogna@jonesday.com


William E. Devitt
JONES DAY
77 West Wacker
Suite 3500
Chicago, IL 60601
Telephone: (312) 269-4240
Facsimile: (312) 782-8585
Email: wdevitt@jonesday.com


Sanjiv P. Laud
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, Minnesota 55402
Telephone: (612) 217-8800
Facsimile: (844) 345-3178
Email: slaud@jonesday.com

Respectfully submitted,

*/s/ David M. Maiorana*
David M. Maiorana (VA Bar No. 42334)
Ryan B. McCrum
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com
Email: rbmccrum@jonesday.com


John J. Normile
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: jjnormile@jonesday.com


Alexis A. Smith
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 243-2653
Facsimile: (213) 243-2539
Email: asmith@jonesday.com


Charles B. Molster, III Va. Bar No. 23613
THE LAW OFFICES OF
CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W. Suite M
Washington, DC 20007
Telephone: (703) 346-1505
Email: cmolster@molsterlaw.com


*Counsel for Plaintiffs RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company*

-30-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of June, 2021, a true and correct copy of the foregoing was served using the Court's CM/ECF system, with electronic notification of such filing to all counsel of record.

<div style="margin-left:50%">

*/s/ David M. Maiorana*
David M. Maiorana (VA Bar No. 42334)
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com

</div>