**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

RAI STRATEGIC HOLDINGS, INC. and
R.J. REYNOLDS VAPOR COMPANY,

Plaintiffs and Counterclaim Defendants,

      v.

ALTRIA CLIENT SERVICES LLC; PHILIP
MORRIS USA INC.; and PHILIP MORRIS
PRODUCTS S.A.,

Defendants and Counterclaim Plaintiffs.

Case No. 1:20-cv-00393-LO-TCB

**REDACTED**

**OPPOSITION TO PM/ALTRIA'S *DAUBERT* MOTION TO**
**<u>EXCLUDE THE TESTIMONY OF RYAN SULLIVAN</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

I.      THE EXPERTS' REASONABLE ROYALTY ANALYSES ........................... 2

II.     THE TWO FONTEM AGREEMENTS RELIED UPON BY THE EXPERTS............... 3

III.    DR. SULLIVAN'S ANALYSIS AND OPINIONS BASED ON THE MOST
        COMPARABLE LICENSE AGREEMENT. ................................................ 5

LEGAL STANDARD ......................................................................................... 7

ARGUMENT ....................................................................................................... 8

I.      DR. SULLIVAN'S ANALYSIS OF THE FONTEM–RJRV AGREEMENT IS
        ADMISSIBLE TO ASSIST THE JURY. ................................................. 8

        A.      Dr. Sullivan Appropriately Uses The Most Comparable Fontem–RJRV
                Agreement. ......................................................................... 9

        B.      Dr. Sullivan Properly Relied On Reynolds's 2020 Forecasted Sales. ................. 10

II.     DR. SULLIVAN PROPERLY DID NOT RELY ON THE PHANTOM ██
        ANALYSIS............................................................................... 18

III.    DR. SULLIVAN PROPERLY CONSIDERED DESIGN-AROUND OPTIONS. ......... 22

CONCLUSION.................................................................................................. 28

## TABLE OF AUTHORITIES

Page

CASES

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson v.
  Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) .......................................................14, 24

*Aqua Shield v. Inter Pool Cover Team*,
  774 F.3d 766 (Fed. Cir. 2014).........................................................................................25, 27

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015)............................................................................................27

*Baltimore Aircoil Co. v. SPX Cooling Techs. Inc.*,
  No. CCB-13-2053, 2016 WL 4426681 (D. Md. Aug. 22, 2016), *aff'd*, 721 F.
  App'x 983 (Fed. Cir. 2018)..................................................................................................10

*Baxter Int'l, Inc. v. Becton, Dickinson & Co.*,
  No. 17C7576, 2020 WL 424918 (N.D. Ill. Jan. 27, 2020) ....................................................25

*Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*,
  No. 2:18cv585, 2021 WL 6034269 (E.D. Va. Dec. 10, 2021) ...............................................15

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,
  No. 09-290, 2012 WL 3686736 (W.D. Pa. Aug. 24, 2012)....................................8, 23, 24, 27

*Commissariat a L'energie Atomique v. Samsung Elecs. Co.*,
  No. 03-484 KAJ, 2006 WL 8452836 (D. Del. Apr. 13, 2006) ...............................................16

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015)............................................................................................15

*Commonwealth Sci. & Indus. Rsch. Organisation v. Mediatek Inc.*,
  No. 6:12-CV-578, 2015 WL 12806515 (E.D. Tex. June 29, 2015) ........................................10

*Covidien Sales LLC v. Ethicon Endo-Surgery, Inc.*,
  No. 1:11-cv-871, 2020 WL 7040643 (S.D. Ohio Dec. 1, 2020)..............................................25

*Datascope Corp. v. SMEC, Inc.*,
  879 F.2d 820 (Fed. Cir. 1989)...............................................................................................26

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009).....................................................................................26

*ePlus, Inc. v. Lawson Software, Inc.*,
  764 F. Supp. 2d 807 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012).........................11

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014)....................................................................................28

*Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*,
  No. 03-cv-1431, 2006 WL 1390416 (N.D. Cal. May 18, 2006).............................................23

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970)..................................................................................7

*Grain Processing Corp. v. Am. Maize-Prod. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)....................................................................................26

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
  378 F. Supp. 2d 459 (D. Del. 2005)................................................................................16

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ..................................................7, 14

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  No. 2:06-CV-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011), *objections
  overruled*, 2011 WL 13196509 (E.D. Tex. Jan. 28, 2011) ....................................................27

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009).................................................................................7, 16

*Mars, Inc. v. Coin Acceptors, Inc.*,
  527 F.3d 1359 (Fed. Cir. 2008).................................................................................8, 25

*Meyer Intell. Properties Ltd. v. Bodum, Inc.*,
  690 F.3d 1354 (Fed. Cir. 2012)....................................................................................23

*Open Text S.A. v. Box, Inc.*,
  No. 13-cv-04910-JD, 2015 WL 393858 (N.D. Cal. Jan. 29, 2015).........................................27

*Pavo Sols. LLC v. Kingston Tech. Co.*,
  No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163 (C.D. Cal. Nov. 20, 2019).........................10

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
   849 F.3d 1360 (Fed. Cir. 2017)..................................................................................8, 25

*Sherwin-Williams Co. v. PPG Indus., Inc.*,
   No. 17-1023, 2020 WL 1283465 (W.D. Pa. 2020)................................................................27

*Silicon Knights, Inc. v. Epic Games, Inc.*,
   551 F. App'x 646 (4th Cir. 2014) ..........................................................................................8

*Smart Skins LLC v. Microsoft Corp.*,
   No. C15544-MJP, 2016 WL 4148091 (W.D. Wash. July 1, 2016)........................................26

*Summit 6, LLC v. Samsung Elecs. Co.*,
   802 F.3d 1283 (Fed. Cir. 2015)..............................................................................................7

*SynQor, Inc. v. Artesyn Tech., Inc.*,
   709 F.3d 1365 (Fed. Cir. 2013).............................................................................................27

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984)............................................................................................16

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012)..................................................................................................9

## OTHER AUTHORITIES

Fed. R. Evid. 702 ........................................................................................................................7

## INTRODUCTION

Each of PM/Altria's criticisms of Dr. Sullivan's opinions is wrong on the facts and the law, and PM/Altria's motion should be denied.  First, PM/Altria takes issue with Dr. Sullivan's use of a 2020 Reynolds[1] sales forecast, as opposed to a 2018 forecast used by PM/Altria, to determine the effective royalty rate under the undisputed most comparable license agreement between Fontem and RJRV.  But, on the facts, Reynolds's 2020 forecast was created in the ordinary course of Reynolds's business (just like the 2018 forecast), and the 2020 forecast provided the most reliable data for Dr. Sullivan's calculation in early 2021.  And, under the law, Dr. Sullivan was right to use the 2020 forecast because his task was to calculate, as precisely as possible, the effective royalty rate that RJRV *actually* paid under the Fontem agreement.  Dr. Sullivan's calculation of the effective royalty rate is more than reliable—it is conservative given the modest royalty base he included.  The fact that PM/Altria considers RJRV's payment to Fontem to be a relatively low royalty rate simply does not provide a basis to exclude Dr. Sullivan's opinions.

Next, PM/Altria argues that Dr. Sullivan's Fontem–RJRV effective royalty rate allegedly "contradicts the conclusion" of a ███████████████████████ of the Fontem–RJRV agreement.  That is pure vapor.  Dr. Sullivan has *never* seen that alleged ███ analysis because PM/Altria never produced it, and it is indisputably *not in the record*.  Dr. Sullivan and PM/Altria's damages expert have no basis to be certain that an ███ analysis of the Fontem–RJRV agreement even exists, let alone whether its analysis or conclusions are reasonable and relevant to the damages issues in this case.  Dr. Sullivan was right not to rely on PM/Altria's speculation about the ███ analysis—to do so would have been an error.

