# EXHIBIT 1
# (PUBLIC)



INTENSITY, LLC
12730 High Bluff Drive, Suite 300
San Diego, California 92130
*telephone* 858.876.9101

**www.intensity.com**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| RAI STRATEGIC HOLDINGS, INC. and R.J. REYNOLDS VAPOR COMPANY, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> ALTRIA CLIENT SERVICES LLC; PHILIP MORRIS USA, INC.; and PHILIP MORRIS PRODUCTS S.A., <br><br> Defendants and Counterclaim Plaintiffs. | Case No. 1:20-cv-00393 <br><br> **REPORT OF** <br> **RYAN SULLIVAN, Ph.D.** |

_____

Ryan Sullivan, Ph.D.

March 24, 2021

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

# 9.    Hypothetical Negotiations

(183)   A reasonable royalty can be determined through an analysis of what a willing licensor and a willing licensee would have bargained for during an arm's-length, hypothetical negotiation occurring on the eve of infringement.[425]   I understand that the date of the hypothetical negotiation for the patents-in-suit would be the eve of first alleged infringement by Reynolds. In this case, the first infringement by Reynolds occurred on separate dates for each of the patents-in-suit.  Therefore, the hypothetical negotiation for each of the asserted patents would occur at different points in time.

(184)   As discussed in Section 2.2, RJRV is the manufacturer for all of the VUSE accused products and their associated flavor packs.  Thus, at the hypothetical negotiations for each of the patents-in-suit, RJRV would act as the licensee.  To the extent that RAI is present at any of the hypothetical negotiations, my opinion remains unchanged.

(185)   Reynolds' first alleged infringement of the '545 patent occurred on or around March 2013, when the accused version of Reynolds' VUSE Solo product launched.  See Section 5.  Thus, the hypothetical negotiation for the '545 patent would occur on or around March 2013.  As discussed in Section 4.1, PM USA is the assignee of the '545 patent.  Thus, the hypothetical negotiation for the '545 patent would take place between PM USA as the licensor and RJRV as the licensee.

(186)   Reynolds' first alleged infringement of the '265 patent occurred on or around August 2018, when Reynolds' VUSE Alto product launched.  See Section 5.  Thus, the hypothetical negotiation for the '265 patent would occur on or around August 2018.  As discussed in

---

[425]   *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006).  ("When an established royalty does not exist, a court may determine a reasonable royalty based on 'hypothetical negotiations between willing licensor and willing licensee.' Fromson, 853 F.2d at 1574.")

*Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).  ("A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits. 35 U.S.C. § 284 (1988); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078, 219 USPQ 679, 681-82 (Fed.Cir.1983) ('If actual damages cannot be ascertained, then a reasonable royalty must be determined.'). The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant. Id. at 1078, 219 USPQ at 682. The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began. Id.")

*State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989).  ("The determination of a reasonable royalty, however, is based not on the infringer's profit margin, but on what a willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started. Radio Steel & Mfg. Co. v. MTD Prod., Inc., 788 F.2d 1554, 1557, 229 USPQ 431, 433 (Fed.Cir.1986).")

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

Section 4.2, PMP is the assignee of the '265 patent. Thus, the hypothetical negotiation for the '265 patent would take place between PMP as the licensor and RJRV as the licensee.

(187)   Reynolds' first alleged infringement of the '911 patent occurred on or around October 23, 2018, the issuance date of the patent. See Section 4. Thus, the hypothetical negotiation for the '911 patent would occur on or around October 23, 2018. As discussed in Section 4.3, PMP is the assignee of the '911 patent. Thus, the hypothetical negotiation for the '911 patent would take place between PMP as the licensor and RJRV as the licensee.

(188)   Reynolds' first alleged infringement of the '374 patent occurred on or around September 24, 2019, the issuance date of the patent. See Section 4. Thus, the hypothetical negotiation for the '374 patent would occur on or around September 24, 2019. As discussed in Section 4.4, ACS is the assignee of the '374 patent. Thus, the hypothetical negotiation for the '374 patent would take place between ACS as the licensor and RJRV as the licensee.

(189)   Reynolds' first alleged infringement of the '556 patent occurred on or around February 11, 2020, the issuance date of the patent. See Section 4. Thus, the hypothetical negotiation for the '556 patent would occur on or around February 11, 2020. As discussed in Section 4.5, PMP is the assignee of the '556 patent. Thus, the hypothetical negotiation for the '556 patent would take place between PMP as the licensor and RJRV as the licensee.

(190)   The Meyer Report contends that there would be a single hypothetical negotiation for the '265, '911, and '556 patents occurring in August 2018 between PMP as licensor and RJRV as licensee.[426]   While I disagree with the Meyer Report's claim that the parties would negotiate licenses for patents that did not yet exist (and, thus, the negotiation not occurring on the eve of infringement), the conclusions of my analysis would not change if, for some reason, it were determined that the appropriate date for the hypothetical negotiations for the '265, '911, and '556 patents would occur in August 2018 as the Meyer Report contends.

---

[426]   Meyer Report, 2/24/2021, ¶¶ 121–124.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

# 13.    Market Approach

## 13.1.  Overview

(258)   I utilize a market approach to evaluate royalties for the '545, '265, '374, and '911 patents.

(259)   The market approach is a method of ascertaining value by comparing historical transactions involving assets similar to the asset being evaluated.[579]  The market approach is based on the premise that the value of an asset may be determined by reference to how others in the marketplace have valued the same or similar assets.[580]  The market approach is a generally accepted and widely used methodology for valuation of both tangible and intangible assets, including patents.[581]

---

[579]   Smith, Gordon and Russell Parr (2000), *Valuation of Intellectual Property and Intangible Assets*, (*Third Edition*), New York, NY: John Wiley & Sons, Inc., at 175.  ("The market approach provides indications of value by studying transactions of property similar to the property for which a value conclusion is desired.")

Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 34.  ("[Under the market approach], intangible assets are valued by comparing recent sales or other transactions involving similar assets in similar markets. . .The market approach utilizes actual transaction values derived from the sale or license of similar assets.")

Corbett, Michaelyn, Mohan Rao, and David Teece (2006), "A Primer on Trademarks and Trademark Valuation," in Daniel Slottje, ed., *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New Jersey: John Wiley & Sons, Inc., at 291.  ("The market approach references a market with comparable transactions to determine the fair market value of an asset.")

Financial Accounting Standards Board, Original Pronouncements as Amended, Statement of Financial Accounting Standards No. 157: Fair Value Measurements, 11/15/2007, at FAS157–10.  ("The market approach uses prices and other relevant information generated by market transactions involving identical or comparable assets or liabilities[.]"

[580]   Murphy, William, John Orcutt, and Paul Remus (2012), *Patent Valuation: Improving Decision Making through Analysis*, Hoboken, NJ: John Wiley & Sons, Inc., at 16.  ("Market methods seek to determine the value of an asset by reference to how other buyers and sellers have valued the same or similar assets.")

