```
              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA


RAI STRATEGIC HOLDINGS, INC.,      )
                                   )
          et al.,                  )  Civil Action
                                   )  No. 1:20-cv-00393-LO-TCB
          Plaintiffs,              )
                                   )  March 17, 2022
          v.                       )  2:00 p.m.
                                   )
ALTRIA CLIENT SERVICES, LLC,       )
                                   )
          et al.,                  )
                                   )
          Defendants.              )
```

*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*


APPEARANCES:

For the Counterclaim        **Maximilian Antony Grant, Esq.**
Plaintiffs:                 Latham & Watkins LLP (DC)
                            555 11th St NW, Suite 1000
                            Washington, DC 20004-1304
                            202-637-2200
                            Email: Max.grant@lw.com

                            **Elizabeth Stotland Weiswasser, Esq.**
                            Weil, Gotshal & Manges LLP (NY-NA)
                            767 5th Ave
                            New York, NY 10153
                            (212) 310-8000
                            Email: Elizabeth.weiswasser@weil.com

                            **William Sutton Ansley, Esq.**
                            Weil, Gotshal & Manges
                            2001 M Street, NW
                            Suite 600
                            Washington, DC 20036
                            202-682-7000
                            Email: Sutton.Ansley@weil.com

APPEARANCES: (Cont.)

For the Counterclaim    **Gregory K. Sobolski, Esq.**
Plaintiffs:    Latham & Watkins, LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
202-637-2267
Email: Max.grant@lw.com

**Brett Sanford, Esq.**
Latham & Watkins, LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111-6538
202-637-2267

**Jamie Underwood, Esq.**
Latham & Watkins LLP (DC-NA)
555 11th Street, NW
Suite 1000
Washington, DC 20004
202-637-2200
Email: Jamie.underwood@lw.com

**Brent Thomas Watson, Jr., Esq.**
Latham & Watkins, LLP
12670 High Bluff Drive
San Diego, CA 92130
858-523-5400
Email:thomas.watson@lw.com

For the Counterclaim    **Charles Bennett Molster, III, Esq.**
Defendants:    The Law Offices of Charles B. Molster
III, PLLC
2141 Wisconsin Ave NW, Suite M
Washington, DC 20007
703-346-1505
Email: Cmolster@molsterlaw.com

**William E. Devitt, Esq.**
Jones Day
77 West Wacker, Suite 3500
Chicago, Illinois  60601-1692
312-269-4240
Email: Wdevitt@jonesday.com

APPEARANCES:   (Cont.)

For the Counterclaim        **David Michael Maiorana, Esq.**
Defendants:                 Jones Day (OH)
                            901 Lakeside Avenue
                            Cleveland, OH 44114
                            216-586-3939
                            Fax: 216-579-0212
                            Email: Dmaiorana@jonesday.com

                            **Jason Todd Burnette, Esq.**
                            Jones Day
                            1420 Peachtree Street, NE
                            Suite 800
                            Atlanta, GA 30309
                            404-521-3939
                            Email: Jburnette@jonesday.com

                            **Frank Thomas Bayuk, Esq.**
                            Jones Day
                            1420 Peachtree Street, NE
                            Suite 800
                            Atlanta, GA 30309
                            404-521-3939
                            Email: Fbayuk@jonesday.com

                            **Sanjiv Prakash Laud, Esq.**
                            Jones Day
                            90 South Seventh Street,
                            Suite 4950,
                            Minneapolis, MN, 55402
                            612-217-8800
                            Email: Slaud@jonesday.com

                            **John Michael Machalik, Esq.**
                            77 West Wacker, Suite 3500
                            Chicago, Illinois 60601-1692
                            312-269-4240
                            Email: Jmachalik@jonesday.com

Court Reporter:             **Scott L. Wallace, RDR, RMR, CRR**
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA 2231-5798
                            703.549.4626
                            scottwallace.edva@gmail.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**AFTERNOON SESSION, MARCH 18, 2022**</u>

(2:25 p.m.)

THE COURTROOM CLERK:  The Court calls *RAI Strategic Holdings, Inc., et al. versus Altria Client Services, LLC et al.,* Case Number 1:20-cv-393.

May I have appearances, please, first for the plaintiff.

MR. GRANT:  Yes, Your Honor.  Mr. Devitt and I discussed it, and I think we're sort of, at least at this point, the plaintiff, so we're going to work it that way, if that's acceptable to the Court.

THE COURT:  That's fine.

MR. GRANT:  Good afternoon.  We appreciate the Court and staff making time this afternoon.  So some good news.  We've bolstered our team slightly with some attorneys from Weil Gotshal who, at our request, have been able to join us.  They've been handling a lot of the other litigation that's been going on outside of this jurisdiction, so I think that's going to contribute to a clean and efficient, organized trial presentation.

So, with that, let me introduce my co-counsel, Ms. Elizabeth Weiswasser.  The Court hasn't had the pleasure of meeting her before, but you're going to like her more than me.  Mr. Sanford you already know, Your Honor.  Ms. Underwood, who you've seen before.  Mr. Ansley, who works with Ms. Weiswasser.  Mr. Sobolski and Mr. Watson.  And I'm sorry that you're

1    outnumbered, but we're all going to be talking just a little bit

2    today.

3         THE COURT:  All right.  Good afternoon to each of you and

4    welcome to the Court.

5         MOLSTER:  Good afternoon, Your Honor.  Charles Molster on

6    behalf of the Reynolds entities.  I have several Jones Day

7    attorneys with me.  With the Court's permission, I'll just have

8    them introduce themselves to the Court when they speak, if that's

9    okay.

10        THE COURT:  Absolutely.  Good afternoon to you, and good

11   afternoon to each of you, and we'll hear from you in turn.

12        MR. MOLSTER:  One quick preliminary matter, if I may, Your

13   Honor.

14        THE COURT:  Yes.

15        MR. MOLSTER:  We want to make sure we budget our time

16   correctly today, and it is our understanding from our previous

17   discussions with you that you are going to have another either

18   phone call or something with us before trial on June 6th to talk

19   about where we are on COVID, jury selection, et cetera.

20        THE COURT:  Yes.

21        MR. MOLSTER:  We have several matters that we would like

22   to raise with you before trial, and we're happy to wait to do it

23   then rather than today.  I just want to make sure that we're

24   going to have that opportunity.

25        THE COURT:  You will have that opportunity, and, you know,

6

```
 1    I don't know how long we're going to go today.  I'm thinking that
 2    it's Friday afternoon.  After a couple of hours, you're probably
 3    not going to be getting much of my attention.  I may have drained
 4    the tank.  So, if we need to come back another time, hopefully
 5    not all of you will be necessary to address any subsequent
 6    discreet issues, but the goal is to get the case framed for trial
 7    beforehand so that you all can prepare timely for the trial and
 8    not get any last minute surprises.
 9         So, you know, as you know, I've got that big gang case
10    coming up, and it's going to take up, you know, most of April and
11    half of May, but that doesn't mean we can't do something on a
12    Friday afternoon --
13         MR. MOLSTER:  Okay.
14         THE COURT:  -- or over the telephone, or at lunch, you
15    know, a lunch break.  So, we'll get it in, and I won't leave you
16    hanging at the last minute.
17         MR. MOLSTER:  Thank you.  Whatever works for you, we'll
18    make ourselves available.
19         THE COURT:  Okay.
20         MR. MOLSTER:  Thank you, Your Honor.
21         THE COURT:  Certainly.  Well, I identified, in response to
22    your call, which I appreciate, that you wanted to focus in on
23    what I was interested in hearing and you were interested in
24    hearing about, and I gave you a list of eight or nine issues,
25    mostly regarding the experts, and -- but they also dovetail into
```

```
 1    different in limine motions, and then the two added motions.  One

 2    was the motion to limit the number of asserted claims, which I

 3    see that you're still dancing around on that one, and then the

 4    Liu dispute regarding the '374 Patent on my plate.

 5         I don't know how you wanted to proceed.  Have you all

 6    talked about how you're going to proceed?

 7         MR. GRANT:  Your Honor, I just assumed, but we haven't

 8    discussed it, that we'll go in the order that you and the Court

 9    provided, and I think we've all been operating on the assumption

10    that we have about an hour each, and we've sort of divvied up the

11    11 motions that are up into roughly that amount, that timeframe,

12    and I think that's what we suggested to our colleagues here, and

13    I think they've probably done the same thing.

14         So, if it's all right with the Court, unless there's an

15    objection, I think we can just go in your order, and then we'll

16    spend more time on some and less time on others but end up right

17    around that 60-minute mark.

18         THE COURT:  Okay.  Does that work?

19         MR. BAYUK:  Yes, Your Honor.  We're prepared to proceed in

20    the order that you told us about on Wednesday, and we appreciate

21    that, if that works for you.

22         THE COURT:  Good.  Well, that's great, then, and let's get

23    rolling.

24         MR. BAYUK:  Right.  So, Your Honor, and thank you again

25    for accommodating us.  My name is Frank Bayuk on behalf of the
```

1    Reynolds entities.  The first motion on Your Honor's list was

2    Reynolds' motion in limine number 11 related to the IQOS product.

3            THE COURT:  Yes.

4            MR. BAYUK:  And I think this can be argued in a fairly

5    straightforward manner.  The relief we're seeking is pretty

6    straightforward.  Essentially, we're asking Your Honor to exclude

7    evidence about the IQOS product.  The IQOS is a -- what's called

8    a heat-not-burn device, not at issue in the current posture of

9    this case.

10           I'm sure Your Honor will remember Reynolds originally

11   filed this case asserting various infringement claims involving

12   that device at PM's request, and I know it's PM, various PM

13   entities and Altria.  For brevity, I'm just going to call them

14   PM, if that's okay.

15           THE COURT:  Okay.

16           MR. BAYUK:  They asked Your Honor to stay Reynolds'

17   affirmative infringement claims in the case and just proceed on

18   their counter claims.  Your Honor granted that motion, which, in

19   our view, essentially would take IQOS out of the case.  It seems

20   clear that PM wants to put on evidence regarding the IQOS device.

21   The fact is I think the most important and really kind of

22   dispositive issue is that none of the technology used at IQOS has

23   anything to do with the patents that are at suit here.

24           THE COURT:  So that's not in dispute, right?

25           MR. BAYUK:  It's not.  There's absolutely no dispute about

```
1    that.  There's no dispute that anything related to IQOS has any

2    relevance to the claims of infringement or the defenses to

3    validity that PM will put on.

4         And so really the two issues that PM says IQOS is relevant

5    to, one relates to damages, Georgia-Pacific, we agree.  We agree

6    they can put on very limited evidence of IQOS that goes to factor

7    number 5 under the Georgia-Pacific case to demonstrate the

8    competitive nature between the parties.  I really don't think

9    there's any dispute that the parties are fierce competitors

10   involving various automatic or at least combustible cigarettes

11   and noncombustible next generation products, including IQOS.

12        I don't think IQOS even really needs to be discussed to

13   demonstrate that, but the plaintiff or Phillip Morris in their

14   opposition briefs cited a few paragraphs from the expert report

15   of Mr. Meyer.  We agree that the essence of those paragraphs that

16   they cite could come into evidence to help demonstrate this

17   evidence as to factor number 5.

18        The second component, though, is the problematic one.  PM

19   says that they want to put on evidence of IQOS as it relates to

20   the FDA regulatory scheme and that FDA's treatment of IQOS sheds

21   light on the patented technology issue here as it relates to

22   damages, and that's our big -- our big problem.  We completely

23   disagree with that, and the premise of that is this:  Nothing

24   that the FDA did with respect to IQOS has anything to do or had

25   anything to do in their review with any of the patents-in-suit
```

10

```
 1    here because, as we said, none of the patents-in-suit here are
 2    even used in the IQOS device.  FDA has never reviewed anything
 3    related to any of the patents that PM is pursuing here as part of
 4    IQOS.  Really, there's no relevance in this case to getting into
 5    the FDA regulatory scheme.
 6         We had a whole proceeding about that last year involving
 7    some of these same lawyers and the ITC where those issues were
 8    front and center, and they were front and center, number one,
 9    because the IQOS technology was at issue, but there was also an
10    issue related to the public interest.  And so the whole FDA
11    assessment of what's beneficial for the public was front and
12    center in that case; not so here where the issues relate to
13    patent infringement.  And so we disagree that there should be any
14    evidence of FDA regulation as it relates to IQOS or any of the
15    FDA documents or an assessment of the IQOS technology.  I don't
16    think that PM will disagree, and I don't think that they'll be
17    able to show any documents -- they certainly didn't cite any in
18    their opposition to show that the FDA approved any of the
19    technology as part of its IQOS review that would be pertinent to
20    the issues in this case.
21         And so PM knowing that resorts to an argument that goes
22    like this, and I'll use the '545 Patent, for example, that
23    relates to battery technology.  Essentially, what Phillip Morris
24    is saying is that the '545 Patent relates to battery technology;
25    IQOS, also uses a battery and battery technology, not anything to
```

11

1    do with the '545 technology.  But IQOS has a battery.  The FDA

2    reviewed IQOS and made some comment that the battery in IQOS

3    worked and performed consistently.  That must mean that FDA means

4    that batteries are important, and that must mean that the FDA

5    would think the '545 technology is important.

6         You're going to hear, I think, after me, argument on one

7    of Philip Morris's experts that goes more to this issue, but

8    there's simply no evidentiary basis for any of those leaps.

9    There's not even a little evidence.  There is simply no

10   foundation at all for making that argument or any relevance to

11   the regulatory scheme regarding the IQOS device as it relates to

12   the issues in this case.

13        Because of that, we've also, you know, made a 403 argument

14   here.  It's not really a "does the prejudice outweigh the

15   probative value?"  There's simply no probative value for what PM

16   wants to do, so I think it's only unfair prejudice.  And the last

17   point I'll make is, if Your Honor is inclined to admit evidence

18   of the IQOS device and FDA, FDA's treatment of that device beyond

19   the limited purpose for -- or the limited amount of evidence

20   under the Georgia-Pacific factor, then we would ask that the --

21   we would be entitled to tell the full story of the IQOS device,

22   including what happened in the ITC and the technology and where

23   that technology came from, and the fact that IQOS is currently

24   banned or excluded from sale in the U.S.

25        We think that if Your Honor permits a broader discussion

1     of that, then we need to be able to complete the picture.  So, in

2     essence, we ask Your Honor to exclude evidence regarding IQOS and

3     FDA regulation, other than the few limited paragraphs that are in

4     Mr. Meyer's report as it goes to the Georgia-Pacific factor.

5          THE COURT:  So, what products are actually on the market

6     that Altria or its family and Reynolds and its family market

7     today in the United States?

8          MR. BAYUK:  In the United States, my memory is that PM --

9     that Philip Morris slash Altria just sells combustible -- in

10    terms of nonoral tobacco products, PM just sells combustible

11    cigarettes.  They can't sell IQOS.  I don't believe they have

12    their own electronic nicotine product.  They have JUUL, which

13    is --

14         THE COURT:  And what's your position on whether JUUL is

15    part of the Altria family and should be a factor in the courts in

16    damages, et cetera?

17         MR. BAYUK:  We think JUUL has relevance to damages.  I

18    mean, depending on Your Honor's ruling on IQOS, we might revisit

19    that position as to JUUL, but JUUL potentially has or does use

20    some of the patent technology, depending on whether there's

21    infringement or not.  We obviously say there's no infringement,

22    but I think JUUL is much closer than IQOS, which is, as I say, no

23    dispute, doesn't use any patents.

24         THE COURT:  Right.

25         MR. BAYUK:  But PM owns, I think, a 35 percent stake in

1    JUUL.  You know, I think, in essence, it can be considered a PM

2    product.

3         THE COURT:  There hasn't been any analysis that I've seen

4    on matching JUUL's product with the patent claims, though; is

5    that right or not?

6         MR. BAYUK:  I think that is right.  I think the closest

7    the evidence -- the record evidence so far is that if there is

8    infringement -- if infrequent was found as to the accused

9    Reynolds products, that JUUL would also practice one or maybe two

10   of the patents or has in the past two weeks.

11        THE COURT:  And what JUUL products have been approved by

12   the FDA?

13        MR. BAYUK:  My memory is that it's the Solo products.

14   Solo products has been granted PMTA and authorization; the other

15   applications are pending.

16        THE COURT:  Pending.  Okay.  Thank you.

17        MR. BAYUK:  All right.  Thank you.

18        THE COURT:  All right.

19        MR. SANFORD:  Good afternoon, Your Honor.  Brett Sanford

20   on behalf of the plaintiffs.  May I proceed?

21        THE COURT:  Yes, sir.

22        MR. SANFORD:  Thank you.  Your Honor, I want to start with

23   your questions, which were pointed about what products are on the

24   market as of today and what products have been authorized,

25   because that's an important component of this case.  The

1    regulatory authorization of IQOS, the heat-not-burn product, and

2    the accused products in this case.  It's relevant to many issues

3    that we're going to talk, presumably, a lot about today with

4    respect to the design-around and damages.

5         But, for the context of this motion, it's important for

6    two reasons.  So, first, I think, as counsel stated correctly,

7    it's undisputed that IQOS and evidence about IQOS is relevant to

8    Georgia-Pacific factor 5 in the competition.  It's not just, to

9    correct the record, Mr. Meyer, the plaintiff's expert talks about

10   it; their expert does it too.  That's in our briefing.  Both

11   experts consider it.  They have a disagreement about the scope,

12   and that's fine.  We'll fight about that at trial, but there's no

13   reason to exclude that evidence.

14        So, separately, with respect to this FDA issue, we agree

15   that IQOS is not relevant to infringement or validity and it

16   doesn't practice.  But where counsel overstepped, we would

17   submit, is the reputation that the technology that the FDA

18   reviewed when reviewing IQOS has no relevance to this case, and

19   that the technology at issue in this case has nothing to do with

20   what the FDA looks at.  That's just wrong, Your Honor.  We do

21   dispute that.  And then that was backed up, I believe, by the

22   representation that we didn't cite a single document showing that

23   the FDA considers these various features when determining what

24   products or authorizations.  I would just point the Court to

25   Exhibit G to our opposition, which is one of the many documents

1    that Ms. Ehrlich, who Mr. Grant will address in a few minutes,

2    discusses.

