```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                         ALEXANDRIA DIVISION

 3    ----------------------------x
      PHILIP MORRIS PRODUCTS S.A.,:    Civil Action No.:
 4                                 :    1:20-cv-393
                    Plaintiff,     :
 5         versus                  :    Thursday, July 21, 2022
                                   :
 6    R.J. REYNOLDS VAPOR COMPANY,:
                                   :
 7                   Defendant.    :
      ----------------------------x
 8

 9         The above-entitled motions hearing was heard before
      the Honorable Leonie M. Brinkema, United States District
10    Judge.  This proceeding commenced at 10:43 a.m.

11                        A P P E A R A N C E S:

12    FOR THE PLAINTIFF:    LAWRENCE GOTTS, ESQUIRE
                            LATHAM & WATKINS, LLP (DC)
13                          555 11th Street, NW
                            Suite 1000
14                          Washington, D.C.  20004
                            (202) 637-2200

15                          GREGORY SOBOLSKI, ESQUIRE
                            LATHAM & WATKINS, LLP (CA)
16                          505 Montgomery Street
                            Suite 2000
17                          San Francisco, California  94111
                            (415) 395-8035
18
                            BRETT SANDFORD, ESQUIRE
19                          LATHAM & WATKINS, LLP (CA)
                            140 Scott Drive
20                          Menlo Park, California  94025
                            (650) 328-4600
21
                            CLEMENT NAPLES, ESQUIRE
22                          LATHAM & WATKINS, LLP (NY)
                            1271 Avenue of the Americas
23                          New York, New York  10020
                            (212) 906-1331
24

25
```

1

```
 1              A P P E A R A N C E S:  (Cont.)

 2    FOR THE DEFENDANT:     CHARLES B. MOLSTER, III, ESQUIRE
                             THE LAW OFFICES OF CHARLES B. MOLSTER,
 3                           III, PLLC
                             2141 Wisconsin Avenue, NW
 4                           Suite M
                             Washington, D.C.  20007
 5                           (703) 346-1505

 6                           JASON BURNETTE, ESQUIRE
                             JONES DAY (GA)
 7                           1221 Peachtree Street, NE
                             Suite 400
 8                           Atlanta, Georgia  30361
                             (404) 521-3939
 9
                             WILLIAM DEVITT, ESQUIRE
10                           JONES DAY (IL)
                             110 North Wacker Drive
11                           Suite 4800
                             Chicago, Illinois  60606
12                           (312) 269-4240

13    COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                             Official Court Reporter
14                           United States District Court
                             401 Courthouse Square
15                           Alexandria, Virginia  22314
                             (571) 298-1649
16                           S.AustinReporting@gmail.com

17         COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

18

19

20

21

22

23

24

25
                                                              2
```

```
 1                   P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Civil Action 20-393, Philip
 3   Morris Products S.A. versus R.J. Reynolds Vapor Company.
 4           Would counsel please note their appearances for
 5   the record.
 6           THE COURT:  All right.  Mr. Molster, you're here
 7   for the defendant.
 8           MR. MOLSTER:  Good morning, Your Honor.  Yes, Your
 9   Honor.  I am here for the defendant.  With me at counsel
10   table is Jason Burnette from the Atlanta office of Jones
11   Day, and Bill Devitt from the Chicago office of Jones Day.
12           THE COURT:  Good morning.
13           MR. BURNETTE:  Good morning, Your Honor.
14           THE COURT:  All right.  For the plaintiff.
15           MR. GOTTS:  Good morning, Your Honor.  Larry Gotts
16   for Philip Morris.  With me today are Greg Sobolski,
17   Thomas Yeh, Brett Sandford and Clem Naples, all of whom may
18   be addressing various issues depending on those, Your Honor.
19           THE COURT:  I'm not sure that will happen, but
20   anyway.
21           All right.  I'm going to resolve some of these
22   very quickly.  We have four motions pending on the docket
23   today.  The first motion is Philip Morris's motion to seal
24   portions of the motion to lift of the partial stay.  There's
25   absolutely nothing in that motion that justifies being under
```

3

1   seal.  Much of it relates to things that happened during the

2   trial.  The trial was completely open, so the motion is

3   denied.

4            I've been denying most of these motions to seal.

5   I am very concerned about how much sealing was done in this

6   case.  And, at some point, even the previous motions need to

7   be reviewed, but I'm not going to do that right now.  But

8   that motion is denied.

