UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **ALTRIA CLIENT SERVICES, LLC** )<br>  )<br>**et al.,** )<br>  )<br>**Counterclaim Plaintiffs,** )<br>  )<br>**v.** )<br>  )<br>**RAI STRATEGIC HOLDINGS, INC.,** )<br>  )<br>**et al.,** )<br>  )<br>**Counterclaim Defendants.** ) | Civil Action<br>No. 1:20-cv-00393-LO-TCB<br><br>May 20, 2022<br>2:00 p.m. |

*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE LIAM O'GRADY,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Counterclaim
Plaintiffs:

**Maximilian Antony Grant, Esq.**
Latham & Watkins, LLP (DC)
555 11th Street, N.W.
Suite 1000
Washington, DC 20004-1304
202-637-2200
Email: Max.grant@lw.com

**Clement Joseph Naples, Esq.**
Latham & Watkins, LLP
885 Third Avenue
25th Floor
New York, NY 10022
212-906-1200
Email: Dement.naples@lw.com

**William Sutton Ansley, Esq.**
Weil, Gotshal & Manges
2001 M Street, N.W.
Suite 600
Washington, DC 20036
202-682-7000
Email: Sutton.Ansley@weil.com

APPEARANCES: (Cont.)

For the Counterclaim         **Lawrence Jay Gotts, Esq.**
Plaintiffs:                  Latham & Watkins, LLP (DC)
                             555 11th Street, N.W.
                             Suite 1000
                             Washington, DC 20004-1304
                             202-637-2200
                             Email: Lawrence.gotts@lw.com

                             **Elizabeth Stotland Weiswasser, Esq.**
                             Weil Gotshal & Manges LLP (NY-NA)
                             767 5th Avenue
                             New York, NY 10153
                             212-310-8000
                             Email: Elizabeth.weiswasser@weil.com

For the Counterclaim         **Charles Bennett Molster, III, Esq.**
Defendants:                  The Law Offices of Charles B. Molster
                             III, PLLC
                             2141 Wisconsin Ave N.W.,
                             Suite M
                             Washington, DC 20007
                             703-346-1505
                             Email: Cmolster@molsterlaw.com

                             **Michael Shamus Quinlan, Esq.**
                             Jones Day (OH-NA)
                             901 Lakeside Ave
                             Cleveland, OH 44114-1190
                             216-586-3939
                             Email: Msquinlan@jonesday.com

                             **John Michael Michalik, Esq.**
                             77 West Wacker Street
                             Suite 3500
                             Chicago, Illinois 60601-1692
                             312-269-4240
                             Email: Jmachalik@jonesday.com

                             **Stephanie Ethel, Parker, Esq.**
                             Jones Day (GA)
                             420 Peach Tree Street, N.E.
                             Suite 800
                             Atlanta, Georgia 30309-3053
                             404-521-3939
                             Email: Separker@jonesday.com

```
APPEARANCES:  (Cont.)

For the Counterclaim        Alexis Adian Smith, Esq.
Defendants:                 Jones Day (CA)
                            555 South Flower Street
                            Fiftieth Floor
                            Los Angeles, CA 90071
                            213-489-3939
                            Email:  Asmith@jonesday.com


Court Reporter:             Scott L. Wallace, RDR, RMR, CRR
                            Official Court Reporter
                            United States District Court
                            401 Courthouse Square
                            Alexandria, VA 2231-5798
                            202-277-3739
                            Email: scottwallace.edva@gmail.com
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

<u>**AFTERNOON SESSION, MAY 20, 2022**</u>

1

2   (2:03 p.m.)

3        THE COURTROOM CLERK:  The Court calls *RAI Strategic*

4   *Holdings, Inc., et al. versus Altria Client Services, LLC, et*

5   *al.*, Case Number 1:20-cv-393.

6        May I have appearances, please, first for the plaintiff.

7        MR. GRANT:  Happy Friday afternoon, Your Honor.

8        THE COURT:  Sir.

9        MR. GRANT:  Max Grant on behalf of the plaintiff, Philip

10  Morris, several entities.  With me are my colleagues Larry Gotts,

11  Clem Naples, and also my colleagues and co-counsel Liz Weiswasser

12  and Sutton Ansley.

13       THE COURT:  All right.  Good afternoon to each of you, and

14  thank you for coming in today.  Mr. Molster.

15       MR. MOLSTER:  Good afternoon, Your Honor.  Charles Molster

16  on behalf of the Reynolds entities.

17       With me at counsel table are lawyers from Jones Day,

18  Stephanie Parker from the Atlanta office, Alexis Smith from the

19  Los Angeles office, Michael Quinlan from the Atlanta office,

20  and -- I'm sorry, Cleveland office, and John Michalik from the

21  Chicago office.

22       THE COURT:  All right.  Good afternoon to each of you,

23  and, again, thank you for coming in.

24       MR. MOLSTER:  Thank you, Your Honor.

25       THE COURT:  I hope that wing isn't too badly injured

1    there.

2         MS. PARKER:  Thank you, Your Honor.

3         THE COURT:  I just had shoulder replacement surgery three

4    months ago and it's actually going really well with the work of a

5    physical therapist who's killing me every other day with a smile

6    on her face but working wonders.  So we have a number of things

7    on the docket today, and I appreciate your letter to me, I guess

8    yesterday about issues, possible issues, many of which I intended

9    to raise; but it's always good to have both of you thinking about

10   that.

11        So we have on my list the motion to move the trial date,

12   the prior art references, motion to exclude evidence as out of

13   time, the motion for sanctions, and the laundry list.  So that's

14   what's on my list.  We may talk about jury instructions as well.

15   Do you have additional matters that I'm forgetting about?

16        MR. GRANT:  Yes, Your Honor.  I think there's the -- there

17   are three motions and the rest are letters.  I think you caught

18   all of them but one.  There's one motion about swapping out one

19   asserted claim for another.

20        THE COURT:  Right.

21        MR. GRANT:  And I think -- I can't recall whether you

22   mentioned the limitation of prior art references.

23        THE COURT:  I did.  You're seeking to limit the six prior

24   art references rather than one --

25        MR. GRANT:  Just to narrow that up.

```
 1          THE COURT:  That's right.  All right.  Good.  Thank you.
 2   We'll take that up in conjunction with the prior art references,
 3   then.  Let me start off with the motion to move the trial date,
 4   and I'm sorry, I think it's unfortunate that you weren't able to
 5   reach an agreement on that.  I mean the trial date's been moved
 6   several times.
 7          I don't need you to get up right now.
 8          And I'm the one that caused the latest move because I had
 9   that criminal case that had to go first.  So you've been doing
10   the best you could to work with your experts to identify any new
11   dates, and I kind of gave you a pretty hard-and-fast date in
12   June, and moving it by a day to allow these experts to testify in
13   front of Judge Gilstrap I don't consider to be a significant
14   event.
15          In the response by Reynolds I didn't see that that would
16   render witnesses that you intended to call unavailable, which I
17   certainly would have considered.  So, I'm going to grant the
18   motion to move the trial by a day.  As I said, I think that's
19   something that should have been worked out, and I'm disappointed
20   it wasn't.  It kind of blends into the -- bleeds into the issue
21   of when we're going to sit.  So we'll start on June 7th, then.
22          There's an investiture here for Judge Nachmanoff at 3:00
23   on the 10th.  So we'll have a half day or, you know, maybe we'll
24   go to 1:30 or 2:00 on Friday, the 10th.  We'll start again on
25   Monday.  If we don't finish by the 16th, then -- if we're real
```

1   close to finishing, I may allow some court on the 17th, on Friday

2   morning, but likely we will not sit on Friday, and then Monday's

3   a holiday, at least on my calendar, and I can't tell you why.

4   Why is Monday, the 20th, a holiday?  What holiday that is?

5         MR. GRANT:  It may be that holiday having to do with

6   the --

7         THE COURT:  Oh, Juneteenth.

8         MR. GRANT:  -- knowledge of the liberation of the

9   Proclamation of Emancipation.

10        THE COURT:  Absolutely, Juneteenth.  All right.  So

11  federal courts are closed, so we'll continue on the 21st and

12  finish up.  And hopefully we'll get it done the second week, but

13  I'm not going to hold you to that.

14        So the prior art references and the motion to swap out a

15  claim.  Mr. Grant, I'll hear you on that, sir, or I'll hear from

16  somebody on your team.

17        MR. GRANT:  Yes, sir.  Clem Naples.

18        THE COURT:  Okay.  Good afternoon sir.

19        MR. NAPLES:  Good afternoon, Your Honor.  Again, these are

20  somewhat related, Your Honor.  Do you have a preference on which

21  one to start with?

22        THE COURT:  No.  I've read the pleadings.

23        MR. NAPLES:  These aren't --

24        THE COURT:  I've read the pleadings.  I know that you've

25  done a lot of work on this, and both sides have narrowed the

8

1    scope of the claims and the prior art, and you're down to the

2    final throes with it, and you got, of course, a response which

3    says, "Hey, we need this and we're going to use it in claims 11,

4    12, and whatever, and so it's not really all that duplicative, so

5    there isn't a lot of prejudice, and it doesn't really go against

6    Judge O'Grady's wishes," so go ahead and start there.

7         MR. NAPLES:  You've certainly captured the essence, Your

8    Honor.  I'll just give you a little more context on the claim

9    we're trying to add.  So this relates to the '911 Patent.  This

10   is the patent that relates to leak detection.  One of the claims

11   that is currently asserted is claim 12, and in that claim it

12   requires two holes for where this leakage is collected.

13        The claim we're trying to add, which we inadvertently

14   didn't add, is claim 13.  All that adds is having 1 hole that's a

15   toroidal shape.  The reason why we're wanting to add that claim,

16   Your Honor, is some products have two holes, and some products

17   have this one hole.  So it's very simple, Your Honor.  This is

18   something that's been in the case since the beginning of the

19   case, of course.  As soon as we realized we hadn't included it,

20   we sent an e-mail to Reynolds telling them we wanted to add this

21   claim.

22        They made some arguments about, you know, there's prior

23   art issues.  To address those, Your Honor, there's another claim

24   in the case, claim 11, and they rely on five prior art references

25   for that claim.  For claim 13 that we're trying to add, they rely

1    on the exact same references.  So -- they're free, of course, to

2    change whatever references they want to rely on, but there's

3    really -- as far as we can tell, Your Honor, there's no

4    prejudice.

5        All their expert would really have to do -- and this would

6    have been something that they could have started back on May 2nd,

7    is decided, okay, I'm also going to need to say to the jury that

8    this piece of prior art also shows a toroidal, a circular, hole

9    instead of two holes.

10       THE COURT:  So remind me.  When did you -- it was -- it

11   was asserted in the counterclaim --

12       MR. NAPLES:  Correct.

13       THE COURT:  -- when discovery was taken on claim 13.

14       MR. NAPLES:  Yes, sir.

15       THE COURT:  It was eliminated at when, and when was it

16   reinserted?

17       MR. NAPLES:  Sure.  It's been in the case effectively the

18   entire time.  Both experts addressed the claim.  Both experts

19   were deposed on the claim.  It was on April 5th that we kind of

20   narrowed our claims and that's when we didn't include it.

21       On April 20th, they identified their references, and, Your

22   Honor, it was literally eight business days later that we sent

23   them an e-mail saying, we inadvertently left 13 out, we want to

24   add it back in, and that's where we are today.

25       So, it's -- I mean, there's been a very, very small amount

