```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   ---------------------------x
     PHILIP MORRIS PRODUCTS S.A.,:    Civil Action No.:
 4                                :   1:20-cv-393
                 Plaintiff,       :
 5        versus                  :   Friday, November 4, 2022
                                  :
 6   R.J. REYNOLDS VAPOR COMPANY,:    REDACTED TRANSCRIPT
                                  :
 7              Defendant.        :
     ---------------------------x
 8

 9          The above-entitled motions hearing was heard before
     the Honorable Leonie M. Brinkema, United States District
10   Judge.  This proceeding commenced at 10:26 a.m.

11                   A P P E A R A N C E S:

12   FOR THE PLAINTIFF:     MAXIMILIAN GRANT, ESQUIRE
                            LAWRENCE GOTTS, ESQUIRE
13                          JAMIE UNDERWOOD, ESQUIRE
                            LATHAM & WATKINS, LLP
14                          555 11th Street, NW
                            Suite 1000
15                          Washington, D.C.  20004
                            (202) 637-2200
16
                            BRETT SANDFORD, ESQUIRE
17                          LATHAM & WATKINS, LLP
                            140 Scott Drive
18                          Menlo Park, California  94025
                            (650) 328-4600
19
     FOR THE DEFENDANT:     CHARLES B. MOLSTER, III, ESQUIRE
20                          THE LAW OFFICES OF CHARLES B. MOLSTER,
                            III, PLLC
21                          2141 Wisconsin Avenue, NW
                            Suite M
22                          Washington, D.C.  20007
                            (703) 346-1505
23
                            JASON BURNETTE, ESQUIRE
24                          JONES DAY
                            1221 Peachtree Street, NE
                            Suite 400
25                          Atlanta, Georgia  30361
                            (404) 521-3939            1
```

REDACTED TRANSCRIPT

```
 1              A P P E A R A N C E S:   (Cont.)

 2   FOR THE DEFENDANT:     WILLIAM DEVITT, ESQUIRE
                            JONES DAY
 3                          110 North Wacker Drive
                            Suite 4800
 4                          Chicago, Illinois  60606
                            (312) 269-4240
 5
                            DAVID MAIORANA, ESQUIRE
 6                          JONES DAY
                            901 Lakeside Avenue
 7                          Cleveland, Ohio  44114
                            (216) 586-3939
 8
     COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
 9                          Official Court Reporter
                            United States District Court
10                          401 Courthouse Square
                            Alexandria, Virginia  22314
11                          (571) 298-1649
                            S.AustinReporting@gmail.com
12
             COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

```
 1                  P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Civil Action 20-393, Philip

 3    Morris Products S.A. versus R.J. Reynolds Vapor Company.

 4          Would counsel please note their appearances for

 5    the record.

 6          MR. GRANT:  Good morning, Your Honor.  Max Grant

 7    and Brett Sandford for Philip Morris.  We'll be the ones

 8    perhaps doing the talking or answering the questions.

 9          THE COURT:  "Perhaps."  I like that.  Yeah.

10          MR. GRANT:  Yeah.  Whatever your flavor is.

11          THE COURT:  All right.

12          MR. GRANT:  And Jamie Underwood and Larry Gotts

13    are with us as well.

14          THE COURT:  Good morning.

15          MR. GOTTS:  Good morning, Your Honor.

16          MR. BURNETTE:  Good morning, Your Honor.

17    Jason Burnette for R.J. Reynolds Vapor Company.  I have with

18    me my colleagues, William Devitt -- who you'll remember from

19    trial -- Dave Maiorana, and Mr. Charles Molster.

20          THE COURT:  Good morning.

21          MR. MOLSTER:  Good morning, Your Honor.

22          THE COURT:  All right.  Well, as you all know,

23    this is before the Court on the plaintiff's motion for a

24    permanent injunction, and, of course, in lieu of a permanent

25    injunction, we're also going to be addressing the issue of a
```
                                                             3

REDACTED TRANSCRIPT

```
 1   royalty.  But the injunction is, I think, the main issue
 2   that's before the Court today, and both sides have briefed
 3   this extensively.
 4           I have a couple of questions, Mr. Grant.  And I
 5   assume you're going to make the argument on behalf of the
 6   injunction?
 7           MR. GRANT:  I'm going to make the argument on
 8   behalf of the injunction.  My colleague will take care of
 9   the compulsory license, which is, depending on how the Court
10   views the injunction, a very important component of this.
11           THE COURT:  All right.  Well, as you know, under
12   the eBay case, the Court has four factors it has to consider
13   in determining whether or not injunction should be -- a
14   permanent injunction should be granted.  And the first issue
15   is whether there's irreparable injury.
16           This is a somewhat of a unique case in that we
17   actually don't have two competitors.  I know -- I mean, I
18   know these two companies compete, but in terms of the
19   product that's at issue in this case, I think the evidence
20   is quite clear that you do not currently sell a product that
21   would compete with the products involved in this litigation
22   in the United States, that you've not gotten permission from
23   the FDA.  And I think the one thing, the IQOS or -- how do
24   you pronounce that?
25           MR. GRANT:  IQOS.
```

4

```
 1              THE COURT:  IQOS.

 2              Is it still pending before the board?

 3              MR. GRANT:  It's still pending before the Federal

 4    Circuit.  But, Your Honor, what I would submit is -- I mean,

 5    the legal standard is clear that irreparable harm must be

 6    actual or imminent -- and this is taking from Reynolds'

 7    brief -- and that threat must be real or immediate.  There's

 8    no debate that IQOS was on the market and the products

 9    competed directly from 2019 to 2021.  And, as set forth in

10    our brief, the declaration from Dr. Gilchrist, manufacturing

11    is expected to begin in the United States in the first half

12    of 2023.  That's confirmed by earnings calls in July and

13    just two weeks ago from the most senior officers at Philip

14    Morris, the CEO and CFO, who committed to that same

15    timeline.

16              So what I would submit, Your Honor, is that step,

17    the U.S. manufacturing and distribution, that's entirely

18    within Philip Morris's control.  Particularly in the context

19    of patents that have 10 to 12 years of remaining life, that

20    return of the product to the U.S. market is imminent and

21    cognizable; it's not speculative.  It was previously on the

22    market, it's FDA approved, it was sold in U.S. test markets

23    and used by U.S. consumers, and it's been wildly successful

24    in other markets.  So all the evidence shows that will be

25    the case here, too.
```
                                                              5

```
 1              THE COURT:  Well, what's the status in the --

 2   before the Federal Circuit?

 3              MR. GRANT:  The Federal Circuit was argued on

 4   October 3rd, and it's been submitted for decision.  And, you

 5   know, the timing of that, as the Court probably knows better

 6   than I know, is on the order of, you know, three to

 7   six months.

 8              THE COURT:  All right.

 9              MR. GRANT:  But, to me, Your Honor, the focus is

10   on the issues that are entirely within Philip Morris's

11   control.  And, on that, I think, you know, the record that's

12   been submitted is unrebutted.  The unrebutted declaration

13   from Dr. Gilchrist says that domestic manufacturing is going

14   to start at the -- by the end of the first half of 2023.

