IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PHILIP MORRIS PRODUCTS S.A.,      )
                                  )
        Plaintiff,                )
                                  )
    v.                            )
                                  )   1:20-cv-393 (LMB/WEF)
R.J. REYNOLDS VAPOR COMPANY,      )
                                  )
        Defendant.                )
                                  )

MEMORANDUM OPINION

On June 15, 2022, after a six-day trial, the jury returned a verdict in favor of counterclaim

plaintiff Philip Morris Products S.A. ("Philip Morris") finding that counterclaim defendant R.J.

Reynolds Vapor Company ("R.J. Reynolds") infringed two of Philip Morris' patents for

components of electronic cigarettes. Before the Court is Phillip Morris' Motion for a Permanent

Injunction or, Alternatively, an Ongoing Royalty ("Motion"). [Dkt. No. 1405]. For the reasons

explained below, Philip Morris' Motion will be denied as to the request for a permanent

injunction and granted in part as to the request for an ongoing royalty, which will be in the

amount of 1.8% of net sales of infringing Alto cartridges and 2.2% of net sales of infringing Solo

G2 cartridges.[1]

---

[1] Because this Memorandum Opinion cites from sealed material for which the parties have been
directed to file, but have not yet filed, revised motions to seal pursuant to the Court's March 22,
2023 Order [Dkt. No. 1454], the Memorandum Opinion will be temporarily issued under seal.
The parties will be directed to jointly review the Memorandum Opinion and propose redactions
so that a public version of the Memorandum Opinion can be issued once the sealing issues have
been resolved.

## I. BACKGROUND

Philip Morris and Reynolds manufacture smoke-free, non-combustible alternatives to combustible cigarettes, including heat-not-burn devices and electronic cigarettes ("e-cigarettes") that vaporize a liquid containing nicotine. In this civil action, the jury found that Reynolds' VUSE Alto ("Alto"), a pod-style e-cigarette, infringed claims 1 and 4 of United States Patent No. 9,814,265 ("the '265 patent"), which covers technology for a compact heater. See [Dkt. No. 1361] at 1. The jury also found that Reynolds' VUSE Solo G2 ("Solo G2"), a cig-a-like-style e-cigarette, infringed claims 1, 11, and 13 of United States Patent No. 10,104,911 ("the '911 patent"), which covers leakage-prevention technology, and also determined that the patent was not invalid. Id. at 2-3. Both the Alto and Solo G2 consist of two parts, a power-unit device with a battery and a disposable cartridge containing the e-liquid and heater. The cartridges were found to contain the infringing components.

The jury awarded Philip Morris damages representing a running royalty for past infringement through December 31, 2021 in the amount of $8,000,000 for the Alto's infringement of the '265 patent and $2,759,755 for the Solo G2's infringement of the '911 patent. Id. at 2, 4. The parties agree that the jury's damages award corresponds with the reasonable royalty rates for a hypothetical negotiation in August 2018 that were presented at trial by Philip Morris' expert, Paul K. Meyer ("Meyer"): 0.6% of net sales of the Alto cartridges for use of the '265 patent and 2.0% of net sales of the Solo G2 cartridges for use of the '911 patent. See [Dkt. No. 1411-27] ¶ 15; [Dkt. No. 1421] at 20; [Dkt. No. 1421-3] ¶ 5.

At trial, Meyer testified that he derived baseline royalty rates for the patents from his analysis of a license agreement executed on September 24, 2018 between Reynolds and Fontem Ventures B.V. and Fontem Holdings 1 B.V. (the "Fontem-Reynolds Agreement"). Under that

2

agreement, Reynolds paid Fontem a lump sum of $79 million for a non-exclusive United States license to Fontem's patent portfolio, which Meyer testified reflected a 5.25% royalty rate. Trial Tr. at 444-49, 452. Relying on other testimony by Philip Morris' experts which showed that the '265 and '911 patents corresponded with patents in the Fontem portfolio, Meyer apportioned 10% of the value of the Fontem-Reynolds Agreement to the '265 patent and 35% of the value of the Fontem-Reynolds Agreement to the '911 patent. Id. at 459-60. Meyer then explained that he took 10% and 35% of the 5.25% royalty rate of the Fontem-Reynolds Agreement, adjusted the resulting rates upwards based on the relevant Georgia-Pacific factors, and obtained reasonable royalty rates of 0.6% for the '265 patent and 2.0% for the '911 patent. Id. at 460-69. The jury's damages award for each patent equates to the respective rate presented by Meyer multiplied by the net sales of the relevant infringing cartridges.

After the jury returned its verdict, the Court concluded that the civil action was not exceptional and declined to entertain a petition for attorney's fees under 35 U.S.C. § 285. Id. at 1082-84. The Court subsequently heard and denied all post-trial motions. See [Dkt. No. 1400]. On August 17, 2022, an Amended Judgment was entered upon the parties stipulating to the inclusion of prejudgment interest and supplemental damages based on net sales of Alto and Solo G2 cartridges from January 1, 2022 through June 15, 2022, for a total judgment of $10,906,042 for the '265 patent and $3,156,700 for the '911 patent. See [Dkt. Nos. 1413, 1414, 1415].

The remaining issue in this civil action concerns Reynolds' ongoing infringement of the '265 and '911 patents. Philip Morris has moved for a permanent injunction or, in the alternative, for an ongoing royalty. [Dkt. No. 1405]. Both parties have conducted discovery as to the remedies requested by Philip Morris, the issues have been fully briefed, and oral argument has been held.

3

## II. DISCUSSION

Philip Morris moves for a permanent injunction prohibiting Reynolds from selling in the United States the infringing Alto and Solo G2 cartridges and "cartridges that are not colorably different therefrom in the context of the infringed claims[.]" [Dkt. No. 1406-50] ¶¶ 1-2. In the alternative, Philip Morris seeks an ongoing royalty rate of 33.5% of net sales of Alto cartridges and 3.75% of net sales of Solo G2 cartridges for the remaining life of the patents.[2] Reynolds opposes entry of a permanent injunction and argues that the jury's royalty rates of 0.6% of net sales for the Alto and 2.0% of net sales for the Solo are an appropriate ongoing royalty.

### A. **Standard of Review**

The Court has the power to grant an injunction for the "violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. For a permanent injunction to be granted, the patentee "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). The patentee bears the burden of "prov[ing] that it meets all four equitable factors" and "must satisfy the court that relief is needed." Nichia Corp. v. Everlight Ams., Inc., 855 F.3d 1328 (Fed. Cir. 2017).

If the Court finds that an injunction is inappropriate, an ongoing royalty rate may be awarded to provide relief to the patentee for the ongoing infringement. See Whitserve, LLC v.

---

[2] The '265 patent will expire on January 29, 2035, and the '911 patent will expire on July 6, 2033.

Comput. Packages, Inc., 694 F.3d 10, 35 (Fed. Cir. 2012); Paice LLC v. Toyota Motor Corp.,

504 F.3d 1293, 1314-15 (Fed. Cir. 2007).  An ongoing royalty rate "may be based on a post-

judgment hypothetical negotiation using the Georgia-Pacific factors."  Arctic Cat Inc. v.

Bombardier Recreational Prods. Inc., 876 F.3d 1350, 1370 (Fed. Cir. 2017) (citing Fresenius

USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1303 (Fed. Cir. 2009)); see Georgia-Pac. Corp. v.