---

[1] The term "Reynolds" refers to the plaintiffs and counterclaim defendants, RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company, collectively.  The term "RJRV" refers to R.J. Reynolds Vapor Company only, such as in relation to its license agreement with Fontem.

Finally, PM/Altria claims Dr. Sullivan should not have considered Reynolds's design-arounds for the '265 and '911 patents as part of the reasonable royalty analysis because those design-arounds had not received regulatory approval as of the date of the hypothetical negotiation. But the law does not impose such a sweeping prohibition on the consideration of design alternatives in a reasonable royalty analysis. To the contrary, the caselaw supports Dr. Sullivan's consideration of Reynolds's '911 and '265 design-arounds. The parties would take into account possible alternative designs at the hypothetical negotiation, both because the cost and feasibility of such alternative designs is relevant to the incremental value of PM/Altria's patented technology, and because the hypothetical negotiators would take into account the possibility that alternatives would become available during the remaining life of the asserted patents. At most, PM/Altria's complaints about the design-around evidence should be the subject of cross-examination, and they provide no basis to exclude Dr. Sullivan's opinions.

Because Dr. Sullivan's opinions are based on a reliable methodology and are closely tied to the facts of this case, they are admissible under Rule 702.

## FACTUAL BACKGROUND

### I. THE EXPERTS' REASONABLE ROYALTY ANALYSES.

PM/Altria bears the burden of proving damages for any Reynolds infringement. PM/Altria served the Opening Expert Report of Mr. Meyer setting forth its position on February 24, 2021 (the "Original Meyer Report"). In rebuttal, Reynolds served the Expert Report of Dr. Sullivan on March 24, 2021, discussing the fundamental errors in Mr. Meyer's opinions as well as Dr. Sullivan's opinions regarding damages for any Reynolds infringement (the "Sullivan Report").

Mr. Meyer amended his report on April 26, 2021 (the "Meyer Report,") (Dkt. 892-1).[2]

The parties' experts both agree that damages for the '545, '265, '911, and '374 patents should be in the form of a running royalty determined by looking to what PM/Altria and Reynolds would have agreed to in hypothetical negotiations between the parties on the eve of alleged infringement of each patent. *See* Dkt. 892-1, § VI.C; Excerpts of the Sullivan Report (attached as Exhibit 1), § 9. In other words, the experts considered what Reynolds, as a willing licensee, would have hypothetically agreed to pay for non-exclusive U.S. licenses to the patents and what PM/Altria, as a willing licensor, would have agreed to accept: on or around March 2013 for the '545 patent, on or around August 2018 for the '265 patent, on or around October 2018 for the '911 patent,[3] and on or around September 2019 for the '374 patent. Ex. 1, ¶¶ 183-188; *see also* Dkt. 892-1, ¶¶ 23, 121-124, 127-128, 130; *see also* Excerpts of May 7, 2021 Deposition of Paul K. Meyer (Dkt. 892-3), 52:1-5. Both experts look to other market transactions in determining those reasonable royalties.

## II.   THE TWO FONTEM AGREEMENTS RELIED UPON BY THE EXPERTS.

There are two, and only two, litigation settlement license agreements involving Fontem's patent portfolio that are relevant to this motion.[4]

**A. The Fontem–RJRV Agreement.** Fontem Ventures B.V. and Fontem Holdings 1 B.V. (collectively, "Fontem") and RJRV executed the Fontem–RJRV agreement effective September

---

[2] Mr. Meyer also submitted a May 6, 2021 Supplemental Citations and Errata. Dr. Sullivan submitted an April 26, 2021 Supplemental Expert Report and a May 8, 2021 Supplemental Rebuttal Expert Report.

[3] Mr. Meyer contends that the hypothetical negotiation for the '911 patent would have taken place in August 2018, prior to the issuance of the patent. Dkt. 892-1, ¶¶ 121-124. Dr. Sullivan disagrees since there could be no infringement of the '911 patent before its issuance (Ex. 1, ¶ 190), but that disagreement is not relevant to the instant motion.

[4] No other Fontem license agreements were produced in this case.



24, 2018.  *See* Fontem–RJRV agreement (Dkt. 892-4).  Under the agreement, RJRV paid ███

███████████ for a nonexclusive license to Fontem's entire patent portfolio, ███████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Dkt. 892-

1, ¶¶ 198, 200; Dkt. 892-4, §§ 3, 5.  The term of the Fontem–RJRV agreement extends until the

last to expire of the licensed patents ████████████████████████████████

████████████████████████████████████████

████.  *See* Dkt 892-4, §§ 1.51, 4.1, Ex. A at 35 ██████████████████████

████████    The licensee of that agreement is RJRV—the *same* hypothetical licensee of the

patents asserted here.  Dkt. 892-1, ¶¶ 215-217, 267; Ex. 1, ¶ 263.  The products licensed under that

agreement include all of the *same* VUSE products accused here.  Dkt 892-1, ¶¶ 215-217, 267; *see

also id.*, ¶¶ 218-219 (discussing the other reasons why the Fontem–RJRV agreement is

economically comparable); Ex. 1, ¶ 263.

Both sides' experts agree that the Fontem–RJRV agreement covers patents that are

technically comparable to the '545, '911, and '265 patents.  *E.g.*, Dkt. 892-1, ¶¶ 201-204; Ex. 1,

¶ 263.  Reynolds's experts opine that the Fontem–RJRV agreement also covers patents that are

technically comparable to the '374 patent, which cites several of the licensed Fontem patents.

Ex. 1, ¶ 263 & n.587, ¶ 266.

**B.  The ████████████ Agreement.**  The ████████████ agreement effective on

█████████████, was executed in connection with the settlement of litigation between ████████

████████████████████████ *See* Dkt. 892-5.  The licensee was ████████

(not the hypothetical licensee here, or even a party here).  The products covered by the ████████

█████████████████████████████████████████ which are not at issue in this

lawsuit. ████████████████████████████████████████████████

███████████████████████████████████.  *See* Dkt 892-3, 83:21-84:1.  The

agreement also provided for ██████████████████████████████████

█████████████████████████████████.  Dkt. 892-5, § 6.3.

## III.    DR. SULLIVAN'S ANALYSIS AND OPINIONS BASED ON THE MOST COMPARABLE LICENSE AGREEMENT.

Dr. Sullivan relied on the *indisputably* most comparable license agreement between

Fontem and RJRV, involving the same licensee and covering the same VUSE products accused

here, in setting the reasonable royalty for any RJRV infringement of the '545, '265, '911, and '374

patents.  Ex. 1, ¶ 263; *see also* Dkt. 892-1, ¶ 267 (Mr. Meyer explaining that "the ████████

██████████████████████████ is less relevant than the ████████████ RJRV paid to

Fontem" because "the ████████████████ is attributable to the Accused VUSE Products

and therefore reflects more accurate sales levels and market share").  However, there were some

economic differences relating to the form of payment and duration of the license that Dr. Sullivan

needed to account for in using the Fontem–RJRV agreement to set a royalty here.