Smith, Gordon and Russell Parr (2000), *Valuation of Intellectual Property and Intangible Assets*, (*Third Edition*), New York, NY: John Wiley & Sons, Inc., at 170.  ("The market approach is the most direct and the most easily understood appraisal technique.  It measures the present value of future benefits by obtaining a consensus of what others in the marketplace have judged it to be.")

Razgaitis, Richard (2003), *Valuation and Pricing of Technology-Based Intellectual Property*, Hoboken, NJ: John Wiley & Sons, Inc., at 59.  ("One of the traditional approaches to the valuation for anything is commonly known as the *market* (or, sometimes, the *comparables*) method.  The simple underlying idea is that there exists a historical transaction that was valued by other parties that can be used as a direct prediction of the value of the present opportunity.")

[581]   Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 30.  ("[T]here are some basic, traditional methods of valuation: the three most popular are the market approach, the income approach, and the cost approach . . . [These are] three accepted and traditional methodologies[.]")

Smith, Gordon and Russell Parr (2000), *Valuation of Intellectual Property and Intangible Assets*, (*Third Edition*), New York, NY: John Wiley & Sons, Inc., at 173 ("The cost, income, and market approaches are the tools for valuation. Virtually any type of

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

(260)   Under the market approach, patent royalties may be estimated using the terms of license agreements that are comparable[582] to the license resulting from the hypothetical negotiation.[583] Adjustments to the terms of comparable agreements can be made where appropriate to account for technological and economic differences that may exist between the license resulting from the hypothetical negotiation.[584]  For example, some of the economic issues that

---

property can be valued using them."), 175 ("Three generally accepted valuation methodologies are useful for valuing intellectual property and intangible assets. They are the *market*, *cost*, and *income* approaches.").

Murphy, William, John Orcutt, and Paul Remus (2012), *Patent Valuation: Improving Decision Making through Analysis*, Hoboken, NJ: John Wiley & Sons, Inc., at 16.  ("The three basic valuation methodologies are income methods, market methods, and cost methods. Sometimes different names are used or some new valuation methodology is claimed, but all valuation methodologies can be traced back to these three fundamental approaches to valuation analysis.")

Razgaitis, Richard (2003), *Valuation and Pricing of Technology-Based Intellectual Property*, Hoboken, NJ: John Wiley & Sons, Inc., at 59.  ("One of the traditional approaches to the valuation for anything is commonly known as the *market* (or, sometimes, the *comparables*) method.")

Financial Accounting Standards Board, Original Pronouncements as Amended, Statement of Financial Accounting Standards No. 157: Fair Value Measurements, 11/15/2007, at FAS157–10.  ("Valuation techniques consistent with the market approach, income approach, and/or cost approach shall be used to measure fair value.")

Murphy, William, John Orcutt, and Paul Remus (2012), *Patent Valuation: Improving Decision Making through Analysis*, Hoboken, NJ: John Wiley & Sons, Inc., at 190.  ("Market methods are regularly used to value patents.")

[582]   Throughout my report, I use the term comparable to refer to agreements or transactions that are sufficiently similar to the hypothetical negotiation such that differences between the agreement or transaction on the one hand, and the hypothetical negotiation on the other hand, can be reliably accounted for.

[583]   Razgaitis, Richard (2003), *Valuation and Pricing of Technology-Based Intellectual Property*, Hoboken, NJ: John Wiley & Sons, Inc., at 60.  ("[Applied to] technology licensing, the market valuation approach is the use of the terms of one or more comparable license agreements to estimate the value of the subject technology licensing opportunity . . . In many cases, applying the market valuation approach leads to numerous, say a dozen or more, agreements in the same broad technology category but no one of which, for different reasons, is exactly or near exactly comparable.  In this circumstance, one may yet be able to estimate a royalty range from this family of agreements.")

Anson, Weston (2010), *IP Valuation and Management*, Chicago, IL: American Bar Association, at 199.  ("[The comparables method] can be a superb way to establish royalty rates, given that sufficient comparable data and sufficient detail on the comparable pieces of data are available.  In this method, royalties are established by comparing a licensing royalty rate to other licensing royalty rates that have been negotiated in the market.")

Corbett, Michaelyn, Mohan Rao, and David Teece (2006), "A Primer on Trademarks and Trademark Valuation," in Daniel Slottje, ed., *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New Jersey: John Wiley & Sons, Inc., at 292.  ("The market approach is often helpful in determining running royalty rates in specific licensing transactions based on similar transactions in the marketplace.")

Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 207.  ("Strong, but not necessarily definitive, evidence of the market rate for a license exists if the plaintiff has an established history of negotiating licenses for products comparable to the one that has been infringed.  The historical evidence, however, is only a guide, a starting point.")

[584]   Frank, Peter, Vincent O'Brien, and Michael Wagner (2007), "Patent Infringement Damages," in Roman Weil, et. al., ed., *Litigation Services Handbook: The Role of the Financial Expert, (Fourth Edition)*, Hoboken, NJ: John Wiley & Sons, Inc., at 22.  ("[The third, fourth, fifth, and seventh factors of the court in *Georgia-Pacific*] raise fact (or descriptive) issues, and the analyst should evaluate them to judge how, if at all, observed royalty rates apply to the infringed product. If similarities exist between an actual license and the hypothetical license, the observed royalty rate can provide a starting point to ascertain the appropriate hypothetical rate. If differences exist between the licensing situations, the expert can make appropriate adjustments.")

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

may impact the terms of a license that can be considered in a hypothetical negotiation analysis include exclusivity, geography, time period, market size, and competitive environment, among others.[585]

(261)  Indeed, the Federal Circuit has approved "of a methodology that values the asserted patent based on comparable licenses…Such a model begins with rates from comparable licenses and then 'account[s] for differences in the technologies and economic circumstances of the contracting parties.'"[586]  In other words, agreements may be considered comparable if they are sufficiently similar such that adjustments can be made to accurately reflect the outcome of the hypothetical negotiation.

(262)  In addition, several *Georgia-Pacific* factors relate to royalties received by the patentee (factor 1), rates paid by the licensee (factor 2), the patentee's licensing practices and policies (factor 4), and the portion of a selling price that may be customary for the contribution of an invention in the industry (factor 12).  See Section 16.

(263)  The Fontem-RJRV agreement is sufficiently comparable to the circumstances of the hypothetical negotiations for the '545, '265, '374, and '911 patents for several reasons.  As I

---

Anson, Weston (2010), *IP Valuation and Management*, Chicago, IL: American Bar Association, at 52.  ("[A]djustment and analysis of comparables that do exist are almost invariably necessary, and these adjustments in the hands of an experienced IP valuation analyst can be used to arrive at an accurate value.")