3         And the reason it's important here, Your Honor, is not

4    because IQOS practices the patents and that shows a value.  What

5    Ms. Ehrlich does is she identifies the features -- she's an FDA

6    expert -- and looks at what does FDA consider when they go

7    through this review process.  They went through it with IQOS

8    already.  That's the precedent.  It was authorized, and we know

9    that.  The Vuse products are going through that right now.  We

10   have one that has been authorized for a few flavors; the others

11   are pending review.

12        She looks at that evidence, among other evidence, to

13   determine what's relevant, what's important to the FDA, and our

14   technical expert matches it up, and then our damages expert

15   articulates the value.  It's highly probative to damages, Your

16   Honor.

17        There's no reason to exclude that or to limit the scope on

18   what the experts and the fact witnesses can talk about with

19   competition.

20        THE COURT:  So, if Ms. Ehrlich, if I find that her

21   testimony is not relevant, it's speculative, then IQOS goes out

22   as probative of anything other than damages?  Is that fair to

23   say?

24        MR. SANFORD:  For -- other than damages, correct, but it's

25   still relevant to factor 5 and the authorization goes in, the

1    specific things the FDA reviewed.  That's correct.

2        THE COURT:  Okay.  Go ahead.

3        MR. SANFORD:  Finally, Your Honor, the last point on the

4    opening the door in the 403, the only 403 argument you really

5    hear from them, that we're going to tout IQOS at trial, and I

6    just want to assure the Court that we'll use references to IQOS

7    and evidence to IQOS for the purposes described in our motion,

8    and any concern they have about opening the door is an issue for

9    trial.  It's premature to address in a broad ruling at the in

10   limine stage.

11       And also on the door opening issue, and Mr. Grant

12   will address this more in our motion regarding IQOS, mere

13   references to competition and authorization and pointing to what

14   the FDA considers comes nowhere near opening the door to the ITC

15   proceedings that's under review, nonfinal, and one of the patents

16   has been invalidated -- or two of the patents have been

17   invalidated already.  That's the minitrial that we should avoid

18   through this in limine process, not excluding relevant evidence

19   to damages.

20       THE COURT:  All right.  Thank you, Mr. Sanford.

21       Did you build in replies or do we go on to the next

22   motion?

23       MR. GRANT:  I think for in limines they don't make sense,

24   Your Honor.

25       THE COURT:  I agree.  All right.  Then let's address

17

1   Ms. Ehrlich.

2        MR. MAIORANA:  Thank you, Your Honor.  David Maiorana on

3   behalf of the Reynolds parties.  I'm going to address the Ehrlich

4   motion.

5        THE COURT:  All right.  Please.

6        MR. MAIORANA:  I want to say at the outset, no one is

7   challenging Ms. Ehrlich's credentials.  She's an FDA lawyer.

8   She's accomplished.  She went to Harvard Law School.  We saw all

9   of that in the papers.  That's really irrelevant to what our

10  motion is about.  What she is purporting to tell the jury is what

11  the FDA would find important with respect to the patents-in-suit.

12       She wants to offer speculative opinions about what FDA

13  might consider important to try to bolster the value of these

14  certain patents in the jurors' minds, and she has no idea what

15  FDA might consider.  She admitted that over and over again, both

16  in her own report in her own words and in her deposition.

17       She has no reliable methodology to back up her purported

18  testimony here, Your Honor.  She doesn't know if FDA would even

19  care about these patented features.  And when I say patented

20  features, the only thing we've seen in her report and in the

21  briefing here is general, vague concepts like battery and safety.

22  Those are the concepts that she is trying to say the FDA would

23  find important.  But in her own report, her own words, Your

24  Honor, in Exhibit 1 to our motion at paragraph 146, she says "it

25  remains unclear to the entire industry how the agency will

1    evaluate these applications."

2         She didn't say reasonable minds may differ.  She knows/

3    she doesn't know.  "The entire industry, it's unclear to them how

4    the agency will evaluate these applications".  Those are her own

5    words in her own report.  In her deposition when we questioned

6    this testimony, she said there's no way to know exactly what FDA

7    considers in issuing a PMTA authorization.  "I don't know why the

8    FDA does or doesn't do the things it does or doesn't do.  I'm not

9    privy to FDA's decision-making process."  Then we asked her

10   questions specifically about these patents-in-suit and the

11   technology because she wants to tell the jury that the FDA thinks

12   these patents are important.

13        These specific patents in this case are important to try

14   to bolster their value in the jurors' minds.  She said, I don't

15   know what FDA thinks about anything unless they directly

16   addressed it in public statements, which they haven't, with

17   respect to this patent.

18        The testimony from her report and in her deposition

19   couldn't be more clear, Your Honor.  She has no idea.  She may be

20   an outstanding FDA lawyer, but she doesn't know what FDA

21   considers important.  She's admitted that.  So she shouldn't be

22   permitted to come in and tell the jury what FDA believes is

23   important.  If they wanted to provide testimony to the jury about

24   what FDA thinks is important, they should have subpoenaed an FDA

25   witness to come in and say what the FDA thinks is important.

1      THE COURT:  Of course, they're not subpoenable, just like

2  a patent examiner.  You can't get to them for really good

3  reasons, because they would spend all their time in a courtroom

4  instead of in their offices.

5      So she has, you know, collected over the years information

6  about e-cigarettes and what the FDA is targeting, you know, the

7  battery, the leakage, the uniformity of the draw, and that's more

8  than just speculation.  She knows that from -- even from just

9  looking at the rejections or the extensions that were provided to

10  the parties, which I guess would be endless unless Judge Grim had

11  intervened, because the FDA -- obviously this is an enormous

12  undertaking that they were clearly choosing to slow roll.  But

13  how does that factor into your thoughts?

14      MR. BAYUK:  So, what PM says her expertise is is

15  experiential expertise, and certainly the case law allow for

16  experts to opine to the jury based on their experience, and if

17  they don't have expertise in a particular area -- but the

18  experiential witness has to have reviewed the relevant materials

19  to be able to apply that experience to the facts of the

20  particular case in order to provide an opinion to the jury.

21      Here, Ms. Ehrlich admits she hasn't even read the

22  technical portions of the Reynolds' PMTAs.  She wants to tell the

23  jury that the FDA will find important the technology of the

24  patents-in-suit when they're reviewing the technical portions of

25  Reynolds' PMTAs, but she hasn't even read those PMTAs, and she

1    admits she's not qualified to read those PMTAs.  Now PM in their

2    opposition points to the fact that she talked to their technical

3    experts, but that's a problem, Your Honor.  You can't take

4    somebody else's expertise, say I'm an experiential expert, not

5    read the thing that you're going to tell the jury that the FDA

6    would find important when reviewing -- the case law doesn't

7    support that.  The *Lance* case clearly makes the point that the

8    experiential expert has to have reviewed the materials that are

9    pertinent in order to provide testimony based on that

10   experiential expertise, and she has admitted she hasn't reviewed

11   those parts of the PMTAs, and she's not qualified to do that.

12        She can speculate -- she is speculating what FDA may or

13   may not find important.  Certainly she has represented clients

14   before the FDA, but she candidly admitted in her report that no

15   one in the industry knows how the FDA is reviewing these

16   applications.  That's part of the problem and the reason that

17   Judge Grim was brought in, because there's frustration among some

18   public groups that these applications aren't being reviewed fast

19   enough.

20        So her experience in representing clients before the FDA

21   doesn't permit her to get past the gatekeeping function unless

22   she is applying that experience to the facts and data of the

23   case, and she's admitted she's not reviewed and isn't qualified

24   to review the technical aspects of Reynolds' PMTA, which is the

25   only thing that her testimony could possibly be relevant to, is

1    that the FDA would find the patents-in-suit technology important

2    when reviewing the technical aspects of Reynolds' PMTAs.

3            Another issue with Ms. Ehrlich, Your Honor, is she doesn't

4    try to quantify this particular benefit she said would exist.  So

5    she said, "I don't think anyone can provide that opinion.

6    There's no way of knowing.  I mean, there are a million different

7    variables there."

8            That's from her deposition, Exhibit 2.  She doesn't know

9    how much the FDA would find this to be important.  She doesn't

10   even know if they would be able to find it important, if they

11   would find it important, and because she can't quantify it, she

12   can't provide any helpful testimony to the jury.

13           So, even putting aside she has experience in this area,

14   applying to this specific fact situation, she doesn't even know

15   how much to quantify it.  But somebody who did try to put a

16   number on it is the plaintiffs' damages expert.  He added a █

17   █████   █████████   on the '545 Patent based entirely on

18   Ms. Ehrlich's opinion.  She says, Oh, the FDA would find it

19   important, and he goes, Well, I'm going to add on another █

20   █████.  That's the danger of her testimony.  This isn't just an

21   academical thing, Your Honor.  They're trying to use her

22   speculative testimony to increase the damages opinion of their

23   expert.

24           Now, a couple other points quickly, Your Honor, on

25   Ms. Ehrlich.  She wants to provide an opinion that Reynolds'

1    products are illegal.

2          That's clearly a legal opinion.  Her opinions are far more

3    than a factual recitation of FDA's policies.  PM wants her to

4    come in here as a lawyer and as an expert and tell the jury what

5    the law is.  Whether or not the FDA thinks Reynolds' products are

6    illegal, first of all, are irrelevant to any issue before the

7    jury in this case because it has nothing to do with patent

8    infringement or invalidity or damages.  It's just a way to try to

9    stain Reynolds in the eyes of the jury.  But it is a legal

10   opinion.  It is a lawyer coming in here to tell the jury what the

11   law is, which is improper, and we cite a number of cases in our

12   briefing, Your Honor, about why that's improper.

13         The last issue on Ms. Ehrlich is that she has some

14   extraneous topics, as we all them in our motions.  The first is

15   about Reynolds products being illegal, and we have a separate

16   motion in limine on that one.  We can start with in limine motion

17   number 1.  She talks about youth vaping and associates youth

18   vaping with Reynolds.  That has nothing to do with any issue in

19   this case.  It's merely to try to stain Reynolds in the eyes of

20   the jury, that somehow they're the reason why there's youth

21   vaping when that is clearly not true and really irrelevant to

22   anything in the case.  We have a motion in limine on that.

23         So her testimony on these extraneous topics is not tied to

24   any fact or anything that the jury is going to be asked to decide

25   in this case, Your Honor.  So I'll save a little bit of time in

1    rebuttal, if Your Honor would indulge me.

2         THE COURT:  Yes, sir.

3         MR. MAIORANA:  Thank you.

4         MR. GRANT:  Your Honor, I have just a couple of slides

5    that I think are going to really help here.  I know you're

6    skeptical.

7         THE COURT:  Tell me why this isn't any different than your

8    trying to get a former commissioner of the patents to come in and

9    talk about how a patent gets issued and office actions and then

10   goes beyond that, goes into the framework and starts talking

11   about what's important to the examiner.

12        MR. GRANT:  If we can put slide 5 up.  This is what you

13   need to understand, Your Honor, for the context.  They filed

14   *Daubert* on all our experts.  They've accused Ms. Ehrlich of not

15   being a technical expert.  They accused Mr. McAlexander of not

16   being an FDA expert, et cetera, but this is how this testimony

17   fits together.

18        So the Court understands the regulatory framework here,

19   without FDA authorization, the products cannot be sold.  The

20   products that are presently being sold without authorization,

21   presuming that they're grandfathered in, they were on the market

22   before 2016, are illegal, undisputedly, but being sold because

23   the FDA said for now we may not enforce that.  We may, but we may

24   not.

25        So here's how it fits together, Your Honor.

```
 1          Mr. McAlexander talks about the two patents that are
 2    important from a regulatory perspective.  One is the '545.
 3    That's battery technology.  But the other one is a '374 which
 4    basically is a technology that says the vaping product won't
 5    start unless you suck on it.  It won't start if you blow on it
 6    the way, for example, someone who's not a real smoker might do
 7    like a youth.  So he talks about, okay, this is what the patents
 8    cover, modulated, controlled pulses from a Lithium battery,
 9    improved battery functionality, less risk of overheating.
10          Ms. Ehrlich then looks at the FDA's statements.  These
11    aren't her opinions, these are the FDA statements, just like the
12    MPEP has a statement about what the policy is.
13          And what she does is she looks at part at the IQOS
14    approvals because there are so few approvals.  There have been
15    thousands -- tens of thousands of these submitted.  They
16    submitted ███   They've only had one device approved, and the
17    others aren't approved.  So it's hard to find where the FDA says
18    what technology is important.
19          Among the technology that's important is, no surprise,
20    power management, reduced battery overheating, no battery
21    explosions.  These FDA statements are based on ███████████
22    submissions.  You saw they spent ███████ on their submissions.
23    We spent ███████████ on ours.  The FDA reviews those things
24    and then these are public statements like my friend said they
25    weren't.  These are public statements by the FDA about what
```

```
 1    technology was important to the approval.

 2         Then, because the patented technology -- Mr. McAlexander

 3    determines what's infringed and what's patented -- Ms. Ehrlich

 4    says, Oh, that technology, that feature, that commercial feature

 5    you're talking about, the FDA has said that's important to

 6    approval.  Then Mr. Meyer says, Well, if that's true, technology

 7    that's important to regulatory approval, which is a go/no go

 8    decision on marketing and commercialization, results in a higher

 9    royalty because it's more valuable.

10         I respectfully submit, Your Honor, for a regulated

11    product, this is the only way that you could describe what

12    technology is important and the only way that you could quantify

13    it.  Mr. Meyer quantifies it.

14         THE COURT:  Well, couldn't you get there by -- to Meyer's

15    damages assessment by taking out Ehrlich?  Isn't she just

16    repeating what --

17         MR. GRANT:  -- so let me just --

18         THE COURT:  -- is saying.

19         MR. GRANT:  Let me tell you the only way we can do it,

20    Your Honor, and here's the problem.  Could you put up slide 7?

21    And so as to the legal issues that Reynolds raises, they're all

22    undisputed, right.  These are all -- it's no different than a

23    patent expert saying here's what the duty of candor is.  So

24    here's the undisputed regulatory context, that if the product is

25    not on the market in 2016, it's not grandfathered in and is off.
```

1          And if the PMTA approval, the FDA approval wasn't filed by
2   September 2020, it's completely off.
3          So only grandfathered products for which applications were
4   filed in 2020 can be on.  You see this hypothetical negotiation
5   here?  What Reynolds is saying is -- they're saying we're
6   pretending that there are design-arounds and those design-arounds
7   drive down the royalty at the hypothetical negotiation, and
8   they're ignoring that those design-arounds have to be approved by
9   the FDA.
10         So all of this is part of that.  What does the FDA
11  consider important, and you can't have a design-around that's
12  available in 2018 if it's not approved, not grandfathered in.
13  So --
14         THE COURT:  So what is it -- so then you have the evidence
15  on cross-examination that you've got these six-month extensions
16  being given out like candy and that the FDA is taking years and
17  years to get to this.  All -- if this is coming in, then all of
18  that's relevant, and that there's no end date.  This is all
19  speculation as to when the FDA is going to get around to
20  approving any of these devices.
21         MR. GRANT:  Right.
22         THE COURT:  And Ms. Ehrlich, I think, also says it's
23  likely that none of these devices are going to be approved, and
24  so -- what does a jury do with that information and why is it --
25  if it's relevant, how does a jury use that information?

```
 1          MR. GRANT:  Yeah.  It's not.  It's speculation, Your
 2     Honor.  So here's the issue.  See that slide which says "August
 3     2016."  The ruling that's important is the Clissold and Sullivan
 4     ruling.  If products aren't on the market in 2016, they're not
 5     available as a noninfringing alternative at the hypothetical
 6     negotiation.  And if you rule that way, then a lot of this
 7     testimony, I agree, goes away, but the whole reason why we're
 8     having this testimony is they're claiming that there's this
 9     hypothetical world and they could have filed an FDA application.
10     And if they filed it, it could have been granted.  That's all to
11     create a nonexistent -- to contrive out of thin air a
12     noninfringing alternative from a hypothetical negotiation that
13     can't exist, as a matter of regulatory law.  That's the problem,
14     and that's where it all comes from.
15          And then the only other things I would say, Your Honor,
16     the youth issue, that's a very minor issue, and it just means the
17     '374 technology, which means blowing isn't good enough to fire up
18     the e-vapor device, is important because it's part of what the
19     FDA considered in mitigating youth risk.  And that whole thing
20     about the thing being illegal.  Give me the next slide --
21     everybody agrees, their expert agrees they're illegal.  So the
22     legal issues that they're complaining about are agreed on and
23     undisputed, no different than the duty of candor.  And the
24     problem is Reynolds' effort to introduce regulatory impossible
25     noninfringing alternatives to the hypothetical negotiation to
```

```
 1    drive it down and that's wrong.

 2         THE COURT:  Okay.  Thank you.  Mr. Maiorana.

 3         MR. MAIORANA:  I'm cognizant that I don't want to use up

 4    the time of my colleagues, so I'll be really brief, Your Honor.

 5    All that you heard is a complete and utter sideshow.  This is a

 6    patent infringement case.  The jury doesn't need to know if

 7    products are illegal or not illegal.  They're not going to decide

 8    that.  It has no relevance as to whether or not these products

 9    infringe Philip Morris and Atria's patents.  The issue around --

10         THE COURT:  The design-around got my attention.  If --

11    and, of course, there's a motion in limine to preclude your

12    expert from testifying about speculative design-arounds that

13    weren't in existence, but tell me what's your response to that.

14         MR. MAIORANA:  I'm going to argue the Clissold motion,

15    Your Honor, if we get to it, hopefully.  And the issue there is,

16    under the reasonable royalty analysis -- there's no loss profits

17    claim in this case, so, under loss profits under factor 2, the

18    plaintiff has to show that, but for the infringement, they would

19    have made the infringing sales, and one way for the defendant to

20    rebut that is to say there is an acceptable noninfringing

21    substance.

22         THE COURT:  Yeah, I understand the law.  I understand the

23    law.

24         MR. MAIORANA:  So the design-around that we're talking

25    about in this case relates to reasonable royalty.  It's a much,
```

```
1   much lower standard for showing.  It doesn't have to be
2   acceptable.  It doesn't have to be on the market.  It doesn't
3   even have to be made.  It doesn't even have to exist, it just has
4   to be an idea in the mind of the parties who are doing the
5   hypothetical negotiation, and it could, as one of the fifteen
6   Georgia-Pacific factors, drive down the royalty rate.  All
7   Mr. Clissold said -- I'm sorry, Your Honor.  Go ahead.
8           THE COURT:  It has to be an idea that they have at the
9   time of the negotiation, right?
10          MR. MAIORANA:  No, it doesn't.  It doesn't have to exist
11  at the time of the negotiation.  It just has to be possible, and
12  the issue that my brother said and his argument was, if it's not
13  FDA authorized, then it can't be sold, but that's not the test.
14          The test is whether or not the defendant could have, and
15  there's case law in our briefing saying "could have" is enough
16  under the reasonable royalty noninfringing alternative.  We're
17  not talking about loss profits.  That's a much higher bar.  So
18  all this FDA stuff a complete sideshow and has nothing to do with
19  the issues.  And really the reason that the plaintiffs want to
20  bring it in is to trumpet how great IQOS is and make it look like
21  they're the innovators and they have IQOS and they have
22  authorization, which we tried ad nauseum in the ITC, but those
23  issues aren't relevant for what the jury is going to be asked to
24  decide.
25          THE COURT:  All right.  Thank you.
```

```
 1          MR. MAIORANA:  Thank you.

 2          THE COURT:  All right.  Number 3.

 3          MR. DEVITT:  Number 3, Your Honor.  Bill Devitt, Jones

 4   Day.

 5          THE COURT:  Good afternoon.

 6          MR. DEVITT:  Good afternoon.  We're talking about the

 7   expert Joe McAlexander, who is Altria/Phillip Morris's technical

 8   expert on two of the patents, the '545 Patent and the '374

 9   Patent.

10          Our motion, Your Honor, is -- we tried to --

11   Mr. McAlexander is a professional expert.  He's an electrical

12   engineer by training, but he's gone a little bit beyond technical

13   expertise, and that's where we tried to reign him in.  We're just

14   trying to have him stay in his lane, so to speak, Your Honor.  So

15   I'm going to point to four points.  The second point will really

16   be 2A and 2B.  So the first point is the regulatory.

17          Mr. McAlexander certainly can talk about the '545 Patent,

18   and he can talk about lithium-ion batteries, and he can talk

19   about pulse-width modulation.  Well, he shouldn't be able to say

20   that they created the idea of pulse-width modulation because it's

21   not in that patent -- it's in the patent, but he didn't invent it

22   -- or Altria didn't.  But he shouldn't be able to say, Your

23   Honor, and we point this out in our reports in paragraphs 78, 81

24   of his opening report.  He shouldn't be able to say the '545

25   patented inventions have significant regulatory importance to the
```

```
 1    FDA in its review of the PMTAs.

 2         He shouldn't be able to say in paragraph 668 that the use

 3    of pulse modulation to conform the discharge current to the

 4    battery's specification has significant regulatory importance

 5    from a safety perspective.  He just needs to stay in his lane and

 6    talk about technical issues and not regulatory issues.

 7         That's our first issue, Your Honor.  The second issue has

 8    two parts.  The first is Mr. McAlexander can give his opinions;

 9    what he shouldn't be doing is being a mouth piece and just

10    testifying as to the invention story for both the '545 Patent and

11    the '374 Patent.

12         That evidence should come in, if at all, through the

13    percipient witnesses, the inventors who he relies on.  But he has

14    long narratives, Your Honor, in his report that we've identified,

15    and I can point those paragraphs out if you'd like, but --

16         THE COURT:  I've read them.  He goes on about personal

17    history of the people.  So, obviously he can review a file, he

18    can look at the patent history.  He can opine about all that.

19    Where do you draw the line?

20         MR. DEVITT:  We draw the line is that he shouldn't be

21    able -- our concern is, Your Honor -- I can't -- he shouldn't be

22    able to bolster that story through an expert telling that story

23    that he's saying that -- I think in particular with Mr. Liu who

24    is the inventor of the '374 Patent, when he talks about the

25    problem that was being solved with this puff sensor that they
```