9            Then we have -- the next motion is the more

10  substantive motions.  We have Philip Morris's motion for

11  judgment as a matter of law of infringement or alternatively

12  for a new trial.

13           And, again, as you know, the standard that a trial

14  court has in addressing these motions, and there's a similar

15  motion from Reynolds, is that it's not appropriate to enter

16  a judgment as a matter of law unless the Court concludes,

17  after consideration of the record as a whole in the light

18  most favorable to the non-movant, that the evidence

19  presented supported only one reasonable verdict in favor of

20  the moving party.  And that's the *Dotson v. Pfizer* case, and

21  it's a Fourth Circuit case.

22           And in this case, you know, we had a very good

23  jury.  They were attentive, they -- the verdict that they

24  issued showed that they very carefully looked at the issues

25  as to both sides, and it was really -- both sides won a

                                                              4

1    little and lost a little.  So I think it's the kind of

2    verdict that shows a very careful jury that thought about

3    the issues.

4           But in terms of the specific issues, and in terms

5    of a new trial, again, the Rule 59 standard in the Fourth

6    Circuit is that it's the duty of the trial court to set

7    aside a verdict and grant a new trial if the verdict is

8    against the clear weight of the evidence or based upon

9    evidence which is false or will result in a miscarriage of

10   justice, even though there may be substantial evidence which

11   would prevent the direction of a verdict.  And that's the

12   *Lifenet Health* case out of this district.

13          And again, in this case -- you know, I've reviewed

14   the record of the trial.  I don't think there are any

15   problems in the trial itself.  Now, there may be problems

16   earlier on in the case.  As I said, I've always been a

17   little concerned about Markman.  That was before this Court

18   came on board, and there wasn't enough time to revise that.

19   And that's an issue that both sides need to think about as

20   you go forward with this case, because I still think this is

21   the kind of case where parties ought to sit down and be able

22   to work it out.

23          But in any case, you know, Philip Morris has made

24   various arguments.  You've argued that the jury lacked

25   sufficient evidence to conclude that the Alto did not

                                                              5

1    infringe Claims 1, 2, 11 and 12 of the '911 patent.  And

2    your first argument, as I understand it, is that a

3    reasonable jury could only conclude that the Alto had "at

4    least one cavity for collecting liquid condensate that is

5    qualified as a blind hole," which is Claim 1.  And Claim 1,

6    of course, is in the independent claim, so if the Court

7    finds -- resolves that issue, it really resolves all the

8    other ones.

9         And I don't agree with that argument, because a

10   reasonable jury could have found and could find that the

11   Alto's open-sided cavity would not qualify as a blind hole.

12   And there was evidence from Dr. Kodama who testified that a

13   person of ordinary skill in the art would not understand a

14   "blind hole" to have open sides.

15        And Dr. Abraham testified that an open-sided

16   cavity would do a poor job trapping liquid, which is the

17   whole purpose of a blind hole for purposes of the patent.

18   And even Mr. Hunt testified that the ribs that created what

19   Philip Morris argued was a blind hole were there to hold a

20   silicone gasket and not "for collecting liquid condensate,"

21   as is required by Claim 1 of the '911 patent.

22        And so, for these reasons, I'm finding that the

23   jury's verdict certainly did not go against the clear weight

24   of the evidence such that a new trial would be warranted.

25   And that's enough to resolve Philip Morris's motion, because

6

 1   that means that the jury had sufficient evidence to find

 2   that the Alto did not meet Claim 1, which was the

 3   independent claim.  And, therefore, the Court does not need

 4   to decide the remaining issues, so I'm going to not even

 5   bother to address those.  And that resolves, as I understand

 6   it, Philip Morris's motion.

 7            In terms of Reynolds' motion, again, the same

 8   standard applies, and my same view about the care in which

 9   the jury went about doing this case applies.

10            You know, Reynolds has argued that it's entitled

11   to a judgment as a matter of law or a new trial on the

12   '265 patent, which the jury found the Alto infringed for

13   four different reasons.  And, again, first Reynolds is

14   arguing that the following limitation is invalid as

15   indefinite, and that is that the thermal resistor has

16   "dimensions substantially the same as a cross-section of a

17   cigarette or a cigar."