```
 1    of time when this claim was arguably not in the case.  And it's
 2    an important claim Your Honor in the sense that it goes to
 3    products that have this particular circular shape, and we didn't
 4    have this claim in before, so that's why we unfortunately had to
 5    bring this to your attention.
 6         THE COURT:  All right.  Thank you.  Let me hear from
 7    Reynolds.
 8         MR. MICHALIK:  Good afternoon, Your Honor.  John Michalik
 9    for the Reynolds entities.  Counsel conceded that the order that
10    you issued after the March 18 hearing on March 21 required the
11    Phillip Morris entities to identify the art -- the claims they
12    were going to bring the trial on June 6th.
13         THE COURT:  Tell me what prejudice you suffered from this
14    two-week time period where you didn't have claim 13.
15         MR. MICHALIK:  So, respectfully, it was slightly more.  It
16    was more than two weeks.  We had two weeks from the April 5th
17    identification of the claims they intended to bring to trial, and
18    in those two weeks we took the universe of prior art that we were
19    asserting against all of the claims in the '911 Patent and made
20    selections to limit that art in accordance with your order to
21    narrow the number of references and combinations we were going to
22    bring to trial.
23         So we had two primary references that had a collection of
24    combinations against all the asserted claims in the '911 Patent
25    and from -- that we did not assert on April 20th so that we
```

1    dropped.  We limited it to three primary references plus those

2    combinations, and essentially decided to forgo two additional

3    references we may have decided to keep in the case at the expense

4    of some we did select if they had chosen or selected claim 13

5    originally on April 5th as required.

6        So I don't know that we would have selected it

7    differently, but we certainly had those two weeks to make the

8    determination of which art of the universe of art that was

9    available to us in the expert report to choose from; and we made

10   a selection based on the claims that Phillip Morris had selected

11   on April 5th.

12       And then we proceeded additionally, the whole point of

13   this was to narrow the claims to get our case ready for trial, so

14   not only in those two weeks did we select the prior art we were

15   going to present at trial, but since that date and beyond, we've

16   been preparing for trial based on the claims that were identified

17   on April 5th.

18       THE COURT:  All right.  Thank you.  Well, I'm going to

19   allow the claim 13 in.  I don't find that there's prejudice, and

20   to the extent you need to amend prior art references to include

21   additional references on claim 13, you're free to do so.

22       So that should take care of any prejudice.  I'm going to

23   allow the six prior art references for the '911 claim.  It's

24   discretionary with the Court.  I think it's overkill, but I

25   haven't looked closely at the references and the combinations of

1    the references.  And I understand they're used other claims, and,

2    frankly, it's something that I have no idea whether the Federal

3    Circuit will look at closely or not and I don't want to take the

4    chance.

5         So it's -- I might be a little more aggressive

6    in another -- if we were looking at a different kind of case, but

7    given the fact that I don't know the art as well as you all know

8    the art and your experts know the art, it may turn out at trial

9    to be total overkill and you may be doing yourselves a

10   disservice, your clients a disservice, by bringing that many

11   combinations of prior art references so that a jury at the end of

12   the day goes, boy, if they need that many prior art references,

13   they're in trouble, which I have seen on more than one occasion.

14        But I'll leave that up to you, but I'm going to allow the

15   additional -- allow the prior art references that have been

16   identified.

17        All right.  The motion to exclude the evidence at a time.

18   I got the letter from Phillip Morris the other day, and I didn't

19   get a response.  I guess you didn't have time to do a written

20   response.  But what's Reynolds' argument there as to the --

21   Dr. Figlar having spoken to an additional six employees and for

22   the new FDA submission on the Vuse Alto product.

23        MR. MICHALIK:  Your Honor, John Michalik again.  I will

24   address the latter point on the FDA submission, PMTA submission.

25        THE COURT:  Okay.

13

```
 1        MR. MICHALIK:  I believe that this issue has already been
 2   decided by your ruling on motion in limine Number 9.  There are
 3   some issues that have been conflated in the letter brief.  The
 4   letter brief was sent because there was a production that
 5   Reynolds made about a month ago of -- a couple of weeks ago based
 6   on the submission that Reynolds made to FDA that, as far as we
 7   know, has nothing to do with the issues raised in this case.  We
 8   have not identified any of the materials in that particular
 9   submission on our amended exhibit list.
10        And I believe their letter conceded that the few items
11   that we added to our amended exhibit list from the recent
12   production they don't have a problem with.
13        We have no intention of using the information from the
14   most recent Alto submission on the PMTA.  It's a matter of
15   Reynolds is still running its business and has to make certain --
16   identify certain documents to the FDA as part of the approval
17   process, and out of an abundance of caution we made those
18   documents -- we produced those documents in this litigation so we
19   wouldn't be accused of hiding anything.
20        The letter also then delves into a prior FDA submission
21   that they assert was late and not produced during discovery, but
22   that issue was actually already raised and addressed in our
23   motion in limine Number 9.  That has to do with an FDA submission
24   that was based on an incorrect CAD file that we discovered in
25   February was incorrect and produced to the Phillip Morris
```

14

```
 1    entities during the fact discovery.
 2         Mr. Hunt, who was mentioned in the letter that Phillip
 3    Morris submitted, was actually deposed on that CAD file.  Their
 4    expert did submit expert reports on the corrected CAD file, so
 5    the portion of their letter that tries to put us all back in the
 6    basket of the September FDA submission that was incorrect, I
 7    think it's something you've already addressed in your motion in
 8    limine Number 9 and shouldn't be a part of this issue.
 9         THE COURT:  And I allowed the later CAD file to be the
10    proper exhibit, and to the extent there's reasons to
11    cross-examine on that earlier one because they're inconsistent or
12    there's other matters that may be relevant, I allowed that to
13    occur, as well, if I recall right.
14         MR. MICHALIK:  Right.  I think your ruling was they could
15    not use the incorrect CAD file as a matter of cross-examination
16    absent something new coming up to make it relevant.
17         THE COURT:  Right, right.  Okay.  All right.
18         MR. MICHALIK:  Mr. Quinlan.
19         My colleague will address the Dr. Figlar issue.
20         THE COURT:  Okay.  Thank you.
21         MR. QUINLAN:  Mike Quinlan, Your Honor, for Reynolds.  As
22    you know, Dr. Reynolds is our corporate representative, and he's
23    a retired former executive of Reynolds.  And he spoke to a number
24    of people recently, and out of an abundance of caution because he
25    had those conversations -- and we informed Phillip Morris that
```

1  he'd had these conversations -- we offered him up for a

2  deposition.  And the reason he had those conversations is he's a

3  retired executive and he's also a 30(b)(6) witness for us on

4  several topics, and he needed to be updated on several topics.

5      And during those discussions we found out his testimony

6  from previously is consistent with what he learned in those

7  conversations; but, again, out of an abundance of caution, we

8  thought that it made sense to give them the opportunity if they

9  wanted to explore those conversations with him.

10     THE COURT:  Well, the time to do that, the time to have

11 Dr. Figlar speak to these people was before he was deposed,

12 right?

13     MR. QUINLAN:  Right -- and I'm sorry, Your Honor, I didn't

14 mean to interrupt you, but one of the issues that's come up post

15 his deposition -- again, this is not, I don't think, a fault of

16 either side; this is just the way the FDA works -- the FDA has

17 approved, or authorized, I should say -- they don't approve

18 products; they authorize them -- has authorized our Vuse Solo

19 device.  That happened after his deposition separate and apart

20 from this case, and they just recently, last -- two weeks ago,

21 authorized our Vuse Ciro and our Vuse Vibe products and

22 Dr. Figlar was a 30(b)(6) topic -- he's a 30(b)(6) witness on

23 those topics of our submissions to the FDA, including the PMTAs.

24     And so while he was personally aware -- he follows the

25 news, he knew about it -- we thought it made sense as that -- on

```
 1    that 30(b)(6) topic, for him to talk to some folks at Reynolds.

 2         And I can promise Your Honor, the letter points out a lot

 3    of things and makes a lot of accusations, but he's not going to

 4    come to Court and parrot hearsay or be a conduit for hearsay.

 5    He's not going to say, you know, "I talked to X, Y and Z and they

 6    told me X, Y and Z.  He's simply going to say, "I spoke to those

 7    folks; it's consistent with my prior testimony."  That's really

 8    the only purpose we had of doing it.