15   And those statements and earnings calls -- which are not

16   statements that are taken lightly or made lightly by senior

17   company officers -- indicate that, by that same time frame,

18   they will have domestic manufacturing and distribution.

19              Now, if that's the case, then this fierce

20   competition -- I mean, the Court -- I don't have to belabor

21   with the Court, these companies have been competing for

22   150 years.

23              Now, what we know for sure is that their future

24   commercial success, their future competition, all depends on

25   not what they've done in the past; it depends on these
```

                                                                  6

1  alternatives to combustible cigarettes.  Those inhalable

2  alternatives, which are the ones consumers prefer, largely,

3  are e-cigarettes and heat-not-burn.  That's the views of

4  Alto and Solo G2 and IQOS.  And I would submit, under the

5  operative legal test of irreparable harm, which is that the

6  threat must be either immediate or imminent, that, under

7  these facts, the irreparable harm is certainly imminent, and

8  we satisfy that first prong of the *eBay* test.

9          THE COURT:  Okay.  And the next prong is whether

10  the remedies at law would be insufficient to compensate

11  plaintiff for its loss.

12          MR. GRANT:  Yeah.  Well -- so there's two

13  components to that, Your Honor.  One, numerous cases,

14  including *Douglas*, *Presidio*, *Bosch*, have found that there's

15  no adequate remedy at law.  And it's true that some of them

16  refer to this as a second prong; some of them refer to it as

17  part of the first prong.  Those prongs tend to get a little

18  conflated.  But requiring a company to compete with their

19  own patented technology, that is proof that there's no

20  adequate remedy at law.

21          Second of all, the *Douglas* case talks about an

22  increase in market share.  It's something that can't be

23  compensated by law.  Now, in *Douglas*, they talked about an

24  increase in market share that went from 0 percent to

25  5 percent.

7

1          Your Honor, in this case, Alto only was introduced

2    to the market in 2018 -- again, front-running the IQOS FDA

3    approval by a few months -- and it's gone to over 34 percent

4    market share.

5          Now, in a -- particularly in a market where brand

6    loyalty is as important as we know it is in this market,

7    that displacement of market share, that displacement of

8    consumers' preferences, before we've even had a chance to

9    compete with them squarely, there can't be an adequate

10   remedy at law.  Putting aside the loss of goodwill, the loss

11   of customers, the requirements to compete with our own

12   patented technology and the taking of market share before

13   we're able to do what the CEO and the CFO are committed to,

14   which is have U.S. domestic production and distribution in

15   the second half of next year for a 12-year life of the

16   patent, I think that shows you all you need to know, Your

17   Honor.

18          THE COURT:  Okay.  And what about the public

19   interest?

20          MR. GRANT:  Yeah.  So, look, the public interest

21   is pretty clear, Your Honor.  The public doesn't benefit

22   from competition that comes at the expense of a patentee's

23   investment-derived property right.

24          This case, in that sense, is a lot like *Apple*.  In

25   *Apple*, the Court made much of the fact that the patentee,

8

1  *Apple*, had invested billions of dollars in an untested

2  product in a new market.  That's exactly what's happened

3  here.

4        Now, I think we can all agree that the world would

5  be better off without combustible cigarettes.  These two

6  companies, certainly Philip Morris, is betting its entire

7  corporate future on that.  So, what's in the public

8  interest?  Well, what's in the public interest is to

9  encourage the 6 to $7 billion investment that Philip Morris

10  has made in order to continue to develop these products.

11        Now, the fact that we don't practice the patents

12  is, in no way, dispositive; what matters is that the

13  products are competitive.  And *Douglas* says that quite

14  clearly, and so does *Bosch*.  But what matters is encouraging

15  the innovation and encouraging the investment.  And, in this

16  case, we have a company that, you know, acquired the

17  technology from a preexisting company from overseas and

18  simply brought it to market with no changes, no alterations

19  whatsoever.  And that company has non-infringing

20  alternatives able.  Now, while that's normally considered in

21  the balance of harms, I would submit that it's also relevant

22  to public interest.

23        Now -- so we have the company that's made no

24  investment, acquired a technology and come out and is taking

25  significant market share, displacing the ability of a

9

1    company like ours to get its product into the hands of

2    consumers once that domestic manufacturing and distribution

3    comes online, and, in doing so, is eviscerating the benefit

4    of that heavy investment that Philip Morris has made in

5    technology that the FDA has found benefits the public health

6    as a whole.

7           THE COURT:  But, you know, that argument also cuts

8    a little bit against an injunction, because, as I understand

9    it, if the injunction were issued, that means defendant has

10   to stop selling that product.

11          MR. GRANT:  Correct.

12          THE COURT:  And, right now, you just finished

13   saying that that product represents about 34 -- almost a

14   third -- of the actual market.

15          MR. GRANT:  Yes.

16          THE COURT:  And the danger there, it seems to me,

17   it's a public health issue.  *Apple* only dealt with money,

18   but this deals with public health as a factor.  And that is

19   that if some of those customers who have been using the

20   defendant's product, without it available, go back and start

21   using regular cigarettes, we have a public health issue.

22          MR. GRANT:  Respectfully, Your Honor, let me see

23   if I can describe why that's the wrong conclusion to draw

24   from the correct facts.

25          First of all, in *Apple*, while we can say it was

                                                              10

REDACTED TRANSCRIPT

1    all about money, the failure to find irreparable harm was

2    determined to be clear error, and the failure to issue an

3    injunction in that case was found an abuse of discretion.

4    That's *Apple*.  This case, I think, is much stronger on that.

5              But here's the difference, Your Honor.  There's no

6    debate from the record in this case and from the parties'

7    overall litigation that consumers need alternatives to

8    combustible cigarettes, and there's a panoply of

9    alternatives.  The inhalable alternatives tend to be the

10   ones that we're focusing on.  Heat-not-burn is a distinct

11   category, and e-vapor is a distinct category.

12             There's no debate that there are numerous

13   alternatives to the Alto product and the Solo G2 product in

14   the e-vapor category.  Three of those alternatives come from

15   Reynolds' own portfolio of FDA-approved products.  And every

16   case that has looked at this issue, Your Honor, has said

17   that where a design-around is easy, or where there's a

18   non-infringing alternative available, then the balance

19   weighs heavily in favor of the innovator and the patentee to

20   require the infringer to simply switch to one of those

21   alternatives.  Now, there are specific pod-based and

22   cig-a-lookalike-based e-vapor alternatives that are

23   currently FDA approved and available to consumers.

24             So, the real issue is, what is it that's driving

25   Alto's success in the market?  So what we would submit, Your

11

REDACTED TRANSCRIPT

1  Honor, is what's driving its success is precisely what

2  Reynolds touts in its marketing materials and what Reynolds

3  touts in its internal documents, which are highly

4  influential in trying to determine the value of features,

5  it's the patented FEELM ceramic wick heater.

6          So it can't be the case that what's driving the

7  increase in market share, which is irreparable harm, is the

8  patented feature that we've developed and patented, which

9  they should not be allowed to use, and that would somehow

10  cut in the favor of them on public interest.  There are

11  non-infringing alternatives, three products are their own,

12  and there are other additional non-infringing e-vapor

13  alternatives on the market.

14          THE COURT:  All right.  Let me hear who's going to

15  respond.

16          MR. GRANT:  Thank you, Your Honor.

17          MR. BURNETTE:  Hello, Your Honor.  Jason Burnette.

18          There is no current or imminent irreparable harm

19  on this record.  The statement was just made that it's

20  entirely within Philip Morris's control to bring the

21  domestic manufacture of the IQOS product to the United

22  States.  That is not the case.

23          There is an exclusion order from the ITC that

24  prevents the importation of components for the IQOS device

25  into the United States.  The declaration from Dr. Gilchrist

12

REDACTED TRANSCRIPT

1    in this case simply says that Philip Morris has plans to

2    bring the manufacture of the device and/or components to the

3    United States.  There would still have to be further

4    proceedings in the commission to rescind that limited

5    exclusion order before Philip Morris could continue to

6    manufacture it.

7            THE COURT:  And that exclusion order is -- or the

8    exclusion proceeding has been going on since 2017; correct?

9    No, it's not that long?

10            MR. BURNETTE:  2020, as I'm told.

11            THE COURT:  2020.  Okay.

12            MR. BURNETTE:  Yes, Your Honor.

13            THE COURT:  Which is, what, still two years ago.

14            MR. BURNETTE:  Yes, Your Honor.

15            THE COURT:  Yeah.  Okay.

16            MR. BURNETTE:  And the Federal Circuit had

17    argument on the exclusion order itself.  But as to the

18    question of whether there is current irreparable harm, there

19    is no evidence of irreparable harm on this record.

20            You've heard the references to the earnings calls

21    as providing evidence of the imminentness of the plans to

22    move the manufacturing to the United States.  Those aren't

23    in earnings calls.  And the very exhibits that PM attached

24    to its reply brief include cautionary statements, the usual

25    forward-looking cautionary statements when making statements

13

REDACTED TRANSCRIPT