U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The decision to grant a

permanent injunction or impose an ongoing royalty is committed to the discretion of the Court.

See Whitserve, 694 F.3d at 35; Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702

F.3d 1351, 1363 (Fed. Cir. 2012).

### B. Permanent Injunction

Philip Morris has not met its burden of establishing that a permanent injunction

prohibiting Reynolds from selling infringing Alto and Solo G2 cartridges is warranted.

#### 1. Irreparable Injury

First, Philip Morris has not established that it has suffered irreparable injury.  "To satisfy

the first eBay factor, the patentee must show that it is irreparably harmed by the infringement,"

which includes "proof that a 'causal nexus relates the alleged harm to the alleged infringement.'"

Apple, Inc. v. Samsung Elecs. Co., 809 F.3d 633, 639 (Fed. Cir. 2015) (quoting Apple, Inc. v.

Samsung Elecs. Co., 695 F.3d 1370, 1374 (Fed. Cir. 2012)).  "To determine whether the patentee

will suffer irreparable harm absent an injunction, the court may consider factors such as the

nature of competition between the patentee and the infringer, the willingness of a patentee to

license, and any lost sales the patentee has proven."  Presidio Components, Inc. v. Am. Tech.

Ceramics Corp., 875 F.3d 1369, 1383 (Fed. Cir. 2017).

Philip Morris argues that it has suffered irreparable harm because its IQOS heat-not-burn

device ("IQOS") and IQOS VEEV e-cigarette ("VEEV") directly compete with Reynolds'

5

e-cigarettes, and by infringing the '265 and '911 patents, Reynolds has "gained an unfair and invaluable stronghold in the U.S. non-combustible market[.]" [Dkt. No. 1411] at 6. Specifically, Philip Morris contends that Reynolds has caused "lost sales and market share" for IQOS and that the continued sale of the infringing products "will stymie the launch of IQOS VEEV in the United States[.]" Id. at 8. Philip Morris maintains that the infringing features of the Alto and Solo G2 drive consumer demand for the products, which satisfies the causal nexus requirement.

Reynolds counters that Philip Morris' asserted injury is too speculative to demonstrate irreparable injury because neither IQOS nor VEEV are currently sold in the United States. Reynolds further argues that even if these products were to be sold in the United States, Philip Morris has not presented evidence establishing that the Alto and Solo G2 would take away sales or market share and that any link between the commercial success of the infringing products and the patented technology is too tenuous to establish a causal nexus between infringement and any purported harm to Philip Morris.

Evidence produced during the trial showed that although Philip Morris and Reynolds are direct competitors internationally in the e-cigarette market, they are not direct competitors in the United States because it is undisputed that VEEV has never been sold in the United States. As for IQOS, it is not currently being sold in the United States because imports of the devices are prohibited under a Limited Exclusion Order issued by the United States International Trade Commission ("ITC") on September 29, 2021 after the IQOS was found to have infringed two of Reynolds' patents. See Limited Exclusion Order, Certain Tobacco Heating Articles and Components Thereof, Inv. No. 337-TA-1199 (Sept. 29, 2021). When the Limited Exclusion Order was issued, the IQOS was "in the midst of . . . [an] initial rollout," [Dkt. No. 1406-25] at 3, had only been "released in just a handful of stores," [Dkt. No. 1411] at 8, and its sales and users

were limited.  See [Dkt. No. 1411-14] at 3.  The absence of VEEV and IQOS from the domestic

market presents a unique situation in that Philip Morris is not presently directly competing with

Reynolds in the United States but nonetheless seeks to exclude the infringing products from that

market.

      Philip Morris instead emphasizes its plans to compete with Reynolds in the United States

market in the future; however, Reynolds correctly points out that Philip Morris' claim of future

domestic sales of IQOS and VEEV is speculative and uncertain.  Philip Morris argues that it has

appealed the ITC's decision to the Federal Circuit and "has presented compelling grounds for

reversal," [Dkt. No. 1411] at 10, and the Federal Circuit could vacate the Limited Exclusion

Order and allow IQOS "immediate re-entry to the U.S. market."  [Dkt. No. 1429] at 3.  The

Federal Circuit heard oral argument on October 3, 2022 and has yet to issue a decision, see

Philip Morris Products S.A. v. Int'l Trade Comm'n, No. 22-1227 (Oct. 3, 2022); regardless, the

Court cannot base a finding of irreparable injury on speculation about the Federal Circuit's

decision and will not weigh in on the strength of Philip Morris' appeal.  Philip Morris also points

out that it plans to begin domestic manufacturing of IQOS which will permit sales of the product

in the United States unaffected by the Limited Exclusion Order; however, the only evidence

Philip Morris has produced to support these plans is a declaration and investor statements by its

employees and executives that Philip Morris is "taking steps to begin manufacturing IQOS

HNBs . . . [and] expects such production to begin by the first half of 2023."  [Dkt. No. 1411-2]

¶ 17; see [Dkt. No. 1425-4] at 24 ("We expect to be in a position to introduce IQOS in H1 of

2023.  I cannot be more precise at this stage.  We continue to work on the plan to be able to do

that."); [Dkt. No. 1425-5] at 9 ("We continue to work on contingency plans, including domestic

manufacturing, and hope to be able to resume U.S. supply in the first half of 2023"); [Dkt. No.

1425-6] at 3.  Even if the Court considers these statements reliable, they show only that Philip

Morris has an intention to begin domestic manufacturing and do not establish that the return of

IQOS to the United States market is impending or even certain.

As for the VEEV product, Philip Morris maintains that it has "definite plans to bring

IQOS VEEV to the U.S. and is engaged in ongoing activities and expenditures to do so."  [Dkt.

No. 1429] at 4.  Although Philip Morris may have such plans, Reynolds is correct that future

domestic sales of VEEV are uncertain.  The Vice President of Strategic and Scientific

Communications of Philip Morris International averred that Philip Morris "will begin sales of the

product in the United States" after the Food and Drug Administration ("FDA") grants premarket

tobacco product authorization.  [Dkt. No. 1411-2] ¶ 16.  Philip Morris has engaged in studies to

support its premarket authorization request, and as of August 12, 2022, its plan was to submit the

application to the FDA in "Spring 2023," id. ¶¶ 13-16; however, as of March 29, 2023, there is

no indication that Philip Morris has filed a premarket authorization application with the FDA,

and as the parties are both aware, the process is "difficult and time-consuming[.]"  [Dkt. No.

1421-9] at 21.  Moreover, Philip Morris' employees have acknowledged

.  See [Dkt. No.

1421-10] at 178; [Dkt. No. 1429-3] at 156-57.  Since oral argument was held on November 4,

2022, Philip Morris has not apprised the Court of any other steps it has taken to introduce VEEV

into the United States or to begin domestic manufacturing of IQOS.