Specifically, because the Fontem–RJRV agreement involved a ████████████████

████████████████████, Dr. Sullivan calculated the effective percentage running

royalty paid by RJRV to Fontem.  Ex. 1, ¶¶ 264-265.  To do that, Dr. Sullivan took the ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████.  *Id.*, ¶ 265.  In calculating the covered VUSE net sales, Dr. Sullivan added the

actual VUSE sales through December 31, 2020 (the actual sales data available at the time of his

report) plus Reynolds's business forecast of VUSE sales for 2021 through 2025[5] (which was actually conservative given that the license term covers many additional years of sales after 2025). Dr. Sullivan discounted the value of those sales ███████████████████████ — September 2018.  Ex. 1, ¶ 265 & nn. 589-591, Attach. D-4, D-5.

Effective Rate of Fontem–RJRV = ██████████████████████████

Finally, Dr. Sullivan apportioned the ████ paid by RJRV to Fontem using PM/Altria's experts' apportionment of value among five of the licensed Fontem patent families.[6]  *Id.*, ¶¶ 267-269, 272-273, 276-277, 279-280.  Specifically, Dr. Sullivan concluded (based on input from Reynolds's technical experts and the apportionment that PM/Altria made among the various Fontem families):  (a) the reasonable royalty for the '545 patent is ████ of net sales (*i.e.*, ████ x 0.35) (*id.*, ¶ 269); (b) the reasonable royalty for the '265 patent is ████ of net sales (*i.e.*, ████ x 0.10) (*id.*, ¶ 273); (c) the reasonable royalty for the '911 patent is ████ of net sales (*i.e.*, ████ x 0.35) (*id.*, ¶ 280); and (d) the reasonable royalty for the '374 patent is ████ of net sales (*i.e.*, ████ x 0.10) (*id.*, ¶ 277).  <u>In total, Dr. Sullivan's opinions result in an upper limit royalty for the four asserted patents that is equivalent to 90%[7] of the rate RJRV paid for a license to Fontem's ████████████████████ as of September 2018.</u>

---

[5] Mr. Meyer similarly looks at the Reynolds actual sales of VUSE products through December 31, 2020 as well as forecasted sales through 2023 in attempting to reconcile his royalty opinion based upon the ████ rate appearing in the ██████████ agreement.  *See* Dkt. 892-1, ¶ 268 & n.409.

[6] While the PM/Altria apportionment of relative values among the five Fontem patent families overstates the value of each included family given that the Fontem portfolio included many other patents, Dr. Sullivan conservatively adopted the PM/Altria apportionment in his rebuttal opinion.

[7] 35% for the '545 + 10% for the '265 + 35% for the '911 + 10% for the '374 = 90% for the four asserted patents collectively.

## **LEGAL STANDARD**

Expert testimony is proper where "(a) the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts."  Fed. R. Evid. 702. "[I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).  Instead, "where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).

In assessing a reasonable royalty, experts may look to comparable licenses.  *See, e.g.*, *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (identifying as the second *Georgia-Pacific* factor "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit").  The analysis properly includes converting a comparable agreement's lump sum royalty to a running royalty by calculating an effective royalty.  *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009).  Disagreements regarding the data an expert relies upon in calculating an effective royalty is grounds for cross-examination, not exclusion.  *See i4i Ltd. P'ship*, 598 F.3d at 855–56 ("[The] expert could have used other data in his calculations.  The existence of other facts, however, does not mean that the facts used failed to meet the minimum standards of relevance or reliability.").[8]

---

[8] Emphasis is added and internal citations and quotation marks are omitted throughout, except where otherwise noted.

Experts may also rely on the existence of non-infringing alternatives as a factor relevant to assessing reasonable royalty damages.  *See, e.g.*, *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) ("A price for a hypothetical license may appropriately be based on consideration of the costs and availability of non-infringing alternatives.").  Where an alleged infringer has or "probably could have designed" a non-infringing alternative, that may be a basis for decreasing the royalty.  *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008) *recalled and amended on other grounds by Mars, Inc. v. Coin Acceptors, Inc.*, 557 F.3d 1377, 1378 (Fed. Cir. 2009).  "[T]he question of whether there is a noninfringing substitute is a question of fact, such that a court should not determine the issue by way of a *Daubert* review." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 3686736, at *5 (W.D. Pa. Aug. 24, 2012).

## ARGUMENT

### I.   DR. SULLIVAN'S ANALYSIS OF THE FONTEM–RJRV AGREEMENT IS ADMISSIBLE TO ASSIST THE JURY.

Dr. Sullivan properly looks to the undisputed *most* comparable license agreement, the Fontem–RJRV agreement, to calculate a reasonable royalty in this case.  Indeed, PM/Altria's motion does not challenge Dr. Sullivan's reliance on the Fontem–RJRV agreement[9] or his method

---

[9] PM/Altria alludes in a footnote to Dr. Sullivan's failure to rely on the ████████████ agreement, as an additional basis for excluding his opinion.  *See* Dkt. 915, n.9.  The fundamental error in Mr. Meyer's use of that agreement to value the '374 patent is discussed in Reynolds's motion to exclude Mr. Meyer's testimony.  *See* Dkt. 892.  However, Dr. Sullivan properly relied on technical expert analysis to conclude that the Fontem–RJRV agreement was technically comparable to the '374 patent.  *See* Ex. 1, ¶ 276.  And there is no real dispute that the Fontem–RJRV agreement is much more economically relevant than the ███████████ Mr. Meyer uses.  Because Dr. Sullivan's use of the Fontem–RJRV agreement to derive a royalty rate for the '374 patent is not substantively challenged in PM/Altria's motion (and is only referenced in a footnote), Reynolds does not address this issue in more detail here.  *See Silicon Knights, Inc. v. Epic Games, Inc.*, 551 F. App'x 646, 650 (4th Cir. 2014) ("[A]n issue raised only in a footnote and addressed with only declarative sentences is waived.").

of calculating the effective royalty for that agreement by looking to the present value (as of September 2018) of covered VUSE sales.  Instead, PM/Altria challenges just a part of one input to Dr. Sullivan's equation—the inclusion of Reynolds's 2020 forecast of VUSE sales from 2021-2025 as part of the undisputed covered royalty base.  PM/Altria's challenge is misguided.

### A.    Dr. Sullivan Appropriately Uses The Most Comparable Fontem–RJRV Agreement.

As an initial matter, PM/Altria's motion does not challenge Dr. Sullivan's use of the Fontem–RJRV agreement as a comparable license or his methodology in converting the █████████ ███████ under that agreement into an effective royalty rate.  Mr. Meyer agrees the Fontem–RJRV agreement is both economically and technically comparable to the hypothetical license between PM/Altria and RJRV here, because it covers the same VUSE products and involves the same licensee.  *See* Dkt. 892-1, ¶¶ 216, 267.[10]

It was also proper for Dr. Sullivan to convert the ████████████ by RJRV into an effective running royalty rate, under both the caselaw and accepted practice in the field of economics.  *See, e.g.*, *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 30 & n.13 (Fed. Cir. 2012) (citing with approval expert converting lump-sum payment into an effective royalty rate by dividing the license fee by the revenue generated by infringing sales); *see also* Sidak, G. (2016), "Converting Royalty Payment Structures for Patent Licenses," The Criterion Journal on Innovation, 1:901–914, at 906 ("Dividing the lump-sum royalty payment by the present value of the licensee's projected sales revenue . . . , one can calculate the derived royalty rate of a lump-sum royalty payment.").

---

[10] *See also* Dkt. 892-1, ¶ 193 (concluding the Fontem–RJRV agreement is "highly instructive when determining a reasonable royalty for a license to the '545, '911, and '265 Patents."); *see also id.*, ¶¶ 236, 239, 242 (opining that the Fontem–RJRV agreement provides "an accurate and reliable indicator of the value of the technology claimed in the ['545, '911, and '265 patents]").