Corbett, Michaelyn, Mohan Rao, and David Teece (2006), "A Primer on Trademarks and Trademark Valuation," in Daniel Slottje, ed., *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New Jersey: John Wiley & Sons, Inc., at 292.  ("Any market approach analysis will likely require reasonable adjustments.")

Leonard, Gregory and Lauren Stiroh (2005), "A Practical Guide to Damages," in Gregory Leonard and Lauren Stiroh, ed., *Economic Approaches to Intellectual Property: Policy, Litigation, and Management*, White Plains, NY: National Economic Research Associates, Inc., at 49.  ("Market-based royalty determination methods must take explicit account of the idiosyncrasies of the particular patent being licensed, the parties to the negotiation, the alternatives to the technology at issue, and the timing of the hypothetical negotiation.")

[585]  Anson, Weston (2010), *IP Valuation and Management*, Chicago, IL: American Bar Association, at 205.  ("Issues such as exclusivity, geography, time period, market size, and competitive environment all have to be considered in any analysis of hypothetical negotiation at the time when the cause of litigation occurred.")

[586]  *Commonwealth Scientific and Industrial Research Organisation v. Cisco Systems, Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015).  (Quoting *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211 (Fed. Cir. 2010).)

*See also*:

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace.")

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1325 (Fed. Cir. 2014). ("As we have held many times, using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent.")

*Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). ("This court has recognized that licenses may be presented to the jury to help the jury decide an appropriate royalty award.")

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

explain in more detail below, the Fontem-RJRV agreement involves the same licensee as the hypothetical negotiations, *i.e.*, RJRV.  The Fontem-RJRV agreement also involves the same products as the hypothetical negotiations, *i.e.*, VUSE products.   Furthermore, the Fontem-RJRV agreement covers patents relating to e-cigarette technology.  Additionally, I understand that the '545 patent is technically comparable to patents in the Fontem Spray Atomizer family, the '265 patent is technically comparable to the Fontem patents in the Air Channel family, the '374 patent is technically comparable to the Fontem patents in the Reed Switch family, and the '911 patent is technically comparable to the Fontem patents in the Shell Design family.[587]   However, there are also differences between the Fontem-RJRV agreement and the circumstances of the hypothetical negotiations, such as the duration of the license, that must be accounted for as I describe below.

(264)   Fontem licensed RJRV ████████████████████████████.  See Section 12.2.1. Product sales covered under the Fontem-RJRV license would have included at least the sales of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSE Alto from their date of first sale by RJRV because the date of first sale of each of the accused products was before the agreement's effective date of 9/24/2018.[588]   The date of first sale of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSE Alto occurred in 2013, 2016, 2017, and 2018 respectively.   See Section 5 and Attachment D-4.

(265)   I calculate the effective percentage royalty rate paid by RJRV based on actual VUSE sales through 2020 and projected VUSE sales through 2025.  Specifically, ███████████████





---

[587]   I understand that the '374 patent also cites several of the Reed Switch family patents, which is another indication that the patents in the Reed Switch family are technically comparable to the '374 patent.  See:

For the '374 and '545 patent: Interview with Travis N. Blalock.  See Attachment A-5.

For the '265 patent: Interview with Jeffrey C. Suhling.  See Attachment A-6.

I understand that U.S. Patent No. 8,156,944 in the Shell Design Family includes similar disclosures about using a cavity or groove to help reduce liquid leakage.  See:

For '911 patent: Interview with Kelly R. Kodama.  See Attachment A-7.

See also: Meyer Report, 2/24/2021, ¶¶ 200–202.

[588]   Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA-001521387). (Indicating that current products included, among other things, ██████████████

See also Section 5.1.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

██████████████████████.[589]  See Attachments D-4 and D-5.  The reason I utilize sales until 2025 is that RJRV has produced sales projections that extend until 2025.[590]  Using projections until 2025 results in an upper bound percentage royalty rate for all patents licensed as part of the Fontem-RJRV agreement of ████████  In other words, this percentage royalty rate is higher than the effective percentage royalty rate from the Fontem-RJRV agreement because it is calculated based on a lower revenue base.[591]

(266)  There are a number of factors to consider in evaluating the Fontem-RJRV agreement relative to the hypothetical negotiations for the '545, '265, '374 and '911 patents, including the following:

a.  Parties.  The Fontem-RJRV agreement involves Fontem as the licensor and RJRV as the licensee.  See Section 12.2.1.  At the hypothetical negotiations for the '545, '265, '374 and '911 patents, PM USA / PMP would be the licensor and RJRV would be the licensee.  See Section 9.  Since RJRV is the licensee for the Fontem-RJRV agreement as well as at the hypothetical negotiations, the royalty described in the Fontem-RJRV agreement is reflective of RJRV's willingness to pay for a license.

b.  Products.  Products covered by the Fontem-RJRV agreement included ████████████████████████████████████████████████████████████████████.[592]  As discussed above, product sales covered under the Fontem-RJRV license would have included at least the sales of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSE Alto ████████.[593]  These are the same products that are at issue in this matter.  See Section 5.

c.  Licensed technology.  As discussed above, I understand that there are similarities between the Fontem Spray Atomizer family and the '545 patent, the Fontem Air Channel family and the '265 patent, the Fontem Reed Switch family and the '374 patent, and the Fontem

---

[589]  I evaluate sales in 2018-Q4 present value terms because the effective date of the Fontem-RJRV agreement was in Q4-2018.  Accordingly the parties would have viewed sales in 2018-Q4 present value terms.

See: Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA-001521385).

[590]  See Attachment B-5.

I understand that the information contained within the spreadsheets are extracted from an RJRV database.  I also understand that the forecasts are created in the ordinary course of business and are used by RJRV to make business decisions.  Interview with Scott Peddycord.  See Attachment A-4.

[591]  If sales through the last to expire patent marked on the VUSE products are used, the effective royalty rate would be ████████  See Attachment D-5.

[592]  Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521391).

[593]  Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA-001521387).  (Indicating that current products included, among other things, ████████████████████████████████████████████████████████████████████)

---

Shell Design family and the '911 patent family.[594]  I also understand that Counterclaim Plaintiffs' expert Mr. McAlexander alleges that "the technology claimed in the Spray Atomizer, Shell Design, Reed Switch, Body Sensitive Sensor & Atomizer, and Air Channel Patents in the Fontem-RJRV and ███████████ Agreements are not comparable to the technology claimed in the '374 Patent."[595]  However, according to Dr. Blalock, I understand that the patents in the Reed Switch patent family are technically comparable to the '374 patent.[596]

The Fontem patents are more widely licensed than the '545, '265, '374, and '911 patents. See Section 12.  Furthermore, I understand that the Fontem Spray Atomizer, Air Channel, and Reed Switch families are at least as valuable as the '545, '265, and '374 patents, respectively.[597]  I also understand that the claims made by Counterclaim experts that the '911 patent is more valuable than the Shell Design family are unsubstantiated, as they do not account for the value of the absence of a detailed dimensional requirement for the interior structure of an e-cigarette device from the claims of the Shell Design family patents.[598]

d.  <u>Number of patents</u>.  The ████████████████ related to the Fontem-RJRV agreement covered ███████████████████████.  Specifically, the licensed patents listed in Exhibit A of the Fontem-RJRV agreement include ██████████████████████ ████████████████████████████████████████████████████████████[599] ███████████.  Furthermore, the Fontem-RJRV agreement also covered ██████████ █████████████████████████████████████████████████████████████[600]

e.  <u>License duration</u>.  The Fontem-RJRV agreement states that the agreement would █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

---

[594]  For the '374 and '545 patent: Interview with Travis N. Blalock.  See Attachment A-5.