1    pointed to.  The --

2         THE COURT:  Is lieu going to be a -- he's on your witness

3    list right?

4         MR. DEVITT:  He's their witness, Your Honor.

5         THE COURT:  Okay.  And he's on the witness list?

6         MR. DEVITT:  I believe he's on their witness list, yes,

7    Your Honor.

8         THE COURT:  Okay.

9         MR. DEVITT:  And my point is, Your Honor, Mr. McAlexander,

10   prior to this case, had no experience in e-cigarettes, so he

11   shouldn't be talking about all the problems that these patents

12   solve.  So he shouldn't be able to testify to that.

13        The second part, 2B, I would say, is he should also not be

14   allowed to testify as to the state of mind or the intent of

15   certain witnesses.  He goes on to say and he points out in

16   paragraph 490, I believe, of his -- I believe it's his rebuttal

17   report, Your Honor, where he talks about -- yes, it's his

18   rebuttal report, and this is in our motion.  He talks about how

19   people at Altria Client Services were surprised about this

20   invention.

21        Well, first of all, he has no experience in this space

22   prior to this case, and those documents don't say what he says

23   they do, but he certainly shouldn't be talking about somebody

24   being surprised on that.

25        And then with respect to, Your Honor, the commercial

```
 1    success, again he gives all the credit to these patents about the

 2    commercial success.  And, as you'll see in our motion, he cites

 3    to these anonymous Internet links that don't even point to the

 4    specific issue of the patent.  There's no particular nexus.

 5    Again, it's just -- he's trying to bolster things that aren't

 6    there.  He's not the right witness for this testimony.

 7            THE COURT:  Great product, loved it, thanks for having it

 8    come along, and, you know, smooth and operates better than

 9    anything in the past, right?

10            MR. DEVITT:  Correct.

11            THE COURT:  Okay.

12            MR. DEVITT:  And the last one, Your Honor, is a little bit

13    more substantive, and that's with respect to the doctrine of

14    equivalence, Your Honor.  They already agreed they're not

15    offering an opinion with respect to the '545 Patent.  But with

16    respect to the '374 Patent, Your Honor, we believe that again, as

17    it relates to Claim 16 in particular and some of the dependent

18    claims from it, his opinion is conclusory.  It's just a summary

19    of what his literal infringement opinion is, and the Federal

20    Circuit has said that's not enough.  And then in the one

21    paragraph that he has for each of the three products on this,

22    Your Honor, he says the same thing.  And those paragraphs, Your

23    Honor, are 531 of his opening report for the Alto; 537 for the

24    Vibe, and 542 for the Solo.  He just takes the claim language and

25    says it would function this way.  There's no analysis, and the
```

```
 1   Federal Circuit has been very clear that that's not enough for a

 2   doctrine of equivalence analysis.  That's all I have, unless you

 3   have any questions.

 4        THE COURT:  I don't.  Thank you.  You act like the Federal

 5   Circuit speaks with one voice there.

 6        MR. ANSLEY:  Good afternoon, Your Honor.  Sutton Ansley,

 7   counsel for Altria Client Services, LLP and Philip Morris.

 8        May I proceed?

 9        THE COURT:  Yes, sir.

10        MR. ANSLEY:  So the Daubert motion targeting Mr.

11   McAlexander's motion that my colleague, Mr. Devitt addressed,

12   covers five distinct topics, each of those can be taken in turn

13   and ruled on separately.  But, in general, Your Honor, Reynolds'

14   motion is moot in many ways because Reynolds has not challenged

15   Mr. McAlexander's experience and expertise in circuitry, and the

16   opinions that Mr. McAlexander will offer in trial will be within

17   his expertise.  Moreover, Mr. McAlexander realizes on fact and

18   information that --

19        THE COURT:  What expertise does he have in FDA

20   regulations?

21        MR. ANSLEY:  None, Your Honor.  None, Your Honor.  But

22   with respect to that topic, which is the first topic addressed in

23   the motion, he's not offering any opinions with respect to the

24   FDA regulations that are outside of his expertise.

25        As my colleague mentioned, what he's doing is he's
```

```
 1    identifying the claimed features that are beneficial from the
 2    '545 and '374 patents.
 3              THE COURT:  To the FDA.
 4              MR. ANSLEY:  No, no, to -- these are benefits from the
 5    claimed inventions themselves, and then he is describing how
 6    those relate to criteria that Ms. Ehrlich has identified and that
 7    he, himself, has seen and reviewed from FDA documents.
 8              THE COURT:  That's important to the FDA.
 9              MR. ANSLEY:  Correct, correct, yes.  So he doesn't have
10    any experience in FDA.  He's not opining on what factors the FDA
11    considers relevant for PMTA purposes and why.  He's strictly
12    looking at the patents from a technical perspective looking at
13    these factors and then making a -- essentially relating the two
14    together to say these factors that the FDA considers, these are
15    the factors, this is technology that comes from the claimed
16    invention and, therefore, it's important to the FDA.
17              The second topic that I'd like to address is this
18    commercial success portion of the motion.
19              Here, you know, Mr. McAlexander isn't doing anything
20    outside of his expertise either.  He's properly relying on the
21    damages expert, Mr. Meyer, to understand whether certain products
22    achieved commercial success.  And then, you know, he's not
23    analyzing sales, he's not looking at marketing data to figure
24    this out on his own, right, he's -- he spoke with Mr. Meyer, he's
25    relying on his testimony in his report and looking at the data to
```

1   verify it.

2          But then, you know, he then uses his specialized technical

3   knowledge to opine whether a nexus exists, and nexus

4   determinations are properly within the province of the technical

5   expert.  That's clear Federal Circuit law.  He explains the

6   products' practice and claims, how features touted and praised by

7   others relate to the claim limitations, the '545 the '374

8   Patents.

9          With respect to the reviews that Mr. Devitt mentioned, you

10  know, he's looking at those reviews and he's reading through them

11  and seeing is there anything here that's describing or relating

12  to any claim limitations that are being asserted here.  Again,

13  this is -- that goes to nexus.  This is the proper province of a

14  technical expert like Mr. McAlexander.  In other words, as many

15  have said, both Mr. McAlexander and Mr. Myer are staying in their

16  lanes with respect to those opinions.

17         The third issue I would like to address as part of the

18  motion has to do with the idea that this doctrine of equivalence

19  argument for the '374 Patent.

20         So these opinions are anything but conclusory, Your Honor.

21  Mr. McAlexander provides an analysis.  It's based on the

22  function-way-result test.  And for each of the three prongs of

23  the function-way-result test he provides a reason why the

24  differences between the claimed invention, specifically the

25  controller limitation, and the accused products, specifically the

37

```
 1   microcontroller and the ASIC, why those differences are
 2   insubstantial.  He does that for each of the three prongs.  This
 3   is different from the case law experts and the case law that's
 4   been cited by Reynolds in their reply brief.  They hang their hat
 5   on this Interloping case, but in the Interloping case, what's
 6   different there is the expert did not provide any reasoning
 7   whatsoever under the function-way-result test.
 8        The expert there just merely said in a conclusory fashion,
 9   the differences are insubstantial and the function-way-result
10   test would be met.  It's very different, again, from what
11   Mr. McAlexander did.  He said this is the reason why the
12   differences are in substantial dysfunction, result, and the way
13   it's done.
14        And this was all done in the opening expert report.  They
15   put Reynolds -- I'm sorry, Mr. McAlexander put Reynolds on notice
16   of this and Reynolds had the opportunity to depose him on this,
17   but Reynolds didn't question Mr. McAlexander about any of this at
18   his deposition.
19        On this point, it's also worth noting that Reynolds has
20   waived its noninfringement argument, this limitation, and should
21   be precluded from raising it at trial, as we expressed in our
22   brief.  They didn't actually rebut the doctrine of equivalence
23   argument at all in expert reports.  And they didn't even raise
24   the noninfringement argument until the rebuttal report, and
25   that's the first time they raised it in the case.  It was not in
```

38

```
 1    their noninfringement contentions at all.

 2         With respect to the mouthpiece arguments, that portion of

 3    the Daubert motion where there's criticisms that Mr. McAlexander

 4    is improperly relying on admitted testimony, Mr. McAlexander

 5    reviewed the deposition transcripts of the witnesses who were

 6    notably under oath and subject to cross-examination.  And under

 7    Federal Rule 703, he can rely on information to support his

 8    opinions of objective indicia and benefits of the claimed

 9    invention, even if the testimony would be otherwise inadmissible.

10         But, Your Honor, here in this case, Robert Ridley, who's

11    the inventor of the '545 Patent, we've let them know that he's

12    going to be at trial, hopefully to testify live in person; the

13    inventor of the '374 Patent, Andy Liu, his deposition testimony

14    can be played in front of the jury.  And, again, he was deposed

15    in this case under oath and subject to cross-examination.

16         So Mr. McAlexander is entitled to listen to that

17    testimony, rely on it in rendering his opinions.  And moreover,

18    Your Honor, it's important that the jury understands the bases of

19    these opinions so that they can properly evaluate

20    Mr. McAlexander's opinions on objective indicia and on the

21    benefits of the claimed invention.

22         Finally, with respect to the criticisms that

23    Mr. McAlexander is relying on -- or speculating about intent,

24    state of mind or motive, he will not be doing that with respect

25    to induced infringement or contributing infringement.
```

```
1        Similarly, Mr. McAlexander is not going to be speculating
2   on the state of mind of --
3        THE COURT REPORTER:  Counsel, I'm sorry.  Slow down a
4   little bit and start that last sentence over for me.
5        MR. ANSLEY:  Let me -- with respect to objective indicia,
6   he's also not going to be speculating on state of mind, motive or
7   intent either.  You know, he's going to be performing the job of
8   any technical expert, reading the documents, interpreting them,
9   and then from that offering an opinion that he's allowed to do.
10       And so, to wrap up, Your Honor, just briefly, we think
11  that Reynolds raises moot points and contends that
12  Mr. McAlexander is going to say things at trial that he
13  actually -- in actuality he won't say.  And with respect to the
14  criticisms of the bases of his opinions, inventor testimony, him
15  relying on certain FDA documents, those are things that can be
16  handled in cross-examination or through objections at trial,
17  not -- we don't think his exclusion is proper here.  So with that
18  we ask that Your Honor deny the motion in full.  Thank you.
19       THE COURT:  Thank you.
20       MR. DEVITT:  Your Honor, may I just be heard briefly?  And
21  I'm not sure if there's an ELMO here that I can put on.  I don't
22  know if you can see.
23       So, Your Honor -- I don't see if you can see it.  I should
24  have come in earlier.  This paragraph 531 -- so this paragraph
25  531, Your Honor, I mention this one in my point.  This is the
```

40

```
 1    entirety of Mr. McAlexander's doctrine of equivalence argument

 2    for the Alto product.  That's it.  And you can look at those last

 3    few lines.  He's basically said -- he's taken the claim

 4    limitation -- I can pull up the claim there to show, if it would

 5    be helpful, but if you look at the '374 Patent claim, Claim 16,

 6    he is just taking the claim language -- that's where you see

 7    those words from -- and he said same function, same wave, same

 8    result.  There's no analysis.  This same paragraph, if you just

 9    replace the word Alto with Solo and Vibe, are the full entirety

10    of his doctrine of equivalence analysis for those other three

11    patents as well, Your Honor -- or three products as well.

12         So, contrary to counsel's statements, this was not a full

13    and fulsome analysis of doctrine of equivalence.  It's improper

14    under the law.

15         THE COURT:  Thank you.

16         MR. DEVITT:  Thank you.

17         MR. ANSLEY:  Your Honor, may I just have one minute?

18         THE COURT:  No.  Thank you, though.  Do you want to cull

19    out other paragraphs where he discussed it?  Go ahead.

20         MR. ANSLEY:  Yes, Your Honor.  I'll come to the podium.

21         THE COURT:  Yes.

22         MR. ANSLEY:  Your Honor -- Yes, Your Honor.  Paragraph 531

23    is the last paragraph in the section that's much longer than that

24    paragraph itself.  And the case law is clear that -- yeah,

25    it's -- so I'm going to ask Your Honor to look at all the
```

41

```
 1    preceding paragraphs beginning at paragraph 5.25, and you'll see
 2    that there's more than just the analysis that's in 521.
 3              THE COURT:  Okay.
 4              MR. ANSLEY:  531.  Thank you.
 5              THE COURT:  All right.  Who's next?
 6              MR. BURNETTE:  Good afternoon, Your Honor.  Jason Burnette
 7    for the Reynolds entities.  May I proceed?
 8              THE COURT:  Yes, sir.
 9              MR. BURNETTE:  So now for something a little different.
10    This is a damages motion to exclude PM's damages expert,
11    Mr. Meyer.  There's some confidential business information that's
12    related to this issue that I'm going to try to minimize
13    references to for the purpose of the discussion.  There's really
14    just four points I would like to make from our motion.
15              THE COURT:  Okay.
16              MR. BURNETTE:  The first one is there's really no debate
17    that there has to be a threshold analysis for baseline
18    comparability, both economic comparability and technological
19    comparability.
20              Now, Mr. Meyer, on our first point, he relies on two prior
21    license agreements -- I'll get to the ███████████   later --
22    two prior license agreements, and he finds them both to be
23    economically comparable.  The one we think he should be relying
24    on, and he relies on the other, but the important point here is
25    that the other one that he relies on really contains ████████
```

1    ██████████.  It has one -- not even ███████████████████████

2    ██████████████████████████████, and then it has a ████████

3    ████ that Mr. Meyer relies on, but that ████████████████████████

4    █████████████████████████████████

5         There is no analysis by Mr. Meyer of the economic

6    comparability of that ████████████████████, which is the one he

7    relies on.  You can't say, Oh, the rate structure A is

8    economically comparable to the hypothetical negotiation and then

9    use the rate structure in B as the basis for your royalty rate.

10   And we think that's what's happening here.  And, importantly, of

11   course, the hypothetical negotiation that he relies on involves a

12   license in the U.S.  That's the economic comparability.  It's not

13   for ████████████████████████████

14        The second point is the fact that Mr. Meyer, to buttress

15   this opinion, relies on ████ licenses and another expert's report

16   that we haven't seen, that he hasn't seen, that, as an expert, he

17   can't reasonably rely on because he doesn't know what's in those

18   materials.  This is a simple bolstering issue.  He's trying to

19   use the fact that another expert, ██████████████████████████████,

20   ████████████████████████████ that Mr. Meyer

21   thinks is the ████████████████████████████████,

22   but no one knows that to be the case.