18            Now, Philip Morris points out that Reynolds raised

19   this argument during the Markman briefing.  And Judge

20   O'Grady rejected it, declining to find any terms as

21   indefinite.  And, again, that's one of the issues that I've

22   raised with you all before.

23            And Philip Morris has correctly pointed out

24   Reynolds did not -- and I think this is correct, did not

25   present this specific argument at trial, and, therefore,

                                                              7

1    there is an issue as to whether it could even be raised in a

2    motion for a JMOL.

3           Now, I understand Reynolds has cited Federal

4    Circuit case law suggesting that its argument is preserved

5    for appellate review.  And I think that's correct, but that

6    argument goes to what Judge O'Grady did in his Markman

7    ruling; it doesn't go to what actually happened during the

8    trial.  And that's, again, one of the reasons why I suggest

9    that sitting down and trying to work this case out makes

10   some good sense.

11          The second argument Reynolds makes is that no jury

12   could have found that the Alto's thermal resistor to have

13   "dimensions substantially the same as a cross-section of a

14   cigarette or a cigar."  And, again, I don't agree with that.

15   Philip Morris's expert, Mr. Walbrink, testified that Alto's

16   S-shaped resistive element was the terminal resistor, and

17   that it was "sized about the size of several cigarettes,"

18   which he then handed to the jury so they could inspect for

19   themselves.  And I remember that demonstrative where we saw

20   these different types of cigarettes.  So that argument

21   doesn't fly.

22          Third, Reynolds argued that no jury could have

23   found that the "heating device" was "configured to be

24   connected to the mouthpiece."  Again, this is also

25   unpersuasive because a reasonable jury could have credited

8

 1   the testimony of Mr. Walbrink who opined that the mouthpiece

 2   is not just the black tip that goes into the user's mouth,

 3   but also encompasses the cartomizer tube, and that the

 4   heating device is configured to be connected.  And the term

 5   "configured to be connected," that's a quote from the

 6   patent.

 7          Again, what constitutes the mouthpiece and what it

 8   means to be configured to be connected to it are factual

 9   questions for which the jury could have decided one way or

10   the other, and there was evidence that clearly supported

11   their decision.

12          Fourth, Reynolds argues that no jury could have

13   found that the terminal resistor was a "metallic foil or a

14   thin sheet" because Dr. Suhling testified that it was

15   rounded like a squeeze of toothpaste; however, this is

16   another highly-factual question.  That is, is the heating

17   element flat or not.  And there was sufficient evidence for

18   the jury to find it was flat.

19          Specifically, the jury could have credited

20   Dr. Walbrink who said it was a foil, which implies that it

21   is flat.  In addition, Dr. Suhling admitted the roundedness

22   of the resistor was only visible under a microscope.  And

23   even Reynolds' witness, Mr. Hunt, called the heating element

24   a "thin heater film."  So that motion -- or that aspect of

25   the motion is denied.

                                                              9

1          And Reynolds also argues that it's entitled to a

2    judgment or a new trial on the '911 patent, which the jury

3    found the Solo G2 infringed, and there are three arguments

4    that Reynolds has made in its papers.

5          First, it argues that Claim 1's dimensional

6    limitation, that is at least one cavity has a largest

7    cross-sectional dimension of between 0.5 millimeters and

8    1 millimeter is obvious in light of the Han patent when the

9    Han patent is combined with the Shizumu patent; however,

10   Reynolds correctly points out that the bar for obviousness

11   is high, and Dr. Kodama admitted that neither Shizumu nor

12   Han identified a dimension for the blind hole.

13         And second, Reynolds argues that no jury could

14   find that the Solo G2 contains a blind hole because a person

15   of ordinary skill in the art would not have understood a

16   blind hole to include the Solo G2's annular groove, that is

17   the doughnut shape.  And that's not persuasive because a

18   jury could credit Dr. Abraham who testified that the

19   Solo G2's doughnut-shaped cavity is very similar to the

20   annular groove in Figure 6 of the '911 patent.

21         And third, Reynolds argues that no jury could find

22   that the Solo G2 has a cavity whose largest cross-sectional

23   dimension is between 0.5 millimeters and 1 millimeter.