 9         THE COURT:  Well -- so I understand the new FDA decisions,

10    but Dr. Figlar's testimony was identified, and he did an expert

11    report, right?

12         MR. QUINLAN:  No, he's not an expert, Your Honor.  He's a

13    fact witness, but he was a 30(b)(6) witness and he's our

14    corporate representative so he's just a fact witness.

15         THE COURT:  All right.  So he's going to change his

16    testimony from the time he was deposed based on speaking to these

17    individuals?

18         MR. QUINLAN:  No, he's not going to change his testimony

19    at all.  Based on these conversations he said -- and we told this

20    to the other side -- that what he testified about from the past,

21    from his previous experience at Reynolds and from before his

22    deposition, everything about the company is consistent with that

23    testimony.  That's going to be the nature of what he would say.

24    If he said anything about it, he would say, you know, "I spoke to

25    those folks."
```

```
 1         And he doesn't even have to say that.  He can just say,

 2    you know, "Sitting here today, my understanding that what I spoke

 3    to previously about how the business operates is how it works

 4    today."

 5         It's consistent.  Nothing has changed in his testimony.

 6         THE COURT:  All right.  So when you began you said -- I

 7    thought I heard the word "altered" some of his opinions, but he's

 8    not going to change his opinions --

 9         MR. QUINLAN:  No, not at all.

10         THE COURT:  -- as to the facts.

11         MR. QUINLAN:  No, he will not change his opinion to the

12    facts other than -- it's not really a change of his opinion, but

13    he has this new piece of evidence about the authorization of our

14    three products and that will come up potentially with him.  Their

15    own expert, Ms. Ehrlich, talks about the relevance of the

16    authorization of a product through the FDA's PMTA pathway and so

17    he may explain simply that our products have been authorized by

18    the FDA and that's it.

19         And that all occurred post his deposition.  We couldn't

20    have done anything about it before his deposition, because they

21    hadn't been authorized by the FDA yet.

22         THE COURT:  When were they authorized by the FDA?

23         MR. QUINLAN:  The Solo PMTA, I believe, was authorized in

24    September of last year, Your Honor, and Ciro and Vibe were

25    authorized just this past two weeks ago.
```

18

```
 1        And again, I mean, it's a bit of a no good deed goes

 2   unpunished.  We were trying to be up front with the other side,

 3   let them know and give them the opportunity to take his

 4   deposition if they wanted to, and they apparently do not want to

 5   but he's still available if that's what they want.

 6        THE COURT:  All right.  Thank you.

 7        MR. GOTTS:  Good afternoon, Your Honor, Larry Gotts.

 8        THE COURT:  Yes.

 9        MR. GOTTS:  Let me first touch the new documents that were

10   produced, and I think we can dispose of that pretty quickly based

11   on what counsel represents here; but to be clear, number one,

12   we're not looking, Your Honor, to any way end-run your order on

13   the bill -- on the motion in limine, right, for the CAD dry.

14        The concern is a really basic one, Your Honor, which is we

15   do not want them to, having now produced on the eve of trial

16   23,000 pages of documents, to then cross-examine our expert and

17   say, "You didn't look at these 23,000 pages of documents," when,

18   in fact, our expert looked at the same stuff their expert looked

19   at and we all agree was accurate.  Their 30(b)(6) witness says

20   it's accurate.  And we don't want to be put in this position

21   where simply because they produced something late which has not

22   been addressed in the expert report, they can use that to cross

23   our expert.

24        If they're saying they're not going to touch that issue

25   and never raise it and never shall be mentioned for any purpose,
```

1   whether it's argument or cross, then I don't think we have any

2   dispute there, Your Honor.

3           But that's what we're looking for some help on from the

4   Court to make sure that doesn't happen, because were it to

5   happen, then we would say we have to supplement the expert report

6   to deal with the new stuff, right?

7           THE COURT:  All right.  That's what I'm hearing,

8   they're --

9           MR. GOTTS:  Okay.

10          THE COURT:  -- they're not going to use it.  So --

11          MR. GOTTS:  -- for any purpose, right.

12          THE COURT:  So I think we're in good shape there.

13          MR. GOTTS:  Okay.  So I think I heard the same thing, Your

14  Honor, but I wanted to explain.

15          THE COURT:  With the exception of the motion in limine

16  Number 9 which has been ruled on.

17          MR. GOTTS:  Sure.  The second point on Dr. Figlar, Your

18  Honor, you know, what I'm hearing now is this just this tiny

19  supplementation relating to the fact that new PMTAs have been

20  authorized.  Let's step back.  We had a letter that identified

21  five individuals, one of whom was a regulatory person, sort of a

22  marketing person and then something else, and two other people

23  whose titles are not even known us to, none of whom were trial

24  witnesses or listed as witnesses, none of whom were even

25  mentioned in the initial disclosures in this case.

1          I didn't know what he did talking to five people for this,

2     but the simple point is we asked, point blank, make a proffer,

3     tell us where it is that these people told Dr. Figlar since this

4     30(b)(6) deposition and then we can evaluate whether we have a

5     problem, number one; and number two, once we know what they

6     talked about, we can also evaluate when he's on the stand what is

7     he testifying to that's his personal knowledge versus either the

8     hearsay or the incompetent testimony he got from a third party.

9          As we all know, a 30(b)(6) witness, he speaks for the

10    company in his deposition; but when he takes the stand, he can

11    only testify to things of his personal knowledge.  He doesn't get

12    to just talk about things that people told him.

13         Right now we have absolutely -- he's been polluted, right?

14    We have absolutely no idea when he gets on the stand, what is he

15    talking about that was just told to him by these five folks where

16    he's essentially being a conduit for undisclosed witnesses, and

17    what is stuff that he already knew by his own nature?

18         So I don't understand what they talked about that they had

19    to raise the five witnesses.  We just don't know.  We asked,

20    "Tell us."  They didn't tell us.

21         Now, you know, even if he gets on the stand and he says,

22    "All I'm going to do is talk about these new PMTA's," we're not

23    going to have any idea of whether or not what he's talking about

24    is stuff within his personal knowledge or not at this point in

25    time, because he's basically now talked to a bunch of folks.  And

```
1   he doesn't get to be a conduit for these other nondisclosed

2   witnesses.

3          THE COURT:  What do you expect his testimony to be about?

4          MR. GOTTS:  I don't know.  I don't know.  He -- as a

5   30(b)(6), the stuff that was told to him previously, he can't

6   testify to that.  We can put it in.  They don't get to put it in.

7   I really don't know what he's going to testify about, and that's

8   part of the problem, right?

9          Not only do we not know what he's going to testify about,

10  we also don't know what's from him and what's from somebody else

11  at this point in time.  They thought it was important enough to

12  write a letter to tell us about five other people, offer a

13  deposition, and we're sitting here scratching our heads, saying,

14  "What's this all about?"

15         It's either two things.  One is they're trying to cure a

16  lack of knowledge from his 30(b)(6) deposition, maybe, or they're

17  trying to funnel in testimony from these other folks who aren't

18  on witness lists, never disclosed, and he had five conversations

19  with them, you know, and then they, you know, sua sponte just

20  sort of say, "Go take the depositions."

21         THE COURT:  I'm sorry.  You already took his personal

22  deposition as well?

23         MR. GOTTS:  He was deposed in his personal and 30(b)(6)

24  capacity.

25         THE COURT:  Okay.  So in his --
```

22

```
 1        MR. GOTTS:  Court-ordered, Your Honor.  We had trouble
 2   getting it.
 3        THE COURT:  And he was enjoying life in Italy and it was
 4   difficult to arrange for the deposition.  But --
 5        MR. GOTTS:  Yeah.
 6        THE COURT:  So did you learn what his personal views were
 7   on issues that were relevant to the case and his personal
 8   deposition?
 9        MR. GOTTS:  Yeah, we did.  And we asked some questions
10   about -- relating to knowledge of the patents and certain other
11   things.  And Mr. Naples actually took that deposition so if there
12   are any specifics on that, we could certainly --
13        THE COURT:  I'm trying to decide weather there's an issue
14   here or not.
15        MR. GOTTS:  Yeah.
16        THE COURT:  Dr. Figlar is obviously a very difficult
17   witness for opposing counsel because he is an expert but he is --
18        MR. GOTTS:  No, he's not an expert, Your Honor.
19        THE COURT:  I know he's not here as an expert, but with
20   the company he's got expert knowledge about these products; but
21   he's testifying his personal knowledge.  By definition it's
22   difficult to determine when he's blending in what would be expert
23   opinion by somebody else, but he disguises it as fact witnesses.
24   And we've had that issue here already, and it comes up a lot in
25   these witnesses who are -- have multi hats.
```

```
 1        So I -- what you really want to know is what they talked
 2   about so that you know -- so that you can look, then, at your
 3   personal deposition of him and determine, well, he didn't answer
 4   the question that way at his deposition, and the reason he now
 5   has changed his story is because he's talked to these other
 6   people.
 7        MR. GOTTS:  Either changed his story or has learned stuff
 8   that wasn't in his personal knowledge which he's now projecting
 9   as if it was his personal knowledge, right?  So he wouldn't be
10   competent to testify to that.
11        THE COURT:  In your deposition did you try and --
12        MR. GOTTS:  Box him?
13        THE COURT:  Yeah, paint the four corners of his knowledge?
14        MR. GOTTS:  I'm sure we did.  Now, whether we hit every
15   corner of the -- right?  That's right.  But that is the problem,
16   Your Honor.  Obviously we don't -- I think a solution to this
17   problem -- I think -- it sounds to me like Your Honor is not
18   disagreeing with our -- with us that he could only testify to his
19   personal knowledge, right?
20        So, I think a solution would be for them to really give us
21   a proffer that says, this is what was discussed, right, and that
22   way we know that he shouldn't be testifying to things that were
23   just communicated to him by these other persons.
24        Otherwise, I'm not sure how we make that objection today,
25   particularly with a jury.  You can't be on every question going
```

24

```
 1    up to sidebar saying, "How does he know that," right?