```
 1    to investors that actual results may vary.

 2             And Philip Morris has the burden on this motion to

 3    convince the Court that its harms are imminent.  And what

 4    did they provide the Court?  They provided a bare-bones

 5    declaration with one paragraph saying we expect -- we

 6    expect -- to domesticate the manufacture of the IQOS device

 7    or components.

 8             If they're going to domesticate the manufacture of

 9    a complex device like the IQOS and they have actual current

10    plans to do so, the Court would expect there to be

11    documents, emails, other written plans, and showing, in

12    detail, that those plans are actually under way and will

13    come to fruit in the first half of 2023.  You have not seen

14    such evidence, so it's not entirely within PM's control

15    because there are other actors who were involved, in

16    addition to the commission itself, which would have to rule

17    on whether what is being manufactured in the United States

18    will allow it to clear the Section 337 violation.

19             The facility that Philip Morris uses has to be

20    registered with the FDA.  There's all sorts of unknown

21    questions in this case about whether the manufacturing of

22    the IQOS product can actually be done at all in the United

23    States, and certainly within the time frame that has been

24    suggested.  And if you look at this record, you will see

25    that it is very, very thin.
```

Stephanie Austin, RPR, CRR USDC/EDVA (571) 298-1649

1             The harm to reputation as an innovator that has

2    been discussed, Philip Morris does not practice these

3    patents.  In the *Douglas* case that my friend mentioned to

4    you, the patentee in that case did practice those patents.

5    There was record evidence -- this is a quote from the

6    case -- record evidence of the patentee's reputation for

7    innovation and quality with snowplows.  That was the issue

8    in the *Douglas Dynamics* case, that there is no record

9    evidence of a reputation for innovation by Philip Morris,

10   and there could not be on the specific patented inventions

11   because they do not practice these patents.  There's never

12   been an assertion that their products do practice these

13   patents.

14             They've referred to the lost sales in the past to

15   show that they would suffer irreparable harm in loss of

16   market share.  The most noteworthy fact on that issue, Your

17   Honor, is that the evidence in the record, Exhibit 10 of our

18   motion, is the deposition testimony of Mr. Martin King.

19             So Philip Morris, the party here, does not

20   actually market the IQOS product in the United States; it

21   licenses it to Altria, an Altria subsidiary, PM USA, and

22   they are the ones that market the product, sell the product,

23   to consumers.  And their choice has been not to market the

24   IQOS product to e-cigarette users.

25             You heard Mr. Grant say that these are distinct

15

REDACTED TRANSCRIPT

```
 1   categories.  Well, that's true of how the product is sold in

 2   the United States.  When a customer goes into an IQOS store,

 3   they are asked whether they use alternatives to combustible

 4   cigarettes, including e-cigarettes.  And if they say that

 5   they do, they will not be sold an IQOS.  So how can it be

 6   that VUSE products, which are e-cigarette products, have

 7   taken sales from IQOS when the IQOS store will not sell an

 8   IQOS to a user who uses e-cigarettes like VUSE?

 9           And there's no causal nexus to connect the harms

10   that they allege to the patented features.  The claims for

11   the '265 patent were extremely narrow, the geometry of the

12   heater itself.  You heard Mr. Grant refer to the advertising

13   and promotional materials from Reynolds showing that they

14   promote the FEELM technology.  Well, we cited the *Riverbed*

15   case -- which is a District of Delaware decision -- and said

16   this is simply too tenuous looking at what the accused

17   infringer has prompted to establish causal nexus.  Because

18   the test for causal nexus is evidence that soundly supports

19   the inference that a significant number of purchasers have

20   made their purchasing decisions based on the patented

21   features.  There is no such evidence like that in this case.

22   The fact that an infringer may promote certain materials

23   doesn't mean that users actually buy them for that reason.