Thus, given the complicated regulatory framework which governs the market for tobacco

products in the United States, there is no certainty that Philip Morris can or will participate in the

relevant domestic market.  Philip Morris is correct that "[w]here two companies are in

competition against one another, the patentee suffers the harm—often irreparable—of being

8

forced to compete against products that incorporate and infringe its own patented inventions."
Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1345 (Fed. Cir. 2013).  The
problem for Philip Morris is that evidence of current or future "[d]irect competition in the same
market" is lacking and uncertain.  Presidio, 702 F.3d at 1363; compare Robert Bosch LLC v.
Pylon Mfg. Corp., 659 F.3d 1142, 1152-54 (Fed. Cir. 2011) (finding direct competition in the
same market and irreparable harm due to loss of market share and access to potential customers);
and Broadcom Corp. v. Emulex Corp., 732 F.3d 1325, 1338 (Fed. Cir. 2013) (finding irreparable
harm from direct competition where "Broadcom lost market share while Emulex gained it").  On
this record, Philip Morris' assertions of harm from anticipated direct competition in the United
States in the form of lost sales, market share, or harm to goodwill and reputation, remain too
inchoate and contingent to support a finding of irreparable harm in the absence of an injunction.
Cf. BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Organisation, 28 F.4th 1247,
1276 (Fed. Cir. 2022) (affirming denial of a permanent injunction where Commonwealth
Scientific and Industrial Research Organisation and its partners "had not yet entered the
commercial market and had not established that entry was coming soon").  Although Reynolds
disputes the extent to which IQOS would even compete with the Alto and Solo G2 were it to be
successfully reintroduced into the United States market, as well as whether there is a sufficient
causal nexus between the patented technology and any harm suffered by Philip Morris, the
evidence at trial established the benefits of the patented technologies and their importance to
consumers.  Even though Philip Morris did not conclusively establish the reasons why
consumers purchased the infringing devices, only "'some connection' between the patented
features and the demand for the infringing products" is needed to satisfy the causal nexus
requirement.  Apple, 809 F.3d at 641-42.

Philip Morris also points to past competition between the infringing products and IQOS to establish irreparable harm. See i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 861-62 (Fed. Cir. 2010) (observing that "[p]ast harm to a patentee's market share, revenues, and brand recognition is relevant" to the irreparable injury inquiry). Although IQOS was sold in the United States for a short period of time, given the limited rollout of IQOS in a few cities and the lack of evidence of lost revenues, profits, or market share, other than speculation by Philip Morris employees, see [Dkt. No. 1411-13] at 102-04, these sales are insufficient to show past irreparable injury justifying the prospective remedy of an injunction. Philip Morris also argues that the harm to its "brand, consumer goodwill, and reputation as an innovator" warrants a permanent injunction. [Dkt. No. 1411] at 9-10. Although Philip Morris may have suffered some intangible injury based on the association of its patented technology with Reynolds' infringing products, many of the allegations of harm are vague and conclusory, and given the absence of Philip Morris' products in the domestic market and the uncertainty as to its future presence, the Court cannot find that any brand or reputational injury is significant, let alone irreparable.

Finally, Philip Morris points to its "unwillingness to license" as evidence of irreparable harm from the loss of its right to exclusivity. [Dkt. No. 1411] at 7. Although it is true that the right to exclusivity is related to the "fundamental nature of patents as property rights" and "is an intangible asset that is part of a company's reputation," Douglas Dynamics, 717 F.3d at 1345, the loss of which supports a finding of irreparable injury, Presidio, 702 F.3d at 1363, a patentee's right to exclude cannot by itself support a finding of irreparable harm and the issuance of a permanent injunction. See Robert Bosch, 659 F.3d at 1149; eBay, 547 U.S. at 393 (rejecting similar "broad classifications" and "categorical rule[s]" as inconsistent with "traditional

10

equitable principles"); <u>Nichia</u>, 855 F.3d at 1341 (observing that an injunction "is not a remedy which issues as of course" and "must be justified").

In sum, Philip Morris has not shown that it has or will suffer an irreparable injury in the absence of a permanent injunction, and this factor strongly weighs against granting an injunction.

2.  <u>Adequacy of a Legal Remedy</u>

The adequacy of remedies at law is "inextricably intertwined" with the inquiry into irreparable harm, <u>ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.</u>, 694 F.3d 1312, 1337 (Fed. Cir. 2012), and for many of the same reasons discussed above, a monetary remedy would be sufficient to compensate Philip Morris for its injury. The cases on which Philip Morris relies to argue otherwise are based on harm to market share, brand recognition, and goodwill, such as <u>i4i</u>, and are therefore inapposite. Philip Morris did not have a significant market before Reynolds infringed its patents, has not demonstrated that it has brand recognition in the United States for its products, and has not provided compelling evidence that shows the loss of goodwill in the domestic market, again because, at best, such damage is inchoate: it could arise this year or next year (if its efforts to bring IQOS and VEEV to market are successful) or not at all. Philip Morris also argues that damages cannot compensate it for "downstream sales of IQOS consumables and accessories lost due to the infringement," [Dkt. No. 1411] at 13, but it has provided no more than conclusory allegations about such lost sales. Philip Morris further argues that its statutory right to exclude, its policy of not licensing out the asserted patents, and its "engagement in lengthy litigation to protect that business decision . . . weigh[] in favor of finding the remedy at law inadequate." <u>Id.</u> at 14 (quoting <u>Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc., USA</u>, 821 F. Supp. 2d 681, 694 (D.N.J. 2011)). Although those rights are unquantifiable, a sufficient ongoing royalty would take into account the loss of those rights and Philip Morris' license-out policy.

The Court also finds that an ongoing royalty would be adequate to compensate Philip

Morris for Reynolds' infringement in light of its distribution model for the IQOS in the United

States.  To bring IQOS to the United States, Philip Morris contracted with Altria Client Services

LLC ("Altria") to sell and distribute IQOS products in the domestic market, and under that

distribution agreement, Philip Morris received a royalty and "per unit revenue from the sales of

IQOS HNB-related products." [Dkt. No. 1411-2] ¶ 9.  As Reynolds points out, to the extent

Philip Morris' exclusive licensee for IQOS lost any sales to Reynolds, Philip Morris itself lost

only a licensing fee or a similar royalty payment that varied with revenue.  See [Dkt. No. 1421]

at 14 (quoting ActiveVideo, 694 F.3d at 1338).  Philip Morris does not assert that its future

United States business model for IQOS or VEEV, should it be realized, would differ from its

past distribution arrangement for IQOS.  Accordingly, the lost royalties and revenue share that

Philip Morris might suffer should IQOS and VEEV compete with the infringing products are the

kind of "[s]traight-forward monetary harm" that is not irreparable and can be remedied through

an ongoing royalty.  ActiveVideo, 694 F.3d at 1338.

       3.  Balance of Hardships

The balance of hardship factor involves "assess[ing] the relative effect of granting or

denying an injunction on the parties." Apple, 809 F.3d at 645.  Philip Morris has not shown that

the balance of hardship weighs in its favor.  Philip Morris argues that the equities favor it

because it will "suffer irreparable harms," "be deprived of its statutory right to exclude," and "be

forced to compete against its own innovations usurped by an adjudicated infringer[.]" [Dkt. No.

1411] at 14-15.  As explained above, Philip Morris has not established that it has suffered, or is

likely to suffer, irreparable harms.  Moreover, although being forced to compete with infringing

products would impose a "substantial hardship" on Philip Morris, Apple, 809 F.3d at 645, the

harm that Philip Morris anticipates from competition is inconcrete and speculative at this point.