In this case, Dr. Sullivan provides a thorough explanation of his conversion of the Fontem–

RJRV ███████████ to an effective running royalty, using data collected and prepared in the

ordinary course of Reynolds's business, making the cases PM/Altria cites inapposite.[11]

### B. Dr. Sullivan Properly Relied On Reynolds's 2020 Forecasted Sales.

Unable to challenge Dr. Sullivan's methodology, PM/Altria challenges his use of the 2020

forecast of VUSE sales covered under the Fontem–RJRV agreement.  But PM/Altria's factual

critique is both wrong and insufficient to warrant exclusion of his opinions.  *See Commonwealth*

*Sci. & Indus. Rsch. Organisation v. Mediatek Inc.*, No. 6:12-CV-578, 2015 WL 12806515, at *3–

4 (E.D. Tex. June 29, 2015) (concluding that issues with effective royalty calculation were "better

addressed by cross examination rather than exclusion").

### 1. Dr. Sullivan calculated the effective royalty rate using actual sales and an actual Reynolds 2020 forecast.

Dr. Sullivan determined the effective royalty rate paid by Reynolds to

Fontem using the best data as of the time he rendered his opinion in March 2021—Reynolds's

actual sales through 2020 and the 2020 sales forecast (forecasting sales from 2021 through 2025).

PM/Altria's complaint is centered around Dr. Sullivan's use of the 2020 forecast as

opposed to the 2018 forecast that Mr. Meyer used.  PM/Altria incorrectly asserts the 2020 forecast

was "litigation-inspired" because it was created after this case was filed.  *Ipso facto*, the 2020

---

[11] For example, in *Baltimore Aircoil Co. v. SPX Cooling Techs. Inc.*, the expert did not have any of the licensee's sales data to calculate an effective royalty.  Instead, he used a *different company's sales data* without explanation.  No. CCB-13-2053, 2016 WL 4426681, at *25 (D. Md. Aug. 22, 2016), *aff'd*, 721 F. App'x 983 (Fed. Cir. 2018); *see also Pavo Sols. LLC v. Kingston Tech. Co.*, No. 8:14-cv-01352-JLS-KES, 2019 WL 8138163, at *4-5 (C.D. Cal. Nov. 20, 2019) (excluding opinion where expert used the number of a party's stores as a "stand-in" for actual sales data, but explaining that lump sum agreements are nevertheless properly admissible as evidence of a running royalty where "experts properly explain their calculations and why they believe that the lump-sum agreements apply to the facts of the case.").

forecast was indeed created after this case was filed in April 2020, but it is one of the ██████

████████████████████████████████████████████████████ Excerpts of Apr. 16, 2021

Deposition of John Scott Peddycord (attached as Exhibit 2), 29:25-30:20, 35:13-36:10, 63:24-64:1,

134:15-135:14.  Reynolds relies on those ████████████ forecasts in making business decisions.

*See id.*, 72:10-16.   Thus, while the 2020 forecast was pulled from the Reynolds system and

produced as part of this litigation—as was, for instance, all of Reynolds's financial data in the

record—the data was not created *for* purposes of litigation.  *See id.*, 133:18-134:3.  Accordingly,

there is no difference in the provenance of the 2018 forecast PM/Altria prefers and the 2020

forecast Dr. Sullivan used.[12]

Further, the 2020 forecast is actually a more accurate indicator of Reynolds's expected

actual sales as of the time of the experts' reports (including because it is based on an additional

two years of actual sales history).  PM/Altria selectively claims that only the September 2018

forecast (Dkt. 915, 1-2) is considered the "best [] forecast data," when in reality, Reynolds's

witness explained the ████████████████████████████████████████████████

████████████████████████   *See* Ex. 2, 75:24-76:9 (discussing a forecast prepared in June 2018); *see*

*also id.*, 77:6-12.  PM/Altria also misleadingly emphasizes Mr. Peddycord's testimony that ██

████████████████████████████ to criticize Dr. Sullivan's use of the 2020 forecast.  Dkt.

915, 15.  But this criticism is ████████████████ because ████████████████████ as

explained by Mr. Peddycord.  Ex.2, 90:17-21, 90:25-91:9.  Accordingly, the 2020 forecast

---

[12] The *ePlus* case, cited by PM/Altria, actually shows why Dr. Sullivan's approach is *proper*.  In
that case, the expert relied on outdated sales figures and projections *from another litigation*, as
opposed to what Dr. Sullivan relies on—actual sales and actual projections obtained directly from
Reynolds.  *ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 810–11, 814 (E.D. Va. 2011),
*aff'd*, 700 F.3d 509 (Fed. Cir. 2012).

PM/Altria impugns is just as reliable as the 2018 forecast its expert prefers. And, it is even more accurate because it was the most recent forecast data available at the time the experts prepared their reports, and therefore provided a more accurate picture of the effective royalty rate Reynolds actually paid for the Fontem license.

PM/Altria's real complaint is that *it* contends the 2020 forecast is too high. That, of course, provides no basis for excluding Dr. Sullivan's opinion. And as PM/Altria elsewhere acknowledges, the vapor market has been growing rapidly. *See, e.g.*, Dkt. 892-1, ¶ 65 ("[T]he value of the U.S. E-Vapor market grew from $2.6 billion to $6.8 billion between 2014 and 2018."); *see also id.*, ¶ 387 (discussing a March 2019 BNP analyst report identifying that, "after only a few months in the market, this new innovation [referring to the VUSE Alto] is growing very fast with a very high conversion rate."). It is therefore no surprise that sales projections for Alto would be higher in 2020—two years after Reynolds launched Alto and after two years of Alto's market growth—than in 2018, when Reynolds first introduced Alto. Even considering that growth, however, PM/Altria's table, ostensibly showing the difference between the 2018 and 2020 forecasts for Alto sales, distorts the numbers. For example, it compares the first years of each forecast, but "Year 1" from the 2018 forecast is 2018 whereas "Year 1" from the 2020 forecast is 2020. A corrected table showing differences by year is provided below and demonstrates that the difference between the two forecasts is less than half of what PM/Altria misleadingly claims:[13]

---

[13] 2018 Forecast (Dkt. 915-13 (Note that the native documents in PM/Altria's Exhibits 12 and 13 appear to have been swapped so that Dkt. 915-13 is the 2018 forecast data, while Dkt. 915-12 is the 2020 forecast data)), ███████████████████████████████; 2020 Forecast (Dkt. 915-12), ████████████████████.

| Alto Forecast | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | | | |
| 2020 | | | | | | | | | |
| Difference | | | | | | | | | |

*Figures in thousands.*

Further, now that the parties have the benefit of the actual 2021 sales data, the undisputable facts are that the 2020 forecast is closer to the actual sales than the 2018 forecast, ███████. Indeed, while PM/Altria cries foul because the 2020 forecast "████████ ██" of ███████ in sales of Alto in 2021 (Dkt. 915, 15), the actual sales of Alto in 2021 were ███████. Excerpt of 2021 VUSE Financials (attached as Exhibit 3).[14] This should put PM/Altria's concerns to rest.

Finally, Dr. Sullivan's royalty is conservative for the additional reason that he uses actual and projected sales through only 2025 in calculating the effective royalty rate. Ex. 1, ¶ 265. The parties agree that the Fontem patents do not expire until at least 2030.[15] Dr. Sullivan's calculation of Reynolds's effective royalty rate thus does not include at least five years (but in reality, more than ███████) of revenue from the royalty base such that the resulting royalty is overstated and

---

[14] PM/Altria also selectively disregards the forecasts for other VUSE products covered under the Fontem–RJRV agreement, where the 2020 forecast shows ████████ than the 2018 forecast. For example, the 2018 forecast projects ████████, whereas the forecasted volume for ████████ *Compare* Dkt. 915-12, tab ████████, *with* Dkt. 915-13, tab ████. But whether the expectations were adjusted up or down is irrelevant; the fact remains that the 2020 forecast reflected Reynolds's most up-to-date business expectations as of the time it was created. *See* Ex. 2, 75:24-76:4.