For the '265 patent: Interview with Jeffrey C. Suhling.  See Attachment A-6.

For '911 patent: Interview with Kelly R. Kodama.  See Attachment A-7.

See also: Meyer Report, 2/24/2021, ¶¶ 200–202..

[595]  McAlexander Report, 2/24/2021, ¶ 727.

[596]  Interview with Travis N. Blalock.  See Attachment A-5.

[597]  For the '374 and '545 patent: Interview with Travis N. Blalock.  See Attachment A-5.

For the '265 patent: Interview with Jeffrey C. Suhling.  See Attachment A-6.

[598]   Interview  with Kelly R. Kodama.  See Attachment A-7

[599]  Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA-001521415–420).

See also:

Meyer Report, 2/24/2021, ¶ 197.

[600]  Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521391, RJREDVA_001521395).

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

 [601] The last to expire patent in the Spray Atomizer family marked on VUSE products expires on June 11, 2027, the last to expire patent in the Air Channel family marked on VUSE products expires on January 28, 2030, the last to expire patent in the Reed Switch family marked on VUSE products expires on September 19, 2027, and the last to expire patent in the Shell Design family marked on VUSE products expires on June 13, 2028.  See Attachment D-1.  Damages herein are calculated through December 31, 2020, the latest date for which sales of the accused products have been provided.

f.   <u>Exclusivity</u>.   The Fontem-RJRV agreement conferred a non-exclusive license to the licensed technology.[602]  Similarly, the parties at the hypothetical negotiations would likely agree to a non-exclusive license to the asserted patents.  See Section 11.1.

g.   <u>Geography.</u>   The territory for the Fontem-RJRV agreement is the ▮▮▮▮▮▮.[603] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮  See Section 11.3.

h.   <u>Relationship between the parties</u>.   Fontem and RJRV were competitors at the time the Fontem-RJRV agreement was executed with its blu e-cigarette product.[604]  As such, royalties reflecting a competitive relationship are already built into the royalties specified in the Fontem-RJRV agreement.  As described in Section 10, there would be some degree of a competitive relationship between RJRV and PMP/PM USA at the time of the hypothetical negotiations.  Therefore, no further adjustment for a competitive relationship is necessary to compare the Fontem-RJRV agreement to the hypothetical negotiation.

---

601   Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521400).

602   Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521395).



Exceptions to sublicensing include, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See:

Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521396).

▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  See Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521407–412).

603   Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521385).

604   Fontem Press Release, "Fontem Acquires Leading Vaping Brand blu eCigs," 7/1/2015, https://www.fontemventures.com/news/fontem-acquires-leading-vaping-brand-blu-ecigs/#:~:text=blu%20eCigs%2C%20the%20number%20one,blu%20to%20the%20Fontem%20family.

---

i.  <u>Royalty structure</u>.  The Fontem-RJRV agreement involved ████████████.  See Section 12.2.1.  As I explain below, I convert the ████████████ described in the Fontem-RJRV agreement into a percentage royalty that can be applied to the period over which damages are calculated.

## 13.2.  The '545 patent

(267)  To determine a reasonable royalty for the '545 patent, I begin with the ████████████ royalty the Meyer Report attributes to the '545 patent based on the Fontem-RJRV agreement. This ████████████████████████████████████████████████████████ ████████████████████.[605] I understand that the last to expire patent in the Spray Atomizer family marked on the VUSE products expires on June 11, 2027.[606]

(268)  One way to account for differences in license duration is to translate a ████████████ into a running royalty.[607]  Furthermore, as described in Section 11.4, a running royalty is likely the most appropriate royalty structure in this case.  One can calculate the derived running royalty rate of a ████████████████ by ████████████████████████ ████████████████████████████.[608]

(269)  I translate the ████████████ in the Fontem-RJRV agreement attributable to the Spray Atomizer family into a percentage running royalty by dividing ████████████████████ ████████████████████████████████████████████████████████████████. This results in a percentage royalty rate of ████ associated with '545 patent.  See Attachment D-6.

---

[605]  As discussed in Section 12.2.1, ████████████████████████████████████████████ ████████████

   Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 903.  (Indicating that the licensing parties "typically calculate a lump-sum payment in advance by using the licensee's projected sales revenue or unit shipments for the duration of the license.")

[606]  See Attachment D-1.

[607]  Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 905.  ("Similarly, one can deconstruct a lump-sum royalty payment into a derived royalty rate. A licensee might make a lump-sum payment either collectively at the beginning of the license's term or progressively following a schedule over that term. In either case, one can calculate the present value of projected revenues over the license's term using the discounted cash flow (DCF) method by applying an appropriate discount rate[.]")

[608]  Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 906.  ("Dividing the lump-sum royalty payment by the present value of the licensee's projected sales revenue . . . , one can calculate the derived royalty rate of a lump-sum royalty payment.")

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

(270)   I utilize the present value of VUSE sales through 2025 (rather than through patent expiration, as described in the Fontem-RJRV agreement) because Reynolds' profit and loss forecasts only extend through 2025.  As such, sales projections over this time period are more reliable.

(271)   Utilizing sales projections through the expiration of the last to expire patent in the Spray Atomizer family marked on VUSE products would result in a lower royalty rate of ███ for the '545 patent.  See Attachment D-6.

## 13.3.   The '265 patent

(272)   To determine a reasonable royalty for the '265 patent, I begin with the ████████████ royalty the Meyer Report attributes to the '265 patent based on the Fontem-RJRV agreement. This ███████████████████████████████████████████████████████ ████████████████████,[609]  I understand that the last to expire patent in the Air Channel family marked on VUSE products expires on January 28, 2030.[610]

(273)   I translate the ████████████ in the Fontem-RJRV agreement attributable to the Air Channel family into a percentage running royalty by ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████.  This results in a percentage royalty rate of ████ for the '265 patent.  See Attachment D-7.

(274)   Similar to the '545 patent analysis, I utilize the present value of VUSE sales through 2025 (rather than through patent expiration, as described in the Fontem-RJRV agreement) because Reynolds' profit and loss forecasts only extend through 2025.  As such, sales projections over this time period are more reliable.