23        But, more importantly, no one knows what the analysis was

24   in that expert's opinion.  He just wants to give the conclusion

25   wholesale to the jury and bolster his own decision.  That's not

43

```
1    something that we can cross-examine him on.  Anything that he has

2    relied on and not seen for himself should not be presented to the

3    jury, and that includes that testimony about this so-called ███

4    ██████████████████████████  and the ████  prior licenses that

5    Mr. Meyer thinks is included within this representation, that

6    ████████████████████████████  earlier meets ████████████████████

7    ████████████████████████

8         No one knows the terms of those prior license agreements,

9    and, importantly, as we pointed out, the representation is about

10   ███████████████████████████████████, but ██████  of those ██████  are about

11   ███████████████, and one of them doesn't even involve ████████, it

12   involves a █████████████.  So, at a minimum, the materials he

13   relies on that he hasn't actually seen should be excluded in this

14   case.

15        The third point is this ██████████  ██████████  You've already

16   heard a reference to it.  It's the fact that he relies on the

17   regulatory significance of the '545 Patent to increase the rate

18   from █████████████  ████  █████████████.

19        I just want to point out for Your Honor that under his

20   latest calculations, that's a ██████████████████████████████████

21   ████████████, when no one on PM's side has given any attempt to

22   quantify the value of the FDA regulation from these patents.

23   They say, Well, Reynolds spent ████████████████  on these PMTAs.  Well,

24   that's the total price of getting the PMTAs together.  The

25   question is, what's the value of the '545 Patent to this process,
```

1    and he increases his rate by ███████ , which -- without any

2    basis, other than his judgment and experience.  He acknowledges

3    that in his deposition.  It's my experience, he says.  I've been

4    doing this for 30 years.  Well, guess what?  He hasn't been doing

5    e-cigarette federal regulations for 30 years.  He hasn't been

6    doing that.  He has no basis -- it's a black box to use his

7    experience to go from a █████ to a ██████ royalty rate to

8    make such a big difference in the damages number in this case.

9         And then the fourth point is this similar issue.  So this

10   is going beyond the ██ license agreements to the ██████

11   ██████ involving the '374 Patent.  He derives a royalty rate

12   from that patent, and in one paragraph he █████ that rate,

13   █████ the rate.  So I was talking about a ██████ increase

14   before.  Now I'm talking about █████████ increase.

15        And again, the only justification given for that and

16   Phillip Morris's opposition to our motion is the regulatory

17   significant of the '374 Patent.  But guess what?  If you look at

18   paragraph 170, which is where Mr. Meyer makes this █████, the

19   only paragraph where he justifies the ██████ -- he doesn't cite

20   the regulatory significance.  He says something general about the

21   foundational value of this patent.

22        Again, these are qualitative factors that he's using to

23   convert into a specific number that's not just a minimal

24   increase, it's not just an upward pressure on the rate; he

25   █████ the rate, and he's doing that, of course, because he

1    recognizes that when this ████████████ was made, it wasn't

2    just ██████████████████████████████████████

3    ████████████  that were included in that assignment.  And so he

4    has to apportion.  He knows he must apportion.  And so he ██████

5    the rate just to have it in and comes back down to the same

6    amount, and there's no methodology, no facts or data that

7    supports that number, and there's no way to cross-examine a

8    witness about that when all they're saying is it's based on my

9    judgment and experience when there's no relevant experience to

10   that question.

11          THE COURT:  All right.  Thank you, Mr. Burnette.

12          MR. BURNETTE:  Thank you.

13          THE COURT:  Go ahead, Mr. Sanford.

14          MR. SANFORD:  Thank you, Your Honor.  So there's a lot of

15   issues in Reynolds' motion, as the Court is aware.  I'm going to

16   keep the argument and try to narrow and try to respond to what

17   counsel raised here.

18          And I want to start with the '374, actually.  And I

19   believe the argument we heard on the apportionment was that the

20   only basis Mr. Meyer gave was regulatory approval, and that's

21   just incorrect, and they represent that our opposition discusses

22   that.  I would invite the Court to read our opposition again.  We

23   do not rely on the FDA regulatory importance for the '374

24   apportionment at all.  That is a '545 issue, and that is where

25   the increase comes in.

1           Paragraph 170, which my friend mentioned, does set forth

2      the basis for his apportionment.  I'll read four of them:  The

3      fundamental value of the technology, the difference in the -- a

4      relationship between the parties negotiating, the actual

5      agreement and the hypothetical; assumption of invalid and

6      infringe, which, of course, didn't exist in the real world; and

7      then in paragraph 171 he explains the basis for the

8      apportionment.

9           So, Your Honor, it's there in black and white, his

10     opinions.  He testified in length about it.  Any disagreement

11     they have about apportionment is a classic question for the jury.

12     All that evidence is cited in our opposition.  There's no basis

13     for excluding on that.

14          All right.  I want to go back now and go to where they

15     started and where their motion really started, because the first

16     words we heard in that argument was there's no dispute that the

17     test is baseline comparability.  That surprised me a little bit,

18     and the reason it surprised me is because the first time those

19     words appear was in our opposition, because the argument that

20     they made to the Court in their motion is based on ResQNet and

21     what I'll call the most reliable license argument.

22          And, of course, in *ResQNet* -- and Reynolds argues that,

23     well, one, an expert can only use the most reliable settlement

24     agreement in the record, and under their contention, the

25     Fontem-RJR agreement is the most reliable.  We explained at

47

 1   length in our opposition, Your Honor, that that's just wrong on

 2   the law.  It's not what *ResQNet* held.  It was a factual finding.

 3        Second, multiple courts, including the Biederman court in

 4   December from this district, expressly took that argument on and

 5   rejected it.  I don't want to dwell on that.  It's legal error.

 6   You didn't hear about it in their reply and it wasn't mentioned

 7   really in their argument.  So it may be a bend.  But, regardless,

 8   it's wrong on the law; it's also wrong on the facts, and

 9   Mr. Meyer explained in detail why he chose to use the Nu Mark

10   agreement as opposed to the Fontem-RJR agreement, specifically

11   because the agreed upon form of damages in this case is a running

12   royalty.

13        Now, I want to pause there because, as I started with the

14   Court, there's a lot of issues raised in their motion.  There's a

15   lot of detail in these agreements, but what's unique about this

16   case is a couple of things you don't typically see in a damages

17   case.

18        First, everyone agrees that the appropriate form of

19   damages is a running royalty.  Both experts use a hypothetical

20   negotiation, and both experts actually use the market approach.

21   They look at settlement agreements, which is a little unique, to

22   value the technology that's at issue in this case.

23        And in terms of Mr. Meyer's methodology, it's detailed in

24   our opposition and I won't dwell on it here.  His selection of

25   the five families -- they disagree with it, but they don't

48

```
 1    challenge it at Daubert; the apportionment that Mr. McAlexander,

 2    who we discussed earlier, talked about.  They don't dispute it at

 3    Daubert, and they have their disagreements about relative value,

 4    just to mention some of the aluminates Your Honor is already

 5    familiar with, but they adopted Dr. Sullivan, Reynolds' expert,

 6    adopted that for his analysis.

 7         And the last thing, and this is unique in these cases if

 8    you look at ResQNet and the commandments, really most cases

 9    involve a settlement agreement.  We have undisputed technical

10    comparability between ████████████████████████████████████████

11    ███████    that Mr. Meyer links up to get to his baseline rate.

12         So what are we talking about here?  We're really talking

13    about economic comparability.  Their main economic comparability

14    argument, the single most reliable license, is erroneous as a

15    matter of law, wrong on the facts.  And, look, we disagree with

16    the relative comparability.  The Federal Circuit has told us

17    repeatedly that's an issue for the jury.  The degrees of

18    comparability, Your Honor is familiar with the Active Video case

19    originally made in this district.  The law is clear on that.

20         So what do they do in their reply?  Well, I want to pause.

21    In their reply brief, they don't address any of those cases.

22    They just say they're inapposite.  No citation.  No explanation.

23    This is page 5 of their reply brief.  They don't take those on.

24    What do they do?  They pivot to what, I think I understand, is

25    called a rate structure, comparability argument.  That's not the
```

1  law, Your Honor.  The law is whether the agreement is

2  economically comparable.  But even if you accept their argument

3  that an expert needs to go by a provision-by-provision basis and

4  explain comparability on each provision, that's what Mr. Meyer

5  did here, and the best they do is raise factual disputes for the

6  jury.

7       And on this rate, Your Honor, let's talk about the

8  ███████████ rate for a second.

9       ███████████████████████████████████, much less any

10  that are comparable.  Everyone agrees on that.  That's our motion

11  in limine number 1.

12       So what the experts did is they looked to the comparable

13  factor 2 and factor 12 references.  There's only among those

14  agreements ████████████████████, the Fontem-Nu Mark

15  agreement.  That rate in there is ██████████.  And, again, the

16  agreed upon form of damages is a royalty, a running royalty based

17  on net sales point.  So, what did Mr. Meyer do?  He looked to

18  that rate, and then he looked to determine, is it sufficiently

19  reliable to use as a baseline rate?

20       The idea that now Reynolds in the reply is saying, Well,

21  no, no, no, there's ████ licenses:  One is ██████████████████

22  only, and the ████████████████████, is just dead wrong.

23  It's new, Your Honor.  It really wasn't flushed out in their

24  opening brief at all.  And to the extent that Your Honor

25  considers it, it's just wrong, and we'll walk through the

1   agreement to show that.  And I do want to correct the record on

2   one thing.  Can I have slide 16, please.

3       So, they say in their reply -- they say in their reply,

4   Your Honor, that Mr. Meyer never even opined on comparability, he

5   just ignored the '545 that forms the heart of his baseline, and

6   that's just incorrect.

7       Paragraph 258.

8       THE COURT:  Hold up a minute while we get this on the

9   screen.  What was the slide you just referenced?

10      MR. SANFORD:  Slide 16, Your Honor.

11      So, the argument we saw --

12      THE COURT:  Hold on.

13      (Brief pause in proceedings.)

14      THE COURT:  It's all right.  Take your time.

15      THE DEPUTY CLERK:  Can you play it on the --

16      THE COURT:  Yeah, can we use the ELMO for now?

17      MR. SANFORD:  Thank you very much.  Your Honor, the

18  argument we heard for the first time in the reply brief is that

19  Mr. Meyer never opined on comparability.  And I want to show the

20  Court the language because it's important.  Extensive paragraphs

21  devoted to his -- in his opening report about the comparability

22  of the agreement itself and the ██████ .  He said the entire

23  agreement is economically comparable.

24      I'll note for the Court, when they make this argument they

25  don't site Dr. Sullivan or Mr. Meyer's deposition testimony for

```
 1    it.  It's just pure attorney argument.  Dr. Sullivan responded to

 2    Mr. Meyer.  Never said -- he never opined on the economic

 3    comparability of that rate.  And when he was asked at deposition,

 4    he couldn't be more clear.  He said it's your testimony that the

 5    Fontem-Nu Mark agreement is just as good or comparable to our

 6    hypothetical negotiations as they are -- as the Fontem-RJR

 7    agreement.  I agree.  Correct on that.

 8          And as it relates to consideration, that's the ███   that

 9    he relied on, that's a much better agreement to use in terms of

10    comparability.  He was deposed at length on that rate, Your

11    Honor.  The idea that he never addressed it and somehow waived it

12    is nonsense.

13          Okay.  The second argument they make is, well, that rate

14    is not comparable.  You heard it again here.  It's ███████████

15    only; it's not ████   That's just wrong, Your Honor.

16          There was ███████████████████████████████

17    ███████   The question is, when you're matching up the agreement

18    in the hypothetical negotiation, what is the licensees -- so

19    we're talking about ███████████████████████company, licensed to

20    do?  Well, if we look at the agreement -- and I'll point the

21    Court to Sections 632 and 633 -- that's the provision that

22    contains the ███   rate -- that rate is ████████████████████████

23    ███████████.  That's a defined term that allows ██████████████.

24    Those ███████████████████████████.  They're ████████████████████

25          It also allows ██████████████████████████████   in the
```

1   territory.  The cover page of the agreement defines it -- and in

2   the defining terms -- ████████████████████████, and it

3   links that up with the ████████ rate on which he relied, Your

4   Honor.  The entire agreement is ████████████████████

5   The fact that ████████████████████████ says nothing

6   about comparability.  And to the extent it does, that's a

7   question for the jury, as we know from multiple Federal Circuit

8   cases.

9        Okay.  Very briefly on the argument that, well, the rate's

10  not comparable because it was ████████, it was ████████████

11  ████████   So, what happened, Your Honor, is they settled in

12  December 2016.  Nu Mark went out of business about two years

13  later.  That ████████ was ████████████.  And it's true, there

14  were ████████████████████████

15       That's, A, irrelevant.  This is nothing about what a

16  damages expert is supposed to do in looking at a market

17  comparable transaction.  So we shook hands, we agreed that the

18  undisputedly technically comparable technology is valued at this

19  rate.  What happened after with respect to business events is

20  irrelevant.  We know that from the *Bio-Rad* case that's cited in

21  our own case.  In our opposition, we took on this exact argument.

22  Okay.

23       Very briefly, just because we didn't really hear much

24  about it in argument, is this idea of a ████████ ████████ and

25  Mr. Meyer ignoring that.  I just want to be clear.  It's not a

1    ███████████████████████████████████, as you sometimes see in

2    agreements.  It's an alternative expression of the ███████████

3    rate that was put in there to basically ██████████████

4    ███████████████████████████████████

5          And the whole premise of their argument that that is

6    somehow lower than the ██████████████ and should have been

7    used is unsupported.  And the reason why it's unsupported is

8    because we don't have any information about the average selling

9    price, and you would need to know that to know which one is lower

10   at the time.

11         So Mr. Meyer looked at that, looked at the evidence, found

12   it's sufficiently reliable.  Any dispute they have with that is

13   on -- is for the jury.

14         The final point is on this -- the ████████████████████

15   ██████, Your Honor.  Mr. Meyer used that to confirm the

16   reliability of it because there have been prior market

17   transactions at ██████████████████.

18         And that's important, and the reason it's important is

19   because I believe the argument you heard from Reynolds' counsel

20   here, and we definitely saw in the brief, is that -- and I wrote

21   it down -- "no one knows the terms of these prior licenses, so he

22   can't rely on it".  Well, first of all, Your Honor, it's not his

23   baseline, to be clear.  It's confirming the reliable nature of

24   that rate.

25         Second of all, they -- the agreement is a representation

54

```
1    in a settlement agreement about prior licenses from the licensor

2    that ███████████████████████████████████████████████████████

3    ████████.  And they quibble with that and say, Well, we don't

4    know based on the evidence what was in the inventory and what was

5    out.  Well, Your Honor, it turns out we do know the terms of

6    these prior licenses.  We don't know -- because we asked for

7    those documents during discovery.  We didn't get them.  We had an

8    RFP 224 that was dead-on asking for all communications with

9    Fontem.  We asked that of RJR.

10        I took their corporate representative's deposition on

11   this.  Didn't get any information other than it's a ████████

12   ██████████, and that's really all we know.  We had to move to

13   compel to get another one.  So, if I may approach the Court, I

14   have a short handout that I think will be important on this

15   issue.  So that's the backdrop.  The dispute here is the

16   sufficiency of the evidence supporting Mr. Meyer's interpretation

17   of that agreement.  They take issue with what he relied on, and

18   that's fine.

19        If I can point to the Court page 89 of what I just handed

20   up.  Now, this is an expert report served in the *Carolina* case,

21   the other litigation that Mr. Grant mentioned earlier, and our

22   co-counsel has been in communication with ██████, and last night

23   at 8 p.m. we got authorization to -- consent to use this, so long

24   as it's confidential.  And what we're looking at here on page 89,

25   Your Honor, is a ████████████████████████████████████████████████
```

```
 1    from ██████████.  The third paragraph -- this is

 2    ████████████████████████████████████████████████

 3    ████████████████████████████████████████████████

 4    ████████████████████████████████████████████████

 5    ████████████████████████████████████████████████

 6    ████████████████████████████████████████████████

 7    ██████████████████████████████

 8         The argument that none of them were outside of the

 9    territory and we don't know is not only incorrect, it was

10    withheld from us.

11         I don't want to dwell on it, Your Honor, but the last

12    point I want to make is we moved to compel their 30(b)(6)

13    witness's deposition on this topic.  We said we want to know what

14    happened in the negotiations.  This is the -- I'm reading from

15    page 8 of their opposition brief.  Quote, "the negotiations

16    leading up to the Fontem-RJRV settlement agreement are not

17    relevant to any issue in this case."

18         That was the representation they made to Judge Buchanan.

19    That motion was denied, and that's the record that this motion is

20    being decided on.

21         We're going to file a motion with this Court to get to the

22    bottom of this.  This is all the information we have, but it's

23    directly relevant to the issues that they're moving on.

24         Now, I'll submit to the Court that this motion should be

25    denied on the record we have.  All the arguments that they raise
```

```
 1   go to the weight of the evidence and are issues for the jury to

 2   decide at trial, but we have evidence directly refuting their

 3   arguments made in that motion.

 4        THE COURT:  Okay.  So you called -- you contacted ████

 5   on your own, and ████ agreed to provide these just in the last

 6   24 hours?  Is that the story?

 7        MR. SANFORD:  Basically, Your Honor, with one -- we have

 8   the benefit now, as Mr. Grant explained, of co-counsel in this

 9   case, and co-counsel is representing Altria in that Carolina

10   litigation.  They contacted ████ got their approval.  And I

11   will represent to the Court that I got this document last night

12   around 8 p.m.

13        THE COURT:  Okay.

14        MR. SANFORD:  So we don't know what to make of it yet

15   completely.  We're going to do our diligence and come back to the

16   Court if we need to.

17        THE COURT:  Okay.

18        MR. SANFORD:  Okay.  The last issue, Your Honor, on the █

19   ████ the only other thing I'll note for the Court, a little

20   foreshadowing, when you read through the argument, and I

21   understand it now, it also goes to the heart of projected sales

22   using projected sales, and the Court will recall the *Daubert* on

23   Dr. Sullivan using that, and it also talks about ████████

24   ████████████████████████████████████

25   ████   We'll go into that.  It's the other brief, but we think
```

1   it's relevant to multiple issues here, but when get the

2   documents, we'll find out.

3          Lastly, briefly on the ████████  ████████  they like to call

4   it.  Your Honor, I think we're talking past each other a little

5   bit.  They say there's no basis, there's no market transaction

6   for that.  The market transaction that provides the baseline for

7   the ███ is from the Fontem agreement.