24   Again, the jury could have credited the testimony of

25   Dr. Abraham, who found such limitations satisfied.

 1          And then finally, Reynolds has argued that the

 2    Court should grant a new trial due to Philip Morris's

 3    pattern of prejudicial questions and remarks.  And then you

 4    cite to statements about the China suppliers, questions

 5    about Reynolds not obtaining an opinion of counsel, and

 6    emphasis on the absence of Reynolds' damages expert,

 7    Dr. Sullivan.

 8          I don't find that any of those brief issues that

 9    came up during the trial would be more than -- would justify

10    finding that the jury was somehow prejudiced by that.  The

11    references to China were de minimis, and the other matters

12    were also de minimis.  I'm going to also note, I don't

13    believe the transcript will show that Reynolds -- well, you

14    did object about the Chinese issue, but I'm not sure the

15    other two were actually objected to.

16          In any case, I don't find that's sufficient to set

17    aside what I thought was a well-tried case by counsel and a

18    very careful jury.  So I'm denying those two motions.  All

19    right.  The verdict is going to stand as it is.

20          And that brings us to the last issue, which is

21    this unopposed motion to lift the partial stay on Philip

22    Morris's claim for permanent injunctive relief.  So both of

23    you have agreed to that, so I will enter an order today that

24    lifts the stay.  And what that now opens up is basically the

25    last remedy in this case that's being sought by Philip

                                                              11

1    Morris.

2             Now, I don't understand why there really is any

3    issue as to why either the injunction or the royalty cannot

4    be done in one pleading.  It's not uncommon to ask for

5    alternative forms of relief, and the amount of time you all

6    want and the amount of pages you all are talking about I

7    don't see as necessary.

8             First of all, it's inconceivable to me given the

9    number of lawyers for both sides and the amount of time this

10   case has been on the docket, I would be shocked if Philip

11   Morris doesn't already have at least 75 percent of any brief

12   addressing injunctive relief and/or royalties all ready to

13   go.  And the same way, this can't come as any surprise to

14   Reynolds, I would be shocked if you haven't been defensively

15   thinking about your position on injunctive relief and on any

16   royalty.

17            And I'm kind of curious as to -- I'm not holding

18   you all to it, but preliminarily, what kind of injunction

19   has been discussed or been thought about by Philip Morris?

20   Who wants to talk about injunctive relief briefly?

21            Now, there was already an injunction in place by

22   Judge O'Grady in this case; right?

23            MR. SANDFORD:  No, there was not, Your Honor.

24            THE COURT:  There was not?

25            MR. SANDFORD:  Brett Sandford on behalf of Philip

                                                              12

1   Morris.

2          There was not, Your Honor.

3          THE COURT:  He never entered it.  All right.

4          MR. SANDFORD:  That's correct.

5          THE COURT:  But you must have requested one at the

6   very beginning of the case.

7          MR. SANDFORD:  Philip Morris moved early on in the

8   case to add a request for permanent injunctive relief, and

9   that was granted by Judge O'Grady.  And then we did some

10  discovery, and then Reynolds moved to stay all of the

11  proceedings on that claim, and Judge O'Grady entered a

12  partial stay and said go ahead and finish that discovery and

13  we'll deal with the rest after -- or later.

14         THE COURT:  Did you ever -- in the early part of

15  the trial, did you ever put before Judge O'Grady a request

16  for a particular type of injunction?  Was there ever a

17  request for injunctive relief early on?

18         MR. SANDFORD:  A preliminary injunction, is that

19  the Court's question?

20         THE COURT:  Yeah.  Yeah.

21         MR. SANDFORD:  Not a preliminary injunction; only

22  a permanent injunction.  But it is set forth in detail in

23  our counterclaim request for relief, you know, what the

24  specific scope of that would be, depending on the jury's

25  infringement findings, of course.

                                                        13

```
 1            THE COURT:  All right.  So what you're saying is,
 2   in the counterclaim --
 3            MR. SANDFORD:  Correct.
 4            THE COURT:  -- you already have spelled out the
 5   parameters of what kind of injunction you're seeking?
 6            MR. SANDFORD:  I believe that's correct, Your
 7   Honor.
 8            THE COURT:  All right.  And since I haven't looked
 9   at that recently, do you remember basically what it calls
10   for?  It's the law of the case -- I mean, it's not law of
11   the case, but I mean, it's out there so there's no secret so
12   you're not giving out some privileged attorney/client
13   discussion.  Tell me what you had in the counterclaim.
14            MR. SANDFORD:  So the scope of -- and I don't have
15   it in front of me.
16            THE COURT:  I know.
17            MR. SANDFORD:  The scope of the injunction was it
18   would be for the Alto cartridges, the pods, that were
19   accused, as well as the Solo G2 cartridges which are for the
20   '911, and then the Alto for the '265.
21            So it would be enjoining the infringing acts.
22   Selling, making those, and -- selling, offering for sale in
23   the United States.
24            THE COURT:  Straightforward.  Okay.
25            I won't ask you to get into the alternative, which
```