 2         THE COURT:  Well, you can cross him and say, "Well, you

 3    told us back in April you didn't know anything about that subject

 4    and now you've been directly testifying about it."  But that --

 5    you're right, that's not the best way of presenting that issue

 6    before a jury.

 7         Okay.  Let me hear from Reynolds again.

 8         MR. GOTTS:  Thank you, Your Honor.

 9         MR. QUINLAN:  Briefly, Your Honor.

10         THE COURT:  Yeah.

11         MR. QUINLAN:  We did describe the general nature of the

12    conversations.  No lawyer was present for these conversations.

13    It was simply Dr. Figlar and his formal colleagues from Reynolds.

14    We did give them a description of -- I would say a broad

15    description of what they talked about.  But if they want to know

16    more about the conversations, that's why we offered for them to

17    take the deposition.  I think they can learn everything they want

18    to know, other than -- what they're requesting is we have to go

19    back to Dr. Figlar, ask him what they talked about, write it up,

20    send it to them, and they take his deposition anyway.  I mean, we

21    can just shortcut it.

22         THE COURT:  Is he available for deposition?

23         MR. QUINLAN:  He is available.  I don't believe he's

24    available next week, but we can make him available at any other

25    time.  I'm sure we can work it out with the other side to make
```

25

1   him available.  I think that's the beauty of the Webex; he can be

2   available via Webex to take his deposition whenever they'd like,

3   convenient with this schedule.

4       We will make him as available as possible for them, and

5   we're happy to stipulate -- if Your Honor wants, or if the other

6   side wants, we can stipulate that he didn't learn anything new

7   and that he's not going to testify about anything new and we can

8   short-circuit all of this; but I'm not hopeful that that's going

9   to be acceptable to the other side.

10      THE COURT:  All right.  Let's make him available for

11  deposition on the week of May 30th through the -- that first week

12  in June.  Arrange dates and take his deposition.  Otherwise,

13  we're back here again because you proffered what he would say and

14  his actual testimony is a little different and we're spending

15  half a day at sidebar.  So, let's take his deposition, okay?

16      MR. GRANT:  That sounds fine, Your Honor.  But just so

17  we're clear, the topic of FDA authorizations is fine; but the

18  broad topics include financial information related to Vuse

19  products, a vaccine project related to COVID.

20      THE COURT:  Right.

21      MR. GRANT:  None of that he's competent to testify about.

22  But we'll take the deposition, but the challenge, of course, is

23  getting the horse to stop before he leaves the barn and not just

24  cross-examining him after the fact.

25      THE COURT:  I understand that, and that's going to depend

 1   on what he says on direct examination.  What I expect your

 2   deposition will be is, "What have you learned from these

 3   gentlemen that you believe will affect your testimony as you

 4   prepare to testify in this case?"

 5          MR. GRANT:  Right.  We'll proffer it that way.

 6          THE COURT:  I think that's the best way to do it.

 7          MR. GRANT:  Yes, sir.

 8          MR. QUINLAN:  Thank you, Your Honor.

 9          THE COURT:  All right.  Let's go to the motion for

10   sanctions.  I've read the -- you know, I've read the pleadings,

11   obviously.  I've read the transcripts of the hearings before

12   Judge Buchanan.  I'm not going to overrule her decisions she

13   made.  If I had the issue myself, would I have decided it the

14   same way, maybe not.  But it's certainly within her -- it's not

15   incorrect as a matter of law to limit the discovery the way she

16   did to the actual agreements, not the materials that went into

17   it, and so it's a rather narrow decision; but it's not an

18   incorrect decision as a matter of law and it's certainly not an

19   abuse of discretion.

20          So what I'm concerned about is the representations of when

21   Jones Day knew about the 5.25 royalty and what they said to me in

22   open court and what they put in their pleading in trying to

23   disqualify Mr. Myer.  So, I didn't get her response in the

24   opposition from Jones Day that satisfied me, and so that's why

25   we're here today.

1          MR. GRANT:  Yes, sir.

2          THE COURT:  And so if you want to address it first, go

3     ahead, or if you want to --

4          MR. GRANT:  Let me just say very briefly, I appreciate and

5     understand the Court's deference to Judge Buchanan, and I hear

6     you loud and clear.  She's an excellent jurist, there's no doubt

7     about it.

8          But the two things we're asking for, I think, are directly

9     related to the trial.  We now have five exhibits that only became

10    part of the record after the close of discovery that basically

11    refute this 5.25 issue.  They refuse to stipulate that they're

12    admissible.  They're Reynolds-produced documents.

13         So the concern I have, Your Honor, is how do we make our

14    evidentiary record?  I mean, if we can take a 30(b)(6) deposition

15    of a corporate representative, a custodian of those documents,

16    that would be fine; but the point is we need to establish the

17    admissibility of those five documents in order to rebut the very

18    false representations that have been made in the expert reports.

19         THE COURT:  Were they produced by the Fontem corporation?

20    Is that how you got them, through a third-party subpoena?

21         MR. GRANT:  So the way we got them, Your Honor, was we did

22    not subpoena Fontem in this case.  Fontem was subpoenaed in the

23    North Carolina case where Ms. Weiswasser was the lead.

24         I would note that Reynolds didn't produce them in the

25    North Carolina case either.  They withheld them from both cases.

```
 1   Fontem produced them.  And the only way we got them is once

 2   Ms. Weiswasser was kind enough to join the trial team to get us

 3   ready for trial, once she was admitted in under the protective

 4   order and we were able to talk to her about what the discovery

 5   was in North Carolina, which didn't happen until right before

 6   that hearing, we then went to Fontem separately and asked for

 7   their permission to have access to those documents which were

 8   produced in the North Carolina case and to use them in this case

 9   under this Court's protective order.  That's the only way we got

10   them.

11            THE COURT:  Okay.

12            MR. GRANT:  And then the last thing we're asking, is Judge

13   Buchanan did grant their damages expert leave to file a

14   supplement report.  That should be stricken, Your Honor.  He

15   shouldn't be getting to change his opinions based on their

16   misdeeds.

17            THE COURT:  Right.  Okay.  Thank you.

18            MS. SMITH:  Your Honor.

19            THE COURT:  Good afternoon.

20            MS. SMITH:  Lexi Smith for Reynolds.

21            THE COURT:  All right.

22            MS. SMITH:  And just at the outset, I know Mr. Burnette

23   was the one here arguing the Daubert motions with you.  He wanted

24   to be here but could not travel because of COVID.

25            So you get me instead.  But I'll tell you I'm very
```

29

```
 1    familiar with the representations, and they were true when made
 2    and they're true today.  I was heavily involved in the briefing,
 3    and I think what's happening here is PM/Altria is actually
 4    misrepresenting to you the contents of these documents in the
 5    negotiations and the relevance of these.
 6         THE COURT:  Well, do they say 5.25 percent in them and
 7    that they're working towards resolution of the licensing based on
 8    that -- do you want me to -- do we have the documents?
 9         MR. GRANT:  Yes, Your Honor, I'm happy to hand it up.  I
10    have the most current exemplary one.
11         MS. SMITH:  Your Honor, just so I know, is that an expert
12    of Altria's expert report or is that the actual underlying
13    document?
14         MR. GRANT:  This is -- Exhibit 1 is document Number 1174.
15    This is the version of the Fontem/Reynolds Agreement with the
16    edits included from Reynolds' outside counsel.  The part that I
17    highlighted, starting with "taking into account these following
18    factors," all the way through the end of the page, all of that
19    was added by Reynolds.
20         So this is a representation and draft that Reynolds
21    thought belonged in there and the representation that directly --
22    I mean, that's a hard thing, what I just heard, "there is no
23    evidence that any party ever agreed to a 5.25 percent royalty."
24    That's what they said in the *Daubert*.  Here's what a Reynolds
25    lawyers said --
```

1        THE COURT:  Hold on.  I'll give you an opportunity to

2   argue that.

3        MR. GRANT:  I'm just pointing out, it's there in black and

4   white.

5        THE COURT:  My question was, do you have the agreement?

6   You've now handed up a draft of the U.S. settlement and license

7   agreement between Reynolds and Fontem, effective date, September

8   of 2018, in this Exhibit 1 filed under seal.  So that was your

9   question.

10       And it most certainly identifies, in paragraph 5, lump sum

11  payment, Fontem -- in connection with the other licenses or

12  exploitation of the patents-in-suit and other patents in the

13  territory, a number of which are based on 5.25 net sales, and

14  scopes and releases.  It then goes on from there.

15       Okay.  So now go ahead.

16       MS. SMITH:  So, Your Honor, to be clear, these -- actually

17  I think we need to step back for a moment to understand why this

18  is even coming into play.

19       THE COURT:  Let me be clear.  I want to know what Jones

20  Day knew and when they knew it, and why they answered the

21  question -- why they made the statement to me in court and why

22  they made the statement to exclude Mr. Myer, if they, in fact,

23  had evidence that a 5.25 royalty had been negotiated and used for

24  negotiations in these Fontem settlements.

25       And to say they never were ultimately used because a lump