24           There was references to prerelease marketing

25   materials that were cited in Philip Morris's motions.  Those
```

                                                            16

REDACTED TRANSCRIPT

1    documents, of course, were prerelease.  There's nothing in

2    the evidence to show that after the Alto released, the basis

3    for its increasing sales was because of the heating

4    technology, or even the leakage prevention technology of the

5    '911 patent.  The most they have is to show that leakage

6    prevention was something that consumers complained about,

7    not that consumers bought the Solo product, for example,

8    because of leakage prevention.

9            And on the '265 patent, they don't have evidence

10   to show that that is what's actually driving consumer sales,

11   when it was one small component of the multi-component

12   device.

13           And Your Honor will see from the *eBay* case itself

14   and Justice Kennedy's concurrence, one of the factors that

15   weighs against an injunction is when the patent covers one

16   small component, and that is certainly the case here.  The

17   Alto was a multi-component device, and the '265 patent is

18   one small piece with narrow claims related to a larger

19   product.

20           On the question of remedy -- adequacy of damages

21   at law, that goes back to the point I was making that PM is

22   merely a licenser here.  It does not market and did not

23   market the IQOS product in the United States.  So its harms

24   are readily -- are readily redressed with monetary damages.

25   And you can look at the *ActiveVideo* case from the Federal

17

REDACTED TRANSCRIPT

1  Circuit, which is similar circumstances, where ActiveVideo,

2  while it was seeking a permanent injunction, which was

3  reversed by the Federal Circuit, because ActiveVideo

4  licensed its technology to Cablevision.  Cablevision was the

5  entity that was competing against Verizon.  What

6  ActiveVideo's harms were was the loss of the royalty from

7  the -- by Cablevision's sales.  That's exactly what Philip

8  Morris loses in this case.  When there's a sale lost in the

9  United States, it doesn't receive a royalty or a per-unit

10  revenue.  That's adequately compensated by money damages at

11  law.

12         We didn't mention the balance of hardships, but I

13  do want to touch it on briefly, because Reynolds Vapor

14  Company, 95 percent of its business comes from this product.

15  There's a suggestion that they could start selling or switch

16  users to the other three products that are the cig-a-like

17  products.  But you have the declaration from Ms. Christy

18  Canary-Garner that there's no basis to think that users

19  would switch back to that cig-a-like form factor, which are

20  the Solo, the Ciro and the Vibe products.  When Juul came on

21  the market, the market changed.  Now users want these

22  pod-style e-cigarette products, which Alto is one.  So

23  there's no reason to think that users would switch to these

24  other products, which takes me to the public health factor

25  that Your Honor mentioned.

18

REDACTED TRANSCRIPT

1              There are four and a half million users of the

2    VUSE product.  It is a successful e-cigarette product.

3    The -- both sides agree on the record in this case that

4    e-cigarettes are the most successful quit smoking aid

5    currently available to consumers.  And taking this product

6    off the market, as Your Honor recognized, runs the very real

7    potential risk that those users will not switch to some

8    other product, but will, instead, go back to conventional

9    cigarettes, which everyone agrees here carries far more

10   risks than e-cigarette products, Your Honor.

11              THE COURT:  All right.  Thank you.

12              MR. BURNETTE:  Okay.  Thank you.

13              MR. GRANT:  Very briefly?

14              THE COURT:  Yes, go ahead.

15              MR. GRANT:  Thank you, Your Honor.

16              With regards to practicing the patents, Your

17   Honor, the *Presidio* case, you know, found it error to find

18   no irreparable harm and an abuse of discretion not to issue

19   an injunction in light of customers in the same markets --

20   competition for customers in the same markets, evidence of

21   direct competition and unwillingness to license.  The

22   District Court put too much weight on the "did not

23   practice."

24              With regard to the feature, the website continues

25   to tout the innovating heating element, and it only -- it

                                                              19

REDACTED TRANSCRIPT

```
 1   need be -- it doesn't need to be the only basis of demand,

 2   just -- per the Apple case, there just needs to be some

 3   connection to demand, and it would be important if that

 4   product -- or that feature was absent, that would make it

 5   less desirable.

 6            With regard to the licensing issue, Your Honor,

 7   I'm -- respectfully, Reynolds is inviting legal error.  Voda

 8   and ActiveVideo are totally off point.  Those are the cases

 9   where there was only licensing.  This case is like Broadcom.

10   The lost sales, the revenue, the customer loyalty, that's

11   borne by Philip Morris, not by Altria.

12            The fact that other entities may also be harmed

13   has no impact on the analysis because the reputation, the

14   investment and the patents, that harm and the destruction of

15   that investment that Philip Morris made, goes and is borne

16   solely by Philip Morris.

17            And with regards to non-infringing alternatives,

18   as Ms. Ehrlich's declaration states, there are plenty of

19   alternatives, including a pod-based alternative that's FDA

20   approved, which is the NJOY e-cigarette.  Regardless, that

21   whole theory that you get to build a successful business and

22   that the success of the business is the basis to deny an

23   injunction in the face of infringement is the opposite of

24   what the law considers to be in the public interest.

25            THE COURT:  All right.  Thank you.
```

REDACTED TRANSCRIPT

```
 1          So obviously, if the Court denies your motion for

 2   a permanent injunction, then the next thing we have to

 3   consider is what a reasonable royalty would be that allows

 4   you to get a reasonable compensation and still allows

 5   Reynolds to have a reasonable profit.  All right.

 6          And my understanding is that the bottom line that

 7   you're seeking in this litigation is -- your request is for

 8   a 33.5 percent running royalty on the Alto, and 3.75 on the

 9   Solo G2; is that correct?

10          MR. GRANT:  It is, Your Honor.

11          THE COURT:  All right.  All right.  And the

12   defendant's position on this is you'd like the Court to

13   impose the same royalty which the jury found, which would be

14   .6 percent on the Alto and 2 percent on the G2?

15          MR. BURNETTE:  That is correct, Your Honor.

16          THE COURT:  All right.  So I know what your

17   positions are.  I'll give you each a few minutes to

18   highlight the basis for those arguments.