On the other hand, Reynolds points out that an injunction would "devastate a substantial portion of its e-cigarette business[.]" [Dkt. No. 1421] at 16. The Court recognizes that the Alto accounts for the vast majority of VUSE product sales and an injunction would significantly impact Reynolds' e-cigarette business. See [Dkt. No. 1421-1] ¶¶ 15-16. Nevertheless, Philip Morris is correct that hardship to Reynolds is discounted because neither commercial success nor the "successful exploitation of infringing technology" can "shield[] a party from injunctive relief." Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008); see i4i, 598 F.3d at 863.[3]

For these reasons, the Court finds that the balance of hardships is neutral and neither favors Philip Morris nor Reynolds.

### 4. Public Interest

"[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i, 598 F.3d at 863. A prohibition on the sale of Alto and Solo G2 cartridges in the United States would not strike such a balance. To be sure, Philip Morris identifies an important public interest "in 'maintaining the integrity of the patent system,'" given that "the 'encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.'" ePlus, Inc. v. Lawson Software, Inc., No. 3:09-cv-620, 2011 WL 2119410, at *17 (E.D. Va. May 23, 2011), modified, 946 F.

---

[3] Reynolds also assets that Philip Morris would be "financially better off from an ongoing royalty, rather than an injunction" in light of the Alto's significant sales in the United States, which causes the balance to favor Reynolds. [Dkt. No. 1421] at 15. Although that might be true as a practical matter given that Philip Morris currently has no sales in the United States of IQOS or VEEV and it is unclear when these competing products will enter the domestic market, the Court declines to find that this consideration weighs in favor of Reynolds because Philip Morris is entitled to its own business judgment about obtaining value from its intellectual property.

Supp. 2d 459 (E.D. Va. 2013) (first quoting MercExchange, LLC v. eBay, Inc., 500 F. Supp. 2d 556, 586 (E.D. Va. 2007), then quoting Sanofi–Synthelabo v. Apotex, Inc., 470 F.3d 1368, 1383 (Fed. Cir. 2006)).

      Nevertheless, there is a countervailing public interest in the availability of combustible-alternatives for adult tobacco users, which is a heightened concern given the undisputed popularity of Reynolds' VUSE products.  Both parties have taken the position that smoke-free alternatives like e-cigarettes and vapes are a harm-reducing alternative for adult cigarette users, and for that reason they may provide a public health benefit to these users.  See [Dkt. No. 1421-32] at 249-50; [Dkt. No. 1421-34] at 1296; Trial Tr. at 145-46.  In granting premarket authorization for e-cigarettes, the FDA has acknowledged the "potential benefit to smokers who switch completely [to these products] or significantly reduce their cigarette use," which it determined "outweigh[s] the risk to youth," provided that post-marketing requirements to reduce youth exposure and access are followed.  FDA Permits Marketing of E-Cigarette Products, Marking First Authorization of Its Kind by the Agency, U.S. Food & Drug Admin. (Oct. 12, 2021), https://www.fda.gov/news-events/press-announcements/fda-permits-marketing-e-cigarette-products-marking-first-authorization-its-kind-agency; see also Vaping Devices (Electronic Cigarettes) DrugFacts, Nat'l Inst. on Drug Abuse (Jan. 2020), https://nida.nih.gov/publications/drugfacts/vaping-devices-electronic-cigarettes ("Research so far suggests that vaping devices might be less harmful than combustible cigarettes when people who regularly smoke switch to them as a complete replacement.").  As of 2022, VUSE is the leading product line in the domestic e-cigarette market with over a one-third share of the market, surpassing JUUL last year.  See [Dkt. No. 1421-1] ¶ 14; [Dkt. No. 1421-3] at 101.  Over 90% of VUSE sales are attributable to the Alto, which is used by more than 4.5 million customers.  [Dkt.

No. 1421-1] ¶¶ 15-16; [Dkt. No. 1421-3] at 102.  Accordingly, the permanent injunction sought by Philip Morris would remove a popular and widely used combustible-alternative from the United States market, which could pose a risk of reversion to combustible cigarettes and consequently harm public health.  See [Dkt. No. 1421-32] at 189-90; [Dkt. No. 1421-13] at 77-78 (agreeing that reversion to combustible cigarettes is a possibility).  Both parties also acknowledge the potential for JUUL to be removed from the market because of the FDA's marketing denial order, which has been stayed pending ongoing administrative review.  See Juul Labs, Inc. v. FDA, No. 22-1123 (D.C. Cir. Mar. 7, 2023).  Because VUSE and JUUL make up over two thirds of the e-cigarette market in the United States, Reynolds correctly points out that the public health ramifications could be "amplified."  See [Dkt. No. 1421] at 17.

Philip Morris counters that removal of Alto and Solo G2 cartridges from the United States market "would have no meaningful effect on the public" because multiple premarket tobacco authorized e-cigarettes are available to adult smokers, such as Reynolds' VUSE Solo G1, Vibe, and Ciro, and consumers using the Alto or Solo G2 would instead switch to a different vaping product or non-combustible device.  [Dkt. No. 1411] at 17.  Reynolds contends that these other products are not alternatives insofar as consumers have shown a strong preference for pod-style e-cigarettes like the Alto and JUUL, as opposed to "cig-a-like" designs (e.g., the VUSE Solo, Ciro, and Vibe products), [Dkt. No. 1421] at 15, but Philip Morris responds that the NJOY Ace, a pod-based e-cigarette, is available to consumers and has obtained premarket tobacco authorization, [Dkt. No. 1429] at 10.  The Court agrees that it is certainly possible that Alto and Solo G2 users would switch to other types of e-cigarettes rather than revert to combustible cigarettes; however, there is no evidence from which the Court can predict the behavior of consumers should the Alto and Solo G2 cartridges be removed from the domestic market.

Nonetheless, an injunction would have a widespread effect on a significant number of e-cigarette users given the popularity of the Alto, requiring millions of consumers to change their consumption choices.[4]  In light of the evidence that e-cigarettes, including the infringing products, are alternatives to combustible cigarettes and therefore have a public health benefit for adult combustible cigarette users, the public interest factor ultimately weighs in favor of denying a permanent injunction.  See Cordis Corp. v. Bos. Sci. Corp., 99 F. App'x 928, 935 (Fed. Cir. 2004) (finding that public health interests can outweigh the interest in "upholding the exclusive rights of a patentee").

Based on a weighing of all four e-Bay factors, with a particular emphasis on the lack of irreparable harm and public interest factors, the Court concludes that a permanent injunction is not warranted.  Accordingly, Philip Morris' Motion is denied as to the request for entry of a permanent injunction.

## C. Ongoing Royalty

In the absence of a permanent injunction, an ongoing royalty is appropriate to compensate Philip Morris for Reynolds' continuing infringement and the loss of its right to exclude.  See Paice, 504 F.3d at 1314.  The parties agree that an ongoing royalty rate should be set at a percentage of the net sales of infringing Alto and Solo G2 cartridges for the remaining life of the patents but have provided the Court with vastly different proposed rates.  Philip Morris seeks a royalty rate of 33.5% for the Alto, representing a baseline royalty of 22.3% based on

---

[4] Philip Morris also argues that an injunction would be "appropriately tailored" to Alto and Solo G2 cartridges and would therefore "leave[] undisturbed continued use of infringing products purchased before the verdict, minimizing public harm."  [Dkt. No. 1411] at 17.  This argument is misleading because testimony at trial has shown that cartridges are disposable and replaced after some amount of use.  Therefore, an injunction would affect consumers who purchased an Alto power unit before the verdict because they would need to buy cartridges to continue using the product.