[15] Mr. Meyer agrees that the Fontem–RJRV license covers VUSE sales through at least 2030. *See* Dkt. 892-3, at 129:4-8. Though not essential to the analysis here, Reynolds notes that the Fontem patents, and Reynolds's licenses thereto, actually extend ███████. *See, supra,* 4.

a cap on the reasonable royalty in this case.  *See* Ex. 1, ¶ 265 & n.591.  As an additional conservative step, Dr. Sullivan adopts PM/Altria's apportionment of the Fontem royalty such that the royalty for the four asserted patents is equivalent to *90%* of the rate RJRV paid for a license to Fontem's entire portfolio.

Far from being exaggerated, Dr. Sullivan's approach results in an effective royalty rate for the Fontem–RJRV agreement that is both reliable and conservative.  To the extent PM/Altria disagrees, it may address that via cross-examination of Dr. Sullivan at trial.  *See, e.g.*, *i4i Ltd. P'ship*, 598 F.3d at 855–56 ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury.").

**2.  PM/Altria misinterprets the role of comparable license agreements.**  PM/Altria conflates the calculation of an effective royalty rate (as is done in assessing the Fontem–RJRV agreement, such as under *Georgia-Pacific* factor two—"[t]he rate[] paid by the licensee [RJRV] for the use of other patents comparable to the patents in suit"), and the framework of the hypothetical negotiation between PM/Altria and RJRV, by suggesting that it is proper to look only to information available to Fontem and RJRV at the time of their agreement.  But the Fontem–RJRV agreement is not hypothetical; the agreement exists and its terms are a matter of fact.  Accordingly, the hypothetical negotiation framework does not apply to the non-hypothetical, executed agreement between Fontem and RJRV, and PM/Altria cites no authority holding otherwise.  Instead, the purpose of looking to a comparable license agreement as part of a reasonable royalty analysis is to ascertain the value of the patent by comparing it to similar market transactions.  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("As we have held many times, using sufficiently comparable licenses is a generally reliable method of

estimating the value of a patent."); *see also Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015) (explaining that a method of valuing patents based on comparable licenses is reliable "because the parties are constrained by the market's actual valuation of the patent").

The valuation of the comparable license, in this case the Fontem–RJRV agreement, is properly made based on *actual* performance in the marketplace. There is no requirement that the valuation look at what the parties to a comparable agreement subjectively believed at an earlier time. This is because the purpose is to calculate, as precisely as possible, the effective rate *actually paid* by the licensee in the comparable agreement. It is therefore proper to look to current, actual data regarding covered sales as opposed to limiting the analysis to only the data known at the time of the comparable transaction. *C.f.*, *Biedermann Techs. GmbH & Co. KG v. K2M, Inc.*, No. 2:18cv585, 2021 WL 6034269, at *10 (E.D. Va. Dec. 10, 2021) (criticizing expert who "did not, for example, calculate an effective royalty rate, based on actual sales numbers [of the licensee's] licensed products, for the [Redacted] called for in that settlement license, so as to approximate the [Redacted] paid.").

Mr. Meyer acknowledges the propriety of looking at actual sales in order to calculate an effective royalty rate for the Fontem–RJRV agreement. Rather than limiting his analysis to information available as of the 2018 execution date of the Fontem–RJRV agreement, he originally relied on Reynolds's actual sales through 2020 when comparing the Fontem–RJRV royalty to the ████████████████████████████████. *See* Dkt. 892-1, ¶ 268. But that calculation inexplicably ignores more than ten years remaining on the life of the Fontem patents, resulting in an inflated royalty rate. In contrast, Dr. Sullivan relies on Reynolds's most recent sales forecast available at the time he prepared his report—including the 2020 forecast projecting sales through

2025—in order to capture sales under the agreement as accurately as possible.  Further, if one were to use actual VUSE sales through 2020 in evaluating the Fontem–RJRV agreement (as Mr. Meyer did), the most appropriate forecast to use is that which most closely align with those sales.  This is precisely the 2020 forecast Dr. Sullivan used, which  allowed him to make a more accurate estimate as to the effective royalty RJRV actually paid than Mr. Meyer's analysis that relied on actual VUSE sales through 2020 only.

   **3.  Federal courts also expressly permit consideration of post-hypothetical negotiation information under the book of wisdom.**  As explained above, Dr. Sullivan properly looks to actual sales and current sales forecasts to determine the actual effective royalty rate for the Fontem–RJRV agreement.  Dr. Sullivan's analysis is also proper because damages experts may consider information post-dating the hypothetical negotiation under the "book of wisdom." Specifically, the Federal Circuit has explained that evidence post-dating the hypothetical negotiation date may be useful to the jury, for example, where it "provide[s] information that the parties would frequently have estimated during the negotiation."  *Lucent Techs., Inc.*, 580 F.3d at 1333-34.  And the Federal Circuit has long held that "[e]vidence of the infringer's actual profits generally is admissible as probative of his anticipated profits."  *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984).

   Relying on this precedent, courts have rejected arguments that using post-negotiation projections is impermissible, concluding instead that "[t]hese most recent projections may approximate what will end up being the use made of the invention by [the infringer] more closely than do the [older] projections."  *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 466 (D. Del. 2005); *cf. Commissariat a L'energie Atomique v. Samsung Elecs. Co.*, No. 03-484 KAJ, 2006 WL 8452836, at *11 (D. Del. Apr. 13, 2006) ("[T]he *Georgia-Pacific* case that

guides this District in determinations of reasonable royalties does not impose a temporal limitation on the evidence a Court may consider.").  Reynolds's actual sales and updated sales forecast plainly fall into this class of admissible and reliable evidence.

PM/Altria fails to acknowledge the book of wisdom in its motion, though its own expert relies on it extensively.  Mr. Meyer expressly states:  "Relying on the doctrine referred to as the 'book of wisdom,' I assumed that the parties to the Hypothetical Negotiations would consider all available information, data and documents, whether dated before or after the Hypothetical Negotiation dates." Dkt. 892-1, ¶ 130.  To cite just a few examples, he relies on the ███████ ████ agreement to calculate a royalty for the '545 patent, even though that hypothetical negotiation occurred in 2013, ████ years before the ██████████ agreement existed.  *See id.*, ¶¶ 121, 243, 274-275.  Mr. Meyer also asserts that the parties to the 2013 hypothetical negotiation for the '545 patent would have considered the purported importance of the technology to FDA regulation that came into effect in 2016, even though there was no FDA regulation of e-cigarettes in 2013.  *See id.*, ¶¶ 66, 121, 514.  Mr. Meyer acknowledges that the FDA's rule setting out the relevant regulation was not issued until May 2016, years after the '545 hypothetical negotiation. *See id.*, ¶ 66.  Further, to apportion the value of the Fontem portfolio among the Fontem patents, he relies on post-negotiation information as to whether Fontem ever litigated the patents and whether patents ultimately issued on pending applications.  *See id.*, ¶ 230.  As to his '374 opinion, Mr. Meyer assigns all value from ████████████████████████████ to the '374 patent, despite the fact it was only a pending patent application at the time ████████████, relying on his post hoc knowledge that the patent issued.  *See id.*, ¶ 162.