(275)   Utilizing sales projections through expiration of the last to expire patent in the Air Channel family marked on VUSE products would result in a lower royalty rate of ████ for the '265 patent.  See Attachment D-7.

---

[609]   As discussed in Section 12.2.1, ██████████████████████████████████ ████████

See also: Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 903.  (Indicating that the licensing parties "typically calculate a lump-sum payment in advance by using the licensee's projected sales revenue or unit shipments for the duration of the license.")

[610]   See Attachment D-1.

## 13.4.   The '374 patent

(276)   I understand that the '374 patent is technically similar to the Fontem patents in the Reed Switch family.[611]  I further understand that 10% of the value of the portfolio of patents in the Fontem-RJRV agreement is attributable to the Reed Switch patent family, as claimed by Mr. McAlexander and in the Meyer Report.[612]  In other words, ██████████████████████ ████████████ is attributable to the Reed Switch family.[613]  This ██████████████ ██████████████████████████████████████████.[614]  I understand that the last to expire patent in the Reed Switch family expires on September 19, 2027.[615]

(277)   I translate the ██████████████ in the Fontem-RJRV agreement attributable to the Reed Switch family into a percentage running royalty by ██████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████. This results in a percentage royalty rate of ██████. See Attachment D-9.

(278)   Similar to the '545 patent and '265 patent analyses, I utilize the present value of VUSE sales through 2025 (rather than through patent expiration, as described in the Fontem-RJRV agreement) because Reynolds' profit and loss forecasts only extend through 2025.  As such, sales projections over this time period are more reliable.

Utilizing sales projections through expiration of the last to expire patent in the Reed Switch family marked on VUSE products would result in a lower royalty rate of ██████  See Attachment D-9.

---

[611]   Interview with Travis N. Blalock.  See Attachment A-5.

[612]   McAlexander Report, 2/24/2021, ¶¶ 10, 728.

Meyer Report, 2/24/2021, Table 7.

[613]   10% × ██████████████████.

[614]   As discussed in Section 12.2.1, ██████████████████████████████████ ██████████

See also: Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 903.  (Indicating that the licensing parties "typically calculate a lump-sum payment in advance by using the licensee's projected sales revenue or unit shipments for the duration of the license.")

[615]   See Attachment D-1.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

## 13.5.  The '911 patent

(279)  To determine a reasonable royalty for the '911 patent, I begin with the ████████████ royalty the Meyer Report attributes to the '911 patent based on the Fontem-RJRV agreement. This ████████████████████████████████████████ ████████████████████.[616] I understand that the last to expire patent in the Shell Design family marked on VUSE products expires on June 13, 2028.[617]

(280)  I translate the ████████████ in the Fontem-RJRV agreement attributable to the Shell Design family into a percentage running royalty by ████████████████████ ████████████████████████████████████████ ████████████████████████████. This results in a percentage royalty rate of ████. See Attachment D-8.

(281)  Similar to the '545 patent, '265 patent, and '374 patent analyses, I utilize the present value of VUSE sales through 2025 (rather than through patent expiration, as described in the Fontem-RJRV agreement) because Reynolds' profit and loss forecasts only extend through 2025. As such, sales projections over this time period are more reliable.

Utilizing sales projections through expiration of the last to expire patent in the Shell Design family marked on VUSE products would result in a lower royalty rate of ████. See Attachment D-8.

---

[616]    As discussed in Section 12.2.1, ████████████████████████████ ████████

See also: Sidak, Gregory J. (2016), "Converting Royalty Payment Structures for Patent Licenses," *The Criterion Journal on Innovation*, 1:901–914, at 903.  (Indicating that the licensing parties "typically calculate a lump-sum payment in advance by using the licensee's projected sales revenue or unit shipments for the duration of the license.")

[617]    See Attachment D-1.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

# 14.   Cost Approach

## 14.1.   Overview

(282)   The cost approach is based on the economic principle of substitution and seeks to measure the future benefits of ownership of an asset by quantifying the amount of money required to replace the asset with something of similar utility.[618]   The cost approach is especially useful for appraising highly specialized property and can be useful in cases where a comparable asset can be implemented and where the costs for the comparable asset are known or can be estimated.[619]

---

[618]   Smith, Gordon and Russell Parr (2000), *Valuation of Intellectual Property and Intangible Assets*, (*Third Edition*), New York, NY: John Wiley & Sons, Inc., at 197-198.  ("The cost approach seeks to measure the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject intellectual property.")

Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 33.  ("The cost approach is based on the economic principle of *substitution*. Essentially, the premise is that potential buyers will pay no more for an asset than it would cost them to develop or obtain another asset of similar utility.")

Corbett, Michaelyn, Mohan Rao, and David Teece (2006), "A Primer on Trademarks and Trademark Valuation," in Daniel Slottje, ed., *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New Jersey: John Wiley & Sons, Inc., at 291.  ("The cost approach values assets based on the cost to create and develop the assets.")

Financial Accounting Standards Board, Original Pronouncements as Amended, Statement of Financial Accounting Standards No. 157: Fair Value Measurements, 11/15/2007, at FAS157–11.  ("The cost approach is based on the amount that currently would be required to replace the service capacity of an asset[.]")

Leonard, Gregory and Lauren Stiroh (2005), "A Practical Guide to Damages," in Gregory Leonard and Lauren Stiroh, ed., *Economic Approaches to Intellectual Property: Policy, Litigation, and Management*, White Plains, NY: National Economic Research Associates, Inc. at 55–56.  ("The licensee's willingness to pay for the patent at issue is primarily driven by the profits flowing from the patent relative to the next-best alternative.  Most important in making this determination are the full economic costs of avoiding the patent.  The patent can be avoided by abandoning the infringing features or product lines and focusing on sales of other products incorporating a noninfringing alternative into the accused product lines, or designing around the patent.  Thus, a fundamental determinant of the value of the patent to the licensee is the availability of noninfringing alternatives.  This means that a necessary step in determining a reasonable royalty is to evaluate the option available to the licensee and, if possible to determine the cost (in both time and dollars) of designing around the patent.")

[619]   Smith, Gordon and Russell Parr (2000), *Valuation of Intellectual Property and Intangible Assets*, (*Third Edition*), New York, NY: John Wiley & Sons, Inc., at 208.  ("The cost approach is especially useful for appraising highly specialized property . . . [and] is also very useful as a valuation method for certain intangible assets, such as computer software[.]")

Corbett, Michaelyn, Mohan Rao, and David Teece (2006), "A Primer on Trademarks and Trademark Valuation," in Daniel Slottje, ed., *Economic Damages in Intellectual Property: A Hands-On Guide to Litigation*, New Jersey: John Wiley & Sons, Inc., at 291.