8          What Mr. Meyer did is he really did two alternative

9   Georgia-Pacific factor analysis.  The first one was what's not

10  considered the regulatory importance of these patents, the value

11  and the benefit that RJR gets.  He got to ████████.  He

12  increased from ████████.  Alternatively, he says, Okay, now if the

13  jury finds that this patent and technology is important, has been

14  used, and the extent of that use, which we all agree is extremely

15  important because they can't sell their products without that,

16  that's GP factors 9 and 10, as Your Honor knows, well then that

17  increases the rate to ████████.  It's an adjustment based on the

18  Georgia-Pacific factors.

19         The law is clear that there's no quantitative need to go

20  through each factor and provide the specific basis for that.  The

21  quantitative basis in the quantum Nu Mark agreement.  Any

22  disputes they have with the amount of the rate, Your Honor, goes

23  to the weight.

24         Unless Your Honor has any questions, I'll pass the podium.

25         THE COURT:  I don't.  Thank you.

1      MR. SANFORD:  Thank you very much.

2      THE COURT:  All right, Mr. Burnette.

3      MR. BURNETTE:  Thank you, Your Honor.  I have no idea

4  about the provenance of this handout, so I'm not going to address

5  it, and we'll see what is said.

6      It is undisputed, however, that the analysis done by

7  whatever the expert -- by the expert that analyzes other

8  candidate agreements, and we don't know whether that was actually

9  the agreement between Fontem and RJRV, we don't know what that

10  analysis itself said by that expert, and it's unreasonable for

11  another expert to rely on someone else when they don't know the

12  basis and the methodology used by that other person.  You can't

13  just take the conclusions wholesale and incorporate that.  Of

14  course, experts can rely on others, including other experts, but

15  they have to be able to assess the reliability of those

16  conclusions.

17      THE COURT:  You think that it's proper to use it as a --

18  to consider whether their own royalty rate is a correct royalty

19  rate?  In other words, as a, I think I'm right, but I want to

20  check around to see whether somebody has done something similar

21  or dissimilar, and then go, Oh, here's one that's right on, and

22  it seems to be an arm's-length negotiation by two big companies,

23  and I don't know the specifics, but I'm going to consider it but

24  only to validate what I've done and not as my base analysis?

25      MR. BURNETTE:  I haven't seen a case that says that the

```
 1    Rule 702 requirements change when we're talking about -- change
 2    from the context when you're establishing a royalty rate to when
 3    you're trying to confirm a royalty rate.  I mean, in the eyes of
 4    the jury, they're going to be equally significant, right.  I
 5    don't think the jury is going to appreciate, Oh, this is just
 6    confirmatory of the royalty rate.  They're going to look at this
 7    evidence and say, Oh, some other expert who's -- you know, not a
 8    hired gun in the case, has no stake in this litigation, said it
 9    was this royalty rate.  That's going to be very prejudicial
10    evidence when no one knows what the analysis was that was done
11    and whether it was reliable.
12         I mean, just to take an example, if it was an analysis of
13    the Fontem-RJRV agreement, there's no evidence that ███████████
14    ████████████████████████████, which is what you would need to
15    convert the payments to get the royalty rate from that.
16         So that's the issue.  And I don't think, respectfully,
17    Your Honor, it would change, that there's some relaxation of the
18    admissibility requirements because it's merely confirmatory of a
19    rate.
20         On this threshold question that we're talking about,
21    economic comparability, I want to make sure the Court
22    understands.  There was a ███████████████ that was ███████████████,
23    and then a ██████ rate that was mentioned, and the statement was
24    made with some citations to the record that Mr. Meyer did do an
25    economic comparability analysis of the Nu Mark agreement and that
```

80

1    our expert, Dr. Sullivan, says it's economically comparable.
2    Well, that's true.  That is true.  But, again, there are
3    different provisions in the agreement itself.  The economic
4    comparability analysis by Mr. Meyer depends on this being a U.S.
5    license.  This is paragraph 262 of Mr. Meyer's report.  It's
6    economically comparable because of A, B and C, including each
7    license would be nonexclusive, include the U.S. territory.  But
8    as you were shown the rate, as opposed to the amount that was
9    ███ -- so the amount that was ███ is what we're saying -- was
10   █████████ but was not used by Mr. Meyer.  He uses the rate.
11   The rate applied to these ████████████████████████████████
12   ████████████████████████████████████████████████████████████
13   ███
14        That's not this hypothetical negotiation license.  It's
15   not economically comparable.  Mr. Meyer does not do an economic
16   comparability analysis as to that question.  They put one
17   statement from his deposition making a reference to the
18   consideration.
19        THE COURT:  So you don't think it's significant that they
20   were corporations in the United States licensing these entities'
21   products that were on sell, as I understand it, in the United
22   States ██████████████████████████████████ or
23   wherever they were going to be transferred?
24        MR. BURNETTE:  No.  So the Reg that's mentioned on the
25   cover page of this agreement, there's a provision, 3.2.2, if you

```
1    want to look at it in the Nu Mark agreement, that ████████
2    ████████████████████████████████  So there was a ████████
3    ████████████████████████████████████████████████████████
4    ████████████  .  That covered the ████████████████████████
5    ██████████████████████████████  .  That's the
6    economically comparable provision.  And, you know,
7    provision-by-provision, generally these cases do talk about the
8    agreement -- not provision-by-provision, but when you have a
9    different rate structure as you have here, there should be some
10   baseline analysis done to show, when you have this very different
11   structure to the agreement, that that's what's economically
12   comparable, not the ██████████  .
13        And, importantly, the rate that's ████████████████████
14   ████████████  and the ██████████████████████  , Mr. Meyer
15   does not do an analysis to show that that rate ██████████████
16   ████████████  He actually compares the rate to the ██████████
17   that RJRV paid under the Fontem-RJRV agreement.  So that's what's
18   missing from that, Your Honor.
19        The last point that my friend on the other side ended with
20   was that there was an adjustment made from ██████████████  .  It's
21   a ████████████████████████████  change.  It's a ████████████
22   increase.  That ██████████  itself is close to the royalty rate for
23   some of these patents.  That's not an adjustment, that's a big
24   change without anything but the judgment and the expertise to
25   support it, which Mr. Meyer, respectfully, does not have in this
```

1    area.

2         And if the Court does not have any other questions, I'll

3    end there.

4         THE COURT:  I don't.  Thank you.

5         MR. BURNETTE: Thank you.

6         MR. SANFORD:  Your Honor.

7         THE COURT:  Yes, sir.

8         MR. SANFORD:  I just want to answer your question.  Your

9    Honor asked if there are any cases saying it is okay to use

10   the -- what's the word -- and not for purposes on the baseline,

11   and for that I would just direct the Court to their cited case,

12   of the MLC Intellectual Property.  It's 10 F. 4th 1358 at 1368.

13   And they criticize the expert for relying, not knowing the

14   specific royalty rate, and then they go on to say in the Federal

15   Circuit, "We acknowledge that Mr. Milani's testimony may have

16   well been proper had he merely asserted that he considered that

17   rate called in the most favored customer provision to reflect a

18   relevant consideration for evaluating a reasonable royalty," and

19   that's exactly what Mr. Meyer did here.

20        THE COURT:  All right.  Thank you.

21        MR. SANFORD:  Thank you, Your Honor.

22        THE COURT:  All right.  What's next?

23        MR. SOBOLSKI:  Your Honor, at this point we turn to the

24   motions we have filed, which is motion in limine number 2.

25        THE COURT:  Yes, sir.

```
1          MR. SOBOLSKI:  Yes, sir.  I don't think I need the ELMO.

2          Greg Sobolski on behalf of the plaintiffs.  Your Honor, as

3     long as the Court and the support has the slides, we can follow

4     along that way.

5          THE COURT:  That's great.  Thank you.

6          MR. SOBOLSKI:  May I proceed, Your Honor?

7          THE COURT:  Please.

8          MR. SOBOLSKI:  Your Honor, motion in limine number 2 is

9     fundamentally about Reynolds abiding by a stipulation that it

10    made to the PTAB in this case about not pursuing prior art

11    invalidity defenses in this case.

12         Slide 35 are the two operative stipulations.

13         As the Court knows, sometimes Petitioners at the PTAB, in

14    order to try to minimize the chance of a discretionary denial,

15    tell the PTAB they'll bind themselves not to pursue arguments

16    about the prior art they could have raised or reasonably could

17    have raised in District Court.  And that's on slide 35 here.

18         THE COURT:  All right.

19         MR. SOBOLSKI:  That's exactly what happened in this case.

20         THE COURT:  So that takes care of obviousness and

21    anticipation, and Reynolds says, Well, that doesn't mean we can't

22    go for a written description and that's not included in those

23    two, and therefore we may want to use this prior art for that

24    purpose.

25         MR. SOBOLSKI:  Written description and damages, Your
```

64

```
 1    Honor, and I'll take each in turn.  Number one, written
 2    description, respectfully, it's irrelevant.  Here's why.  Putting
 3    aside that written description is about the four corners of the
 4    specification, the issue there is that patent incorporates by
 5    reference a certain piece of prior art, and what Reynolds is
 6    saying is that piece of prior art adds nothing beyond what's
 7    already in the specification.  But we don't contest that.  We
 8    don't disagree.  So it's a nonissue.  There's no reason to be
 9    testifying about that prior art, other than to mislead or confuse
10    the jury about its contents.  It's not a disputed issue.  It's
11    irrelevant.
12         I think the second issue is damages, and there that's --
13    the timing of these stipulations decides that issue.  It's a
14    little bit specific to this case, Your Honor.  Here's what I mean
15    by that.  If I can direct the Court's attention to slide 36,
16    please.
17         Slide 36, Your Honor, is an excerpt from Reynolds'
18    damages, rebuttal expert report, and here's what Reynolds says
19    they can use the prior art to do.
20         That individual, Dr. Sullivan, has rebuttal in which he
21    says that for the '545 Patent, he understands from Reynolds'
22    technical expert, Dr. Blalock, that the patent has little value
23    over what was already in the prior art.
24         Here's the key point.  What's that understanding from that
25    technical expert that Reynolds is asking the Court to permit
```

1    testify before the jury?  That's the next slide, 37.

2         Top excerpt on 37, Your Honor, is that technical expert,

3    Dr. Blalock, his rebuttal report that we just saw referenced.

4    That rebuttal report merely incorporates the gentleman's opening

5    report on obviousness and anticipation.

6         It's exactly the same thing.  The proposal amounts to

7    doing an analysis of the prior art without using the word

8    "anticipation" and "obviousness," which is exactly why we had to

9    bring this mill, because that's only going to mislead and confuse

10   the jury left wondering, what's going on with the prior art?  Is

11   this patent legitimate or is it invalid?

12        One more point about this damages issue, Your Honor, and

13   that's on slide 38.  Reynolds argued in their briefing that, as a

14   matter of law, it's proper for their damages expert to be looking

15   at this little value of the prior art.  The case they cite from

16   the Federal Circuit, *Exmark,* is about prior art systems.  In this

17   case they haven't raised any prior art systems on the relevant

18   patents, all prior art patent, so it's not even a legally proper

19   justification for it.

20        The fundamental point here, Your Honor, is that the

21   stipulation that the PTAB came in after all the rebuttal reports

22   came in -- in other words, Reynolds made the choice to structure

23   its damages rebuttal based on an analysis of all that prior art

24   that they subsequently stipulated away to try and enhance

25   institution at the PTAB.  They got the benefit of that bargain,

1   and now they should be precluded from backtracking from it and

2   misleading and confusing the jury at trial about that exact same

3   prior art.

4        THE COURT:  All right.  Thank you.

5        MR. SOBOLSKI:  Thank you, Your Honor.

6        MR. MAIORANA:  David Maiorana on behalf of the Reynolds

7   parties.  May I proceed, Your Honor?

8        THE COURT:  Yes, sir.

9        MR. MAIORANA:  I put on the ELMO the stipulation that

10  we're talking about here.  The stipulation, which I wrote when we

11  filed it with the Court, says that Reynolds will not pursue as to

12  the challenged claims any ground raised or that could have

13  reasonably been raised in the IPR in the above-captioned

14  litigation.

15       Ground has a specific meaning with respect to this issue,

16  Your Honor.  A ground, as you said at the beginning of my

17  brother's argument, participation or obviousness based on patents

18  or current publications, those are the grounds you can raise in

19  an IPR.  That's it.  That's all you can raise in an IPR.

20  Everything you just heard, damages, written description, those

21  are not grounds that can be raised in an IPR.

22       By the plain language of the stipulation, Reynolds did not

23  give up the right to raise those issues in this litigation.

24  There's no dispute.  You cannot raise a written description in an

25  IPR.  There's no dispute.  You can't raise damages in an IPR.

```
 1    And I heard a lot about the jury's going to be confused by all of

 2    this.  This motion is not based on 403.  This motion is based on

 3    the stipulation.  The plain language of the stipulation makes

 4    clear.  The only thing Reynolds gave up in this Sotera's

 5    stipulation, Your Honor, is that we would not pursue any ground

 6    raised or that could have been raised.  We're not trying to

 7    include any grounds that were raised or could have been raised.

 8    We're not going to tell the jury that the claims are invalid

 9    because they're obvious.  We're not going to tell the jury that

10    the claims are invalid because they're anticipated.  Everything

11    you heard during my brother's presentation is different.

12         The fact that one of our experts relies on a comparison

13    between the prior art and the claims is relating to damages.  No

14    expert is going to get on the stand here and say these claims are

15    invalid or raise any ground that we raised or could have raised

16    in IPR.  That should dispose of this mill, Your Honor.

17         THE COURT:  So you're going to put Dr. Sullivan on to say

18    he considered this prior art and also that the doctor can be

19    cross-examined, I guess, by Philip Morris, who will say that

20    everybody admits it has little value to it?  Why would you do

21    that, or am I missing the point?

22         MR. MAIORANA:  The value of the patents is highly disputed

23    and goes to damages, as we heard a lot about today in the

24    Georgia-Pacific factors, but my point is that the only thing that

25    the stipulation precludes --
```

```
 1          THE COURT:  No, I understand that.  I'm trying to think
 2     beyond.  Why would you use it -- if you had the authority to use
 3     it, why would you use it?
 4          MR. MAIORANA:  It goes to -- for example, Mr. McAlexander
 5     says that the '545 Patent is the greatest thing since sliced
 6     bread and has all of these great features.  The prior art
 7     actually has those features years before the '545 Patent, so we
 8     would use it in that way, for example.  So we're not going to say
 9     the patent is invalid because of that prior art, we're going to
10     say that the '545 Patent wasn't the first time that someone
11     thought of that idea.
12          So, our experts aren't going to say it's obvious or
13     anticipated.  It's not going to be on the verdict form, Your
14     Honor.  We're not asking the jury for this particular patent for
15     these claims in this case to provide a verdict as to obviousness
16     or anticipation, so we don't think there's any risk of jury
17     confusion here.  They're not going to get asked that question.
18          THE COURT:  Okay.  All right.
19          MR. MAIORANA:  All right.  Thank you, Your Honor.
20          THE COURT:  Thank you.
21          MR. WATSON:  Good afternoon, Your Honor.  Tom Watson on
22     behalf of the plaintiffs.
23          THE COURT:  All right.  Good afternoon to you.
24          MR. WATSON:  Reynolds seeks to have its retired, 18 months
25     retired vice president of scientific and regulatory affairs
```

1   testify that Reynolds did not infringe the asserted patents and

2   that the asserted patents are invalid.

3        There is no dispute that this witness, a Dr. Figlar, is

4   not qualified as an expert.  He provided no reports and Reynolds

5   does not say he is an expert.  And there's no dispute about the

6   law.  Only an expert can opine on the invalidity and

7   noninfringement of a patent.  This is dispositive of this motion.

8        And here's why, Your Honor:  Because Dr. Figlar's express

9   testimony is that he has an opinion on noninfringement.  If I may

10  just read from his transcript.  He says, "I do have an opinion on

11  that.  I do not believe that Reynolds is infringing on any of

12  those patents at this point in time."

13       Dr. Figlar then goes on to say that his role in trial will

14  be -- and I'll again quote directly from his deposition -- I'll

15  quote directly from his deposition.  "Probably either an expert

16  or a corporate company witness."  Those are Dr. Figlar's words.

17  But even beyond Dr. Figlar's choice of words from his testimony,

18  he confirmed that his opinion about infringement is not about

19  some contemporary fact from years ago, rather it was an opinion

20  on noninfringement that, quote, "is at this point in time."

21  That's again from Dr. Figlar's deposition.

22       That point of time was the time of his deposition, not the

23  time when they first learned of the patents.

24       I would like to explain to the Court real quickly why this

25  matters, why is Reynolds trying to circumvent Rule 26 regarding

1  expert testimony.  Willful infringement has been at issue in this

2  case since the beginning.  We pled it in our complaint.  And

3  throughout discovery Dr. Figlar was never identified as having

4  any knowledge regarding willfulness.  For example, we sought a

5  30(b)(6) witness on topics relevant to willfulness.  Reynolds

6  never identified Dr. Figlar for those topics.  We asked in an

7  interrogatory Reynolds' position on willfulness, and including an

8  identification of people with knowledge related to that.  Again,

9  Reynolds never identified Dr. Figlar.

10      In fact, ████████████████████████████████████████████

11  ██████████████████████████.  Based on that representation, we

12  withdrew our claims for willful infringement of those two

13  patents.

14      Now, Dr. Figlar's deposition and corporate topics have

15  been in dispute in three motions to compel.  So when we finally

16  had the opportunity to ask Dr. Figlar questions, he testified

17  that ██████████████████████████████████████████████████████████

18  ██████  that directly contradicted Reynolds previous

19  representation in its interrogatory response.

20      Such information should have been provided during

21  discovery, but, nevertheless, based on this new information, we

22  reasserted our claims of willful infringement.

23      It was during this deposition that Dr. Figlar offered the

24  opinions at issue in this motion.  Reynolds has characterized

25  these opinions as a good faith belief, i.e., again, an opinion

 1    that Reynolds did not infringe, yet Reynolds never identified

 2    Dr. Figlar as having any particularized knowledge on this field.

 3    Tellingly, Reynolds' own opposition fails to cite anything in the

 4    factual record that shows Dr. Figlar had particularized

 5    knowledge.  They just rely on attorney say-so to do so.  If Your

 6    Honor has any questions --

 7         THE COURT:  I don't.

 8         MR. BAYUK:  Your Honor, Frank Bayuk on behalf of Reynolds.

 9    I'll be brief with this.  We don't have any intention to put

10    Dr. Figlar on to give specific noninfringement opinions with

11    respect to the patents-in-suit.