                                                                14

```
 1    is the royalty, because I think that's one that you may have

 2    some issues about, although obviously there were royalty

 3    numbers discussed during the trial.

 4              MR. SANDFORD:  Correct, Your Honor.

 5              THE COURT:  All right.  Let me hear from the

 6    Reynolds folks what your opposition to injunctive relief

 7    would be.  And, again, I'm not forcing you to -- I just want

 8    to get a preview.  Give me a preview of what you think is

 9    coming down the pike.

10              MR. BURNETTE:  Yes, Your Honor.  Jason Burnette

11    for Reynolds.

12              We have been thinking about it.  This is a very

13    important issue for my client.  The Alto product is its most

14    successful product.  And, again, this is -- R.J. Reynolds

15    Vapor Company is the company that sells e-cigarettes.  We're

16    not talking about other Reynolds' entities in conventional

17    cigarettes.  So the products that they seek to exclude from

18    the U.S. market in total would create a huge hardship for my

19    client.

20              Our argument will be that the basis that has been

21    put forward so far in the interrogatory responses on the

22    injunction claim relate to Philip Morris's, or PMP's IQOS

23    product and the VEEV product, which you may recall from

24    trial.  The IQOS product has been excluded from the U.S.

25    market under the ITC's ruling.  And Judge O'Grady's order
```

1  when he stayed the injunction issues in the case -- we moved

2  to stay because we said the ITC ruling makes the basis for

3  an injunction speculative.  The IQOS product, which PMP says

4  is the basis for their need for an injunction, cannot be

5  sold in the United States.  That issue is currently on

6  appeal to the Federal Circuit and will be resolved at some

7  point in the course of that appeal proceeding.

8         The VEEV product, which is a product that I

9  believe is sold outside of the United States -- it's not

10  sold in the U.S., and I believe it is sold outside of the

11  U.S., would need a PMTA authorization from the FDA before it

12  could be sold in the United States.

13         So, at this point, any harms alleged from the

14  continued sale of Alto and Solo to these other products by

15  PMP is not ripe enough for an injunction.  There is --

16  that's just one lead argument.  There's going to be many,

17  many arguments we would make in addition to that.

18         But these IQOS product -- the IQOS product, for

19  example, it doesn't practice the '911 patent or the '26

20  patent technologies.  They're seeking to use their own

21  product.  And you may recall, we filed this lawsuit.  We

22  have our affirmative infringement claims in this case

23  directed to the IQOS product that we still maintain the IQOS

24  infringes those patent claims.  The ITC agreed with us as to

25  two of those patent claims.  Now, those claims in this court

16

1  are statutorily stayed, but they're trying to use their

2  other products to prevent us from selling our products in

3  the U.S. when that would create a great hardship to R.J.

4  Reynolds Vapor, and there's no basis for it because there's

5  not a current or imminent hardship to PMP.

6          THE COURT:  What if that were to change, however?

7  What if the Federal Circuit reverses the ITC and now Philip

8  Morris can bring those products into the United States?  So

9  now that there's more of an argument that they can make that

10  the infringing product that you're selling does impact, to

11  some degree, the ability of them to make their sales?

12          MR. BURNETTE:  It would not affect the other

13  arguments we would make under the balance of the hardships

14  and the four factors of the *eBay* test.  But the argument I

15  just articulated would be far weakened by the fact that IQOS

16  could be sold in the United States.

17          THE COURT:  All right.

18          MR. BURNETTE:  But the issue is, you heard the

19  evidence at trial about these companies being competitors.

20  The companies are competitors, but these are not competing

21  products.  The IQOS product is a heat, not burn, product.

22  And the Alto and the Solo are e-cigarette products, they use

23  vapor and aerosol.  The IQOS product takes actual tobacco,

24  heats it, but doesn't burn it, so that it creates a tobacco

25  vapor.