```
 1   sum was arrived at or this was some renegade attempt at
 2   settlement that was determined was totally improper and we
 3   weren't going to use it, that's not the answer.  The answer is,
 4   what did you know and when did you know it?
 5        This is like in a criminal case -- I don't know if you've
 6   ever had a criminal case --
 7        MS. SMITH:  No, Your Honor.
 8        THE COURT:  -- there's stuff called Brady.  And when you
 9   get a Brady document, prosecutor's required to turn over any
10   documents which are exculpatory, which may inculpate the
11   defendant, help the defendant.  You get one of these documents as
12   a prosecutor and you go, "Oh, shit," and then, you know, "I need
13   to turn it over."
14        And that's what this is in my mind.  That's how I
15   translate this.  So that's my view of what we're talking about.
16   So go ahead.
17        MS. SMITH:  So if I may, respectfully, I happily will
18   answer what we knew when we knew.  I would also greatly
19   appreciate the opportunity to explain to you in context what this
20   document is and why still today we do not think it supports or
21   proves that anyone has paid 5.25 percent.
22        So to get to your first question, we did not collect and
23   produce documents, the Fontem/Reynolds negotiations, because we
24   objected to that production, Judge Buchanan agreed, and we didn't
25   have to go do that in the case.  Fact discovery closed in this
```

1    case in April of 2021.

2         Altria served a subpoena on Fontem in North Carolina in

3    May of 2021.  These documents were produced at that time, in June

4    of 2021, and that's when Reynolds received a copy.  Quite

5    frankly, we did not know how they were going to be construed by

6    the plaintiffs until we saw, of course, the April 2021 expert

7    report by Mr. Malakowski, which we think takes these provisions

8    wildly out of whack and out of context.

9         So we received these documents in June 2021 at the same

10   time Altria received these documents.  And while certainly they

11   were produced as CBI to Altria and Reynolds' outside counsel, the

12   fact of their production was not a secret, okay.  And I

13   understand that while only recently appeared in this case, but

14   they had been handling issues very related to this case,

15   including IPRs, for the two Altria patents at issue in this case.

16   So, you know, to say that it's a surprise that these even existed

17   I think is a great mischaracterization.

18        But now if I may explain the contents of the documents.

19   What this shows is that Reynolds sought to obtain the same MFL

20   provision that NuMark obtained.  That's what was in this

21   document.  They're taking one excerpt of representation that is

22   nearly identical to the representation in NuMark's agreement.  So

23   what this shows is that Reynolds' lawyers tried to negotiate for

24   that same MFL clause that NuMark got.

25        It doesn't show what settlements, if any, were subject to

1    the representation.  It doesn't prove any of those things.  To

2    prove those things you would need the other Fontem licenses and

3    they never, ever asked for them.  And I think this whole gotcha

4    moment is a way to try to salvage and backfill that opinion.  I

5    mean, they could have asked us to produce these in June when

6    Fontem produced them, but they didn't.  They didn't make this an

7    issue until the *Daubert* --

8        THE COURT:  But you were told by Judge Buchanan they

9    couldn't have them, right?

10       MS. SMITH:  Right, but they could have asked once they

11   were already produced by Fontem.

12       THE COURT:  They've already had a ruling from Judge

13   Buchanan.

14       MS. SMITH:  Well, they've also taken that position that

15   ruling didn't cover document requests, so I agree with you, Your

16   Honor, I agree that they were outside of the scope.  And to this

17   day we think they're not relevant, and to this day I would tell

18   you I do not believe this proves anyone paid 5.25 percent.

19       THE COURT:  What your opinion is, is a hundred percent

20   irrelevant.  You realize that, right?

21       MS. SMITH:  I understand, Your Honor --

22       THE COURT:  Looks like to me you're looking at this

23   document, deciding whether it's exculpatory or not.

24       "Boy, this really, when you look at it, it really isn't

25   going to help the defendants so I'm not going to produce it."

1      Do you know how many lawyers have been disbarred by -- or

2   by courts for not producing that?  One of my good friends in the

3   U.S. Attorney's Office made that same decision and it's the last

4   case he ever tried.

5      So, it's not your decision.  It's for the Court to decide

6   whether it's relevant.  It's for a jury to decide whether it's

7   relevant.  It's for an expert to decide whether it's relevant.

8   But it's not you.

9      So, you haven't answered my question yet.  So, please,

10  I've listened to you, now answer my question.  And I'm sorry that

11  you're here for the first time listening to me bark at you.  I

12  rarely do.  This is one of those occasions.  So, please, go

13  ahead.

14      MS. SMITH:  I'm sorry.  I thought I answered your

15  question.

16      THE COURT:  No, you didn't.

17      MS. SMITH:  We -- Jones Day -- sorry.  Jones Day obtained

18  the copies of these documents when Fontem produced them in the

19  North Carolina action.

20      THE COURT:  And when was that.

21      MS. SMITH:  In June of 2021 after fact discovery had been

22  closed here and after expert reports had been done.

23      THE COURT:  And when did you represent to the Court that

24  there were no documents?

25      MS. SMITH:  I think the representation was that Fontem did

1  not identify in its -- how many, if any, other licenses were at

2  5.25 percent.  And I think it's a -- I don't think --

3         THE COURT:  There's no evidence of how many, if any, prior

4  agreements are subject to Fontem's representation.  No one knows

5  the terms of those prior license agreements.  So when those

6  statements were made, were they accurate?  Jones Day had never

7  received the Fontem agreements and you hadn't received them as

8  of, what, June of --

9         MS. SMITH:  I'm sorry, Jones Day doesn't have and never

10  had the other Fontem license agreements.  Is that the concern?

11  We don't have copies of the other Fontem license agreements.

12  This is just a --

13         THE COURT:  You were involved in the prior litigation,

14  right?  I mean Jones Day was involved in the prior litigation.

15         MS. SMITH:  With Fontem, no, Your Honor, we were not.

16         THE COURT:  Not Fontem, NuMark.  In an earlier case

17  with -- the North Carolina case what -- Jones Day was involved in

18  the --

19         MS. SMITH:  Yes, yes, Jones Day is involved in the North

20  Carolina case.

21         THE COURT:  Right.  And did Jones Day in the earlier

22  litigation get any of these Fontem agreements?

23         MS. SMITH:  No, Your Honor, we don't have other -- are you

24  asking in the North Carolina action that's pending currently with

25  Altria?  Is that what you are asking about?  Or what -- I just

```
 1   want to make sure I understand what North Carolina litigation.

 2         THE COURT:  A prior litigation.  I'm lost now.

 3         Mr. Grant, help me out on --

 4         MS. SMITH:  The reason I'm trying to clarify is because

 5   Fontem was also in North Carolina, the Fontem/Reynolds.

 6         THE COURT:  Yeah, right.  Okay.

 7         MR. GRANT:  So, the prior litigation against

 8   Fontem/Reynolds was represented by Brinks Hofer and Ralph Gabric.

 9   As near as we can tell from these documents, it sure looks like

10   they had access to them, otherwise how could they possibly say "a

11   number of which were based on 5.25"; but when we asked their

12   30(b)(6) witness, he claimed he had no idea and it was just

13   outside counsel, and that was quite a while ago.

14         So Jones Day -- not just Jones Day, but 10 or 11 of the

15   exact same lawyers who have appeared here have been representing

16   Reynolds in the North Carolina case and they certainly had access

17   to these documents which were not among the 23,000 pages they

18   supplemented.

19         MS. SMITH:  I'm sorry, Your Honor, may I just clarify

20   something?  There is a case where Fontem sued Reynolds in North

21   Carolina and Reynolds was represented by Brinks Gilson and Ralph

22   Gabric.  Reynolds -- or Jones Day had nothing to do with that

23   litigation.  We don't have access to documents from that

24   litigation.  We represent Reynolds against Altria in North

25   Carolina, and we received just these draft Fontem/Reynolds
```

1    negotiations.

2         We have not -- and I received the copies of the other

3    Fontem licenses.  I don't know what's in them.  I don't think

4    anyone on our team could know because we do not have them.

5         THE COURT:  So Exhibit 1 is one of those licenses, a draft

6    of one of those licenses from -- with an effective date of

7    September 2018 between Reynolds and Fontem, right?

8         MS. SMITH:  Sorry, Exhibit 1 to which -- the objections?

9         THE COURT:  Yes.

10        MS. SMITH:  Yes, sir, and I think I follow here.

11        THE COURT:  All right.  So when did Jones Day receive

12   these -- at least this one license which discusses the 5.5 [sic]

13   even if you didn't get the other four?

14        MS. SMITH:  So the draft Reynolds/Fontem license?

15        THE COURT:  Yes.

16        MS. SMITH:  This is the Fontem production from North

17   Carolina that we received in June of 2021.

18        THE COURT:  Okay.  And that's the first time that Jones

19   Day had any evidence that there was a 5.25 royalty discussed

20   between Fontem and the earlier -- and the other third-party

21   corporation; is that right?  Because this license, paragraph 5

22   talks about the prior licenses negotiated by Fontem contained the

23   same 5.25 royalty, right?

24        MS. SMITH:  Right.  You're talking about the Reynolds

25   draft that had that same representation that they gave NuMark?

```
1          THE COURT:  Yes.

2          MS. SMITH:  So we would have received that in June of

3     2021.

4          THE COURT:  But you did not have that knowledge prior to

5     that.  So again, when were the representations made that Mr. Myer

6     should be excluded because he had no basis for using the 5.25

7     royalty on net sales and, also, your representation to the Court

8     that no one knows the terms of those prior license agreements?

9          MS. SMITH:  All right.  So I believe we filed a Daubert

10    motion in January of this year.  And we think there's two issues

11    with Myer's reliance on the 5.25 percent.  First, his, you know,

12    kind of primary reliance of that rate based on what's in the

13    NuMark agreement, we think is fundamentally flawed because it's

14    not what was paid for the comparable U.S. license and Mr. Myer

15    doesn't actually opine that the 5.25 percent rate that applied

16    to -- in U.S. sales, he doesn't opine that that's comparable to

17    the situation here with the parties, so that's kind of problem

18    one with his use of the 5.25.

19         He then does try to bolster it by saying nine other

20    licensees, you know, paid at least 5.25 percent because of the

21    representation in the NuMark agreement, and so our representation

22    then and still now is we don't know how many, if any, agreements

23    that applies to because we haven't seen them.  And I think there

24    could be agreements that haven't; there might not be.  We don't

25    know because it's not evidence in the case.  It was never -- I
```

```
 1   would think that if PM/Altria wanted to rely on the other Fontem

 2   licenses, they would have subpoenaed them from Fontem, but we

 3   don't have them.