19          MR. SANDFORD:  Good morning, Your Honor.

20   Brett Sandford on behalf of Philip Morris.  May I begin?

21          THE COURT:  Yes, sir.

22          MR. SANDFORD:  Your Honor framed the issue

23   correctly.  The key question for the Court is how is Philip

24   Morris going to be compensated, not necessarily for a

25   reasonable royalty, but for a post-verdict royalty for
```

21

REDACTED TRANSCRIPT

1   giving up the right to exclude, that right to exclusivity

2   that it has in its patents, and what would leave Reynolds

3   with a reasonable profit.

4            And, Your Honor, I think it really boils down to

5   four key issues, but I want to put some context behind those

6   issues that I think really frame what the equitable result

7   is for the ongoing royalty.

8            Now, since the jury reached its verdict in June,

9   based on the sales data that we know from 2022, Reynolds has

10  sold about $388 million in infringing Alto cartridges.  Now,

11  just to make that a little bit more digestible, that's about

12  $4 million in infringing sales per business day.  So an

13  ongoing royalty, just like the injunction, is an equitable

14  remedy.

15           And the key question that the Court just

16  articulated, the answer to that is not adopting the jury's

17  pre-verdict royalty rates, as Reynolds asked the Court to

18  do, and would allow Reynolds to retain 99 percent of those

19  $4 million per business day in sales.  That's the profit

20  they want.  They want to retain 98.6 percent, to be

21  specific, of the profits over the next 12 years on the '265

22  patent.  That is not an equitable result.  It would also be

23  a legal error.  To reach that result would require the Court

24  to ignore the changed circumstances.

25           And what's clear from the Federal Circuit cases

                                                            22

REDACTED TRANSCRIPT

1    cited in our brief -- from *ActiveVideo*, which they rely

2    heavily on, *Amado*, *XY*, *Arctic Cat* -- it's an abuse of

3    discretion for the Court to ignore those post-verdict

4    changed circumstances and the significant change in

5    bargaining positions and just look to the jury's rate.  That

6    is clear from the Federal Circuit.

7            The right path is a profit-sharing approach.  The

8    methodology would be different because the circumstances

9    have fundamentally changed since the August 2018

10   hypothetical negotiation.  And, frankly, since the jury

11   verdict.

12           This is a very unique situation.  I believe Your

13   Honor started off the hearing that this is a very unique

14   case.  It is.  The Alto's success has been tremendous.  Over

15   the last year, the data that the jury did not consider, the

16   profitability, the ██████████████████, it is very

17   unique, and it is coming at the expense of taking, in a

18   compulsory license, Philip Morris's exclusive right.  A

19   company that doesn't license their patents, particularly to

20   competitors -- these patents to competitors like Reynolds,

21   and they want to take it, and they want to retain 99 percent

22   of the profits.  It's just not equitable, Your Honor.

23           I just want to highlight and dig into some of

24   those cases a little bit more and start with the first of

25   the four key issues, and that is the fundamental difference

                                                              23

REDACTED TRANSCRIPT

1   in the methodologies.  Reynolds' approach boils down to the

2   hypothetical negotiation pre-verdict; that's a willing

3   licensor/willing licensee determining what the pre-verdict

4   royalty should be.

5           The Federal Circuit told us, starting in *Amado* and

6   consistently since then, that the circumstances now are

7   fundamentally different.  In *Amado*, the Federal Circuit

8   "easily disposed of the trial Court's escrow payment of

9   four cents per infringing unit, finding that it was based on

10  infringing pre-verdict conduct, which is irrelevant to the

11  post-verdict negotiation."

12          In *ActiveVideo*, the District Court rejected

13  exactly what Reynolds asked the Court to do here, use the

14  agreement between the patentee and a third-party licensee,

15  rejected that, found it improper.  The Federal Circuit

16  affirmed and adopted the profit-sharing approach that Philip

17  Morris submits is proper in this case.

18          Again, *XY*, the same thing, used a pre-verdict

19  license to base the royalty, and the District Court actually

20  lowered the jury's royalty in that case.  The Federal

21  Circuit reversed, found an abuse of discretion because it

22  was, one, already considered by the jury; and, two, does not

23  consider the changed circumstances.  That's on all fours

24  with what Reynolds is asking this Court to do.  Reynolds is

25  marching this Court down a path of legal error by urging on

                                                                24

REDACTED TRANSCRIPT

1    the jury's pre-verdict rates, Your Honor.

2              And from a factual matter, that license, Reynolds

3    disclaimed validity infringement, it didn't consider

4    willfulness, it licensed both cartridges and devices, that's

5    the battery part, and Alto's sales in 2018 were completely

6    unknown when that case -- when that agreement was entered in

7    September of 2018.

8              Here, we know from the verdict that validity and

9    liability are established.  There can be no question that

10   willfulness post verdict is established.  We know, and

11   there's been no dispute that Alto is extremely successful,

12   both from a profitability and a revenue perspective.  And

13   the license -- prospective license would only be for

14   cartridges.  It's both legally and factually improper to

15   adopt Reynolds' position in this case, Your Honor.

16             So what does that lead us to?  Well, there's no

17   dispute that the circumstances have changed.  They admit on

18   page 12 of their opposition that the Federal Circuit has

19   recognized that a jury verdict is a substantial shift in the

20   bargaining positions.  If they don't shift their rate at all

21   and they don't identify any offsetting factors, it can't be

22   the right result.

23             The right path is to follow what the Federal

24   Circuit did in *ActiveVideo*, what the District Court did in

25   *Joyal*, and what -- the Federal Circuit's reasoning in *Arctic*

25

REDACTED TRANSCRIPT

1   *Cat*, two of which were affirmed as a proper use of the

2   Court's equitable discretion.

3           I want to briefly turn to those cases because

4   they're highly instructive.

5           In *ActiveVideo*, the Court looked at the

6   incremental profit margin of $6.86.  It looked at

7   post-verdict, with this change of circumstances, how would

8   you divvy that up.  And the Court said, well, here, Verizon

9   has a non-infringing alternative, and while they don't know

10  when it's going to come, that would lower the rate to

11  40 percent.  So we'll give -- let Verizon keep 60 percent of

12  the profits, patentee gets 40.  Verizon objected, said

13  that's a flawed methodology and said it's too high, we would

14  never agree to that.  And the Federal Circuit affirmed the

15  Court's decision, said it was well reasoned, and said

16  exactly what I suspect we'll hear from Reynolds based on

17  their briefing, it's too high, it's wildly disproportionate,

18  reject it.  While it -- the Court said, while it may seem

19  high, the circumstances have fundamentally changed.  This is

20  a totally different position than where we were pre verdict.

21          Reynolds, unlike Verizon, has no design-around.

22  And even if they could, they would need FDA authorization.

23  And there was also no willfulness here -- in the

24  *Verizon/ActiveVideo* case where, here, post-verdict

25  willfulness is established.  So the facts here are even

26

REDACTED TRANSCRIPT

1    stronger than *ActiveVideo*, Your Honor.

2         *Joyal* corroborates that, allocates 100 percent of

3    the profits to the patentee using the infringer's net

4    operating profit margin from the most recent fiscal year.

5    Here, there's no dispute the calculations, Mr. Meyer, our

6    damages expert did, are only from 2022.  He properly looked

7    at the post-verdict data, the most recent data under *Joyal*

8    and *ActiveVideo*, which is appropriate to do, and he did the

9    calculations.  There's no dispute as to the calculations;

10   there's only a dispute from Reynolds as to these adjustments

11   that they are now making for the first time.

12        So, under *ActiveVideo* and *Joyal*, the right result

13   is a profit-sharing approach.  We would submit, Your Honor,

14   that the right split, based on the negotiating stance, is

15   50/50 for the '265 patent, and then that should be enhanced

16   by 50 percent.

17        And one more point on the profit sharing, Your

18   Honor.  I want to -- I think this could have been better

19   highlighted in the briefing, so I want to make it clear,

20   because it's important.

21        *Arctic Cat*, Your Honor, is on point for what the

22   Court has to consider here.  In *Arctic Cat*, the patentee

23   requested a $210 post verdict -- per jet ski post-verdict

24   royalty.  The infringer objected to that, wanted the

25   pre-verdict royalty rate.  And they also objected and said,

27

REDACTED TRANSCRIPT

1    whoa, that would eat up all of our profits; we would never

2    agree to that.  The Court rejected that, said the Federal

3    Circuit has affirmed at margins near or above; said, in

4    these circumstances of post verdict, the situation has

5    fundamentally changed.  And if you want to make more

6    profits, you can pass those costs along, you could change

7    your business, but what you can't do is you can't infringe

8    and then claim, well, this doesn't leave us with enough

9    money.  That's not equitable, because the purpose of this

10   remedy is to disincentivize infringement.  It's judicial

11   economy.  And to adopt Reynolds' request would just

12   incentivize infringement, Your Honor.  And that decision,

13   again, was affirmed by the Federal Circuit as a proper use

14   of the Court's discretion.

15          Finally, very briefly on the *Read* factors.  Your

16   Honor's familiar with the trial record and the record of

17   this case.  I would just point out that three of the factors

18   are not disputed.  They didn't dispute the other

19   considerations.  Really, one of the factors that they

20   disputed, which is the behavior as the party in the

21   litigation, Your Honor is familiar with the sanctions order

22   that we discussed.  The argument -- only argument on that

23   that we heard was that, well, we were already sanctioned, so

24   don't consider it again.  That's just wrong on the law, Your

25   Honor.  And so we would submit that the proper enhancement

28

```
1   is 50 percent on top of that 22.3 percent baseline, which is

2   how we arrived at the 33.5 percent total post-verdict

3   royalty rate.