Reynolds' ▮▮▮▮▮▮▮ for the Alto cartridges from the first half of 2022, which is then

enhanced by 50% for willfulness. For the Solo G2, Philip Morris seeks a royalty rate of 3.75%,

representing a 2.5% baseline royalty based on the jury's rate and adjusted for the applicable

Georgia Pacific factors, which is then enhanced by 50% for willfulness. Reynolds contends that

an ongoing royalty rate reflecting the jury's royalty rates—0.6% for the Alto and 2.0% for the

Solo G2—should be awarded with no adjustments.

     1.  Baseline Royalty Rate

     The Federal Circuit has made clear that "there is a 'fundamental difference' between 'a

reasonable royalty for pre-verdict infringement and damages for post-verdict infringement.'"

XY, LLC v. TransOva Genetics, 890 F.3d 1282, 1297 (Fed. Cir. 2018) (quoting Amado v.

Microsoft Corp., 517 F.3d 1353, 1362 (Fed. Cir. 2008)). To determine an appropriate ongoing

royalty, the Court should "take into account the change in the parties' bargaining positions, and

the resulting change in economic circumstances, resulting from the determination of liability."

ActiveVideo, 694 F.3d at 1343 (quoting Amado, 517 F.3d at 1362). The Court may determine

an ongoing royalty based on a "post-judgment hypothetical negotiation using the Georgia-

Pacific factors,"[5] Arctic Cat, 876 F.3d at 1370, just as those factors were presented to the jury to

determine its damages award for past infringement.

---

[5] The factors include: (1) the "royalties received by the patentee for the licensing of the patent in
suit"; (2) the rates paid by the licensee for the use of comparable patents; (3) the "nature and
scope of the license," in terms of exclusivity or territorial restrictions; (4) the "licensor's
established policy and marketing program to maintain his patent monopoly by not licensing
others to use the invention or by granting licenses under special conditions"; (5) the "commercial
relationship between the licensor and licensee, such as, whether they are competitors in the same
territory in the same line of business; or whether they are inventor and promoter"; (6) the value
of the patented technology as a generator of "derivative or convoyed sales"; (7) the "duration of
the patent"; (8) the "established profitability of the product made under the patent," "its
commercial success," and "its current popularity"; (9) the "utility and advantages of the patent
property over the old modes or devices"; (10) the "nature of the patented invention," the
"character of the commercial embodiment of it as owned and produced by the licensor," and the

Although Philip Morris agrees with starting with the jury's rate of 2.0% for the Solo G2,

Philip Morris has abandoned the jury's 0.6% royalty rate for the Alto and instead proposes a

22.3% baseline royalty rate reflecting                                      for Alto cartridges.

The Court finds Philip Morris' position perplexing given that the jury's rate for the Alto was

indisputably based on the testimony of Meyer, one of Philip Morris' experts, and given that the

starting point for a court's analysis of an ongoing royalty is often the jury's implied royalty rate.

See, e.g., Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co. ("UroPep"), No. 2:15-cv-1202-

WCB, 2017 WL 3034655, at *7 (E.D. Tex. July 18, 2017); I/P Engine, Inc. v. AOL Inc., No.

2:11-cv-512, 2014 WL 309245, at *2 (E.D. Va. Jan. 28, 2014); Arctic Cat Inc. v. Bombardier

Recreational Prods., Inc., No. 14-cv-62369, 2017 WL 7732873, at *1-2 (S.D. Fla. Jan. 3, 2017);

Affinity Labs of Texas, LLC v. BMW N. Am., LLC, 783 F. Supp. 2d 891, 898-99 (E.D. Tex.

2011). To justify disregarding the jury's rate, Philip Morris points to three "drastically" changed

circumstances since the 2018 pre-verdict hypothetical negotiations: (1) Philip Morris' increased

bargaining power because of the jury's verdict finding infringement; (2) increased competition

between Philip Morris and Reynolds in the e-cigarette market in the United States; and (3) the

substantially increased sales, market share, and profitability of the Alto. [Dkt. No. 1411] at 19-

21. Philip Morris contends that these circumstances justify the use of the so-called "analytical

method" for determining a royalty, which focuses on the "infringer's projections of profit for the

infringing product" and involves dividing the profits between the patentee and the infringer.

---

"benefits to those who have used the invention"; (11) the "extent to which the infringer has made
use of the invention"; (12) the "portion of the profit or of the selling price" customary in the
business or comparable businesses to allow for the use of the invention or analogous inventions;
(13) the "portion of the realizable profit that should be credited to the invention as distinguished
from non-patented elements, the manufacturing process, business risks, or significant features or
improvements added by the infringer"; and (14) "opinion testimony of qualified experts."
Georgia-Pac., 318 F. Supp. at 1120.

Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009) (comparing the analytical method and hypothetical negotiation approach to calculating a reasonable royalty). Despite using the hypothetical negotiation approach in his trial testimony, Meyer now focuses on profit-sharing in his expert declaration on behalf of Philip Morris.

The Court is not persuaded that adopting a profit-sharing approach and disregarding the jury's rate based on a hypothetical negotiation is appropriate. It is not clear why the three purported changed circumstances identified by Philip Morris warrant using a profit-sharing approach when they are incorporated into the Georgia-Pacific factors that inform a hypothetical negotiation, specifically factors 5 (commercial relationship between the parties, including the nature of their competition) and 8 (commercial success and profitability of the infringing product). Evidence of profit projections to support use of the analytical method is also limited, see, e.g., [Dkt. No. 1411-27] at 142; by contrast, significant evidence was presented at trial by Meyer about a hypothetical negotiation and has since been supplemented by the parties in briefing this Motion. See Centripetal Networks, Inc. v. Cisco Sys. Inc., 492 F. Supp. 3d 495, 583 (E.D. Va. 2020), vacated on other grounds, 38 F.4th 1025 (Fed. Cir. 2022) (declining to use the analytical method where "there was insufficient evidence submitted to the Court based on the infringer's profit projections").

Moreover, as Reynolds points out, the jury's rate of 0.6% reflects apportionment of the '265 patent, because at trial, Meyer testified that he based his calculation of a baseline royalty rate on expert testimony that the '265 patent was equivalent to 10% of the value of the Fontem-Reynolds Agreement. See Trial Tr. at 459-60. By contrast, apportionment is not discernible in Philip Morris' proposed profit-sharing rate. In response, Philip Morris appears to question whether apportionment is required in determining a post-verdict royalty and contends that even if

it were, under its proposed rate, Reynolds would retain                    . See [Dkt. No. 1429] at

16-17. These arguments are unpersuasive. Philip Morris cites no cases supporting the

proposition that fundamental apportionment rules governing the calculation of damages do not

apply to post-verdict running royalties, particularly where, as here "the accused technology does

not make up the whole of the accused product." Finjan, Inc. v. Blue Coat Sys., Inc., 879 F.3d

1299, 1309 (Fed. Cir. 2018) (providing that "apportionment is required" in such circumstances to

calculate a royalty for damages). Rather, "the ultimate combination of royalty base and royalty

rate must reflect the value attributable to the infringing features of the product" even in the

context of determining an ongoing royalty. Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201,

1226, 1235 (Fed. Cir. 2014) (vacating the district court's ongoing royalty award where the jury's

damages award was vacated in part because the jury was not properly instructed on

apportionment principles); see also Georgia-Pac., 318 F. Supp. at 1120 (providing that factor 13

considers the "portion of the realizable profit that should be credited to the invention as

distinguished from non-patented elements"). Philip Morris makes no attempt to explain that a

royalty rate reflecting                                        takes into account the contribution

of the '265 patent to the Alto cartridges, other than citing qualitative statements about the value

of the infringing heater component, see [Dkt. No. 1411] at 24, and that the rate would permit

Reynolds to keep half of its operating margin, which it characterizes as "reasonable" and

accounts for other "alleged contributions," [Dkt. No. 1429] at 17. This argument is insufficient.