* * *

-17-

Because Dr. Sullivan calculates an effective royalty for the Fontem–RJRV agreement by looking to the most accurate sales and forecast data available—which is itself reliable and reflective of the facts underlying this case—his opinion is admissible under Rule 702.

## II.   DR. SULLIVAN PROPERLY DID NOT RELY ON THE PHANTOM █████ ANALYSIS.

**1. Dr. Sullivan properly did not rely on any ██████████ analysis, because there is *no such analysis* in the record.** PM/Altria argues that Dr. Sullivan's opinion should be excluded because he supposedly ignored and "directly contradict[ed]" an ████████ analysis of the Fontem–RJRV effective royalty rate.  Dkt. 915, 18.  The problem with that argument is that PM/Altria never produced any ████ analysis, so neither Mr. Meyer nor Dr. Sullivan actually knows whether it exists or what any such analysis says.  *See* Dkt. 892-3, 103:22-25 ██████████
████████████████████████████████████████████████████████████
██████████████████████████████████████; *see also* Dkt. 892-6, 173:20-21.  In fact, Reynolds repeatedly asked PM/Altria for any ██████████████████████
██████████████████[16]  But PM/Altria *never* produced any ████████ analysis or conclusions that it now claims Dr. Sullivan should have relied upon.[17]

As a result, it is unknown whether an ████████ analyzed the Fontem–RJRV agreement, as opposed to some other agreement.  PM/Altria's Rule 30(b)(6) representative on the matter testified that "████████████████████████████████████████████████" Dkt 892-

---

[16] *See* Nov. 3, 2020 Michalik Ltr. to Koh; Nov. 6, 2020 Michalik Ltr. to Koh; Nov. 16, 2020 Michalik Ltr. to Koh; Nov. 16, 2020 Humphrey Ltr. to Michalik;  Nov. 20, 2020 Michalik Ltr. to Humphrey; Nov. 24, 2020 Humphry Ltr. to Michalik (attached as composite Exhibit 4).

[17] The only document related to the ██████ that PM/Altria produced was ████████████████ ██████████████████████████ produced as ALTRIA_IQOS_EDVA0000004620-24 (attached as Exhibit 5).  *See also* Composite Ex. 4, 6-8.

6, 173:10-13.   PM/Altria also asserts that Fontem did not enter into any subsequent license agreements apart from the Fontem–RJRV agreement, but the parties here do not have that information and PM/Altria's citation does not support its assertion.   Dkt. 915, 18-19.   Indeed, in the cited excerpt of Dr. Sullivan's deposition, he points out that no other Fontem licenses are in the record; he does not say Fontem did not enter into any subsequent license agreements.   *See* 915-4, 214:22-215:10.   Thus, PM/Altria misstates that it is "undisputed" that ███████████████

███████████████████.

Assuming arguendo that the ███████ did analyze the Fontem–RJRV agreement, there is no evidence of the ███████ conclusions on the effective royalty rate or that the █████ calculated an effective royalty rate at all.   PM/Altria's corporate representative testified that the ████████████████████████████████████ Dkt. 892-6, 173:20-24.   The ██████ of the agreement could, of course, refer to a number of factors apart from the effective royalty rate.   PM/Altria therefore seeks to infer the ███████ conclusion based upon only a ████████████████████████ ████████████████████████ . *See* Dkt. 892-5, § 6.10.4.   But there is no evidence the ███████ actually made such a determination.

Finally, even if the ███████ had calculated an effective rate for the Fontem–RJRV agreement, there is no evidence of how she did so or what rate she calculated.   Contrary to PM/Altria's assertion that it is "undisputed" that the ████████████████ ███████████████, there is *no evidence* of what the ███████████ ███████ . *See, e.g.*, Dkt. 892-6, 173:25-174:6 ████████████ ████████████████████████████

-19-

████████████████████████████████ For example, she may have relied on publicly available data as to VUSE sales (*see* Dkt. 892-5, § 6.10.6(a)), but she certainly did not have internal Reynolds sales or forecast data, which is indisputably the best data for calculating an effective royalty rate.

Thus, it is not at all "undisputed" that the ████████ determined *any* effective royalty rate for the Fontem–RJRV agreement, much less ████████████████████ And, even if she did, there is no evidence that her determination was reliable.

What can be said for certain is that Dr. Sullivan calculated an effective royalty rate for the Fontem–RJRV agreement based on the best available actual sales and forecast data, which was used in the ordinary course of Reynolds's business. And his use of that best available data directly contradicts the notion that Reynolds paid ████████████████████. *See supra* Section I.B. Dr. Sullivan cannot be criticized for not using a phantom ████ analysis. And there is no question that his effective royalty rate is more reliable than PM/Altria's speculation, based upon a phantom ████ analysis, that Reynolds ████████████████████[18]

**2. Dr. Sullivan was right to reject PM/Altria's unsupported factual assertions.**

PM/Altria also criticizes Dr. Sullivan for "us[ing] the ████████████ from the Fontem-RJR Agreement—not the ████ royalty rate in the ████████████ or nine prior agreements that include at least the same rate." Dkt. 915, 7. But PM/Altria's representations as to the ████ rate and the nine prior agreements are untrue.

████████ did not pay a ████████████, and ████████████████████ ████████████ ████ agreed to a ████████████ for that U.S. license, with

---

[18] *See also* Dkt. 892, 11-20.

no additional running royalty payments required.  *See* Dkt. 892-1, ¶ 248; *see also* Dkt. 892-5, §§ 3, 6; Dkt. 892-3, 83:21-84:1.[19]  PM/Altria fails to even mention that payment.

Similarly, PM/Altria asserts that nine other Fontem licensees paid "███████████ ███."  (Dkt. 915, 4).  As PM/Altria well knows, the nine agreements it alludes to are *not* of record in this case.[20]  Mr. Meyer cites eight press releases (*see* Dkt. 892-1, § 195 n.321).  He admittedly did not review any other license agreements, nor were they sought or produced in this litigation. *See* Dkt. 892-3, 40:3-11, 44:13-21.  PM/Altria points to ████████████████ as a basis for making assumptions about the agreements and the consideration paid thereunder, asserting ██████████████████████████████████████

███████████████████████████████████████

██████████████████      *See* Dkt. 915, 4.   But that is a misstatement of ███████

█████████ .  *See* Dkt. 892-5, § 6.10.9.  ████████████████████████████



███████████████████████████████████

██████████████      *Id.*

---

[19] To be sure, the ███████████ agreement included provision for ██████████████████ ███████████████████████████████████████████████████████████ . *See* Dkt. 892-5, § 6.3.  But neither of those circumstances has any relation to the hypothetical negotiations here.  Moreover, ███████████████████████████████ ██████████████████   Dkt. 892-1, ¶ 248; *see also* Dkt. 892-3, 89:9:13, 98:18-22; Dkt. 892-6, 169:19-170:11.

[20] Indeed, Mr. Meyer made no reference to those agreements in the Original Meyer Report. Instead, having seen Dr. Sullivan's criticisms, Mr. Meyer untimely amended his report to cite press releases regarding the Fontem settlements.  *See* Dkt 892-1, ¶ 195 n.321.  Separate and apart from the fact that the nine Fontem settlements are not of record in this case, PM/Altria can hardly criticize Dr. Sullivan for not addressing those settlements in his rebuttal report when Mr. Meyer also did not address them in his original report and added his citations to them only *after* receiving Dr. Sullivan's report.