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

(283)   Under the cost approach, patent royalties may be informed by calculating the cost savings gained by the infringer as a result of its infringing use of the patented technology.[620] Specifically, a reasonable royalty may be informed using this method by comparing the cost difference "between what the defendant did that was infringing with a non-infringing alternative that the defendant could have done."[621]   The costs that are included when calculating value with the cost approach method should be considered within the current economic environment.[622]

(284)   The Federal Circuit has approved of the cost approach as a "well settled" and "appropriate approach" that is informative for a reasonable royalty.[623]   The Federal Circuit has stated that the requirement for valuing a patented technology during a hypothetical negotiation can be met "if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action" and the price for the hypothetical license may consider the "'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings.'"[624]   For example, the Court in *Finjan, Inc. v. Cisco Systems Inc.* found:[625]

> "Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty."   *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983).   Under this method, "[a] price for a hypothetical license may appropriately be based on

---

[620]   Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 33.   ("The cost method assesses the value of assets by measuring the expenditures necessary to replace the assets in question.   The historical cost to develop the intellectual property, or cost basis, is sometimes used to determine value.")

[621]   *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2020 WL 474650, at PDF 3 (D. Del. Jan. 29, 2020).

   See also:

   Leonard, Gregory and Lauren Stiroh (2005), "A Practical Guide to Damages," in Gregory Leonard and Lauren Stiroh, ed., *Economic Approaches to Intellectual Property: Policy, Litigation, and Management*, White Plains, NY: National Economic Research Associates, Inc. at 55–56.   ("The licensee's willingness to pay for the patent at issue is primarily driven by the profits flowing from the patent relative to the next-best alternative.   Most important in making this determination are the full economic costs of avoiding the patent.   The patent can be avoided by abandoning the infringing features or product lines and focusing on sales of other products incorporating a noninfringing alternative into the accused product lines, or designing around the patent.   Thus, a fundamental determinant of the value of the patent to the licensee is the availability of noninfringing alternatives.   This means that a necessary step in determining a reasonable royalty is to evaluate the option available to the licensee and, if possible, to determine the cost (in both time and dollars) of designing around the patent.")

[622]   Anson, Weston (2005), *Fundamentals of Intellectual Property Valuation: A Primer for Identifying and Determining Value*, Chicago, IL: American Bar Association, at 33.

[623]   *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080–1081 (Fed. Cir. 1983).   ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty. . . The method is appropriate where other approaches (such as established royalty or lost profits) would be 'difficult.'")

[624]   *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017).

[625]   *Finjan, Inc. v. Cisco Systems Inc.*, Case No. 17-cv-00072-BLF, Order on *Daubert* Motions, 4/17/2020, at 7.

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

consideration of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings.'" *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (affirming damages award that was based, in part, on the costs saved by renting an infringing backhaul structure versus building a non-infringing backhaul structure) (citation omitted). This "cost savings" method in determining a reasonable royalty compares the difference in cost "between what the defendant did that was infringing with a non-infringing alternative that the defendant could have done." *Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-CV-00453-RGA, 2020 WL 474650, at *2 (D. Del. Jan. 29, 2020).

(285)   I have discussed potential design-arounds with Eric Hunt, a Reynolds employee who has knowledge of the accused products and the proposed changes that would need to be made to avoid the alleged infringement.  I have also confirmed my understanding with discussions with technical experts Dr. Suhling and Mr. Kodama.

(286)   I understand that each of the proposed design changes discussed below could have been implemented with the PMTA filings for each of the accused VUSE products.[626]  Additionally, I understand that, if the proposed design-arounds work as well as the allegedly infringing design, then the use of a design-around would not make PMTA authorization less likely.[627]  I also understand that there is no indication that the timing of the review would be affected by including the proposed design-arounds in the original PMTA submissions.[628]

(287)   In relation to the proposed design-arounds, the Meyer Report states that "RJRV [has] not explained how it would have, much less provided any evidence that it could have, implemented its alleged design arounds of these products to address the FDA's compliance policy and therefore keep its redesigned products on the market in the U.S."[629]  The Meyer Report's argument is misguided.  The cost of a design-around would be a relevant consideration at the hypothetical negotiations since it can provide a reasonable measure of the value of the patented technology.  It would be improper to assign value to a technology based on potential delays that could arise from seeking PMTA authorization for an available alternative because such value would not be premised on the actual contributions of the technology.  Instead, the parties to the hypothetical negotiations would evaluate the proposed design-arounds in the context of a willing licensor and a willing licensee seeking to reach an agreement.

---

[626]   Interview with David B. Clissold.  See Attachment A-9.

[627]   Interview with David B. Clissold.  See Attachment A-9.

[628]   Interview with David B. Clissold.  See Attachment A-9.

[629]   Meyer Report, 2/24/2021, ¶ 484.

## 14.2.  The '265 patent

(288)  Based on discussions with Eric Hunt and Dr. Jeffrey C. Suhling, I understand that RJRV would be able to incorporate a non-infringing alternative to the '265 patent for the accused Alto products.[630]

(289)  I understand that the claims of the '265 patent require a thermal resistor in the shape of a sinuous line or dual coil.[631] ████████████████████████████
████████████████████████████████████████████████████████████
████████ .[632] ████████████████████████████████████
████████████████████ .[633]

(290)  According to Mr. Hunt, ████████████████████████████████
████████████████ .[634] ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████ .[635]

---

[630]   Interview with Eric Hunt.  See Attachment A-3.

Interview with Jeffrey C. Suhling.  See Attachment A-6.

See also:

RAI  Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4.

[631]   Interview with Jeffrey C. Suhling.  See Attachment A-6.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ("Each asserted claims [*sic*] of the '265 patent requires, *inter alia*, 'a thermal resistor comprising a metallic foil or a thin sheet in a shape of a dual coil and/or sinuous line.'")

[632]   Interview with Jeffrey C. Suhling.  See Attachment A-6.

[633]   Interview with Jeffrey C. Suhling.  See Attachment A-6.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ███████████████████████████████
████████████████████████████████

[634]   Interview with Eric Hunt.  See Attachment A-3.

[635]   Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ████████████████████████████████
████████████████████████████████████████████████████████████

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

[REDACTED] 636

[REDACTED] 637

[REDACTED] 638

## 14.3.   The '911 patent

(291)   Based on discussions with Eric Hunt and Kelly R. Kodama, I understand that RJRV would be able to design around the '911 patent [REDACTED] 639

[REDACTED] 640

---



636   Interview with Eric Hunt.  See Attachment A-3.

637   Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. [REDACTED]

638   Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. [REDACTED]

639   Interview with Eric Hunt.  See Attachment A-3.

Interview with Kelly R. Kodama.  See Attachment A-7.

See also:

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4.