12         You know, I think this is resolved by the testimony that

13    my colleague on the other side cited.  That's Exhibit 18 to their

14    motion.  This was obviously PM taking his deposition asking him

15    the questions.  If Your Honor looked at the testimony, you

16    probably saw that the Reynolds attorney was repeatedly objecting

17    saying this calls for expert testimony, and how we weren't

18    proffering Dr. Figlar as an expert to talk about infringement.

19    He is -- he has a doctorate in chemistry.  He's a long time R.J.

20    Reynolds senior executive in research and development.  He's

21    retired from the company.  He'll testify as a fact witness about

22    his time at the company, his assessment of the accused products

23    and their development, the knowledge back in time of the

24    patents-in-suit, but certainly on direct examination we have no

25    intention to ask him to give opinions about infringement or these

1    specific patents, whether the products infringe the patents.

2         THE COURT:  It's always a good idea to come to the podium

3    in the middle of the podium when you're --

4         MR. BAYUK:  -- I'm sorry --

5         THE COURT:  -- because I can hear you better, but I was

6    able to hear you.

7         MR. BAYUK:  Yes.  Here?

8         THE COURT:  Especially here in the Eastern District of

9    Virginia.  And Mr. Molster has been held in contempt several

10   times for violating that role.

11        MR. MOLSTER:  Objection, Your Honor.

12        MR. BAYUK:  I apologize, Your Honor.

13        THE COURT:  It's okay.  I'm kidding.  So I think this

14   motion is -- we want to make sure that Dr. Figlar isn't just

15   anecdotally going to say, Well, we didn't think we infringed

16   these patents, and that's why we did this and that's why we did

17   that, and you're telling me that's not going to happen?

18        MR. BAYUK:  He's not going to say we didn't infringe these

19   patents.

20        THE COURT:  All right.  Good.  Then we've resolved that.

21   Thank you.

22        MR. BAYUK:  Thank you.  Mr. Grant.

23        MR. GRANT:  Your Honor, the next one is our plaintiffs'

24   motion in limine number 9 regarding these collateral

25   investigations.  Let's start with the easy ones.

```
 1          The FTC investigation is not only irrelevant, it was also
 2     legally baseless.  The administrative law judge dismissed it on
 3     February 24th, which I think was the day before our reply went
 4     in.
 5          The state court actions that are being pursued are
 6     similarly irrelevant, but the most important thing, Your Honor,
 7     is both of those are against JUUL.  And while Altria may have
 8     made a minority investment in JUUL several years in the past,
 9     there's no claim or proof of control or -- it's not one of the
10     Altria companies.  There's no overlapping directors or
11     executives.  So the idea that somehow we get tarred with whatever
12     JUUL did, even when baseless, it's just got no place in the case.
13          The last issue is the ITC, and this one, I agree, is more
14     interesting.  So of course it's not relevant.  It's on appeal.
15          Their exclusion order that they like to talk about is not
16     final, and two of the three patents on which its based have been
17     invalidated, one at the IFC, one in the PTAB.  And the last one
18     that's the thread that pulls that exclusion order up is subject
19     to a PTAB ruling that we'll find out before the trial.
20          So, needless to say, there's nothing to talk about with
21     the ITC.  In terms of IQOS, you heard that discussion.  It's for
22     this very limited purpose of discussing features, technical
23     features that the FTI has communicated to the public that they
24     find important.
25          Now, can R.J. Reynolds' lawyers impeach with the ITC
```

```
1    testimony?  Sure.  They just have to say it's testimony from a
2    prior proceeding.  They don't get to disclose the ITC or anything
3    about it.  There's no relevance to disclosing it.  It's as much
4    of a side show as their stayed offensive claims in this case.
5    It's got no part in what we're going to be doing in June.
6         THE COURT:  Tell me about JUUL.  I'm confused.  So you had
7    a 30 percent interest in JUUL.  JUUL sells lots of products here
8    in the United States, and they've obviously been the subject of
9    some Press exposure.  How does JUUL play a part in your
10   case-in-chief, if at all?
11        MR. GRANT:  Zero.  It has no role whatsoever.  I hate to
12   say it out loud, but the reality is, Your Honor, that ███████
13   ████████████████████████████████████  It was written down,
14   and I think the ████████████████████████████████████
15   ██████████, and the ████████████████████████████████████
16   ████████████████████████████████.  We're not
17   talking about JUUL.  It's got no place here.  We're not in
18   privity with JUUL, and there's almost nothing to do with it.
19        The only minor tangential issue has to do with JUUL
20   practicing this '545 Patent which, you know, no surprise, just
21   about everybody does, and it is █████████████████████.
22        But that's going to be a very minor component of the
23   damages presentation, and we're not going to say anything more
24   than we've got a ███████████████████████ --
25        THE COURT:  JUUL practicing the '545.
```

75

```
 1              MR. GRANT:  Correct.

 2              THE COURT:  All right.  Thank you.

 3              MS. WEIZENECKER:  Good afternoon, Your Honor.

 4              THE COURT:  Good afternoon.

 5              MS. WEIZENECKER:  Jen Weizenecker on behalf of the

 6    defendants.  And I know we're approaching your two-hour mark, so

 7    I'll try to be brief and also save time, if Your Honor wants to

 8    go to additional motions.

 9              THE COURT:  Yes, please.

10              MS. WEIZENECKER:  I think I can be brief, because I don't

11    think there's that much disagreement, as long as we have an

12    understanding as to what the scope of the motion is.

13              So the first part is the ITC investigation.  Reynolds does

14    not intend to introduce the ITC investigation of IQOS.  That

15    being said -- and I don't want to reiterate too much what you've

16    already heard from Mr. Bayuk and from Mr. Maiorana.  If the

17    plaintiffs go beyond using IQOS as a market competitor under

18    Georgia-Pacific 5, that's fair for that very limited purpose of

19    saying otherwise.  As everybody can see, they had a competitor

20    product.  But if they go beyond that and they want to say, Well,

21    it had FDA approval, that is trying to tout and to say in front

22    of the jury this positive thing about the IQOS product that has a

23    special approval from the FDA, there's no relevance to that.

24    They haven't articulated a relevance to that.  And if that

25    happens, we can't let that story be one-sided in front of the
```

76

```
 1    jury, and that's when we would be entitled to then say that IQOS
 2    got approval using Reynolds' technologies; that IQOS isn't
 3    allowed to be sold in the United States.  So that's that motion.
 4          THE COURT:  Okay.
 5          MS. WEIZENECKER:  The other one is the FTC investigation,
 6    and similarly, within that scope, if their motion is just saying
 7    Reynolds should not introduce that FTC investigated Altria's
 8    investment in JUUL, we have no intention of saying that.  I do
 9    want to clarify because I think there may have been some talking
10    past each other and the response and the reply, that party
11    admissions from Altria in that proceeding, when that admission is
12    relevant to something in this case, that is admissible.  So we
13    are not going to in any way talking about the FTC investigation,
14    but what we will be able to introduce are statements, party
15    admissions of Altria, what they said when relevant, and I can
16    give you an example of that, Your Honor.
17          So, in that investigation, they said that their effort to
18    develop a successful e-vapor product was a failure.  They said
19    that in the answer.  We also have requests for admissions in this
20    case saying something similar.  That clearly goes to
21    Georgia-Pacific factor five as to whether or not their e-vapor
22    products from the Altria subsidiary, Nu Mark, whether or not they
23    had those and they considered those to be competition.  If those
24    were already a failure, obviously that concludes the royalty rate
25    in that hypothetical negotiation.
```

```
1          I don't think that's what their motion is intending, but I
2     do want to make sure that we're limiting it to the scope of what
3     the motion was, which was just that FTC investigation of the
4     Altria investment.
5          THE COURT:  Okay.  Thank you.
6          MS. WEIZENECKER:  Thank you, Your Honor.
7          THE COURT:  Do you want to address the admissions or do
8     you think you're clear about that?
9          MR. GRANT:  Look, Your Honor, to me it's like prior
10    testimony in the ITC.  If somebody says, isn't it true, then in
11    another proceeding you said X, I think that's appropriate subject
12    to your rulings on a question-by-question basis at the trial.
13         THE COURT:  Good.  Thank you.  Claim construction.  Are we
14    formally going to revisit claim construction?
15         MR. SOBOLSKI:  I'm pleased to say there's absolutely no
16    reason to revisit claim construction, Your Honor.
17         THE COURT:  I think I predicted you would say that.
18         MR. SOBOLSKI:  So, slide 43.  The Court remembers claim
19    construction in this case, lots of briefing, lots of terms.  The
20    Court's claim construction order had three important conclusions,
21    and that's what we've highlighted on slide 43.
22         Number one, the Court concluded none of the disputed terms
23    needed to be modified because their common English words, they
24    have a common meaning the jury can understand.
25         Number 2, the Court also said none of those terms were
```

78

1    modified by disclaimers.

2         And number 3, the Court recognized that part of what the

3    parties were doing was trying to load up constructions that

4    really have to do with trying to win on their infringement

5    positions, and the Court rejected that.

6         That ruling meant that the proposed modifications in the

7    plain meanings or the constructions, as a matter of law can't be

8    noninfringement arguments in this case because they're

9    limitations that Reynolds sought to impose onto the claims that

10   the parties disputed and the Court concluded as a matter of law

11   were not part of the claims.

12        Here's why we filed this *Daubert*.  For seven claim terms

13   in four of the five asserted patents, the noninfringement

14   opinions that Reynolds experts have are identical or nearly

15   identical to exactly what the disputed construction that they

16   proposed over a year ago was, exactly the same.

17        It's black letter law that you can't do that.  I

18   understand the defendant's trying to salvage a construction that

19   they lose with noninfringement, but it is beyond the pale and

20   completely disregards the Court's *Markman* order to recycle those

21   constructions as noninfringement arguments because they were

22   rejected.

23        So one point.  Reynolds argues that the Court did not

24   construe these terms.  That's the excerpt at the top of slide 44.

25        They said the Court, despite all the proceedings and all

79

```
 1    the briefing and the Markman order, the Court didn't construe
 2    these terms.  The Court knows what it did, and far be it from me
 3    to say that, but I want to be clear about one point, which is a
 4    legal point.  The Federal Circuit has taken up this issue exactly
 5    before and explained that when a district court expressly rejects
 6    an interpretation that should have a plain ordinary meaning, that
 7    is a resolution of the claim construction dispute and a claim
 8    construction.  That's exactly what happened here.  We argued for
 9    plain ordinary meaning.  Our friends disagreed.  They argued for
10    modifications to the plain meaning, be it disclaimer or
11    otherwise, and the Court resolved that dispute.  There's micro
12    issue here because it's exactly the same proposals that are
13    resurfacing.  The Court construed these terms.
14         Just to put a little meat on the fork, Your Honor, we have
15    some examples of exactly what we're talking about.
16         The first is at slide 45.  The top of slide 45, Your
17    Honor, is an excerpt from Reynolds' opening claim construction
18    brief in this case.  The claims terms are on the left.  In the
19    middle is what the proposed construction was, and on the right is
20    their recognition that we were arguing for plain ordinary
21    meaning.  We argued the term was indefinite or otherwise it
22    includes an essentially circular shape.  The Court rejected that.
23         On the bottom is their expert's noninfringement opinion.
24    His opinion is that the accused products don't infringe this
25    claim because there's not an essentially circular shape.  That's
```

80

```
 1    the exact same issue.  That's exactly what the dispute was at
 2    claim construction and it was resolved in the other direction.
 3         Next slide, 46.  Exactly the same thing but now for a
 4    second patent.  At the top again, Reynolds disagreed that the
 5    plain ordinary meaning controlled because they wanted to impose
 6    that there was a "distance defined by the thickness of the first
 7    capillary material."
 8         And on the bottom, having lost that construction,
 9    nonetheless, their expert has a noninfringement opinion based on
10    not having a distance defined by, exactly that first capillary
11    material.
12         Putting aside that there's no straight-faced sense in
13    which this is an explication of the plain meaning of being
14    distant -- of a distance defined by, it's an exact recycling of
15    the proposed construction on which they didn't prevail.
16         One last example, Your Honor, on the disclaimer point.
17    That's slide 47.  The Court found there were no disclaimers in
18    any of these patents, and there were a number of disputes about
19    that.
20         Subsequently, in the expert report on noninfringement,
21    their expert, Mr. Kodama, argues that there was a clear and
22    unmistakable disclaiming of a structure and configuration in the
23    patent.  Putting aside the disclaimer is a illegal issue that the
24    expert really shouldn't be opining on in the first place, the
25    dispositive point here is it's identical to what they proposed.
```

1   And there really is no debate about that, Your Honor, because we

2   deposed that gentleman about his opinion.  That's on slide 48.

3   We asked him, "Your opinion is that the plain and ordinary

4   meaning.... is the claim constructions that Reynolds had proposed

5   earlier in the case?"

6        "Yes, in most cases, that's true."  That's dispositive.

7   You can't put on an infringement case as a matter of law based on

8   rejected constructions.

9        MR. DEVITT:  Your Honor, Bill Devitt again.  Jones Day.

10   So I'm going to put the Court's claim construction on -- I know

11   you wrote it, Your Honor.  It goes on to the second page, but

12   most of it is on the first page, and I highlighted a couple of

13   key language points that I'm going to get to.  I'm going to come

14   to those.

15        But I want to clarify something.  I don't know if it was

16   intentional or not.  Just to be clear, I was at claim

17   construction; you were at claim construction.  I read all the

18   briefs.  At no point did Reynolds argue disclaimer for any of its

19   terms.  Let the record be clear.  We never argued for disclaimer

20   for any of the terms that were argued.  The only disclaimer that

21   was argued was by now plaintiffs PM, Altria with respect to our

22   two patents.  You can check the record.  It's clear.  We never

23   argued it.  We've always said plain and ordinary meaning.  And

24   there's case law, Your Honor.  And I think Your Honor recognized

25   that sometimes the plain and ordinary meaning by itself, the

82

```
 1    words themselves are fine and you can -- a person with ordinary
 2    skill in the art may have disagreement as far as what that means.
 3    And if you look at the cases cited in our opposition Daubert, we
 4    cite those cases where the courts have said, a dispute as to how
 5    a person of ordinary skill in the art would understand the plain
 6    and ordinary meaning of the terms is a factual question that must
 7    be resolved by the jury.  Disputes over how one skilled in the
 8    art would understand the plain meaning of a term raises a factual
 9    question that must be resolved by a jury."
10         That's where we are, Your Honor.  That's -- we understood.
11    Your order here, Your Honor, where you said the -- first
12    highlighted -- you said, "Each side asks the Court to give the 15
13    terms in dispute their ordinary and customary meaning to the
14    person of ordinary skill in the art."  That's all we asked you to
15    do before.
16         What we tried to do, Your Honor -- and there's a case
17    cited in our opposition claim construction brief that I think is
18    helpful, and it's the Terlep versus Brinkman case in the Federal
19    Circuit, 2005, and in it it says, "The construction of claims is
20    a simple way of elaborating the normal first claim language in
21    order to understand and explain but not to change the scope of
22    the claims."  Philip says, what is the ordinary meaning within
23    the context of the patent?  That's all we argued in claim
24    construction that's all we're arguing now.  We believe that's
25    completely consistent with the Court's claim construction order.
```

1       The second --

2       THE COURT:  I mean, are you going to take a word that says

3  round and change the definition of round to square?  Then

4  obviously, by apposite, that's improper.  So, how much latitude

5  are you thinking that your experts are entitled to?

6       MR. DEVITT:  Well, perfect example, Your Honor.  The first

7  example counsel put up there.  He showed dimensions -- the claim

8  term, Your Honor, "dimensions are substantially the same as a

9  cross section of a cigarette or a cigar.

10       THE COURT:  Right.

11       MR. DEVITT:  I think a jury's going to recognize, as a

12  person of ordinary skill in the art would, a cigar or cigarette

13  is almost always round.  It's almost always circular.  I don't

14  think that's an unreasonable position for an expert to say that,

15  a person of ordinary skill in the art.

16       THE COURT:  Okay.

17       MR. DEVITT:  They're saying that we can't say that -- that

18  I find that it doesn't infringe because it's not circular.  I

19  think that a person in the ordinary skill in the art can look at

20  that and say that based on his experience.  That's a factual

21  question that the jury should be able to consider.

22       THE COURT:  Okay.

23       MR. DEVITT:  Okay.  The second one, Your Honor, he pointed

24  to.  He says, "a second capillary material spaced apart from the

25  opening by a first capillary material."  The term "spaced apart,"

1    one from the other.  All we're saying is that they have to be a

2    distance apart.  That's a person in the ordinary skill in the art

3    just trying to understand the claim language.  We believe that's

4    what our position was at claim construction, we believe it's

5    consistent with the Court's order, and that's what all of them

6    are, Your Honor, except I will say there is a second part of this

7    argument.

8          So, with respect to --

9          THE COURT:  Well, with the second one you clearly are

10   modifying the language in the claim term "by a distance defined

11   by the thickness of the first capillary material," right?

12         MR. DEVITT:  But that's what the claim language says, Your

13   Honor.  If you look at the claim term itself -- look at the claim

14   language.  The claim language says, "spaced apart from the

15   opening by the first capillary material."

16         THE COURT:  Right.  Okay.

17         MR. DEVITT:  The claim language itself dictates that.

18         THE COURT:  Okay.  All right.  I got you.  Go ahead.

19         MR. DEVITT:  That same argument, Your Honor, with respect

20   to the plain and ordinary meaning, is with respect to all the

21   terms they have identified in their brief.

22         However, with respect to the '911 patent, there is a

23   caveat, and I want to make sure we're clear on this and make sure

24   the record is clear.

25         So the '911 Patent, Your Honor, there were three claim

85

1    terms construed at claim construction.  There was at least one

2    cavity in the wall of the aerosol forming chamber.  There was

3    blind hole, and there was recessed in the wall of their soft

4    forming chamber.

5         Now, they only point to the first and the third in their

6    brief, and they haven't focused on the blind hole, but that's the

7    one that we need to focus on because the others are all the same

8    of what one ordinary skilled in the art would look for.