                                                        17

1          In some ways they're similar, because they're

2    designed to be alternatives to conventional cigarettes, but

3    they're not competing products.  So even if IQOS was sold in

4    the United States, we don't think PM can show the

5    competitive harm necessarily for the exceptional remedy of

6    an injunction.

7          THE COURT:  All right.  Now, of course if an

8    injunction were not available to Philip Morris, then based

9    on the jury verdict, they're certainly entitled to a

10   royalty.  Because I mean, again, they found your product

11   infringes their intellectual property, and they clearly have

12   a right to compensation for your use of their intellectual

13   property without their permission.

14         MR. BURNETTE:  Yes.  And one of the *eBay* factors

15   is whether there is an adequate remedy at law in the -- with

16   monetary damages.

17         And PM in this case asked for a damages amount

18   based on a royalty rate of .6 percent for the '265 patent,

19   2 percent for the '911 patent.  The jury accepted that

20   wholesale.  They accepted PM's request.  So PM's own sense

21   of what amount -- what a royalty rate would be sufficient to

22   compensate it for past infringement was accepted by the

23   jury.  I think it will be our position that that should be

24   the ongoing royalty rate because that was the rate put

25   forward by Philip Morris.  I understand they may say things

```
 1    change after a finding of infringement, and they may ask for
 2    a higher rate.  But I believe our position will be that the
 3    rate, if the Court is going to order a rate, should be the
 4    rate that was accepted by the jury and put forward by Philip
 5    Morris.
 6              THE COURT:  All right.  Well, this has helped me
 7    only in evaluating how much -- how many pages I'm going to
 8    give you all.  And I think the standard page limit for
 9    dispositive motions is more than sufficient.  I mean, you've
10    asked for 40, and I'm reducing it.  So you'll have to comply
11    with the local rules on that.
12              I'm going to set a briefing schedule.  And, again,
13    I don't think the amount of time that you requested is
14    necessary or reasonable.  So what I'm going to do is I will
15    grant the request to lift the stay, and I'm going to give
16    the plaintiff until August 21st, which is about three weeks.
17    Let me double-check my calendar.  I'm sorry.  I'm giving the
18    plaintiff until August 12 to file -- and that's Monday, to
19    file your brief for whatever damages or injunction relief
20    you're requesting.
21              And then I will give 21 days to Reynolds to
22    respond, which I think will come out around September 5, if
23    my counting is correct.  And then a week for Philip Morris
24    to file their reply.  And we can hear this for argument
25    either on the 16th or 23rd of September, whichever date will
```

19

```
 1   work better for counsel.  All right.  I'll let you all just
 2   notice it for one of these two Fridays.
 3            You've asked me -- again, I don't understand, this
 4   is the only case I've had where I can remember the lawyers
 5   always sort of doing these sort of preemptive strikes or
 6   preemptive requests.  You've asked me whether or not I want
 7   declarations.  It's up to you to decide what you're going to
 8   do.  I have no objection to declarations as long as they're
 9   helpful.  I don't take evidence at these types of hearings,
10   so whatever it is, you've got to present with your papers.
11   All right.
12            And, again, Judge Buchanan was the -- is the
13   assigned magistrate judge, but she's close to retiring.  I
14   don't know whether -- if there were a serious interest in
15   trying to work this out, I would direct you to talk to
16   Judge Anderson.  If either -- if you all think you do want
17   to work with somebody -- because, of course, he's also very
18   knowledgeable about patent law.  But if you do want to work
19   with him, call my chambers first so I can alert him since
20   he's not the assigned magistrate judge.  But her cases are
21   being divvied up among everybody else right now, so I think
22   it would not be inappropriate to ask him to take it if both
23   sides are interested in trying to work this thing out.  All
24   right.
25            I believe that covers everything that was on the
```

```
 1    docket.  Anything further to address?
 2               MR. GOTTS:  Nothing for Philip Morris, Your Honor.
 3               THE COURT:  All right.  How about for Reynolds.
 4               MR. BURNETTE:  Nothing for Reynolds, Your Honor.
 5               THE COURT:  Very good.  We'll recess court for the
 6    day.
 7                    (Proceedings adjourned at 11:08 a.m.)
 8                    ----------------------------------
 9    I certify that the foregoing is a true and accurate
10    transcription of my stenographic notes.
11
12                                _____
                                      Stephanie Austin
13                                Stephanie M. Austin, RPR, CRR
14
15
16
17
18
19
20
21
22
23
24
25
                                                                  21
```