 4        So we still think it's a flaw to rely on agreements you

 5   can't see.  I mean, just looking at the NuMark agreement shows

 6   you the error even if there was one term known.  Even if it was

 7   assumed that somewhere in each of those agreements there was a

 8   5.25 percent, that doesn't mean anyone ever paid it.  It's in the

 9   NuMark agreement and NuMark didn't pay it.  So how can you prove

10   what's in other agreements without the other agreements?  I think

11   that's fundamentally our problem and we do think it's an error

12   for Mr. Myer to rely on that.

13        THE COURT:  Okay.  And when did Jones Day represent that

14   no one knows the terms of those prior license agreements to me

15   when we were doing the Daubert hearings?  That was just, you

16   know, March of 2022?

17        MS. SMITH:  Yes, Your Honor.

18        THE COURT:  And don't you think you had knowledge at least

19   that there was this 5.25 negotiation in this Exhibit 1?

20        MS. SMITH:  We had knowledge that Reynolds tried to get

21   that same rep that NuMark got.  So it's not any different.  It's

22   the same thing as the NuMark rep.  It's the same thing where

23   NuMark tried to -- obtained and did, in fact, get Fontem to

24   represent to it that any other sole U.S. licenses were at

25   5.25 percent or higher.
```

40

1         This document doesn't add anything new to that.  It's the

2    same representation that Reynolds tried to get that NuMark

3    already had.  It doesn't change the evidence that we don't have

4    the other Fontem licenses.

5         THE COURT:  Wow.  Wow.  You're a good advocate, but you've

6    just admitted that Jones Day knew about this license agreement

7    and didn't accurately present its knowledge and also didn't

8    accurately respond to questions during the *Daubert* hearing, and

9    that is really unfortunate.  All right.  Thank you.  You may sit

10   down.

11        Mr. Grant.

12        MR. GRANT:  Yes.  I appreciate the opportunity, Your

13   Honor.  Let me just see if I can clarify a couple of things.

14   One, with respect to my colleague, I think what you heard was

15   sophistry.  There was no contrition.  There was a doubling down

16   of their positions.  There was no admission that in June 2021

17   they had documents that were in their possession which were

18   drafted by their lawyers.

19        What I didn't hear either is that before June 2021, during

20   the discovery period in this case, when we specifically requested

21   these documents and specifically put a 30(b)(6) notice, nobody

22   went to Mr. Gabric of Brinks Hofer, or his subsequent firm -- I

23   know he's moved on -- and asked him whether he had those because

24   he was Reynolds' -- he and Reynolds are the same thing.  He was

25   Reynolds' lawyer, and he was the one that made this

41

1    representation.

2         So they didn't prepare their witness and according to what

3    I heard, there's no evidence they even tried.

4         Second thing is, I want to be clear, Your Honor, about

5    this somewhat hard-to-hear argument.  On our license agreement

6    with Fontem there's a 5.25 running royalty.  On their license

7    agreement they paid a lump sum.  Fontem wanted to make sure that

8    the imputed royalty was 5.25 and Reynolds wanted to make sure

9    they weren't paying more than that.  That was the whole purpose

10   of these representations that were going back and forth.

11        And what subsequently happened is their expert,

12   Mr. Sullivan, has contrived a 1.1 percent imputed royalty into an

13   agreement when we all know it's 5.25.

14        Now the document that I gave you, which is Exhibit 1 of

15   Docket 1174 says expressly -- these are Reynolds' words from

16   Reynolds' outside counsel -- a number of which are based on 5.25

17   of net sales.  That's a representation by Reynolds' lawyers of

18   what the prior agreement said when they told you there's no

19   evidence of what any prior Fontem licensee paid.  This is an

20   admission from Reynolds.

21        They also told you there's no evidence that anybody ever

22   agreed to pay 5.25.  This is an admission from Reynolds.  They

23   also said no one knows the terms of those license agreements.

24   That was all untrue.

25        There are additional documents that are in the record,

1    Exhibit 2 of Docket 1174, says -- again, this is a representation

2    from the Fontem/NuMark agreements that RJR knew about and tried

3    to add to their version of the agreement.

4          It says, "The data rights and the territory have been

5    subject to a running royalty at a rate or equal to or higher than

6    5.25 percent."

7          And Exhibit 3 of Docket 1174 is the one from Mr. Gabric

8    where he says, "The projected 1 percent growth rate of net sales

9    is fine."

10         What Mr. Sullivan did is he calculated a 1.1 percent

11   imputed royalty, which is false by Reynolds' own admissions.  It

12   was four times that.  And then what Mr. Sullivan did is he used a

13   20 percent growth rate to arrive at his actual proposal on what

14   the damages should be; and there's another document, the one I

15   just mentioned which is Mr. Gabric e-mailing that a 1 percent

16   projected growth rate is the right one to use.

17         All of these have the effect of artificially diminishing

18   the damages based on this comparable agreement by orders of

19   magnitude impugning Mr. Myers' analysis when it turns out it was

20   based on a hundred percent truth and admissions now we've learned

21   from Reynolds.

22         And I have to tell you, Your Honor, I haven't seen

23   something like this in a long time.  They knew that they had

24   their own admissions saying that there was a number of those

25   agreements of 5.25, and then they had their expert and they

43

```
 1    argued to you that Myers should be excluded for taking that
 2    position when their own admission proves it to be true.  I don't
 3    know what to ask for other than the Court's help.
 4         THE COURT:  All right.  So you're -- you've asked for the
 5    documents to be authenticated, these five exhibits?
 6         MR. GRANT:  Yes, sir.
 7         THE COURT:  All right.  Is there any argument that these
 8    exhibit aren't true and accurate copies of the agreements that
 9    were produced?
10         MR. MICHALIK:  If I could step to the podium, Your Honor.
11         THE COURT:  Yes.
12         MR. MICHALIK:  I think there's some misunderstanding here.
13    I can check with my client to make sure that those are the
14    documents that we're being asked to authenticate, but the
15    misunderstanding here goes back to the representation that Jones
16    Day knew the contents of agreements that Jones Day has never
17    seen.  And that's a fundamental error here.  The point --
18         THE COURT:  As of when?  The representations to me in
19    court in the --
20         MR. MICHALIK:  To this day, Your Honor, the simple
21    solution here, if Mr. Myer wanted to rely on the contents of --
22         THE COURT:  No, no.
23         MR. MICHALIK:  -- nine other agreements would have been to
24    subpoena them and --
25         THE COURT:  You started out by saying there's a
```

44

```
 1   misconception as to when we knew.  Okay.  Finish --
 2        MR. MICHALIK:  And we still don't know.  Jones Day has not
 3   seen the contents of --
 4        THE COURT:  But you had these documents.
 5        MR. MICHALIK:  I have a draft agreement that asks for a
 6   same representation from Fontem that Fontem provided to another
 7   entity.  That doesn't mean that Jones Day or I have the
 8   underlying agreements that are the reason for that request.
 9        THE COURT:  Oh, my gosh.  Oh, my goodness.  Okay.
10        MR. MICHALIK:  And that's the absence of testimony we
11   pointed out in the *Daubert* motion, which is if Mr. Myer wanted to
12   rely on the substance of those agreements for his opinion, they
13   could have subpoenaed Fontem to obtain all the nine agreements
14   that they say are relevant, and never did.
15        THE COURT:  Yeah, but that's different than saying no one
16   knows the terms of these prior license agreements.  And I know
17   you're saying, yeah, I don't have the final agreement, all I have
18   is a draft, and so you don't know, but -- and then to say that
19   Myer has no idea what he's talking about when he comes up,
20   through magic, he pulls a 5. -- 5.25 percent out.
21        MR. MICHALIK:  We're conflating two things --
22        THE COURT:  It's right in the documents that Reynolds and
23   Jones Day have prepared as a license agreement.
24        MR. MICHALIK:  We have a draft in which we're trying to
25   get the same provision NuMark got.  That doesn't mean we have the
```

45

```
 1    actual other agreements that show what other people paid.
 2         THE COURT:  Yeah.  Okay.
 3         MR. MICHALIK:  So that's the point we're making in the
 4    Daubert was when Mr. Burnett was here, and, again, he caught
 5    COVID this week so he was unable to come here and defend what he
 6    had said.  But his point that no one knows what was in those
 7    agreements, his point was Mr. Myer never laid eyes on those
 8    agreements, so he can't say what was in them.  That was the
 9    argument he was making.
10         And that remains true today.  Mr. Myer has not seen those
11    nine agreements to say, yes, this amount was paid in agreement
12    number 1, this amount was paid in agreement number 2, this amount
13    was paid in agreement 3.  That remains the case, and that was the
14    basis for the statement that Mr. Burnette made before Your Honor.
15         THE COURT:  All right.  Thank you.
16         MR. MICHALIK:  Thank you, Your Honor.
17         THE COURT:  You're just too narrowly drawing and
18    wordsmithing your responsibility to be honest with the Court and
19    evaluate neutrally the draft documents and license and
20    negotiations and the existence of the 5.25 percent sales, so I'm
21    going to grant the motion to admit the five documents subject to
22    your checking with your client.  And if you do have an objection,
23    then I'll consider it, but I don't see any -- well, I haven't
24    studied the document, but it doesn't look to me to be a document
25    that was -- that is generated other than through the counsel
```

```
 1    working on the case and it looks to be genuine to me, and it will

 2    be admitted.

 3         And the leave to file a sur-reply by Mr. Sullivan is

 4    denied.  There will be no further pleadings other than the

 5    additional pleading allowed by Myer.

 6         All right.  Let's go to --

 7         MR. GRANT:  Just a brief point of clarity, Your Honor.  I

 8    think that that has been served already, so I don't think it's --

 9         THE COURT:  It will be struck.

10         MR. GRANT:  Thank you.

11         THE COURT:  All right.  So the trial will follow the

12    typical order that you have identified in Joint Issue Number 2.

13    I will -- I'll get a jury pool list, and we do a questionnaire

14    which identifies those jurors who have been immunized and have

15    taken at least the first booster shot.  I'll exclude anybody who

16    has not taken the shots and the first booster.  So the pool

17    itself will be vaccinated people only.