4              THE COURT:  All right.

5              MR. SANDFORD:  Finally, Your Honor, I just want to

6   end with --

7              THE COURT:  Hold on a second, though.

8              You know, it's interesting.  The G2 kind of gets

9   lost in all this.  Do you also want to explain why you've

10  come up with the recommendation on the G2 to be 3.75?

11             MR. SANDFORD:  Yeah.  Yes, Your Honor.

12             So the G2 is pretty straightforward.  So Your

13  Honor started with the question of what would you give up --

14  what would compensate you for giving you right to exclude,

15  yet allow them to make a profit.  The record is, I think,

16  undisputed that on the Solo G2, they're not earning a

17  profit, right.

18             THE COURT:  Right.

19             MR. SANDFORD:  So it's a question we can't answer

20  in terms of profitability.  Otherwise, you could use the

21  methodology that we used for the Alto and apply it for the

22  G2.

23             So what we submit is the right answer is that

24  there's no real dispute that the circumstances have changed

25  because we have a jury verdict, and so that's where the
```

                                                                    29

REDACTED TRANSCRIPT

1   increase comes from the 2 percent baseline to 2.5 percent,

2   and then the --

3              THE COURT:  But is there any evidence that the --

4   that the lack of profit has changed?  In other words --

5              MR. SANDFORD:  The lack of profit.

6              THE COURT:  Well, my understanding from the record

7   is that the G2 is not showing a profit.

8              MR. SANDFORD:  Based on the 2022 sales data,

9   that's our understanding, correct, Your Honor.

10             THE COURT:  Okay.  So you're talking about equity.

11  I mean, the jury found a 2 percent royalty appropriate on

12  the data that was before it then.

13             MR. SANDFORD:  Correct.

14             THE COURT:  And I think even then the data was

15  that it wasn't making a profit.  I'd have to check my notes

16  on that.

17             MR. SANDFORD:  Your Honor, I believe -- I mean,

18  the profits change year to year.

19             THE COURT:  Yeah.

20             MR. SANDFORD:  I don't recall offhand is the

21  correct answer.

22             THE COURT:  So what would the rationale be for

23  change for that particular product?

24             MR. SANDFORD:  Well, two things, Your Honor.

25  There's different methodologies you can use to arrive at

30

1  different baseline royalty rates.  Where, here, we're using

2  two different methodologies.  One is a profit sharing for

3  the Alto and the '265, and the other is an increase that

4  just accounts for the only changed circumstances.  Because

5  the Federal Circuit's been clear that if you're going to

6  change it, it's got to be grounded in the economics, the

7  markets, the profitability and the bargaining positions that

8  have changed since the jury verdict.

9          In our view, when you look at the '911, from the

10 commercial standpoint, not much has changed.  They weren't

11 selling a lot, as Your Honor mentioned, pre verdict, and

12 they're still not selling a lot post verdict.  And so the

13 only circumstance that would change -- well, two, in terms

14 of the post-verdict negotiation, would be, one, we now have

15 a stronger negotiating posture due to the verdict, and

16 there's willful infringement post verdict, and so that's the

17 enhancement side of it.  So we've focused on, as the law

18 compels us to do, what has changed.  And the answer for that

19 is there's -- not very much has changed for the '911, and

20 there's no real opposition on that.  They just say the

21 jury's verdict was generous, so you should give it to them

22 again.  And that's not based in any law that I'm aware of,

23 Your Honor.

24         THE COURT:  All right.

25         MR. SANDFORD:  Thank you.

31

REDACTED TRANSCRIPT

```
 1              THE COURT:  Who's going to respond?  Mr. Burnette,

 2   you're doing this one, too?

 3              MR. BURNETTE:  I'm sorry, Your Honor?

 4              THE COURT:  You're going to do this one as well?

 5              MR. BURNETTE:  Yes, I am, Your Honor.  I'm doing

 6   double duty for this argument.

 7              This issue reminds me of the rule in Ancient

 8   Athens where the jury could only decide -- could only pick

 9   the litigants' positions.  You know, they couldn't come up

10   with their own resolution of the issue, so that incentivized

11   the litigants to be reasonable in the positions that they

12   put forward to the jury in Ancient Athens.

13              But that's not the case for Your Honor.  We have

14   made positions for the Court, but Your Honor gets to decide

15   what should be the ongoing royalty rate.  The issues here

16   are, it's still governed by patent damages law.  So it's a

17   post-verdict ongoing royalty, but patent damages law still

18   applies.

19              So, for example, you heard a reference at the

20   beginning of the presentation that we -- Reynolds makes

21   $4 million of infringing sales per day.  There's never been

22   any claim to all of Reynolds' sales.  That's the entire

23   market value rule.  In this case, there's a component of the

24   Alto device, for example, and there was apportionment at

25   trial that the jury heard to determine what the value of
```

```
 1    that component would be.  There has been no effort at
 2    apportionment in the profit split approach that has been
 3    presented to this Court after the verdict.  Absolutely none.
 4    There still has to be apportionment.  The 50 percent split
 5    of the profit was suggested in the reply brief as fair
 6    apportionment, but there's no economic analysis to show that
 7    that is apportionment.
 8              What is the basis for an apportioned award?  It's
 9    the jury's verdict.  At the trial, the jury was presented
10    with evidence of the market-based approach based on
11    licenses.  And Mr. Meyer presented to the jury his testimony
12    that the -- these two entities, at the hypothetical
13    negotiation, would have used the Fontem-Reynolds agreement.
14    He determined that that agreement was worth a certain
15    percentage -- that I'm not going to say just to avoid some
16    sealing issues -- and that he applied the apportionment for
17    Mr. McAlexander, their technical damages expert, that said
18    that the '265 patented heater was worth 10 percent of the
19    Fontem portfolio.  And so he took that starting percentage,
20    took 10 percent of that percentage to get to an apportioned
21    value, and then used the Georgia-Pacific factors to bump it
22    up to the .6 percent, which, no dispute, that is what the
23    jury accepted as the basis for damages in this case.
24              That is an apportioned rate that Philip Morris
25    presented to the jury as the basis for full compensation for
```

                                                                33

REDACTED TRANSCRIPT

1   past damages.  That should be the starting point for the

2   Court's analysis.  And there are many courts that have said

3   that.  That is an apportioned basis for an ongoing royalty.

4   The alternative approach that has been suggested based on a

5   profit split has no apportionment.  And, Your Honor, I do

6   think it would be legal error.  I haven't thrown out that

7   word very much, but I think if the Court were to award an

8   ongoing royalty that has no basis in apportionment, which is

9   a requirement, that would be a problem.  And it's PM's

10  burden, and PM came forward with an approach that did not

11  apportion, and they said, well, we're only taking

12  50 percent, so that's apportionment.  That's the rule of

13  thumb.

14          You know, we cited the *VirnetX* case, which has a

15  50/50 split, and the Federal Circuit said, no, that's the

16  same kind of 25 percent rule of thumb that we long ago said

17  was no longer tied to the facts.  Just saying 50 percent is

18  not tied to the facts of apportionment.  We know what an

19  apportioned rate is in this case because it was presented to

20  the jury.

21          Now, it is true, and we acknowledged in our brief,

22  that once you start with the jury's rate, you have to

23  consider the substantial change and the bargaining position

24  of the parties as a result of the verdict.  Now, that may

25  mean that you would increase the rate.  We cited many

34

REDACTED TRANSCRIPT