   In sum, Philip Morris has not shown that the circumstances are so different post-verdict

that the jury's royalty rate, which was based on Philip Morris' expert testimony, is irrelevant to

calculating an ongoing royalty for the Alto cartridges.[6]  Philip Morris must contend with the

expert testimony that it chose to present at trial, especially where the premise of that testimony—

a hypothetical negotiation—is the more appropriate method for calculating an ongoing royalty in

this case.  Therefore, this Court will begin with the jury's royalty rates for both the Alto and the

Solo G2 and determine whether the rates should be adjusted based on the Georgia-Pacific factors

and the changed circumstances identified by Philip Morris.

> ### 2.  Georgia-Pacific Factors

As an initial matter, the jury's royalty rates include some of the Georgia-Pacific factors

that have not changed post-verdict.  Specifically, Meyer testified that he determined the 0.6%

royalty rate for the Alto and 2.0% royalty rate for the Solo G2 based on a historical license

agreement, the Fontem-Reynolds Agreement, which reflects what Reynolds would pay for

comparable technology (factor 2), and increased the rates based on Philip Morris' general policy

of not licensing out its patents (factor 4), and the lack of a design-around and the consumer

benefits of the patents (factors 9 and 10).  See Trial Tr. 461-468.  Aside from these factors, an

increase in the jury's royalty rates is warranted to account for changed circumstances between

the original August 2018 hypothetical negotiation and the June 2022 post-verdict hypothetical

negotiation.

First, the Court agrees with Philip Morris that the "change in the parties' bargaining

positions . . . resulting from the determination of liability" justifies an increase in the royalty

---

[6] In support of its profit-sharing approach, Philip Morris points to ActiveVideo, 827 F. Supp. 2d 641 (E.D. Va. 2011) and Joyal Products, Inc. v. Johnson Electrical North America, Inc., No. 04-cv-5172, 2009 WL 512156 (D.N.J. Feb. 27, 2009).  Both cases present different circumstances in part because they concerned setting a post-verdict royalty until the issuance of an injunction, which substantially increases the patentee's bargaining power.  Moreover, as Reynolds points out, courts in both cases did not wholly disregard the jury's royalty rate, and in neither case was the jury's rate enhanced to such a great extent as demanded by Philip Morris here.

rates (factor 5). XY, 890 F.3d at 1297 (quoting Amado, 517 F.3d at 1362).  In XY, the Federal

Circuit explained that "[w]hen patent claims are held to be not invalid and infringed, this

amounts to a 'substantial shift in the bargaining position of the parties,'" emphasizing that courts

should focus on the patentee's "improved bargaining position."  Id. at 1297-98 (quoting

ActiveVideo, 694 F.3d at 1342).  Even though the pre-suit hypothetical negotiation assumes a

patent is valid and infringed and some courts have declined to increase the royalty rate on those

grounds,[7] the Court recognizes that liability for infringement and the validity of the patent are

more certain following the jury's verdict and that "a determination on the merits can strengthen a

party's position."  Juno Therapeutics v. Kite Pharma, Inc., No. 2:17-cv-7639, 2020 WL 2844410,

at *16 (C.D. Cal. Apr. 2, 2020); see Amado, 517 F.3d at 1362 (explaining that before judgment,

both "liability for infringement" and "the validity of the patent" are "uncertain, and damages are

determined in the context of that uncertainty").  Under the Federal Circuit's guidance in

ActiveVideo and XY, an upward variance is justified to account for the change in the parties'

bargaining positions; however, the Court rejects Philip Morris' assertion that the "big stick" of a

permanent injunction warrants a substantial increase in this case because an injunction has been

determined to be improper.  See EMC Corp. v. Zerto, Inc., C.A. No. 12-956 (GMS), 2017 WL

3434212, at *3 (D. Del. Aug. 10, 2017).

   Philip Morris also argues that the royalty rate for the Alto should be increased because

competition with Reynolds in the United States e-cigarette market "has increased and become

more concrete since the August 2018 hypothetical negotiation."  [Dkt. No. 1411] at 20.  Philip

Morris maintains that in 2018, it had not disclosed any intent to release VEEV in the United

---

[7] See, e.g., UroPep, 2017 WL 3034655, at *6; Altria Client Servs. LLC v. R.J. Reynolds Vapor
Co., No. 1:20-cv-472, 2023 WL 1093654, at *3 (M.D.N.C. Jan. 27, 2023).

States, whereas today it has announced its plans to file for premarket tobacco authorization to

sell VEEV in the United States.  Reynolds counters that there has been no change because it was

"aware of VEEV before the August 2018 hypothetical negotiation" and the domestic release of

VEEV is "uncertain and years away, at best."  [Dkt. No. 1421] at 22-23.

Philip Morris correctly points out that Reynolds has not produced any evidence showing

that it knew of Philip Morris' plans to bring VEEV to the United States in 2018; instead,

Reynolds has cited only two exhibits which discuss anticipated testing of VEEV in 2016 outside

the United States.  See [Dkt. No. 1411-3]; [Dkt. No. 1411-8].  Moreover, the jury heard only

limited testimony that Philip Morris has an "e-vapor product" that is sold overseas, and that

"there is" a plan to bring the product to the United States eventually, but did not consider

evidence of those plans.  Trial Tr. at 161-62; see also id. at 122, 1008.  In briefing this Motion,

Philip Morris has produced evidence showing its intent to introduce VEEV in the United States

market, including taking steps to apply for premarket tobacco authorization, which it plans to

submit in spring 2023.  [Dkt. No. 1411-2] ¶¶ 14-16.  Although, as previously discussed, the

likelihood that Philip Morris will successfully realize domestic sales of VEEV is uncertain and

does not support entry of a permanent injunction, in the case of a hypothetical royalty

negotiation, Philip Morris' intent to compete directly with Reynolds in the relevant market would

no doubt substantially increase the royalty rates that it would be willing to accept for Reynolds'

competitive infringing products.  At the time of a post-verdict hypothetical negotiation, Philip

Morris had already submitted and received authorization from the FDA for protocols for studies

to support its premarket tobacco authorization request.  See id. ¶ 14.  Accordingly, under

Georgia-Pacific factor 5, the Court finds that Philip Morris' intent and plans to introduce VEEV

into the United States and compete directly with Reynolds in the domestic e-cigarette market,

Case 1:20-cv-00393-LMB-WEF   Document 1471   Filed 03/30/23   Page 24 of 31 PageID# 41447


which was not considered in the first hypothetical negotiation, justify increasing the jury's royalty rate for the Alto.