█████████████████████████████.  Moreover, Mr. Meyer's conclusion as to the applicability of the representation to the other, unseen Fontem licenses—and the rates contained therein—is actually contradicted by the limited evidence available.  The eight press releases he cites indicate that ██████████████████████████████████████ ████ does not even apply.  While one press release is silent on its geographic scope, the other seven are not ███████████, and at least one references only a single payment and not any running royalty.[21]

## III.    DR. SULLIVAN PROPERLY CONSIDERED DESIGN-AROUND OPTIONS.

PM/Altria's argument as to Dr. Sullivan's discussion of design-around options is also based on misstatements of law and fact.  The design-arounds for the '911 and '265 patents are straightforward, and Dr. Sullivan was right to consider them.  Despite PM/Altria's assertions to the contrary, in a ***reasonable royalty*** analysis, such alternatives need not be on the market, or ready for market, to be relevant.  Here, the parties would have considered the alternative designs Dr. Sullivan identifies both because those designs could have gained regulatory approval during the life of the patents (which would exert downward pressure on the royalty rate) and because the

---

[21] DEF_PUB_EDVA000056247 ("The agreement ends proceedings between the parties in **Germany and the European Patent Office** … Under the terms of the agreement, Fontem Ventures has granted Nicoventures Holdings Limited a non-exclusive licence … in consideration for **a settlement payment**."); DEF_PUB_EDVA000056246 ("Fontem Ventures has granted Spark Industries a non-exclusive royalty-bearing **global licence**."); DEF_PUB_EDVA000056245 ("Fontem Ventures has granted Electronic Cigarettes International Group, Ltd., a non-exclusive royalty-bearing **global licence**."); DEF_PUB_EDVA000056241-242 ("Fontem Ventures has granted Vapor Corp. a non-exclusive royalty-bearing **global licence**."); DEF_PUB_EDVA000056239-240 ("Fontem Ventures has granted NJOY, Inc. and its affiliates a non-exclusive royalty-bearing **global licence**."); DEF_PUB_EDVA000056237-238 ("Fontem Ventures has granted Ballantyne Brands a non-exclusive royalty-bearing **global licence**."); DEF_PUB_EDVA000056243 (Fontem granted license to VMR Products, "a **global force** in the vapor products industry" whose products are "sold in many countries.") (attached as Composite Exhibit 6).

ability to design around the asserted patents is evidence relating to the actual technical value of the patents.[22]

To the extent PM/Altria argues there is no alternative design as a matter of law, that view is contradicted by the facts, and, regardless, PM/Altria cannot raise that summary judgment argument via a *Daubert* motion. *See Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012) ("[W]e conclude that the district court erred in addressing the sufficiency of Bodum's inequitable conduct defense on an evidentiary motion."); *see also* Opposition to PM/Altria's Motion to Exclude the Design-Around Testimony of David Clissold, Section I. Courts repeatedly have found that whether a design-around is a viable non-infringing alternative is not an issue to be decided on *Daubert* review. *See, e.g.*, *Carnegie Mellon Univ.*, 2012 WL 3686736, at *5; *Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*, No. 03-cv-1431, 2006 WL 1390416, *7 (N.D. Cal. May 18, 2006) ("While Baxter hotly debates whether the 2008H model is, in fact, a viable alternative to the 2008K, this is not an issue for the Court to determine under a *Daubert* review.").

1.   **Dr. Sullivan's design-around opinions are supported by the evidence.**   In considering the alternative designs, Dr. Sullivan properly relied on discussions with technical experts and Reynolds's employee Eric Hunt, who has personal knowledge of the feasibility of the

---

[22] PM/Altria's expert also opined on the technical comparability and relative value of certain licensed patents to the asserted patents here. In doing so, he "considered the scope of the claims in the patents licensed in the various agreements and the technology claimed in the Asserted Patents, and **assessed the likelihood that a competitor would (or would not) be able to design around the claims.**"   Excerpts of Joseph McAlexander Second Supplemental Opening Expert Report dated May 10, 2021 (attached as Exhibit 8), ¶ 696; *see also id.*, ¶ 700 (explaining that "For my apportionment analysis … I considered the relative value of the technology claimed in the patents in the licensed patent families [and] **considered the likelihood that one could feasibly and successfully design around the claims** recited in the licensed patent(s).")

designs.  *See* Ex. 1 ¶¶ 285, 288-295; *see also Apple Inc.*, 757 F.3d at 1321 ("Consistent with Rule 703, patent damages experts often rely on technical expertise outside of their field when evaluating design around options.").   The non-infringing designs Dr. Sullivan describes based on this technical input are straightforward:



- For the '265 patent, the alternative design involves ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Ex. 1, ¶ 289.

- For the '911 patent, the alternative design ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See id.*, ¶ 291.

As Dr. Sullivan explains, Mr. Hunt reports, based on his personal experience, that the former change would take ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to develop, while the latter change would take ▮▮▮▮▮▮▮▮▮ to implement and cost approximately ▮▮▮▮▮▮. *See* Ex. 1, ¶¶ 290, 292-95; *see also, e.g.*, Excerpts of Apr. 14, 2021 Deposition of Eric Hunt (attached as Exhibit 7), 384:16-385:13, 414:10-415:8.  Dr. Sullivan does not use the alternative design evidence to set a royalty rate or to lower a royalty rate.  Instead, he uses the alternative design evidence for the limited purpose of confirming that his royalty opinion calculated based on his market approach, using the Fontem–RJRV agreement, is reasonable.  Ex. 1, ¶ 378.

Critically, PM/Altria does not challenge (1) that the alternatives Dr. Sullivan relies on are non-infringing, (2) Dr. Sullivan's opinion as to technical feasibility or cost, or (3) any of the supporting evidence as to those opinions.  Given that the basis for Dr. Sullivan's opinion is undisputed, it is for the jury to determine how much weight that opinion should carry.  *See, e.g.*, *Carnegie Mellon Univ.*, 2012 WL 3686736, at *5.

**2. An alternative design does not need to be on the market or have regulatory approval to be considered in determining a reasonable royalty.**  PM/Altria essentially requests

that the Court impose an absolute bar on considering alternative designs that did not have regulatory approval at the time of the hypothetical negotiations. The Court should reject any such sweeping rule—it is unsupported by law. PM/Altria agrees, as it must, that the availability of non-infringing alternatives is a variable affecting the hypothetical negotiation. *See* Dkt. 915, 20; *see also Prism Techs.*, 849 F.3d at 1376. The purpose of such an analysis is also clear: "valuing the patented technology." *See Prism Techs.*, 849 F.3d at 1376; *see also Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 772 (Fed. Cir. 2014) ("[C]ost savings or value enhancements compared to alternatives … may be used in the inquiry to determine the economic value of the patented technology in the marketplace"). Because the alternatives Dr. Sullivan identifies could have been implemented and approved by the FDA *during the life of PM/Altria's patents*, and are relevant to the technical value of PM/Altria's patents, the parties would have considered them at the hypothetical negotiation.

For example, in *Mars, Inc.*, a case cited by PM/Altria, the Federal Circuit affirmed the district court's reduction of a royalty rate because the infringer "did not have—*but probably could have designed*—an acceptable alternative." 527 F.3d at 1373. Other courts have similarly concluded that "[a]n accused infringer need not have the ability to sell the non-infringing alternative before the alternative's features can be compared to those of the accused product for valuation purposes." *Baxter Int'l, Inc. v. Becton, Dickinson & Co.*, No. 17C7576, 2020 WL 424918, at *7 (N.D. Ill. Jan. 27, 2020); *see also, e.g.*, *Covidien Sales LLC v. Ethicon Endo-Surgery, Inc.*, No. 1:11-cv-871, 2020 WL 7040643, at *3 (S.D. Ohio Dec. 1, 2020) ("As a matter of common sense, it appears at least possible that such negotiations could be colored by whether the licensee has developed a design (even if not ready yet to go to market) that is non-infringing.").