640   Interview with Kelly R. Kodama.  See Attachment A-7.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. [REDACTED]

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ . [641]

(292)   According to Mr. Hunt, implementing such a change would be relatively simple and would not have any significant impact on product performance.[642] ██████████████████████████████████████████████████████████████████████████████████████

██████████████ . [643]

(293)   ████████████████████████████████████████████████████████████████████████████████████████████████████████████████ . [644]

_____

████████████████████████████████████████████████████

[641]   Interview with Kelly R. Kodama.  See Attachment A-7.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ████████

[642]   Interview with Eric Hunt.  See Attachment A-3.

[643]   RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ████████

[644]   Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4. ████████



(294)

(295)

645 Interview with Eric Hunt.  See Attachment A-3.

646 See Attachments E-1 and E-2.

647 See Attachment E-3.

648 Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4.

649 Interview with Eric Hunt.  See Attachment A-3.

RAI Strategic Holdings, Inc. and R.J. Reynolds Vapor Company's Nineteenth Supplemental Objections and Responses to Altria Client Services LLC, Philip Morris USA, Inc., And Philip Morris Products S.A.'s First Set of Interrogatories (No. 4), 3/24/2021, at Third Supplemental Response to Interrogatory No. 4.

650 Interview with Eric Hunt.  See Attachment A-3.

651 Interview with Eric Hunt.  See Attachment A-3.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

# 17.    Reasonable Royalties

(365)   Based upon the entirety of research and analysis contained throughout my report, including attachments and referenced materials, I have determined reasonable royalties for the patents in-suit as set forth below.  I have qualitatively and quantitatively addressed the *Georgia-Pacific* factors throughout my report.  Section 16 of my report outlines how I have addressed each *Georgia-Pacific* factor, with references to other parts of my report that provide additional detail on the impact of the factor on the determination of a reasonable royalty.  The approach detailed in my report demonstrates that the reasonable royalties set forth herein represent an upper bound.

(366)   As discussed in Section 8.4, reasonable royalties would be no more than ████████ for the '556 patent.  See also Attachment F-5.

(367)   As discussed in Section 13.2, ██████ is an appropriate percentage running royalty rate for the '545 patent.  Applying this percentage royalty rate to net sales of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSO Alto devices and cartridges respectively from June 29, 2014 through December 31, 2020 results in reasonable royalties for the '545 patent of ███████.[676]  See Attachment G-1.

(368)   As discussed in Section 13.3, ██████ is an appropriate percentage running royalty rate for the '265 patent.  Applying this percentage royalty rate to net sales of VUSO Alto cartridges over the damages period results in reasonable royalties for the '265 patent of ██████.  See Attachment G-3.

(369)   As discussed in Section 13.5, ██████ is an appropriate percentage running royalty rate for the '911 patent.  Applying this percentage royalty rate to net sales of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSO Alto cartridges over the damages period results in reasonable royalties for the '911 patent of ████████  See Attachment G-4.[677]

(370)   As discussed in Section 13.4, ██████ is an appropriate percentage running royalty rate for the '374 patent.  Applying this percentage royalty rate to net sales of VUSE Solo, VUSE Vibe, VUSE Ciro, and VUSO Alto devices and cartridges respectively over the damages period results in reasonable royalties for the '374 patent of ███████  See Attachment G-5.

---

[676]   I provide an alternative damages calculation in Attachment G-2 with damages starting on June 29, 2020.

[677]   Attachment G-6 shows reasonable royalties attributable to Solo G1 vs. Solo G2.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

(371)   Reasonable royalties based on the market approach for the '545, '265, '911, and '374 patents are shown below in Tables 7, 9, 10, and 11, respectively.  Table 8 shows reasonable royalties for the '545 patent with damages beginning June 29, 2020.

**Table 7: Market Approach Reasonable Royalties for the '545 Patent (6/29/2014–12/31/2020)**[678]

| Product | Reasonable Royalties | | |
|---------|---------|-----------|-------|
|         | **Devices** | **Cartridges** | **Total** |
| Solo | ■ | ■ | ■ |
| Vibe | ■ | ■ | ■ |
| Ciro | ■ | ■ | ■ |
| Alto | ■ | ■ | ■ |
| Total | ■ | ■ | ■ |

(372)   The reasonable royalties described above result in an effective per-unit royalty of ■ per unit for the '545 patent.  See Attachment G-7.

---

[678]   See Attachment G-1.

■■■ See: Meyer Report, 2/24/2021, ¶ 486–487, Table 13, Attachment 12.1. ■■■

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

**Table 8: Market Approach Reasonable Royalties for the '545 Patent (6/29/2020–12/31/2020)[679]**

| Product | Reasonable Royalties | | |
|---------|---------|-----------|-------|
|         | **Devices** | **Cartridges** | **Total** |
| Solo | ██ | ██ | ██ |
| Vibe | ██ | ███ | ███ |
| Ciro | ██ | ██ | ██ |
| Alto | ███ | ████ | ███ |
| Total | ███ | ████ | █████ |

**Table 9: Market Approach Reasonable Royalties for the '265 Patent[680]**

| Product | Reasonable Royalties | | |
|---------|---------|-----------|-------|
|         | **Devices** | **Cartridges** | **Total** |
| Alto | █ | ███ | ███ |

(373)   The reasonable royalties described above result in an effective per-unit royalty of ████ per unit for the '265 patent.  See Attachment G-7.

---

[679]   See Attachment G-2.

████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████ See: Meyer Report, 2/24/2021, ¶ 486–487, Table 13, Attachment 12B.
███████████████████████████ cartridges are found to infringe the '545 patent, reasonable royalties for the '545 patent for the VUSE Alto would be 0.

[680]   See Attachment G-3.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

**Table 10: Market Approach Reasonable Royalties for the '911 Patent[681]**

| Product | Reasonable Royalties | | |
|---|---|---|---|
| | Devices | Cartridges | Total |
| Solo | ██ | ████ | ████ |
| Vibe | ██ | ████ | ████ |
| Ciro | ██ | ████ | ████ |
| Alto | ██ | █████ | █████ |
| Total | ██ | █████ | █████ |

(374)   The reasonable royalties described above result in an effective per-unit royalty of ████ per unit for the '911 patent.  See Attachment G-7.

**Table 11: Market Approach Reasonable Royalties for the '374 Patent[682]**

| Product | Reasonable Royalties | | |
|---|---|---|---|
| | Devices | Cartridges | Total |
| Solo | ███ | ████ | ████ |
| Vibe | ███ | ████ | ████ |
| Ciro | ██ | ███ | ███ |
| Alto | ████ | ████ | ████ |
| Total | ████ | ████ | ████ |

(375)   The reasonable royalties described above result in an effective per-unit royalty of ████ per unit for the '374 patent.  See Attachment G-7.

(376)   Total reasonable royalties for the patents-in-suit as calculated herein are shown below in Tables 12 and 13, respectively.  Table 13 shows total reasonable royalties with the '545 patent damages beginning June 29, 2020.