9         On the term "blind hole", Your Honor, we did focus in

10   claim construction on what the spec said.  We said what the

11   examiner kind of agreed with.  But, just to clarify the record,

12   because I think this blind hole term, which we're going to go

13   with the plain ordinary meaning, is a little mis -- confusing.  A

14   blind hole is the opposite of a through hole, meaning if you

15   drill a hole in the wall and you see your way through, that's a

16   through hole.  If you just dig a hole in the ground and you still

17   have dirt at the bottom and you have a side around it, that's a

18   blind hole because you can't see all the way through.  We thought

19   that was the understanding after claim construction, Your Honor.

20   And if you may recall, you issued your order, I think it was in

21   November, four months after claim construction, for the first

22   time, their expert, Dr. Abraham, provided supplemental

23   infringement contentions with respect to the Alto product.

24        And with respect to that infringement contentions, he did

25   violate prosecution disclaimer, and we did in summary judgment

```
 1    write a motion and say he has -- there is disclaimer on this term

 2    with respect to the Alto with respect to blind hole.  And this is

 3    in our summary judgment brief, Your Honor.  I believe it's docket

 4    686.

 5         And Your Honor denied the summary judgment motions, and

 6    there's an argument -- I believe it's on pages 20 through 22, if

 7    I recall in 686 -- there's arguments with respect to this

 8    disclaimer, Your Honor, but in your order you didn't specifically

 9    address the disclaimer argument as relates to Alto, and that's

10    what we have in our opposition brief.  We clarify it.

11         So in view of this Daubert motion with respect to this

12    blind hole term, we're seeking clarification now.  We think there

13    is expressed disclaimer.  We think there should be

14    noninfringement based on the Alto under the '911 Patent.  We got

15    rid of that product with respect to that, because I think you'll

16    agree -- what they've said, Your Honor, and it's in their brief,

17    is that if you dig a hole, right, they're saying it would be --

18    you would have sides -- you'd dig down, right, that's a blind

19    hole, but what their expert now says, is if I could open up the

20    sides and let water -- if I'm planting a tree, right, I want to

21    let the water stay in the hole, but if I dig a channel, that

22    water is going to flow away.  That's not a blind hole.  Those are

23    the expressed disclaimers.

24         These are pointed out, you know, in our opposition brief,

25    Your Honor.  Let me find the page for you.  Excuse me.  It's in
```

87

1    our opening summary judgment memorandum, Your Honor, which is

2    Document 686.  And at page 6 in paragraphs 25 and 27 are the

3    express disclaimers I wanted to point out, and that's in our

4    summary judgment motion, Your Honor, that we asked you to

5    clarify, whether the blind hole is -- is it a legal disclaimer

6    and Alto should be noninfringing, or if you say it's not a

7    disclaimer, that it's a factual issue that the experts should be

8    allowed to testify on.  So we're seeking clarification on that

9    point, Your Honor.

10        THE COURT:  Okay.  That's fair.

11        MR. DEVITT:  I have nothing more, Your Honor.

12        THE COURT:  All right.  Thank you.  I want to talk about

13   Dr. Sullivan's testimony, and I apologize for leaving it off the

14   list.  And in particular, it was, you know -- we talked about it

15   a little bit, about the damages equation including a ████████

16   unit, extra units that were identified for a period after a

17   hypothetical negotiation.  And, Mr. Sanford, do you want to

18   discuss that, sir?

19        MR. SANFORD:  I will, Your Honor, if I may.

20        THE COURT:  Sure.  Go ahead.

21        MR. SANFORD:  So, the ████████ in Alto units, there's a

22   2018 forecast, there's a 2020 forecast that Dr. Sullivan used,

23   and then there's the time and the ████████ agreement.

24        The point is real simple, Your Honor.  When determining

25   the ████████████ of what the ████████ Reynolds paid

```
 1    Fontem in December 2018, you've got to look at what the parties
 2    were considering.  The law says that.  The economic articles,
 3    even the ones that Dr. Sullivan relies on, all say that.  And it
 4    makes sense, because they wouldn't know that there's ███
 5    ██████████████████████████ in 2015, the ██████████ that
 6    Your Honor is referring to.  So the sales are ███████████████
 7    but that really just shows the motive, Your Honor.  The legal
 8    error is in the choice of data.  It's a binary decision.  He
 9    could have used what was available to the parties or what was not
10    available, and they tried to defend it in the construct of the
11    hypothetical negotiation in the Book of Wisdom, but it just
12    really misses the point.  We're talking about a real world
13    negotiation where real world parties sat down and tried to value,
14    undisputedly, technically comparable technology, and they ended
15    up at a ████████, but ██████████ were based on forecasts made at
16    the time.
17         And the problem with what he did is he -- and they admit
18    it in their opposition -- they say it's the best information
19    available at the time of his expert report, but the focus is on
20    what the parties knew when they agreed upon that consideration.
21    And, to be sure, Your Honor, they served a supplemental report as
22    the parties agreed to do as a standard, you know, let's update
23    the report based on new sales data.  So we got their 2020 sales
24    data, and what we saw, what we got from Dr. Sullivan is -- now we
25    have three different ██████████████████.  Now he's saying,
```

```
1    well, now I have a 2021 forecast, and I know all the actual sales

2    in 2020, and so under their, you know, best time of the expert

3    report theory, which finds no support in the law or in economic

4    treatise, well now I have a new ███████████████████.  And

5    that's just -- it's illogical and it's a moving target.  And what

6    happens when we go to the jury at trial and there's new data?  Is

7    he going to say that's the effective royalty rate?  It just

8    doesn't make sense and it invites legal error.

9         The reason is -- what should be used is what's the best

10   available data at the time those real world parties sat down and

11   negotiated.  And according to their own witness, the guy who fed

12   Dr. Sullivan the information about the forecast who did it 30

13   years at Reynolds, that's the 2018, and that's a matter of common

14   sense because that's the most recent forecast at that time.

15        So I'm happy to answer anymore questions, but that's

16   really the crux of the issue.

17        THE COURT:  I understand.  Thank you.

18        MR. SANFORD:  Thank you, Your Honor.

19        MR. BURNETTE:  Hi, Your Honor.  Jason Burnette again for

20   the Reynolds entities.

21        There's been no case cited that says you can't ███████

22   ████████ to an effective royalty rate this way.  My friend on the

23   other side --

24        THE COURT:  Using data that didn't exist during the time

25   of the hypothetical?  I mean, right?  Is that -- isn't that what
```

1    you're doing?  Isn't that what Dr. Sullivan was doing?

2         MR. BURNETTE:  It's not a hypothetical negotiation, it's a

3    real negotiation.

4         THE COURT:  Okay.

5         MR. BURNETTE:  We're using data from 2020, not 2018.  The

6    cases that have been cited are for the proposition that you have

7    to use actual sales data, which is what we're doing.  They cited

8    cases where, for example, an expert relied on not the number of

9    widgets that were sold at a Staples store but the number of

10   Staples stores.  Well, that's not an accurate basis to do this

11   conversion from ███████ to a running royalty.

12        The point is there's not one right way to convert ████

13   ██ into a running royalty.  There's no mathematical precision

14   required.  You can approximate.  There's an approximation

15   inherent in this process.  You can have different ways of doing

16   it.  What we're trying to determine is what is the effective

17   royalty rate of this ██████████ number?

18        Now, importantly, there are two experts in this case, and

19   both of them have used sales data post-dating the actual

20   agreement.  Mr. Meyer, PM's expert, uses sales data from 2020 to

21   convert the royalty rate as part of the Fontem RJRV royalty rate

22   to show it's consistent with his ██████████ percent royalty

23   rate.  He's using post-agreement data as well.

24        You know, theoretically you wouldn't know the effective

25   royalty rate until the last two expired patterns expired, and

```
 1    then you would know how many sales you had and how much you paid,
 2    but we don't have that perfect data.  What we have is the data as
 3    of the time that the report was made.  And the suggestion that
 4    the Reynolds employee who's giving the forecast data says this is
 5    the best available, that's slightly misleading.  He did say that,
 6    that, as a company, this data is produced every year with
 7    forecasts in five-year chunks, but he also recognized that the
 8    data is inherently uncertain.  The forecast changed every year.
 9    They were anticipating ████ sales.  There's really no dispute
10    that the sales data that Mr. Sullivan -- Dr. Sullivan, our
11    expert, relies on, is more accurate.  It's the more accurate data
12    than was available as a forecast in 2018.
13         It's not a new opinion.  So we have updated financial
14    information.  We have updated our tables.  Dr. Sullivan says
15    these confirm my royalty opinions that the new data confirms,
16    that the numbers I use derived from the 2020 numbers are accurate
17    numbers, and so the opinions on the royalty rates have stayed the
18    same.  So there's not a moving target issue here as well.
19         There's no question that the methodology is correct.  It's
20    permissible to convert ████ to a running royalty.  So this
21    is one data input that they have challenged.  And the other
22    context with Mr. Meyer, they say, you know, the challenge to one
23    data input is a question for cross-examination.
24         Well, it's the same here.  If they want to run the numbers
25    based on an alternative data set, they can do that, but they're
```

1    asking you for a categorical ruling that you can never convert ▮

2    ▮▮▮▮▮ into an effective royalty rate based on this analysis.

3         THE COURT:  I may have misunderstood what they were asking

4    for.  I think -- when is the hypothetical negotiation taking

5    place on these sales with these patents?  Because you have

6    different dates.

7         MR. BURNETTE:  Yeah.  You're going to test my memory.

8    It's from 2013 to 2018.  I can check my notes.

9         THE COURT:  So Dr. Sullivan uses projections when he's

10   looking at royalty rates and sales, and, assuming there's

11   infringement, what the bottom line should be, right?  Am I

12   following that correctly?

13        MR. BURNETTE:  That is correct.  He uses actual sales from

14   2013 up through up through 2020.  He's using a -- he's using

15   financial data produced in 2020.

16        THE COURT:  When is the hypothetical negotiation taking

17   place versus --

18        MR. BURNETTE:  It's varying times for different products

19   but 2018 to --

20        THE COURT:  Right.  So you're saying -- the question is,

21   is he restricted to using data that's been produced by Reynolds

22   that exists in 2018, or can he -- because he's actually in 2020

23   and has this additional data.  Is he permitted to use that data

24   in using -- in his projections of sales?  And Phillip Morris is

25   saying that's not right, it didn't exist and you can't use it,

```
 1   and otherwise a hypothetical negotiation wouldn't be a
 2   hypothetical negotiation at the time of our first infringement,
 3   it would be the hypothetical negotiated at the negotiation at the
 4   time of trial.  So what -- I think you are telling me
 5   Dr. Sullivan should be allowed to use the latest data that he had
 6   when he formed his opinion in his report; is that right?
 7        MR. BURNETTE:  Yes, Your Honor, that is what we say.
 8        THE COURT:  You think that that's legally sound?  You
 9   know, that you've got legally sound basis for that?
10        MR. BURNETTE:  Yes, Your Honor.  Yes, Your Honor, we do.
11   As viewed as a hypothetical negotiation, the Book of Wisdom does
12   permit --
13        THE COURT:  The Book of Wisdom is worth as much as
14   Dr. Goldschneider's report that there should be 25 percent
15   royalty on every infringing product.  That went by the wayside,
16   as far as I can tell, a while ago, for good reasons.  Wasn't his
17   name Goldschneider?  Do you remember?
18        MR. BURNETTE:  I do not know.
19        THE COURT:  You may not have even -- that predates all of
20   you.  There was an expert out there that said 25 percent to
21   everybody, and it caught fire and for about three or four years
22   25 percent was the rate.  And we were like, why?  And it was
23   because Dr. Goldschneider said it.  That's how I feel about the
24   Book of Wisdom.  You have to get a little more finite than that.
25   So all right.  I understand your position.
```

```
 1        MR. BURNETTE:  The Book of Wisdom still exists, as far as

 2    I understand it, and viewed as a hypothetical negotiation, it can

 3    be considered.  But also I do want to note the methodology is not

 4    in dispute.  This is a data input.  And they're not challenging

 5    in a case-specific way the reliance on the data.  It really is a

 6    blanket rule.  Your Honor can consider, for purposes of

 7    converting ███████ to an effective royalty rate projections

 8    and data that prevailed at the time of the agreement.

 9        THE COURT:  But it changes the numbers that the jury looks

10    at, right?

11        MR. BURNETTE:  It will.  It will.

12        THE COURT:  Okay.  Thank you.

13        MR. BURNETTE:  Thank you, Your Honor.  Mr. Sanford,

14    briefly.

15        MR. SANFORD:  Your Honor, very briefly.  I know we're

16    short on time.  First, the idea that we're not challenging the

17    methodology is just flat wrong.  What we know -- the general idea

18    that you can take ███████ and convert it into a royalty rate,

19    it can be done.  That we don't object to.  But the Federal

20    Circuit in cases in this district decided in our brief has told

21    us you've got to be really skeptical about that, because it's

22    hard to do.

23        There's fundamental differences between those two, and

24    when you do it, you have to have a sound methodology, and that's

25    not what Dr. Sullivan has here.  They didn't point you to a case
```

 1    to support their theory.  It's their burden of proving their

 2    expert testimony.

 3          The cases Your Honor should look at are *Lucent* and *WordTec*

 4    cases cited in our reply.  The Federal Circuit explained there

 5    that -- I mean, *Lucent* just takes a step back and looks at the

 6    fundamental differences, as Your Honor knows, between lump sum

 7    and royalty and talks about what parties consider at the time of

 8    the agreement.  *Word Tech*, the same.  The only case cited in

 9    their opposition to support these current actual sales are proper

10    is the *Biederman* case.  And in our reply, Your Honor, it doesn't

11    use the word current.  It says "actual sales data."  Current is

12    the linchpin of what Dr. Sullivan did, and there's no basis in

13    the law.

14          And the last point I want to make, Your Honor.  This is

15    Exhibit 12 to our reply.  To the extent the law hasn't disposed

16    of this argument, every economic article is in the record,

17    including the one Dr. Sullivan relies on, says the opposite of

18    what you're hearing from my colleague.

19          Exhibit 12.  You have to put yourself in the shoes of the

20    parties negotiating the agreement and understand what they were

21    projecting at the time they agreed to X dollars for ████████

22    That makes sense.  And we talked a lot about today how the market

23    changed so much, how the sales have grown, how they got

24    authorization, how the FDA has -- so many change between August

25    2018 and these data sets that Dr. Sullivan is using.  There's no

```
1    basis.  And the reason they're doing it is because he gets at an

2    effective royalty rate of about          █████████     when everything else in

3    the record says    ██████████████████████████ .

4         THE COURT:  Okay.

5         MR. SANFORD:  Thank you, Your Honor.

6         THE COURT:  All right.  Let's move on to David Clissold.

7         MS. UNDERWOOD:  Good afternoon, Your Honor.  Jaime

8    Underwood from Latham and Watkins on behalf of the plaintiffs.

9         THE COURT:  Good afternoon.

10        MS. UNDERWOOD:  May I proceed?

11        THE COURT:  Thank you.  Your Honor, Mr. Clissold's

12   opinions that the redesigns of the '265 and '911 patents were

13   available, for purposes of considering them in a damages

14   assessment, are unreliable and built on speculation.  They should

15   not be before a jury, and they should not be used as part of

16   Dr. Sullivan's dramatic reduction in his damages calculation.

17        In a typical case, a product would be on the market in

18   order to be considered available for consideration in any type of

19   damages assessment.

20        And here there is no question that, number one, the

21   redesigns required PMT authorization from FDA before they could

22   be sold in the United States.

23        It is also uncontested that, as of 2018, at the time of

24   the hypothetical negotiations, the redesigns did not have such

25   authorization, and, therefore, it is not contested that in 2018
```

97

1    the redesigns could not be sold in the United States.  Plaintiffs

2    submit, Your Honor, that that should be the end of the inquiry,

3    because the products would not be available for sale to U.S.

4    consumers.

5         But should Your Honor entertain some elasticity in terms

6    of the notion of availability, that availability still needs to

7    be somehow a commercially reasonable time period in conjunction

8    with the damages that you're talking about.

9         Now, Mr. Clissold does not limit his damages -- does not

10   limit the period in any manner.  And as we stand here today, Your

11   Honor, the vast majority of the Vuse e-cigarette PMTAs have yet

12   to be granted.  So when you apply the theory that Mr. Clissold is

13   espousing, it can be quite dramatic in that he says, essentially,

14   that as long as you file a PMTA for the redesigns, at any point

15   in time during the entire life of the patent, then that should be

16   sufficient to consider those redesigns available.  That means

17   that you can go all the way to 2035 when the second patent

18   expires and then say that you can then harken all the way back to

19   2018 and say that those redesigns were available.  Your Honor,

20   that is not reasonable.  That is reversible legal error.

21        Theoretical availability is not enough.  We know that from

22   the case law.  Even if you take the three-year period from 2018

23   for the hypothetical negotiations to the recent grant in October

24   of 2021 for a handful of the Solo PMTAs -- and, as an aside, not

25   all of the Solos have been granted.  Ten of them were denied and

1    three of them were granted, about ▮ percent of the overall Vuse

2    PMTAs.  But even there, three years is too long to be considered

3    available in the context of a hypothetical negotiation, and

4    Reynolds does not cite a single case to the contrary.

5         And by the way, Your Honor, because we have just been

6    talking about Dr. Sullivan and his damages assessment,

7    Dr. Sullivan never accounts in any way for this lag time between

8    when the products actually become available and when they are

9    supposedly deemed available under Mr. Clissold's theory.

10        Finally, Your Honor, Mr. Clissold's opinions are based on

11   utter speculation because there is an assumption in his opinions

12   that whenever a PMTA for the redesigns is going to be filed, that

13   that will eventually be granted, and we all know better; RJR,

14   more than anyone else, because they already received PMTA

15   denials, and they have received so few grants, and most of the

16   PMTAs are in limbo.  Mr. Clissold has told us about the

17   precarious nature and the uncertainty of the PMTA process.  He

18   said that nobody knows what's going to happen within that PMTA

19   process, and there's clear uncertainty as to whether a PMTA will

20   be granted.

21        In sum, Your Honor, Mr. Clissold's opinions cannot tell

22   the Court and cannot tell the jury when or even if a PMTA

23   redesign would ever be granted.  What we do know are the

24   redesigns are not available as of the times of the hypothetical

25   negotiations.  And as we sit here today, the vast majority of

1    them still are not available.  Those kinds of unreliable and

2    speculative opinions have no role in front of the jury, and we

3    ask that you grant the motion.

4         THE COURT:  Thank you.

5         MR. MAIORANA:  David Maiorana on behalf of the Reynolds

6    entities.  May I proceed?

7         THE COURT:  Yes, sir.

8         MR. MAIORANA:  What you just heard is a summary judgment

9    argument, Your Honor.  This motion is a summary judgment motion

10   disguised as a *Daubert*.  They are asking you to rule as a matter

11   of law that the alternatives that our expert points to are not

12   noninfringing alternatives in the reasonable royalty analysis.

13   They should have moved on that at the time of summary judgment.

14   They chose not to.  Now is not the time to do that.  That alone

15   is a basis for denying this motion.  But whether or not something

16   is a noninfringing alternative is a question of fact for the

17   jury.  They cited the *Carnegie Mellon* decision out of the Western

18   District of Pennsylvania, and Judge Fisher said, "the question of

19   whether there is a noninfringing substitute is a question of fact

20   such that a court should not determine the issue by way of a

21   *Daubert* review."  And she was quoting -- citing the 3M case from

22   the Federal Circuit in 1992.

23        This is a highly factual inquiry.  Was it available or was

24   it not available?  That's for the jury to decide.

25        As a matter of law, whether it could be, because it

```
 1    doesn't have FDA authorization as they're now arguing, that's a
 2    summary judgment issue that should have been raised months ago.
 3           So there are two independent reasons why this motion
 4    should be denied.  But on the merits, if you look at the merits,
 5    their motion is premised on the faulty argument that a
 6    noninfringing alternative has to do FDA authorization in order to
 7    be admissible in a case like this, and that's simply not true.
 8    Design-arounds can be taken into consideration, even if they're
 9    not on sale at the hypothetical negotiation date, and you and I
10    talked about this earlier today.  They don't even have to exist
11    at the time of the hypothetical negotiation.  All the case law
12    requires in this -- and the cases are summed up on page 8 of our
13    brief, that the accused infringer need not have the ability to
14    settle the noninfringing alternative before the alternative's
15    features can be compared to those of the accused product for
16    evaluation purposes.
17           In the Carnegie Mellon case, the Federal Circuit said it
18    was fine that the District Court found that defendant could have
19    come up with one during the life of the patents.  That's all
20    that's needed for this very low bar for noninfringing
21    alternatives for reasonable royalty.
22           And as I mentioned to you earlier today, we're not talking
23    about acceptable noninfringing substitutes for reasonable royalty
24    under Panduit.  That's not what's at issue here.  The test that
25    they're trying to apply here is from the reasonable royalty
```

1    cases.  And they cite the *DUSA* case, *DePuy* and *Ethicon*.  Those

2    are all lost profit cases, and those cases don't hold that FDA

3    authorization has to be obtained by the time of the hypothetical

4    negotiation.  All there has to be is that defendant has to come

5    forward with evidence that they could have turned to a different

6    design as an alternative.  It's only one of the 15

7    Georgia-Pacific factors that we're talking about here.

8         Mr. Clissold's opinion is that the redesigns, the design-

9    arounds that the technical experts point out in their reports,

10   that Reynolds could have put those into the PMT -- PMTA

11   application to try to seek FDA approval.  Whether they could have

12   gotten approval or not, those are questions of fact for the jury

13   to decide based on the he evidence presented to them, but not as

14   a *Daubert* gatekeeping function.

15        In our footnote 5 on page 9 in our brief we point out

16   numerous cases saying that something that may not be a

17   noninfringing alternative in the loss profits context may be a

18   noninfringing alternative in the reasonable royalty context, and

19   that's because you're looking at one factor of the

20   Georgia-Pacific analysis which talks about a reasonable licensee

21   talking to a reasonable licensor, what would they pay if they

22   were negotiating a royalty?  And one factor that goes into that

23   is, is there another design that doesn't infringe that they could

24   have gone to, and that's going to, depending on the facts, may

25   drive down the royalty rate that's ultimately arrived at through

1    the entire Georgia-Pacific analysis.  That's the issue we're

2    talking about with Mr. Clissold.  All of this about deeming dates

3    and everything that's in their brief, that that's not relevant.

4    All he's saying is that the technical design-arounds that the

5    technical experts proposed in their expert reports -- and they

6    can cross-examine the technical experts on those during trial --

7    all he's saying is that when Reynolds did their PMT applications

8    after the hypothetical negotiation date, they could have included

9    those in their PMTs to get -- to try to get FDA authorization.

10   Maybe they will or maybe they won't, but the jury is entitled to

11   decide those questions of fact.  It's not appropriate for a

12   *Daubert* motion, Your Honor.  Thank you.

13        THE COURT:  Thank you.  So I guess the issue is, at the

14   time of the hypothetical negotiation, what was out there in the

15   field that might have provided noninfringing alternatives?  If I

16   framed the question that way and we had technical experts talking

17   about noninfringing alternatives -- I'm, frankly, not sure when

18   those came into existence.  But how do you respond?

19        MS. UNDERWOOD:  Certainly, Your Honor.  So let me separate

20   for a moment sort of the technical availability of a product

21   versus the regulatory availability of a product.  And what my

22   friend discusses in his case law is the availability of technical

23   aspects.  So, is something feasible?  Could something come up

24   from a technical perspective?  That's a slightly different

25   question, Your Honor.  What we're talking about here is

1    regulatory availability, and it is black letter FDA law that if a

2    design was not on the U.S. market as of the date of the enactment

3    of the deeming rule, then that product, if it cannot take another

4    FDA path, it is new tobacco product, then it has to obtain PMT

5    authorization prior to being on sale in the United States.  So

6    that --

7         THE COURT:  That could be ten years from now, right?

8         MS. UNDERWOOD:  Exactly.

9         THE COURT:  The way things are going, that could be ten

10   years from now.  In the meantime, all these products are on the

11   market, they're being -- there are products like them.  I mean,

12   how many million e-cigarettes are being sold in the marketplace

13   these days?  And how do I square all of that?

14        MS. UNDERWOOD:  I can certainly understand the confusion,

15   Your Honor.  So, at the time of the deeming rule, all

16   e-cigarettes became immediately --

17        THE COURT:  -- I understand the regulations, and I read

18   Judge Grimm's opinion, and I looked at your brief, and I

19   understand the 2018 cutoff date, you know, what products were in

20   existence in 2016 and which ones weren't and the rules that apply

21   from the FDA based on that.

22        I guess my -- so I don't quarrel with your argument.  If I

23   agree with you that noninfringing alternatives had to be

24   available in a marketplace because they had been approved by the

25   FDA, then you're a hands-down winner on this issue.  If I look at

1   the marketplace and say it's a mess and nobody had approval for

2   anything, but there was in existence at the time of the

3   hypothetical negotiation an alternate means of using a different

4   battery or using a different mechanism for uniform flow, then

5   that's a different -- a different way to look at it, and I'm

6   really having difficulty making that decision because of the way

7   the real world is working with the FDA and products by both of

8   your companies.

9          MS. UNDERWOOD:  So I certainly understand your confusion,

10  Your Honor.  The products that you see -- the e-cigarette

11  products that you see that are currently on the market, nearly

12  all of them are going to be in that special group that FDA said,

13  Boy, this is really going to be unfair to you because your

14  product is going to be instantly illegal, so we're going to let

15  you keep selling it as long as you eventually put in a PMTA at

16  the appropriate time.

17         THE COURT:  Right.

18         MS. UNDERWOOD:  So when you look at the landscape of the

19  e-cigarette market right now, Your Honor, that's the kind of

20  product that you see.  The redesigned products do not fit into

21  that category.  They cannot fit into that category for the

22  reasons that you understand and have articulated.  They have to

23  have PMT authorization prior to being sold.

24         So in terms of looking in 2018 at the landscape, you can

25  say, Well, maybe there's another product that's available, if

1    that design was on the market as of the deeming rules enactment

2    date, but you're not going to see new products, and that's what

3    the redesign is.  By law, under FDA regulation, the redesign is

4    defined as a new product because it has been modified from the

5    design that was on sale on August 8th, 2016.

6         THE COURT:  All right.  Now I understand.  Thank you.

7         MS. UNDERWOOD:  So just a couple of points, Your Honor.

8    So, with regard to the notion that our motion should be better

9    characterized as a summary judgment motion, a *Daubert* motion is

10   the quintessential procedural vehicle to test the reliability or

11   challenge the reliability and speculation for expert opinions,

12   and that's exactly what we've done here, Your Honor.  We've gone

13   through -- and I won't go through every detail, but our briefing

14   sets forth a number of examples where Mr. Clissold's opinions are

15   so far afield from --

16        THE COURT:  I don't have any problem with you bringing

17   this as a *Daubert* motion, so.....

18        MS. UNDERWOOD:  I'll move on.  Thank you, Your Honor.  So,

19   with regard to the timing of this, again, if it's a six-week

20   delay, perhaps that's okay.  If that's a six-month delay, perhaps

21   that's okay under certain circumstances.  Maybe you're waiting

22   for raw materials, maybe you're waiting for your factory to be

23   retooled, but this is something very different.  This is

24   something entirely out of RJR's control.  They simply do not have

25   one of the components, if you will, in order to provide this

106

1    product to the market, and that is PMT authorization.

2         Now, in terms of the case law, again what my friend has

3    cited to you deals more with the technical aspects of things, but

4    when you look at the regulatory aspect, it's a little bit

5    different.

6         Now, one of the things also that my colleague described

7    was that you only need to show availability for a product if

8    you're dealing with lost products as opposed to a reasonable

9    royalty analysis, and that's simply not correct.

10        We cite in our brief, Your Honor, the *Sherwin-Williams*

11   case, both in our initial brief and in the reply, and in that

12   case it specifically says that this involved both lost profits

13   and reasonable royalty analyses.  And the gist of that case is if

14   a product is not on the market and available, then you can't

15   consider that in a damages assessment.  Now, this case, the

16   *Sherwin-Williams* case, relies significantly on a CASC case called

17   *Grain Processing*.

18        There's another case that we cite in our briefing, Your

19   Honor, that also relies on that same Federal Circuit case, and

20   that's *Laser Dynamics*, and *Laser Dynamics* makes absolutely clear

21   that theoretical availability is simply not enough.

22        If it's not going to be available at the time of the

23   period you're looking at for damages purposes, it's not going to

24   be relevant.

25        THE COURT:  Thank you.  I'll look at your case law.

```
 1          MS. UNDERWOOD:  Thank you.

 2          THE COURT:  All right.  So we've come to our number of

 3   asserted claims, and are we still working through that?  And, you

 4   know, this is -- this is a dance that, you know -- who goes

 5   first, who goes second.  Obviously, we're not going to put on 50

 6   different combinations of prior art to invalidate the patents,

 7   and we're not going to put a jury through every claim asserted in

 8   the five different patents.  So, Mr. Grant, you need to look at

 9   your portfolio and identify the ones that are -- whether it's the

10   independent claims or whether it's specific to products, and

11   identify the ones that you are going to hold onto, and it's got

12   to be a reasonable number.

13          MR. GRANT:  Understood.

14          THE COURT:  And then Reynolds needs to look at those

15   claims and decide, you know, what prior art they're going to

16   identify, and it's not going to be, you know, the night before

17   the cross-examination of the experts.  We're going to identify

18   prior art combinations in time for them to be reviewed and

19   focused in on by the experts.  So we've got a mid-June trial

20   date.  Let's take 30 days -- let's take 15 days to identify your

21   claims in speaking to people, and let's take 15 days after that

22   to identify and limit the combinations that you're going to use

23   so you'll have them, you know, mid-April, and you can prepare

24   your experts as we move forward towards trial.

25          MR. GRANT:  Thank you very much, Your Honor.
```

```
1          THE COURT:  All right.

2          MR. MICHALIK:  Your Honor, John Michalik.  If I may speak

3     just briefly on this.

4          THE COURT:  Yes, sir.

5          MR. MICHALIK:  I think one sticking point is maybe some

6     guidance from the court on what the Court deems reasonable in

7     terms of the number of claims that should be supplied to the

8     jury.

9          THE COURT:  I'm going to let Mr. Grant look at what he

10    thinks he needs.  If it turns out to be an unreasonable number,

11    I'm going to tell him that he needs to reduce it by a third, and

12    we'll go that way.

13         MR. MICHALIK:  Thank you, Your Honor.

14         MR. GRANT:  Your Honor, what I anticipate is I'm going to

15    cut them down a bunch, the way we proposed.  They're going to

16    pick their prior art references, not 18 combinations.  That will

17    be narrowed down.  And then, once I see that, we may be able to

18    streamline it some more.  The last time I was here as a

19    defendant, I came forward and I identified two prior art

20    defenses.  We're going to narrow this trial down, too.  Thank

21    you.

22         THE COURT:  All right.  Thank you.  Keep working on it.

23         MS. WEISWASSER:  Your Honor, good afternoon.  Elizabeth

24    Weiswasser.  I guess I'm almost saying good evening.  May I

25    proceed?  I think we have the last issue for you here.  So, thank
```

1    you for hearing us.  Back to the '374 Patent and a piece of

2    alleged prior art that Reynolds is asserting.  This is the

3    Chinese utility patent, CN '667.  So this is the Liu-Liu issue.

4    So our inventor is Lieu, and the inventor on the Chinese utility

5    patent is also Liu.  There's no question they're the same Liu.

6         We submitted to you yesterday with our reply brief on this

7    issue the decision of the PTAB, of the Patent Office, which

8    denied Reynolds' petition to institute interparty review on

9    precisely the basis that we're asking Your Honor to rule.

10         Reynolds in their IPR petition put forward obviousness

11   arguments based on the Chinese utility patent, Liu, and the

12   Patent Office denied institution, saying it's not prior art

13   because it is not another, they are the same person, and so on

14   that basis the Patent Office declined to take up the obviousness

15   arguments based on that.  We're asking you to clear this issue up

16   and remove the arguments based on the Chinese utility patent.

17         THE COURT:  Okay.  Thank you.

18         MR. LAUD:  Thank you, Your Honor.  Sanjiv Laud from Jones

19   Day from Reynolds.  I want to make an important point about the

20   IPR -- two important points.

21         First is that the IPR did not address the possibility that

22   it is prior art under Section 102(d), which applies only if it's

23   the same inventor.  That issue wasn't disposed of by the PTAB.

24   The second point about the PTAB proceedings is that there is no

25   waiver argument at issue in the PTAB proceedings, but that is

1  precisely the reason why we believe we should be permitted to use

2  this reference under Section 102(a) in this case.

3        I won't belabor you, Your Honor, this afternoon with that

4  argument because the whole thing was briefed and argued already

5  at summary judgment.  I would just refer you to our brief, which

6  is docket 728, which has a full explanation of our arguments.

7        And my last point, Your Honor, is we ask that you actually

8  reserve this issue for post-trial because your ruling is not

9  going to affect whether this prior art reference is available to

10  us at trial.  As your summary judgment order said, there's a

11  viable issue of fact on whether the priority date is 2010 or

12  2015.

13        If the priority date is 2015, there's no question that

14  this many years older patent is prior art, so this won't

15  eliminate the reference from trial.  It can be sorted out after

16  trial if the jury verdict turns out in a way that they thought

17  the priority date was 2010 and they relied on that reference, as

18  opposed to something else, much like a doctrine of equivalence

19  defense that you could do after the case.

20        THE COURT:  All right.  Thank you.

21        MR. LAUD:  Thank you.

22        MS. WEISWASSER:  A couple of points.  So, first of all,

23  our request that we're making for a ruling on this issue is only

24  in the event that the jury were to find that we are not entitled

25  to our earlier priority date.  We think it would be beneficial to

1     do that now because it will be very confusing to the jury to hear

2     about Liu, Liu, this priority date, that priority date.  It's a

3     straightforward issue.  We should be able to resolve this and say

4     it's not prior art, it's not by another, if the jury finds it's

5     the earlier priority date.

6          The 102(d) issue has been raised very belatedly.  It was

7     not raised by Reynolds.  They never raised a 102(d) prior art in

8     their IPR petition.  That can also be easily resolved.  102(d)

9     requires that it be the same invention.  The fact that Reynolds

10    is only relying on this Chinese utility patent to support an

11    obviousness argument shows it's the not the same invention.

12         And finally, this idea that somehow we waived the idea of

13    saying that Mr. Lieu is the same as Mr. Lieu is, respectfully,

14    absurd.  We didn't waive it.  We disclosed it in our rebuttal

15    report, but the Patent Office has already identified that and has

16    denied proceedings based on that ground, so there's no waiver

17    here.  It's a fact.

18         THE COURT:  Okay.  All right.  Thank you.  All right.

19    That's all I've got.  Anybody have anything that they need to

20    bring up right now other than --

21         MR. GRANT:  Your Honor, one of my colleagues just asked

22    whether we might get a few days with the transcript just to

23    ensure there's not something confidential that we might want to

24    ask the Court to see.  If there is something, it won't be more

25    than a line or two or perhaps a royalty percentage or two, but we

1    want to be cognizant of that.  If the Court could give us that

2    indulgence, we'd welcome it.

3         THE COURT:  Yeah, absolutely.  Absolutely.

4         MR. GRANT:  Thank you.

5         THE COURT:  How are we doing with settling this case?  Are

6    you going to take a couple of days and go off to some nice town

7    in the mountains of North Carolina and try to work this out?

8         MR. GRANT:  Your Honor, I would be happy to work it out,

9    whether by settlement or arm wrestling, whatever means available,

10   but I think I can probably speak for the sea of lawyers in this

11   room that we have a fairly high level of confidence that the time

12   and effort, the Court and staff has put in, preparing this case,

13   isn't going to be wasted.

14        THE COURT:  Okay.  All right.  Well, I know you've been

15   trying, and I know you've worked out certain of them.

16        MR. GRANT:  And it's way above our pay grades, way above.

17        THE COURT:  Understood.  We need to get the business

18   people together, and maybe those are the people we need to send

19   to a nice town in North Carolina.  Okay.  Well, thank you for

20   coming in.  This was very helpful.  The work you're doing is most

21   appreciated, and we'll get something out to you soon with our

22   rulings, and we'll move forward from there.  All right.  Have a

23   good weekend, everyone.  Thank you.  Safe travels.

24        (Proceedings adjourned at 5:25 p.m.)

25

1

## C E R T I F I C A T E

3

            I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
proceedings in the above-entitled matter.

5

     /s/ Scott L. Wallace                 3/21/22
     ---------------------------          ----------------
      **Scott L. Wallace, RDR, CRR**          **Date**
       **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25