18         And we'll select eight persons.  The way I select the jury

19    is I'll ask, you know, the voir dire questions that you want me

20    to ask.  I haven't looked at those yet.  I don't know if they've

21    been filed yet, but I haven't looked at them yet.  But I'll err

22    on being generous in asking the questions that you think are

23    relevant to you as parties.

24         And after I've finished my voir dire, I'll ask you whether

25    there are additional questions you want me to ask, and you may
```

1   suggest some additionals.

2        And then we'll exclude for cause -- I exclude for clause

3   jurors who have, you know, are single moms at home, have a

4   business that they're the sole practitioners of, medical

5   appointments that can't be rescheduled, people with paid

6   vacations or business trips out of town, and people who have

7   difficulty understanding or hearing or seeing documents and

8   testimony.

9        And then we'll give you the preemptory strikes that you

10  want and we'll go back and forth until we have eight people.

11  Obviously, you know six are required.  I'll seat eight.  We'll

12  keep eight, and eight will deliberate.

13       And I would like a copy of the physical set of the

14  exhibits.  I know that's a pain, but I would appreciate a

15  physical set of the exhibits.

16       Yes, sir.

17       MR. MICHALIK:  Your Honor, would you like an electronic

18  copy as well or just physical?

19       THE COURT:  So you're going to have an electronic copy --

20  you're going to use our electronics and the answer to the other

21  question is yes.  You'll have an opportunity to go up here when

22  I'm not here with Lance, our IT, person and go through and make

23  sure everything is working properly and jives with your own

24  technology and just need to arrange that with Lance Bachman down

25  in the Clerk's Office.

48

```
 1          Do we need a separate electronic copy?  If I need one,
 2   I'll ask for one.  I don't need one right now.  I allow witness
 3   binders when you have a particular witness on the stand who you
 4   think is going to be focusing on two or three documents that are
 5   important to your case and you would like the jury to be able to
 6   read those documents while they may be on the screen at the same
 7   time and you think people may want to read them in print instead,
 8   as long as they don't get cumbersome and for a few of the
 9   witnesses, I'm not going to object to that.
10          I don't want every witness to have binders passed out and
11   then brought back and then passed out again and brought back.  I
12   don't think it's necessary for every witness, but if you have,
13   you know, three or four documents that you want to put in a
14   binder and focus on, I'll allow that.
15          If you want to play the video, I've never had a patent
16   case where one side or on the other doesn't object to the video.
17   "Oh, this is prejudicial."
18          MR. GRANT:  We worked it out, Your Honor.
19          THE COURT:  All right.  Then we'll play a video.  I'm not
20   sure what version of the video it is.  I haven't seen one in ten
21   years.  But if you all agree on it, that's fine, we'll play the
22   video.  And make sure that our technology will work with the
23   playing of the video.
24          MR. GRANT:  We'll have it teed up and ready to go and,
25   obviously, show which version it is to Reynolds.
```

49

```
 1            THE COURT:  You can bring your laptops, of course, and
 2     I'll allow each side to have one cell phone, so you can call
 3     witnesses and update witnesses on -- you know, when they're going
 4     to be needed.  And don't tell Judge Brinkema I'm doing that.
 5            And then there's an issue -- I guess Dr. Figlar has been
 6     working on COVID vaccines, and is that somehow relevant to our
 7     case?
 8            MR. GRANT:  The reality, Your Honor, is both Philip Morris
 9     and Reynolds have tried to work on COVID stuff.  If they mention
10     it then we'll mention it.  It seems like a big waste of time.
11     It's not relevant to any issue.
12            THE COURT:  Okay.  Then it doesn't appear relevant to me,
13     but maybe I just don't understand.
14            MS. PARKER:  Your Honor, if I may.
15            THE COURT:  Yes.
16            MS. PARKER:  As part of Dr. Figlar's work, Dr. Figlar
17     himself has worked on this, and so as we're explaining to the
18     jury who he is and the work he's done, that's just part of his
19     story.  I'm not at all planning to go beyond that other than,
20     "What did you do at Reynolds?"
21            "I did this, I worked on this," et cetera, et cetera.
22            Part of it is working on this vaccine, and he's been
23     nationally recognized for his work.
24            THE COURT:  Okay.  And separate and apart from the work he
25     did at Reynolds?
```

50

```
 1        MS. PARKER:  At Reynolds.  He did this at Reynolds.

 2        THE COURT:  And did that result in anything occurring with

 3   the vaccine?  I mean, what -- what came of that, I guess is the

 4   question?

 5        MS. PARKER:  Research toward a vaccine for COVID, and,

 6   again, both of the tobacco companies were involved in that.  It

 7   received national press coverage as a potential vaccine that

 8   might be successful in treating or preventing COVID.  It's not

 9   been approved.  It's not gone forward in that way, if that's what

10   Your Honor is asking.

11        THE COURT:  Again, just -- okay.  I understand Phillip

12   Morris would have the same testimony through one of its witnesses

13   or not?

14        MR. GRANT:  I mean, we would, Your Honor, but again,

15   courts have looked at this in the past and excluded it.  And if

16   it's -- first of all, he retired 18 months ago and COVID was just

17   getting going.  And second of all, why is it on the list of stuff

18   he talked about with the five witnesses if it's his purported

19   personal knowledge?

20        THE COURT:  Yeah.

21        MR. GRANT:  It just seems like we're creating nothing but

22   trouble.

23        THE COURT:  We're far afield.  I'm not going to allow the

24   COVID testimony.

25        MS. PARKER:  Your Honor, while I'm up here may I point
```

 1    this out?

 2          THE COURT:  Yes.

 3          MS. PARKER:  Thank you, Your Honor.  I just need to state

 4    I think, just for the record, our objection about the Court's

 5    policy on requiring only vaccinated jurors, and if I may just

 6    explain why.

 7          THE COURT:  Yes.

 8          MS. PARKER:  These are -- I represent a tobacco company --

 9    both sides are tobacco companies.  And I've tried a lot of cases

10    for Reynolds, and I don't think there's any question that there

11    are a lot of jurors who have strong feelings about tobacco

12    companies.

13          And jurors who have health issues and health concerns and

14    who are particularly interested in health issues, which would

15    tend to be somebody who was vaccinated as opposed to someone who

16    was not, those types of individuals are, generally speaking,

17    anti-tobacco companies; and my client is the one at risk here for

18    a dollar verdict and everything else that they're asking for, and

19    so I just wanted to make clear for the record our objection to

20    limiting the jurors to those who actually have been vaccinated

21    because of this concern that that's excluding the unvaccinated

22    jurors who might have a different view in terms of these health

23    issues relating to tobacco companies.

24          So I wanted to say that for the record, if I may.

25          THE COURT:  Sure.

```
 1          MS. PARKER:  And then, again, while I'm up here, what is
 2     Your Honor's policy about how long openings are so we can plan
 3     for that?
 4          THE COURT:  Thank you for bringing that up.  I don't set
 5     a:  You've got an hour, you've got 45 minutes.  I think 45
 6     minutes is about right for an opening statement, but -- as Judge
 7     Ellis often says, TV shows are a half an hour including
 8     advertisements because that's the length of time that a juror is
 9     going to pay attention to you.
10          But if you want 45 minutes to an hour, I'll give that to
11     you; and if you want more than that, then we need to talk about
12     it because I think that's probably too lengthy.
13          MS. PARKER:  Your Honor, frankly from our perspective, 30
14     minutes would be fine.  If you want to give us 45, that's fine,
15     too.  I think -- I can't speak for Phillip Morris, of course, but
16     I think that that would make sense.
17          THE COURT:  I think Mr. Grant was here a couple of years
18     ago and I think it was well under 30 minutes so I'm not --
19          MR. GRANT:  It comes out of our time, Your Honor, so I
20     don't think this is something we need to spend much time talking
21     about.
22          THE COURT:  If it gets too long-winded, then we may have
23     to talk about it.  So, 45 minutes is about right.
24          MR. GRANT:  I plan to try to do better than that, but if
25     that's the cap, that's an easy one to live with.
```

```
 1        THE COURT:  Okay.  And how much time did I give each side,
 2   a week, I guess?  Is that the way --
 3        MR. GRANT:  Well, we've got eight trial days, Your Honor,
 4   and we'll split it up equally.  And, you know, it's up to you
 5   depending on how much time we get in during the day, but I don't
 6   have any concerns about that either.
 7        MS. PARKER:  So --
 8        THE COURT:  Okay.  Then -- go ahead.
 9        MS. PARKER:  I'm sorry.  I didn't mean to interrupt you.
10        So, just in terms of calculating that, will somebody keep
11   a clock or do we keep that ourselves or --
12        THE COURT:  All of the above.  We'll keep a clock and you
13   keep a clock; and at the end of each day we should make sure that
14   we sync up.  And at the end of each day, we should check to make
15   sure that the exhibits that each side has sponsored have been
16   admitted and that you and Ms. Miller all agree on the exhibits as
17   well as the time.
18        MR. GRANT:  So, apparently, they keep a clock, and it's
19   usually easy for them to work it out.
20        THE COURT:  Okay.  Good.  The unvaccinated issue, you
21   know, I've looked at that, and I've read a bunch of articles
22   from -- for those for and against excluding -- please, have a
23   seat -- the unvaccinated, and you know, I'm -- I don't think
24   there's been hard evidence that unvaccinated jurors are more or
25   less likely to be attracted by certain issues and, in particular,
```

54

```
 1   whether they would be more likely to be more kind to tobacco
 2   companies.
 3         You're both tobacco companies, so it's really kind of a
 4   nonissue, I think, because they're either going to like you or
 5   they're going to hate you based on the fact that they have
 6   children who are being introduced to chocolate-flavored vaping
 7   pens and that's something you're going to have to live with; and
 8   that's their perception, but that's going to be for both of you.
 9   And that's why you should settle the case.
10         And I will note that I saw that somebody spent $15 billion
11   buying some European company recently to foster its sales.  So --
12   but the bigger issue is that the COVID numbers have gone back up.
13   They're double from two weeks ago in Virginia; and Northern
14   Virginia is now a medium danger area and expected to continue to
15   climb for the next three or four weeks.
16         And the jurors are concerned with having unvaccinated
17   people in their jury room.  So -- and also it clearly raises the
18   risk that we'll get two or three days into a trial and a juror
19   tests positive and we're out for, you know, between five and ten
20   days.  And it's in the interest of the parties and the Court to
21   try and keep us all COVID-safe during the course of the trial,
22   and that is paramount in the Court's mind.
23         So we'll -- you know, we do our best to only let
24   vaccinated people in the courthouse.  We can't tell witnesses
25   they can't come in if they're -- or defendants, but -- if they're
```

55

1   in the general population, but we can narrow it to the extent we

2   can, otherwise.

3          What else do we have today?

4          MR. GRANT:  There's just one issue, Your Honor.  The

5   parties have done a good job of working out all the pretrial or

6   trial disclosures of witness lists and the like.  There's only

7   one issue we can't resolve, exchanging opening demonstratives.

8   We would like it to be Sunday night, or the night before,

9   whatever night that ends up being, at 6 p.m. so the parties have

10  a chance to talk.

11         They want to do it at 8 a.m. the morning of openings.

12  That seems to me too late either for us to try to work things out

13  or for us to be ready to bring the issues to you in a thoughtful

14  way.

15         THE COURT:  Yeah, I need you to produce them the night

16  before so that you can hit me at 8:00 in the morning or -- we

17  won't start until 10:00 on Tuesday now because the jury isn't

18  ready until 10:00, but I need to know if there's argument about

19  that, you know, at 9:00 on Tuesday morning so that I can resolve

20  it so we're not having the jury sit around.

21         You'll find very quickly, I really care about using the

22  jurors' time wisely, so we'll -- I think that Mr. Molster

23  probably told you, we'll start at 9, we'll have a mid-morning

24  break.  We'll break an hour for lunch, we'll have a mid-afternoon

25  break, and we'll go until 5:30 or 6, depending on whether we have

```
 1    a witness on the stand.

 2           Every time we have a break, after the jury goes back I'll

 3    ask, "Any issues doming up for the next witness or issues we need

 4    to raise," and we discuss them outside of the presence of the

 5    jury.

 6           When I come back in after a break, the jury is still in

 7    the jury room, I ask, "Is there anything that we need to talk

 8    about before we bring the jury in?"

 9           You know, evidentiary issues, objections to exhibits, all

10    of that stuff I want discussed outside of the presence of the

11    jury so we're not at sidebar all the time.  Jurors hate sidebars,

12    and for good reason, because it's information that they are not

13    getting that they probably think they should be getting.

14           So the trial, I think, runs a lot more smoothly and you

15    also get a chance to explain why you're objecting versus -- I

16    don't allow speaking objections, or I discourage speaking

17    objections, and this way you get a speaking objection if the

18    jury's not in the room.  So it's beneficial to you.  So, 6:00 the

19    night before.

20           MR. GRANT:  Thank you, Your Honor.

21           MR. MICHALIK:  Your Honor, I think we have two very

22    small -- well, one small item and one a little bit more important

23    item.  One is I think we agree with our friends that they will be

24    the plaintiffs and we will be the defendants in this case.

25           THE COURT:  Okay.
```

57

1          MR. MICHALIK:  Some of the pleadings, for example, on the

2     joint verdict form we've submitted I think has -- labels us as

3     very different things.  Is that something we will be able to

4     resolve before it goes to the jury and they see that there's

5     different party names for --

6          THE COURT:  Yeah, absolutely.

7          MR. MICHALIK:  Okay.

8          THE COURT:  Amend them to reflect that, and certainly we

9     can continue to work on those until the final verdict form goes

10    back.

11         MR. QUINLAN:  Okay.  Thank you.  The second item is how

12    the Court intends to treat confidential business information.

13    For example, we have some source code that is some Reynolds

14    source code and also the third-party vendors that provide some of

15    the parts of the products we make that are accused of

16    infringement, financial information, and other design

17    information.

18         We're preparing a motion pursuant to the local rule to

19    identify those exhibits that we believe -- we hope to keep the

20    treatment -- I'm sorry -- we hope to keep subject to confidential

21    treatment in advance of the trial so that you have a list of what

22    we would like to keep as confidential before it's offered into

23    evidence.  I think that's the timing that the local rules require

24    so we're preparing a motion along those lines.

25         THE COURT:  That's fine.  Thank you.  And what's testified

1    to in open court is going to remain open, so if somebody has a

2    lengthy code and you want to identify it by, you know, a surname

3    or something, then that's the time to do that in the testimony

4    because the testimony is going to -- it's going to be in the

5    public, it's going to remain in the public.

6         The documents themselves that you believe are

7    confidential, we can seal those up, and so they won't be made

8    available to the public, but not the testimony.

9         MR. MICHALIK:  Am I understanding you correctly, then,

10   that there won't be any sealing of the courtroom during the

11   testimony?

12        THE COURT:  No sealing of the courtroom.

13        MR. MICHALIK:  Thank you, Your Honor.

14        THE COURT:  Jury instructions.  You all submitted jury

15   instructions and worked hard on them, and long before I thought

16   about them, so thank you for that.

17        It occurs to me that Judge Gilstrap probably has a

18   standard set of instructions that he throws out in every case and

19   rarely probably detours from, and I thought I would either ask

20   you or call his chambers and ask for his instructions; but have

21   you all used his instructions and what do you think about them?

22        MR. GRANT:  We have, Your Honor.  I'm happy to get you a

23   set of them.  I don't think they're that controversial.  I also

24   don't think that they're all that different from the ones this

25   Court has used in the past.  To the extent the Court wanted to

```
 1   develop a standardized set of jury instructions, we could

 2   certainly use this as an opportunity to help create that.

 3           THE COURT:  Okay.  How do you --

 4           MR. MICHALIK:  Your Honor, I'd just add I think that the

 5   parties working together largely adopted the TecSec set of

 6   instructions that we both use as our basis with a slight

 7   variation from both sides to fit the facts of this case, at least

 8   as they view them.  And where there was not an instruction from

 9   TecSec that we thought was relevant, we adopted it from either a

10   standardized set of instructions from the Federal Circuit Bar

11   Association or some other one that folks --

12           MR. GRANT:  I think the only disputes we have are sort of

13   the substantive ones that you expect, you know, to have a handful

14   of in a case.

15           THE COURT:  Okay.

16           MR. MICHALIK:  I agree with that.

17           THE COURT:  Okay.  Then don't worry about Judge Gilstrap's

18   stuff.  Okay.

19           I'm sorry, Mr. Molster, you were on your way up.

20           MR. MOLSTER:  Yes, thank you, Your Honor.  Very minor

21   issue, but just in working on the logistics.  May we each have

22   one of the witness rooms to use for our --

23           THE COURT:  Yeah.  I think that's pretty standard.  Yeah,

24   absolutely.  And those will be, you know --

25           Ira, we lock those up at night and they can keep stuff in
```

```
 1    there if they want?

 2         THE COURT SECURITY OFFICER:  Sure.

 3         THE COURT:  I mean, obviously, if I have another matter,

 4    it will be before we start court or at lunch or afterwards if I'm

 5    going to try to get a plea in or something like that.  If that

 6    happens, I'll ask you to take your stuff off the front table.

 7         MR. MOLSTER:  Sure.

 8         THE COURT:  But otherwise, you're allowed to keep boxes

 9    and everything that you want to keep for the length of the trial

10    here in the courtroom and it will be locked up.

11         MR. MICHALIK:  And on the lunch for jurors, you're not

12    bringing in lunch; they're going to go out and they're going to

13    do whatever they're going to do for their hour?

14         THE COURT:  I've been actually -- you know, I don't know

15    if you saw that in the --

16         MR. MOLSTER:  I did.

17         THE COURT:  -- in the Reccless Tiger case, I brought in

18    lunch.  And I don't normally do it, but with COVID and with the

19    length of that trial, I did it for their convenience.  I'll give

20    them the option.  If they want to have lunch brought in, I'm

21    going to bring in lunch for them --

22         MR. MOLSTER:  Okay.

23         THE COURT:  -- and make it a little easier on them.  Okay?

24         MR. MOLSTER:  Okay.  How about us?  Just kidding, Your

25    Honor.
```

```
 1          MR. GRANT:  I think you could skip lunch.

 2          MR. MOLSTER:  I need to skip lunch.

 3          THE COURT:  Oh.

 4          MR. GRANT:  Sorry.  I'm sorry, Your honor.  That was a low

 5     blow, but only because he's a good friend.

 6          THE COURT:  Okay.  He's a very quick-witted guy.  You've

 7     got to be careful of that, throwing out those -- he'll come back

 8     at you.

 9          MR. MOLSTER:  I'm trying to bite my tongue, Your Honor.

10     It's all right.

11          THE COURT:  Well done.

12          Anything else today?

13          MR. GRANT:  Not for the plaintiffs, Your Honor.

14          THE COURT:  All right.  Keep working on settling that

15     case.

16          MR. MOLSTER:  Thank you, Your Honor.

17          THE COURT:  I appreciate you.  Have a good weekend and

18     we'll see you in a couple of weeks.  All right.  We're in recess.

19          (Proceedings adjourned at 3:30 p.m.)

20

21

22

23

24

25
```

1

2                    **C E R T I F I C A T E**

3

4                    I, Scott L. Wallace, RDR-CRR, certify that
    the foregoing is a correct transcript from the record of
5    proceedings in the above-entitled matter.

6
    /s/ Scott L. Wallace                    5/23/22
7    ---------------------------           ----------------
    **Scott L. Wallace, RDR, CRR**              **Date**
8      **Official Court Reporter**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25