```
 1    decisions by many courts where they did not increase the
 2    rate, even acknowledging that the Federal Circuit has said
 3    that.
 4            So I'm not -- we are not asking you to ignore the
 5    change in the bargaining position.  We acknowledge that
 6    change.  But we did cite these decisions that,
 7    notwithstanding that fact, have awarded an ongoing royalty
 8    rate at the amount of the jury's rate.  And for that, you
 9    should look to see what the changed circumstances have been
10    after the first hypothetical negotiation.  And, for that
11    point, we simply noted that there hasn't been much of a
12    change.
13            The evidence before the jury in the first -- in
14    the trial was that Alto's sales were increasing.  The
15    evidence was presented that VEEV coming on the market
16    increases the competition.  But the -- Reynolds knew about
17    VEEV.  Reynolds knew VEEV was out there and could some day
18    come on the market in the United States.  That's still the
19    facts as they are today.  So there may be some basis for
20    enhancing the rate, but certainly not the rates that have
21    been requested here.
22            THE COURT:  All right.  Now, one of the things
23    that Mr. Meyer has in his report is a discussion that in
24    your -- in the post-verdict conduct of Reynolds, that has
25    been willful because you were on notice from the jury
```

35

REDACTED TRANSCRIPT

1   decision that you are infringing patents that are valid.

2   And so he has one chart towards the end of his report where

3   he suggests a three -- a three-time factor.  In other words,

4   multiplying the .6 by three to address a willful violation.

5           Do you want to address that?

6           MR. BURNETTE:  Yes, Your Honor.

7           So I don't believe that enhancement for

8   willfulness is legally supported, but I think a similar

9   enhancement based on changed circumstances would be legally

10  supportable.

11          And I know it sounds like I'm splitting hairs, but

12  the point is, the willfulness inquiry is not the inquiry

13  here.  And that's what the Federal Circuit said in the *Amado*

14  case, where there was an escrow royalty to be paid while an

15  injunction was entered.

16          The Federal Circuit said, well, the infringer's

17  not wilfully infringing; it's paying a royalty pursuant to

18  court order.  And there are many cases that we've cited.  A

19  wilful infringer is a company or a person who conceals its

20  infringement, uses the technology and does not pay the

21  patentee.

22          What we're asking for here is the opportunity to

23  continue selling the product and to pay the patentee.  That

24  is not willful infringement.  And since 2016, the question

25  of enhancing for willful infringement has been governed by

                                                          36

REDACTED TRANSCRIPT

```
 1    the Halo case and the Halo standard.  It requires egregious

 2    infringement behavior; it's not just willfulness.  So I

 3    think the 3 percent -- trebling would be not justifiable on

 4    the basis of willfulness.

 5          The Court could consider the substantial change in

 6    the bargaining position and other changed circumstances to

 7    arrive at a rate, but I don't believe willfulness, per se,

 8    is the actual issue there.

 9          And Philip Morris is asking for rates that are,

10    you know, if you don't include willfulness, would be 37

11    times the jury rate; and if you did include willfulness,

12    would be 56 times the jury rate.

13          Even the cases that my friend has presented to

14    you, those rates were far lower than that.  ActiveVideo was

15    actually a 2.4-times increase over the jury's rate.  Joyal

16    was a 3.25-times increase over the jury's rate.  That's the

17    highest enhancement that any of the parties -- in any case

18    any of the parties have cited, 3.25 percent.  And, in that

19    case, in Joyal, it was like a five- or six-month royalty

20    until an injunction was going to be entered.  And the

21    defendant in that case admitted willfulness.  So it was an

22    admitted willful infringer from the beginning of trial.  And

23    the patent holder was no longer a going concern.  It was

24    trying to sell its patents.  It didn't have a company left.

25    And so those were the facts that justified increasing the
```

REDACTED TRANSCRIPT

 1   rate by 3.25 percent in *Joyal*, which are not the facts here.

 2   And in the *Arctic Cat* case, which was mentioned, that was a

 3   two-times increase.

 4          So the amount of the increase that Philip Morris

 5   is requesting is not supported in the law.  And the

 6   fundamental approach to the ongoing royalty question, I

 7   respectfully submit, is not appropriate because it does not

 8   take into account patent damages laws requirements, which

 9   includes the apportionment requirement, and there has been

10   no suggestion that the profit-split approach does apportion.

11          You know that this jury was very attentive,

12   listened to the evidence, made some very precise

13   distinctions among the patents and what the parties were

14   arguing, and they considered the evidence as to damages, and

15   these were the rates that that jury awarded as full

16   compensation to PM.

17          THE COURT:  And they were the rates that were

18   cited by the plaintiff's expert.

19          MR. BURNETTE:  Yes.  Those were the exact rates.

20   You remember the slide that was on the screen?  I think it's

21   one of the exhibits to the briefs here.  .6 and point -- and

22   2 percent were presented directly to the jury.  Remember,

23   the jury asked for the profit and loss information so they

24   could go back and figure out, well, how much would that mean

25   for the '911 patent, because we don't think the Alto

                                                            38

REDACTED TRANSCRIPT

```
 1    infringes the '911 patent, but we think the Solo does.  And
 2    we had to point them to the exhibit so they could apply the
 3    rate to the net-based sales.
 4            And one reason that you don't have the information
 5    about the '911 patent as to profits, it goes back to this
 6    point:  Mr. Meyer did not present to the jury a
 7    profit-split-based methodology; he presented a methodology
 8    based on the market-comparable licenses, and that's what the
 9    jury had.  And he did that because there was apportionment
10    available from those licenses to show, what is the '265
11    patent worth?  It's worth 10 percent of the Fontem patent.
12    And so that's how apportionment was resolved, without
13    dispute, in the trial.
14            Here, there's no basis to decide what the
15    apportionment should be.  And that's why we don't have the
16    evidence of the profitability of the Solo product because,
17    at trial, the question was, well, just what is the base?
18    It's not the profits; it's, what is the amount of net sales
19    to which we would apply the rate?  So profits weren't a
20    concern.
21            THE COURT:  All right.  Thank you.
22            MR. BURNETTE:  Thank you, Your Honor.
23            MR. SANDFORD:  Very briefly, Your Honor.
24            Let me address four points.  I'll start with the
25    apportionment and the patent damages law argument you heard.
```

REDACTED TRANSCRIPT

```
 1      That was the only time I believe Mr. Burnette said it would

 2      be legal error, but he cited no case, other than VirnetX, to

 3      support that argument.  Because every case cited in their

 4      brief is a pre-verdict damages case:  ResQNet,

 5      LaserDynamics, VirnetX.  Those are all well-established,

 6      well-known patent damages cases in the pre-verdict,

 7      reasonable royalty, willing licensor/willing licensee

 8      contexts.  The Federal Circuit's been clear in Amado,

 9      ActiveVideo, XY, Arctic Cat; it doesn't apply.

10              And I'll just point the Court's attention to one

11      quote from XY where the patentee presented a comparable

12      license at trial.  For the ongoing royalty, the District

13      Court adopted that and then lowered it.  And the Federal

14      Circuit reversed, finding it an abuse of discretion and said

15      it is, therefore, not relevant -- referring to the license

16      rate, pre-verdict comparable license -- not relevant to

17      assessing any changed circumstances that could alter a

18      hypothetical negotiation after the jury's verdict.  That's

19      exactly what Reynolds is asking the Court to do here.

20              And on the apportionment, Your Honor, putting

21      aside what they don't cite, Joyal and ActiveVideo, there was

22      no apportionment in either of those, and ActiveVideo was

23      affirmed by the Federal Circuit.

24              So there's not a single case, District Court or

25      Federal Circuit, supporting the notion that apportionment --
```

40

REDACTED TRANSCRIPT

1    the traditional apportionment -- is required post verdict.

2    And that makes sense because it's a totally different

3    negotiation.

4         And Mr. Burnette also suggested that, well, it was

5    only a 2.74 percent increase in *Joyal* and *ActiveVideo*.  Your

6    Honor, that's just wrong, because what Reynolds is doing to

7    get these big multipliers to make it sound wildly

8    disproportionate, as they say, is adopting the jury's

9    starting rate and comparing that to where the Court ended

10   up.  But in *Joyal* and *ActiveVideo*, that's not what the Court

11   did.  The Court looked at profits, and then either gave

12   100 percent or gave 40 percent.

13        True, he's 100 percent right that if you look at

14   the jury's pre-verdict rate and compare it to where the

15   Court ended up, that he's right on the percentages, but

16   that's irrelevant, because the proper methodology that's

17   been affirmed by the Federal Circuit is not to start with

18   that.  You can use a profit-sharing approach, and that's

19   just a function of the numbers.  And the fact is -- and it's

20   not disputed -- that they've -- that's their profits,

21   ██████████████ in the first six months of 2022.  It's a

22   function of the numbers.  So comparing that to the jury's

23   verdict rate and saying this is disproportionate, it's just

24   a bit misleading, Your Honor.

25        The second point is on this willfulness.  There's

41

REDACTED TRANSCRIPT

```
1    no case that I'm aware of -- and just for the record, the
2    correct standard is intentional infringement, not the
3    egregious infringement that Mr. Burnette cited.  But,
4    putting that aside, there's not a case that I'm aware of
5    that says willfulness is improper in the post-verdict
6    negotiation.
7            The two cases they cite, Amado and ActiveVideo,
8    they were Court-ordered stays.  So the Court ordered a
9    limited stay and authorized the infringement for a limited
10   period and said that's not wilful.  And we agree; that's not
11   the situation here.  And if you look at the cases cited in
12   our brief, it's clear, there's -- this is a completely
13   different situation where you're forcing the patentee to
14   take a compulsory license and taking their right of
15   exclusivity.  That is the definition of an intentional
16   infringement.
17           And we take a step back, and why is that?  Because
18   seeking an ongoing royalty is judicial economy.  We don't
19   have to seek it.  If we went and filed another suit in a
20   couple months and infringement would be established, they
21   couldn't challenge it, validity established, they couldn't
22   challenge it, they didn't even present the defense at trial,
23   and willfulness would be no question.  There would be a jury
24   verdict.  We would move for summary judgment.  I would
25   submit that there would be no Rule 11 basis to oppose that.
```

1    So why should the patentee be punished for engaging in

2    judicial economy?  The idea that you have a verdict telling

3    you that you are infringing, there's no circumstance that

4    I'm aware of, and definitely none proposed by Reynolds, that

5    would absolve you of that intentional infringement.

6              And then if you look at the Federal Circuit -- I

7    would point Your Honor again to the *Arctic Cat* case.  In

8    *Arctic Cat* and in *Bard*, the District Court considered

9    willfulness as part of the -- determining the ongoing

10   royalty, and the Federal Circuit in both cases affirmed.

11             THE COURT:  Okay.

12             MR. SANDFORD:  So I would submit that the

13   controlling law, Your Honor, there's definitely nothing that

14   says it's not a proper consideration under this

15   circumstance, and courts have affirmed where the District

16   Court properly considered it.

17             The last point, Your Honor, Philip Morris is here

18   in equity seeking injunction.  To be clear, that is what we

19   want.  That is what is proper, for the reasons that

20   Mr. Grant stated and in our briefing.

21             Mr. Burnette started his argument with talking

22   about what is reasonable in light of patent damages.  What

23   is not reasonable is to want to keep 99 percent of the

24   profits from $388 million in sales over the last five months

25   and force your, as they say, fierce competitor to compete

                                                        43

REDACTED TRANSCRIPT

```
 1    against its own infringing technology that they are out
 2    there touting -- their CEO, their marketing, their internal
 3    documents -- to the tune of an operating profit of
 4    ████████, as innovative, game changer to 34 percent of the
 5    market.  That is not equitable; it's definitely not
 6    reasonable.  But the right result here is to do, as the
 7    Federal Circuit approved in ActiveVideo, a profit-sharing
 8    approach that gives Philip Morris something reasonable for
 9    its forced loss of right to exclusivity, which leaves
10    Reynolds with much more than a reasonable profit for its
11    knowing infringement.
12              THE COURT:  All right.  Thank you.
13              MR. SANDFORD:  Thank you, Your Honor.
14              THE COURT:  Did Reynolds want any last word?
15              MR. BURNETTE:  Not if -- unless the Court has any
16    questions, Your Honor.
17              THE COURT:  I don't have any questions.  All
18    right.
19              Thank you, gentlemen, for the argument.  We'll get
20    an opinion to you at some point in the not-too-distant
21    future.
22              MR. SANDFORD:  Just one housekeeping issue.  There
23    was a bill of costs submitted that is not opposed.  The
24    Court hasn't acted on it.  I just want to make sure it's in
25    the Court's mind.
```

REDACTED TRANSCRIPT

1            THE COURT:  I'll make sure that's acted on.  If

2    there's been no opposition, then we'll get that out to you

3    in the next day or two.

4            MR. GRANT:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            (Proceedings adjourned at 11:22 a.m.)

7            ---------------------------------

8    I certify that the foregoing is a true and correct copy of

9    the transcript originally filed with the clerk of the court

10   on November 7, 2022, and incorporating redactions requested

11   by David Maiorana, attorney of record, in accordance with

12   Judicial Conference policy.  Redacted characters appear as

13   "█" in the transcript.

14                          _Stephanie Austin_

15                          Stephanie M. Austin, RPR, CRR

16

17

18

19

20

21

22

23

24

25

                                                              45