Next, Philip Morris contends that the commercial success of the Alto since the jury's verdict warrants a further increase in the ongoing royalty rate for the '265 patent. Philip Morris argues that as of the 2018 hypothetical negotiation, the Alto had only been released in a few test markets in the United States, but by June 2022, Reynolds had "achieved exponential increases in profitability and sales by using the '265 patented heater in the Alto[.]" [Dkt. No. 1411] at 20-21. Philip Morris and Meyer maintain that in 2019, the first full year the Alto was available in the United States, Reynolds had an ▓▓▓▓▓▓▓▓▓▓▓▓▓ per Alto cartridge and incurred over ▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Id. at 21; [Dkt. No. 1411-27] ¶ 30; id. at 43. By contrast, Reynolds sold ▓▓▓▓▓▓ units of Alto cartridges in the first half of 2022, ▓▓▓▓▓▓▓▓▓▓ units it projected in 2018, and profits have "skyrocketed" to ▓▓▓▓▓▓ in gross profits and ▓▓▓▓▓▓ in net operating profits from Alto sales for that six-month period, ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ for all of 2021. [Dkt. No. 1411] at 21; [Dkt. No. 1411-27] ¶¶ 37-39; id. at 46-47. Philip Morris argues that the commercial success and increased profitability of the Alto in 2022 was not considered by the jury and increases Philip Morris' negotiating leverage at a post-verdict negotiation.

Reynolds and its expert Ryan Sullivan ("Sullivan") counter that Meyer's profitability data for the Alto cartridges for the first half of 2022 is "incomplete and inaccurate." [Dkt. No. 1421] at 24. Sullivan points out that Meyer omits certain costs that ultimately reduced the cartridges' profitability, basing his analysis on a conversation with Robert Ferris ("Ferris"), RAI Services Company's Director of Commercial Finance for New Categories, and a summary spreadsheet provided by Ferris that "provides Alto's fully-burdened operating profitability from

24

2019 through June 2022" and "certain underlying financial data." [Dkt. No. 1421-3] ¶ 21. First,

Sullivan contends that the profitability of the Alto cartridges cannot be considered in isolation

from the Alto devices, which had an ▮▮▮▮▮▮▮▮▮▮▮▮▮, because Alto cartridges

cannot be used without an Alto device and sales of Alto devices enable future sales of cartridges.

Id. ¶ 22. Second, Sullivan maintains that other costs incurred by Reynolds' vapor business

during the first half of 2022 must be included and allocated to the Alto product line, such as

"costs pertaining to the development and commercialization of the VUSE portfolio" (e.g.,

premarket tobacco authorization costs, research and development costs, and "shared services

allocations"), "the cost of a new ERP system that was implemented," and "certain accounting

accruals that will be reversed later in the year," totaling ▮▮▮▮▮▮▮ in additional deductions.

[Dkt. No. 1421-3] ¶ 23; id. at 91. Sullivan avers that adjusting the Alto's financials accordingly

for these expenses yields an adjusted operating income of ▮▮▮▮▮▮ for the first half of 2022.

Id. ¶ 23.

Philip Morris disputes the authenticity and reliability of Sullivan's "hearsay discussions"

with Ferris and Ferris' spreadsheet, pointing out that Reynolds did not timely disclose Ferris to

Philip Morris, produce him for a deposition, or produce the spreadsheet—which was devoid of

any metadata—until five days after filing its opposition. [Dkt. No. 1429] at 14. Meyer also

asserts that Reynolds has not produced underlying sources for the ▮▮▮▮▮▮ deduction for

allocated costs, points out that some of the expenses are undefined, and questions the propriety

of including other expenses such as one-time accounting adjustments. See [Dkt. No. 1429-8]

¶¶ 19-27.

Philip Morris has raised valid questions about the reliability of Ferris' spreadsheet and

the adjusted operating income figures in Sullivan's report. The unsubstantiated cost allocation

adjustments and adjustments for losses for Alto devices, when the focus of this civil action has been on Alto cartridges, are problematic; however, the Court need not resolve these accounting disputes because the evidence shows that Alto cartridges generally have become more profitable since the first hypothetical negotiation. Indeed, even Reynolds' adjusted operating income figures show a substantial increase in the profitability of Alto cartridges for the first six months of 2022 compared to previous six-month periods from 2019 through 2021. See [Dkt. No. 1421-3] at 91. Moreover, Reynolds' internal forecasts indicate that it expects the operating margin for the Alto to increase substantially from     in 2023 to     by 2026. See [Dkt. No. 1411-27] at 142. In light of this evidence and the profitability data provided by Meyer, see id. at 42-47, 129-41, the Court finds that the growth in profitability of Alto cartridges since 2019, the positive operating profits during the first six months of 2022, and the expected increases in profitability weigh in favor of a higher royalty rate for Alto cartridges, because parties at the second hypothetical negotiation would take into account the realized and anticipated increase in profitability in setting a royalty rate for the infringing product. See UroPep, 2017 WL 3034655, at *11 ("[A]ll other factors being equal, parties engaged in a hypothetical negotiation at the time of the verdict would understand that an anticipated increase in Lilly's incremental profits would likely produce a higher recovery for UroPep, since the size of the pie being divided is an important factor in determining the size of the slice allocated to each of the interested parties.").

Reynolds counters that Philip Morris and Meyer "disregard the running royalty structure and confuse the royalty base (Alto net sales) with the royalty rate," because the running royalty structure takes into account "future market changes" and ensures that Philip Morris benefits if Alto sales increase. [Dkt. No. 1421] at 23. That argument has some merit with respect to changes in sales or market share, because an increase in net sales would increase the royalty base

and would be incorporated in the royalty which is a percentage of that base; however, the resulting higher margin could still put upward pressure on a hypothetical negotiation.  See Aqua Shield v. Inter Pool Cover Team, 774 F.3d 766, 772 (Fed. Cir. 2014) (observing that "anticipated incremental profits under the hypothesized conditions are conceptually central to constraining the royalty negotiation").

Both parties point to changes in the regulatory landscape that would purportedly affect the Alto's market share, such as the removal of JUUL from the United States market (which Philip Morris contends would increase the Alto's market share) or the FDA's denial of premarket tobacco authorization for the Alto (which would cause it to have no market share).  Resulting changes in market share are to some extent accounted for in the royalty base, and because the regulatory uncertainty points in both directions with respect to the Alto's future success, potential regulatory changes do not warrant an increase in the royalty rate.

Sullivan also maintains that there is insufficient evidence that the patented heater is "driving demand" for the Alto cartridges, pointing out that the NJOY Ace uses similar heater technology but has a market share of only 3%, which shows that "other features of Alto besides the heater technology are responsible for its success[.]"  [Dkt. No. 1421-3] ¶¶ 26-28; see Altria Client Servs., 2023 WL 1093654, at *6 (declining to increase jury's royalty rate for infringement where Altria had not shown that the Alto's commercial success was attributable to the relevant patents).  Although Reynolds and Sullivan are correct that there is no evidence showing that all of the commercial success of the Alto is attributable to the infringing component and the success could instead be explained by other factors, evidence produced at trial and in briefing this Motion shows that the heater technology has value for consumers and is at least in part responsible for the Alto's success.

27

In sum, considering the changed circumstances between the first and second hypothetical negotiations, including Georgia-Pacific factors 5 (the commercial relationship between the parties, including changes in bargaining power and competition in the relevant market) and 8 (profitability of the infringing product), an increase in the jury's royalty rate for the '265 patent to 1.8% of net sales of infringing Alto cartridges is appropriate. As for the '911 patent, Philip Morris argues that the jury's rate should be increased by 0.5% on account of changes in the parties' bargaining positions but acknowledges that the Solo G2 is not profitable. The Court finds that a slight increase of the jury's rate to 2.2% of net sales of infringing Solo G2 cartridges is appropriate to account for the change in bargaining positions.

      3.  Willfulness

Finally, Philip Morris argues that the baseline royalty rates should be enhanced by 50% because Reynolds' infringement of the '265 and '911 patents following the jury's verdict is willful. Philip Morris supports its enhancement argument by citing to the factors set forth in Read Corporation v. Portec, Inc., 970 F.2d 816 (Fed. Cir. 1992), and pointing to Reynolds' lack of a good-faith belief in non-infringement or invalidity, "dubious behavior" throughout this civil action, its size and financial condition, the lack of closeness of the case, the duration of the infringement, the lack of preventive or remedial action to avoid infringement, and its motivation to obtain an "unfair competitive advantage at Philip Morris' expense through infringement[.]" [Dkt. No. 1411] at 26-29. In response, Reynolds argues that it cannot be accused of willful infringement "for operating under a court-sanctioned ongoing royalty." [Dkt. No. 1421] at 27.

Philip Morris' arguments are unpersuasive. First, Philip Morris suggests that continued infringement following a determination of liability and non-invalidity is willful and justifies enhanced damages, citing Affinity Labs for that proposition. See Affinity Labs, 783 F. Supp. 2d at 902 ("Upon entry of judgment, [the infringer's] continued voluntary and intentional

28

manufacture and sale of the accused products is willful."). Some courts have accepted that argument and awarded enhanced damages on those grounds, see VirnetX Inc. v. Apple Inc., 324 F. Supp. 3d 836, 861 (E.D. Tex. 2017); Mondis Tech. Ltd. v. Chimei InnoLux Corp., 822 F. Supp. 2d 639, 649-52 (E.D. Tex. 2011); I/P Engine, 2014 WL 309245, at *4; Soverain Software LLC v. J.C. Penney Corp., Inc., 899 F. Supp. 2d 574, 589-90 (E.D. Tex. 2012); however, it is certainly not a "rule," as characterized by Philip Morris, and other courts have rejected that argument. See UroPep, 2017 WL 3034655, at *9-10; Genband U.S. LLC v. Metaswitch Networks Corp., No. 2:14-cv-00033-JRG, 2018 WL 11357619, at *22-23 (E.D. Tex. Mar. 22, 2018); ABS Glob., Inc. v. Inguran, LLC, No. 14-cv-503-WMC, 2020 WL 2405380, at *11 (W.D. Wis. May 12, 2020); EMC Corp., 2017 WL 3434212, at *4-5. This Court joins those other courts in finding that an enhancement for willfulness is not called for just because infringement continues after the entry of a verdict and judgment, otherwise enhanced damages would appear to be an appropriate factor in all decisions imposing a post-verdict ongoing royalty.

The Federal Circuit's reasoning in Amado, 517 F.3d 1353, is instructive for this issue. In Amado, the Federal Circuit found that a district court had "centered its damages assessment on willful infringement" when determining the appropriate royalty during the pendency of the stay of an injunction and concluded that "willfulness . . . is not the inquiry when the infringement is permitted by a court-ordered stay." Id. at 1362. As other district courts have observed, "[i]f it is improper to use willfulness as a basis for enhancing the ongoing royalty in a case in which an injunction has been granted and stayed, it would seem at least equally improper to use willfulness as a basis to enhance the ongoing royalty in a situation in which the equities would

29

not even permit the issuance of an injunction in the first place." UroPep, 2017 WL 3034655, at *9; see EMC Corp., 2017 WL 3434212, at *5.

 Moreover, there is no basis to enhance the ongoing royalty rates for willfulness in this case. "The question of enhanced damages is addressed by the court once an affirmative finding of willfulness has been made," i.e., a finding of "deliberate or intentional infringement." Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc., 946 F.3d 1367, 1378 (Fed. Cir. 2020). Enhanced damages pursuant to 35 U.S.C. § 284 "are generally reserved for egregious cases of culpable behavior." SRI Int'l Inc. v. Cisco Sys., Inc., 930 F.3d 1295, 1308 (Fed. Cir. 2019) (quoting Halo Elecs., Inc. v. Pulse Elecs., Inc., 579 U.S. 93, 104 (2016)); see Halo, 579 U.S. at 103-04 (observing that "enhanced damage awards under the Patent Act . . . are not to be meted out in a typical infringement case, but are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," such as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant" conduct). Here, the Court granted Reynolds' oral Rule 50(a) motion on willfulness after finding a lack of evidence of intent to infringe. See Trial Tr. at 877-78. Therefore, the Court will not entertain Philip Morris' attempts to relitigate issues of willfulness based on pre-verdict conduct, such as its assertion that Reynolds "presented no evidence of a good-faith belief in non-infringement or invalidity when it designed the Solo G2 or bought the Alto." [Dkt. No. 1411] at 25. As for post-verdict infringement, because Reynolds' continued infringement will be permitted pursuant to a court-ordered ongoing royalty, Reynolds cannot be considered to have the "specific intent to infringe." BASF, 28 F.4th at 1274. Even if post-verdict infringement pursuant to a court-ordered ongoing royalty could be considered intentional or deliberate infringement, the standard for awarding enhanced damages has not been

met because Philip Morris has not shown that Reynolds' post-verdict conduct rises to the level of egregiousness warranting the punitive sanction of enhanced damages.

For these reasons, the ongoing royalty rates will not be enhanced for willful post-verdict infringement.  An ongoing royalty rate of 1.8% of net sales of infringing Alto cartridges and 2.2% of net sales of infringing Solo G2 cartridges will result in substantial royalty payments from Reynolds to Philip Morris, which will compensate Philip Morris for infringement and serve as a deterrent to future infringing conduct.

Both parties' experts agree that the second hypothetical negotiation occurs on June 15, 2022, the date of the jury's verdict, see [Dkt. No. 1411-27] ¶ 20; [Dkt. No. 1421-3] ¶ 6; however, because the parties have stipulated to supplemental damages through June 15, 2022, the ongoing royalty will begin to run as of June 16, 2022, through the remaining life of the respective patents, to be paid quarterly and accompanied by an accounting of infringing sales.[8]

### III. CONCLUSION

For the reasons stated above and by an Order to be issued with this Memorandum Opinion, Phillip Morris' Motion for a Permanent Injunction or, Alternatively, an Ongoing Royalty [Dkt. No. 1405] will be denied as to the request for a permanent injunction and granted in part as to the request for an ongoing royalty, which will be in the amount of 1.8% of net sales of infringing Alto cartridges and 2.2% of net sales of infringing Solo G2 cartridges, to begin as of June 16, 2022.

Entered this 30 day of March, 2023.

                                                              /s/

Alexandria, Virginia                                   Leonie M. Brinkema
                                                       United States District Judge

_____

[8] Reynolds has not objected to Philip Morris' request that the ongoing royalty be paid quarterly and be accompanied by an accounting of infringing sales.