Here, Dr. Sullivan properly relied on conversations with Reynolds's FDA regulatory

-25-

expert, Mr. Clissold, to conclude that Reynolds could have included alternative designs in its PMTAs, and that doing so would not have made authorization less likely. Ex. 1, ¶ 286. PM/Altria does not dispute those conclusions. That Reynolds could have included the alternative designs in its PMTAs is simply a reality resulting from the hypothetical negotiations occurring before Reynolds submitted its PMTAs, a fact PM/Altria acknowledges. *See* Dkt. 915, 23. Because the evidence is that Reynolds had straightforward design-around options, and those options could have been granted regulatory approval during the life of the patents, they are properly considered as part of the reasonable royalty analysis.

The cases PM/Altria cites suggesting otherwise are facially inapplicable because they each apply a lost profits analysis. *See* Dkt. 915, 20-21.[23] "These cases don't apply, because [PM/Altria] is seeking reasonable royalty damages." *Smart Skins LLC v. Microsoft Corp.*, No. C15544-MJP, 2016 WL 4148091, at *2 (W.D. Wash. July 1, 2016). The distinction between reasonable royalty and lost profit damages is critical here. In the lost profits framework, often considered under the *Panduit* factors, a patentee looks backwards in time to reconstruct the "but-for" world to determine whether it lost profits because it would have made the accused infringer's sales. *See Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1349-50 (Fed. Cir. 1999). In that scenario, the accused infringer can argue that some or all of its infringing sales instead would have gone to a non-infringing alternative. *See id.* at 1348-49. If that alternative is not on the market, the accused infringer has to show that it could have been "available" during that past damages period. *See id.* at 1349, 1353.

---

[23] Citing *DUSA Pharms., Inc. v. Biofrontera Inc.*, 495 F. Supp. 3d 21, 30 (D. Mass. 2020); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1332 (Fed. Cir. 2009); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 825 (Fed. Cir. 1989).

The reasonable royalty analysis is totally different.  There, the parties are looking forward in time from a hypothetical negotiation date, in order to determine the value of the patents in the form of a reasonable royalty.  As the cases cited above establish, the hypothetical negotiators are free to consider possible non-infringing alternatives, even those that are not on the market, to set a reasonable royalty.  "[F]or a reasonable royalty, problems with a non-infringing alternative … would end up being accounted for in the reasonable royalty number itself."  *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 393858, at *4 (N.D. Cal. Jan. 29, 2015); *see also Carnegie Mellon Univ.*, 2012 WL 3686736, at *4 ("[T]he presence *or possibility* of alternatives can still play a role in the reasonable royalty analysis.").

PM/Altria provides no authority for its position in the reasonable royalty context,[24] and for good reason.  It would make no sense to preclude consideration of alternative designs that would certainly be relevant to the negotiating parties.  *See Aqua Shield*, 774 F.3d at 773 ("[T]he court should consider all relevant record evidence, including the advantages of the patented product [and] the ease and cost of designing around the claimed invention.").  To hold otherwise would

---

[24] The reasonable royalty opinions PM/Altria cite actually support Reynolds's position.  For example, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, explains that an alternative design is available where:  "(1) the defendant could readily obtain all of the material needed to implement [it]; (2) the non-infringing alternative was well known in the field at the time of infringement; and (3) the defendant had all of the necessary equipment, know-how, and experience to use [it]."  No. 2:06-CV-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011), *objections overruled*, 2011 WL 13196509 (E.D. Tex. Jan. 28, 2011).

PM/Altria also cites *Sherwin-Williams Co. v. PPG Indus., Inc.*, No. 17-1023, 2020 WL 1283465, at *8-10 (W.D. Pa. 2020), in which there was no evidence of a non-infringing product available during the damages period, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1340-41 (Fed. Cir. 2015), in which the identified alternative could not be considered non-infringing, because it was the subject of suit by the patent holder at the time of the hypothetical negotiation, and *SynQor, Inc. v. Artesyn Tech., Inc.*, 709 F.3d 1365, 1382-83 (Fed. Cir. 2013), in which there was uncontroverted evidence the technology for the purported alternative was not accessible.  None of those cases advances PM/Altria's argument where Dr. Sullivan's design-around opinion is supported by reliable evidence PM/Altria does not challenge.

defeat the purpose of a reasonable royalty analysis—*i.e.*, to value the patented technology. *Id.* at 770. PM/Altria is not entitled to extract excessive royalties by excluding evidence of non-infringing alternatives simply because the parties operate in a regulated field. *Cf. Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014).

Accordingly, PM/Altria's conclusion that, if Reynolds had adopted non-infringing alternatives, it "███████████████████████████████████████████████████████ ████████████████████████████" (Dkt. 915, 23), misses the mark. Separate and apart from the FDA's regulatory scheme, the existence and simplicity of alternatives is relevant to the technical value of PM/Altria's patents. And, as to Reynolds's ability to implement the alternatives, the point is that *after* Reynolds received FDA authorization, it would be able to sell the non-infringing products, and that is a fact rational hypothetical negotiators would consider in valuing PM/Altria's patented technology.

\* \* \*

Because (1) the evidence shows that the alternative designs Dr. Sullivan cites would have been straightforward to implement and could have obtained regulatory approval during the life of the asserted patents, and (2) non-infringing alternatives are relevant to a reasonable royalty analysis even where those alternatives are not yet marketable, Dr. Sullivan appropriately considered the availability of alternative non-infringing designs as one factor confirming the reasonableness of his royalty opinion.

## CONCLUSION

For the foregoing reasons, PM/Altria's motion to exclude certain of Dr. Sullivan's opinions should be denied in whole.

Dated: February 11, 2022

Respectfully submitted,


_/s/ David M. Maiorana_

David M. Maiorana (VA Bar No. 42334)
Ryan B. McCrum
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com
Email: rbmccrum@jonesday.com

Stephanie E. Parker
JONES DAY
1221 Peachtree Street, N.E.
Suite 400
Atlanta, GA 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Email: separker@jonesday.com


Anthony M. Insogna
JONES DAY
4655 Executive Drive
Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178
Email: aminsogna@jonesday.com

John J. Normile
JONES DAY
250 Vesey Street
New York, NY 10281
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Email: jjnormile@jonesday.com


William E. Devitt
JONES DAY
77 West Wacker
Suite 3500
Chicago, IL 60601
Telephone:  (312) 269-4240
Facsimile:  (312) 782-8585
Email: wdevitt@jonesday.com

Alexis A. Smith
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Telephone:  (213) 243-2653
Facsimile:  (213) 243-2539
Email:  asmith@jonesday.com


Sanjiv P. Laud
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
Telephone:  (612) 217-8800
Facsimile:  (844) 345-3178
Email: slaud@jonesday.com

Charles B. Molster
THE LAW OFFICES OF
CHARLES B. MOLSTER, III PLLC
2141 Wisconsin Avenue, N.W. Suite M
Washington, DC 20007
Telephone:  (202) 787-1312
Email:  cmolster@molsterlaw.com

_Counsel for RAI Strategic Holdings, Inc. and
R.J. Reynolds Vapor Company_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of February, 2022, a true and correct copy of the

foregoing was served using the Court's CM/ECF system, with electronic notification of such filing

to all counsel of record.

/s/ David M. Maiorana
David M. Maiorana (VA Bar No. 42334)
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
Email: dmaiorana@jonesday.com

*Counsel for RAI Strategic Holdings, Inc. and
R.J. Reynolds Vapor Company*