---

[681]   See Attachment G-4.

[682]   See Attachment G-5.

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████    See: Meyer Report,
2/24/2021, ¶ 486–487, Table 13, Attachment 15A.

████████████████████████████████████████████████

---

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

**Table 12: Total Reasonable Royalties for the Patents-in-Suit[683]**

| Patent | Reasonable Royalties | | |
|---|---|---|---|
| | **Devices** | **Cartridges** | **Total** |
| '545 Patent | ■ | ■ | ■ |
| '265 Patent | ■ | ■ | ■ |
| '911 Patent | ■ | ■ | ■ |
| '374 Patent | ■ | ■ | ■ |
| '556 Patent | ■ | ■ | ■ |
| Total | ■ | ■ | ■ |

**Table 13: Total Reasonable Royalties for the Patents-in-Suit ('545 Patent Damages Starting June 29, 2020)[684]**

| Patent | Reasonable Royalties | | |
|---|---|---|---|
| | **Devices** | **Cartridges** | **Total** |
| '545 Patent | ■ | ■ | ■ |
| '265 Patent | ■ | ■ | ■ |
| '911 Patent | ■ | ■ | ■ |
| '374 Patent | ■ | ■ | ■ |
| '556 Patent | ■ | ■ | ■ |
| Total | ■ | ■ | ■ |

(377)   The reasonable royalties derived herein represent upper bounds for the following reasons. First, as discussed in Section 8.3.4, the Fontem patent families from which the reasonable



[683]   See Attachment G-8.
■ See: Meyer
Report, 2/24/2021, ¶ 486–487, Table 13, Attachments 12A, 15A.
■

[684]   See Attachment G-9.
■ . See: Meyer
Report, 2/24/2021, ¶ 486–487, Table 13, Attachments 12B, 15A.
■

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

royalty rates are derived are at least as valuable as the '545, '265, '374, and '911 patents. For example, the Fontem patents are widely licensed whereas the asserted patents are not. Second, in arriving at reasonable royalty rates, I do not assign value to ████████████████ ████████████████████████████████████████ even though these patent families and design patents are likely to have some value associated with them. In doing so, I assign more value to the Spray Atomizer, Air Channel, Reed Switch and Shell Design patents to which the '545, '265, '374, and '911 patents are comparable. Third, I utilize projected net sales through only 2025 when evaluating an effective royalty based on the Fontem-RJRV agreement. Utilizing sales projections through patent expiration for each patent family would result in a lower royalty rate. Fourth, as discussed in Section 8.4 in relation to the '556 patent, the parties would consider that, relative to the Ciro product, the allegedly infringing design on the Vibe provides no materials cost savings.

(378)   The royalties herein are reasonable and would be agreeable to the parties at the hypothetical negotiations for several reasons. First, the royalties are commensurate with or greater than the inherent value of the claimed inventions. As discussed above, the royalties represent upper bounds. Second, the royalties herein are in line with or greater than royalties determined by the market via the Fontem-RJRV agreement. See Section 13. Third, the royalty analysis herein accounts for and is consistent with the *Georgia-Pacific* factors, as discussed in Section 16. Fourth, the royalties for the '265, and '911 patents are reasonable in light of their potential costs for implementing a design-around. For example, the costs to implement a design around for the '265 patent would total ███████████████. See Section 14.2. The costs to implement a design around for the '911 patent would total ██████████. See Attachment E-3.

**Attachment D-4**

2018-Q4 Value of Net Sales of the Accused Products (2013–2030)

| Description | Source | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| █████ | █ | █████████ | ███████████████████████████████████████████████████████████████████████████████ |  |  |  |  |  |  |  |  |
| █████ | █ | █ █ | █ █ | █ █ | ███████ | ████████ | ████████ | █████████ | ████████ | ████████ | ██████ |
| █████ | █ | █ █ | █ █ | █ █ | █ █ | ████████ | ████████ | █████████ | ████████ | ████████ | ██████ |
| █████ | █ | █ █ | █ █ | █ █ | █ █ | █ █ | █ █ | ███████████████████████████████████████████████████████████ |  |  |  |
| ████████████ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| ████████████ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ | █ |
| ████████████ | █ | █ | ████████ | ████████████████████████████████████████████ | ████████ | ████████ | ████████ | ████████ | ████████ | ████████ |  |
| ████████████ | █ | █ █ | █ █ | █ █ | █ █ | ███████ | ████████ | ████████ | ████████ | ████████ | ██████ |
| ████████████ | █ | █ █ | █ █ | █ █ | █ █ | █ █ | ████████ | ████████ | ████████ | ████████ | ██████ |
| ████████████ | █ | █ █ | █ █ | █ █ | █ █ | █ █ | █ █ | ███████████████████████████████████████████████████████ |  |  |  |
| ██ | █ | █ | ████████████████████████████████████████████████████████████████████████████████████████████████████ |  |  |  |  |  |  |  |  |



| Description | Source | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Total |
|---|---|---|---|---|---|---|---|---|---|---|

*Notes and sources:*

[A]–[D]:

    2013–2019: Meyer Report, 2/24/2021, at Attachment 17.

    2020: from Attachment B-1 at Net Sales for each product.

    2021–2025: from Attachment D-2 at [A]–[D].

    2026–2030: from Attachment D-3 at [A]–[D].

[E] calculated as factor required to obtain present value as of 2018-Q4, around the time the Fontem-RJRV agreement was executed.  See:

    Fontem-RJRV US Settlement and License Agreement, 9/24/2018 (RJREDVA_001521385–1559, at RJREDVA_001521385).

    Calculation uses midpoint convention, where annual net sales are assumed to occur at the midpoint of each year:

        2013–2018: set to 0 since all net sales are assumed to occur prior to license execution date.

        2019–2030: calculated as Year - 2018 - 0.25.

[F] = 1 / (1 + Present value rate)^[E].

    Present value rate is equal to rate used in RJRV Ciro Business Case Workbook, c. 2017 (RJREDVA_001543081, at tab 'Solo+', cell B33).

| | |
|---|---|
| Present value rate: | 7.5% |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ See Attachment A-9 (Discussion with Nicholas Gilley).

[G] = [A] × [F].

[H] = [B] × [F].

[ ] = [C] × [F].

[J] = [D] × [F].

[K] = [G] + [H] + [ ] + [J].

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

**Attachment D-5**

Effective Royalty Rate for Fontem Portfolio

| Description | Source | Value |
|---|---|---|
| ███████████ | █ | █ ████ |
| ████████████████ | █ | ██████ |
| ████████████ | █ | ██████ |
| ████████████ | █ | ███ |
| █████████ | █ | ███ |

*Notes and sources:*

[A] from Meyer Report, 2/24/2021, at Attachment 11.

████████████████████████
████████████████████
████████████████

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER